**LAW OFFICES OF MATTHEW C. DAVIDSON, LTD**
1859 N Grand Ave, Suite 1
Nogales, AZ 85621-1386
(520) 281-0433
Matthew C. Davidson
State Bar No. 015021

**MARCHETTI LAW, PLLC**
177 N. Church Avenue, Suite 1100
Tucson, Arizona 85701
(520) 334-2067
Brian Marchetti, brian@yourtucsonlawfirm.com
State Bar No. 027193

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| ASHLEY CERVANTES, a single woman,<br><br>Plaintiff<br><br>v.<br><br>UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION AGENT SHAMEKA LEGGETT and "JOHN DOE" LEGGETT; UNKNOWN UNITED STATES CUSTOMS AND BORDER PROTECTION AGENTS; HOLY CROSS HOSPITAL, INC; PATRICK F. MARTINEZ AND "JANE DOE" MARTINEZ; QUANTUM PLUS, INC., dba TEAMHEALTH WEST; JOHN DOES 1-5; JANE DOES 1-5; XYZ CORPORATIONS 1-5; ABC PARTNERSHIPS 1-5<br><br>Defendants | **4:16-CV-00334-CKJ**<br><br>**OPPOSITION TO DEFENDANT HOLY CROSS HOSPITAL, INC.'S JOINDER IN DEFENDANT QUANTUM PLUS, LLC'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Ashley Cervantes ("Ashley") opposes Defendant Holy Cross Hospital's ("Holy Cross") Joinder in Defendant Quantum Plus, LLC's ("Quantum Plus") Motion for Summary Judgment (Doc. 130)[1] because there is ample evidence Holy Cross was independently negligent in training and supervising Defendant Patrick Martinez, MD who performed unconstitutional forensic evidentiary searches on her while functioning as a federal actor. Quantum Plus was the staffing agency that placed Dr. Martinez in the position to perform those searches which occurred at Holy Cross. The evidence establishes those searches violated: 1) the applicable Holy Cross policy; 2) the standard of care for a staffing agency and a hospital; and, 3) the US Constitution. As such, Holy Cross's negligence is independent of Dr. Martinez's tortious conduct and Ashley's claim is properly presented to a jury under Arizona negligence law.

As set out below, Holy Cross's Motion is properly denied because it erroneously applies federal law and mischaracterizes Ashley's claims against it. Dr. Martinez searched Ashley's body cavities for evidence of a crime at the behest of U.S. Customs and Border Protection ("CBP"). Because those searches were performed while she was in custody and without her consent, Dr. Martinez violated her Constitutional rights, the standard of care and Holy Cross's own policies. Because Dr. Martinez was not rendering medical care, traditional medical malpractice tort law is inapplicable. Rather, a *Bivens* action is the appropriate vehicle for such constitutional tort claims against a federal actor.

A negligent hiring, training and supervision claim is the proper cause of action against the hospital at which Dr. Martinez performed those torts and against the staffing

---

[1] Plaintiff filed an opposition to Quantum Plus's Motion on December 8, 2017.

agency who placed him at the hospital. As such, Ashley's independent negligence claims against Holy Cross (and Quantum Plus) are proper. Additionally, it is appropriate for a jury to weigh the credibility of the witnesses and decide whether Dr. Martinez violated Holy Cross's own policy and breached the standard of care by failing to obtain and document her consent prior to the searches.

This Opposition is supported by the following Memorandum of Points and Authorities, the Controverting Statement of Holy Cross's Facts ("CSOF-HC") filed herewith, and the record.

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

In opposing the pending Motion, Ashley need not establish a material issue of fact conclusively in her favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968). Moreover, the evidence Ashley provides in her CSOF is to be believed and all justifiable inferences are to be drawn in her favor. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242 at 255 (1986).

## I.    <u>FACTUAL BACKGROUND</u>

In that light, the following facts establish the basis for Ashley's federal Constitutional tort claims against Dr. Martinez and her independent negligence claims against Holy Cross:

**Ashley's Custodial Detention**

1.      On the morning of Saturday, October 18, 2014, Ashley, a natural-born US Citizen, crossed the international border at the Nogales Port of Entry. CSOF-HC ¶ 12. She crossed into Sonora to have breakfast at a restaurant she frequented. *Id*. After enjoying her breakfast, Ashley returned to the Port of Entry and crossed back into the United States. *Id*.

2.      Ashley did <u>not</u> use drugs while in Mexico, did <u>not</u> possess any contraband at the time she re-entered the United States and did <u>not</u> have any drugs on her person during her interactions with the Defendants. CSOF-HC ¶¶ 10 and 42.

3.      Despite being a US citizen who was not in possession of contraband, Ashley was detained at the Port of Entry for at least a few hours by CBP agents. CSOF-HC ¶ 14.

4.      While at the Port of Entry, Ashley was taken into custody. CSOF-HC ¶ 15.

5.      During that custodial detention, CBP escalated the method and manner of its searches and eventually requested authority to transport Ashley to a medical facility. As set out in the United States Public Health Services Division of Immigration Health Services' Treatment Authorization Request ("TAR"), Ashley was "diagnosed" as an alleged "potential internal carrier of foreign substance" and the "course of treatment" was identified as "request for X-Ray". CSOF-HC ¶ 16.

6.      CBP did not obtain a search warrant. CSOF-HC ¶ 17.

**Invasive Searches at Holy Cross**

7.      Ashley was then taken, in custody, to Holy Cross for the alleged sole purpose of undergoing an X-ray to determine whether she was carrying contraband. CSOF-HC ¶ 18.

8.     She was transported to Holy Cross in handcuffs and lead into the hospital in handcuffs. CSOF-HC ¶ 19.

9.     Ashley was never X-rayed (despite that being the only "course of treatment" authorized by the TAR). CSOF-HC ¶ 20.

10.    Rather, Dr. Martinez entered the exam room and, after asking a few cursory questions and with the CBP agents watching, invaded her body on a warrantless and unjustified search for contraband. CSOF-HC ¶ 21.

11.    Dr. Martinez performed those invasive body exams without obtaining Ashley's consent, as she never consented to a pelvic or rectal search. CSOF-HC ¶ 21.

12.    Dr. Martinez was not providing medical treatment, nor was he testing or evaluating Ashley for an emergent medical condition. CSOF-HC ¶ 22. He was acting as an extension of CPB for the express purpose of searching her for contraband. *Id.*

**Standard of Care for Holy Cross and Quantum Plus**

13.    Plaintiff's standard of care expert, Dr. Michael Levine, MD, has opined that the standard of care for a hospital emergency department, any entity engaged in staffing an emergency department, and any medical doctor working in an emergency department is not to participate in law enforcement searches without a search warrant or the express, informed consent of the individual to be searched. CSOF-HC ¶ 23. That standard of care requires a hospital, staffing agency and emergency department physician to ensure that individuals who are accompanied by law enforcement are treated with dignity and respect and are educated about their rights prior to an examination for forensic evidence collection. *Id.*

14.     Absent a search warrant or the express, informed consent of the individual, the standard of care mandates that a doctor must not undertake, and a hospital must not allow, a forensic evidence collection examination of any kind. CSOF-HC ¶ 24. If an examination is undertaken based on the individual's consent, that consent must be given knowingly and freely and only after the doctor has adequately explained the examination(s) to be conducted and advised the individual of their right to withhold consent. *Id.*

15.     The standard of care further requires a doctor and/or emergency department staff member to document the method and manner in which the consent was sought and obtained. CSOF-HC ¶ 25. A hospital and staffing agency must ensure that all doctors and staff are aware of the extreme limitations on examining an individual to collect evidence absent a warrant or express, informed consent. *Id.*

16.     Those standards of care are a bedrock principal of emergency care and the standards are so explicit that a specific written policy is unnecessary. CSOF-HC ¶ 25. That said, Holy Cross had written policies in effect at the time Ashley was brought there by agents of the United States. *Id.*

**Holy Cross Policy**

17.     The "Consent for Treatment" policy disclosed by Holy Cross is in accord with standard policy Dr. Levine would expect to be in use at any medical facility in the United States. CSOF-HC ¶ 26. The "Consent for Treatment" sets out the principles and practices underlying the method and manner in which consent must be obtained and documented. *Id.*

18.     As set out in section I of the "Consent for Treatment" policy, a signature on the Conditions for Admission form provides the hospital with, at most, consent <u>only</u> for an

anticipated course of treatment. CSOF-HC ¶ 27. Based on Holy Cross's policy, a patient must give express permission for a specific invasive or diagnostic test by signing an additional consent form. *Id*. Moreover, the hospital's own policy requires additional consent forms be signed before any non-emergent procedures are performed, and that signed form must be placed in the patient's medical records. *Id*.

19.     Section II of the "Consent for Treatment" policy sets out the requirement that consent be obtained for all invasive procedures with few exceptions unrelated to this case. CSOF-HC ¶ 28. Section III of the "Consent for Treatment" policy sets out the hospital's definition of "consent" and "informed consent" which Dr. Levine believes are consistent with the generally accepted uses and definitions of those terms in medicine. *Id*. That policy in no way limits its application solely to Holy Cross employees. *See* Exhibit 3-B to CSOF. Rather, it clearly sets out that it is intended for "CHN associates" and physicians *Id*.

20.     Section V of the "Consent for Treatment" policy details the roles and responsibilities of the health care professionals who interact with a patient during the process of obtaining and documenting consent. CSOF-HC ¶ 29. Section V(A) sets out the requirement that <u>it is the responsibility of the physician performing the procedure to obtain the required consent</u>. *Id*. As set out above, that policy language is not limited to Holy Cross employees. Thus, the Policy, by its own terms, applies to a physician practicing at Holy Cross Hospital, such as Dr. Martinez here.

21.     Holy Cross disclosed another applicable policy titled "Care of Inmates, Law Offenders, or Persons in Custody of Law Enforcement". CSOF-HC ¶ 31; CSOF Exhibit 3-D. As set out in section I of that policy, employees or <u>anyone involved</u> in interacting with

an in-custody patient are required to have completed an education/training module related to the care of incarcerated persons. *Id*.

### Quantum Plus and Holy Cross's Lack of Training and Supervision

22.     In the medical documentation associated with Ashley's time at Holy Cross on October 18, 2014, there are <u>no</u> documented references to any discussion with her about the examinations to be performed or her right to refuse them. CSOF-HC ¶ 30. There are also <u>no</u> documented references to her providing her express, informed consent for any examination, let alone the pelvic and rectal examinations that were performed. *Id*. At most, Holy Cross secured Ashley's general consent for admission. *Id*.

23.     Quantum Plus was the staffing company responsible for Dr. Martinez's presence at Holy Cross on October 18, 2014. CSOF-HC ¶ 32.

24.     Quantum Plus admits that all policies governing medical personnel's interactions with Ashley while she was at Holy Cross were produced by Holy Cross. CSOF-HC ¶ 32. Quantum Plus does not, however, have copies of any of the policies which apply to treatment performed at Holy Cross by the personnel it staffed to work there, let alone the Consent for Treatment and Care of Inmate policies. *Id*.

25.     There is no evidence Holy Cross provided Quantum Plus with copies of its policies governing the conduct of medical personnel practicing at Holy Cross. CSOF-HC ¶ 32. There is also no evidence that Quantum Plus provided Dr. Martinez with any Holy Cross policies. *Id*.

26.     Dr. Martinez is unable to provide information on any academic or post-academic training he has received relating to the constitutional limits for the search of an

individual in law enforcement custody. CSOF-HC ¶ 33. Dr. Martinez likewise does not recall training on specific policies and/or procedures regarding the search of individuals/patients who presented at Holy Cross in the custody of law enforcement. *Id.*

27.     Dr. Martinez is unable to state what policies/procedural guidelines controlled his encounter with Ashley on October 18, 2014. CSOF-HC ¶ 34.

28.     Dr. Martinez is not in possession of any of the Holy Cross policies detailed above. CSOF-HC ¶ 35.

29.     There is no evidence Dr. Martinez completed the Care of Inmates, Law Offenders, or Persons in Custody of Law Enforcement training as required by Holy Cross policy. CSOF-HC ¶ 31.

### Ashley was at Holy Cross for a Law Enforcement Search, Not Medical Care

30.     Based on the Holy Cross records, Ashley did not present to the emergency department for medical care or in an emergent situation. CSOF-HC ¶ 36. The Holy Cross charts indicate that Ashley's vitals were near normal, and she did not complain of any pain. *Id.* The records do not document that Ashley presented with any symptoms consistent with internal drug smuggling or that she exhibited any symptoms of feeling sick or unwell. *Id.* Ashley denied using or carrying drugs. *Id.* She was in the midst of her menstrual cycle. *Id.*

31.     Based on the Holy Cross records, Ashley signed a "Condition of Admissions" form, which contains a general consent provision, set out in paragraph 2 of the document, that references X-rays. CSOF-HC ¶ 37. Regardless, Ashley did not undergo an X-ray. *Id.*

32.     Ashley was not a patient for medical purposes. CSOF-HC ¶ 40. For that reason, the "Consent of Admission" form is neither applicable nor sufficient to allow a rectal or pelvic exam to search for contraband. *Id*.

33.     The records from Holy Cross also include "consent" forms, denoted as Appendix E and Appendix F, which are apparently United States Customs and Border Protection forms. CSOF-HC ¶ 38. Those forms, which are for X-rays and Pelvic/Rectal Exams, are blank and unsigned. *Id*.

34.     There is no evidence that Ashley consented to any examination in writing. CSOF-HC ¶ 39. There is also no documented evidence in her medical records that she verbally consented to any examination while at Holy Cross. *Id*. There is no indication in the Holy Cross records that Ashley expressly provided her knowing and informed consent for a pelvic and/or rectal exam. *Id*. Regardless, Dr. Martinez performed vaginal and rectal exams on her. *Id*.

35.     Ashley was brought to Holy Cross for the forensic collection of evidence only, not for a medical emergency or for medical treatment. CSOF-HC ¶ 41. EMTALA applied to this situation only to the extent necessary to perform a Medical Screening Examination to determine and rule out an imminent condition threatening her life or limb. *Id*. That type of an exam can be performed by a nurse or non-doctor during the triage/initial admission process. *Id*. EMTALA does not provide any basis for the pelvic or rectal examinations which Ashley underwent. Therefore, the "Consents in an Emergency" exemptions set out in section IV of the "Consent for Treatment" policy do not apply to Ashley. *Id*.

**<u>Holy Cross and Quantum Plus's Breach of the Standard of Care</u>**

36.     Dr. Levine timely opined in his Rule 26(a)(2)(b) Report that Holy Cross and Quantum Plus, through their agents and employees, specifically Dr. Martinez, fell below the standard of care by failing to obtain Ashley's informed, express consent for a pelvic and/or rectal exam. CSOF-HC ¶ 40.

37.     Dr. Levine further opined that Holy Cross and Quantum Plus, through their agents and employees, specifically Dr. Martinez, fell below the standard of care by negligently failing to have appropriate and trained staffing and failing to have policies and procedures in place in the emergency department to ensure the internal policies detailed above were followed. CSOF-HC ¶ 43.

38.     Dr. Levine also opined that Dr. Martinez did not adequately obtain and document an express, informed and voluntary consent from Ashley for the forensic evidence collection procedures he performed on her. CSOF-HC ¶ 44.

39.     Finally, Dr. Levine opined that Holy Cross and Quantum Plus failed to ensure the "Consent for Treatment" policy was followed. CSOF-HC ¶ 45.

**II.     <u>THE FACTS SUPPORT A *BIVENS* CLAIMS AGAINST DR. MARTINEZ</u>**

Based on those facts, which for summary judgment must be accepted as true, Ashley's claims against Dr. Martinez arise from her federal Constitutional rights and are based on his serving as a federal actor conducting a law enforcement search. Ashley's claims against Dr. Martinez are properly pursued as a *Bivens* claim against him.

Ashley's claims are not based on the proper (or improper) rendering of medical treatment or health care. To be clear: based on the record currently before the Court, Ashley

did not receive anything close to medical treatment or health care. While in custody, she

was searched by a doctor for evidence of a crime at the behest and in the presence of CBP

agents without due process of law. She did not consent to the searches. The Supreme Court

has specifically approved *Bivens* actions for violations of the Fourth Amendment (the

*Bivens* case itself) and the Fifth Amendment, *Davis v. Passman*, 442 U.S. 228 (1979).

Those are the Constitutional protections Dr. Martinez violated.

A *Bivens* claim may only be brought against an <u>individual</u> "engaged in governmental

(or 'state') action." *Sutton v. Providence St. Joseph Med. Cntr.*, 192 F.3d 826, 844 (9th Cir.

1999). That is exactly what Ashley alleges here as against Dr. Martinez. Moreover, the

Supreme Court has made clear that a *Bivens* claim is brought against the individual official

for his or her <u>own</u> acts, <u>not</u> the acts of others. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1860

(2017). Again, Ashley's *Bivens* claim is only against Dr. Martinez and for his conduct. The

negligence of the hospital and staffing agency that placed him there are independent claims.

**III.    <u>ASHLEY'S NEGLIGENCE CLAIMS AGAINST QUANTUM PLUS AND HOLY CROSS ARE BASED ON THEIR INDEPENDENT ACTIONS AND DO NOT CIRCUMVENT *BIVENS*</u>**

Holy Cross and Quantum Plus base their Motions on a mischaracterization of

Ashley's claims against them. Contrary to their assertions, Ashley is not attempting to hold

either of them vicariously liable. As is evident from the record, vicarious liability is not an

issue in this case, despite the attempt by Holy Cross and Quantum Plus to use it as a basis to

be summarily dismissed. Ashley is seeking to hold them liable for their independent

negligence in allowing pelvic and rectal exams to be performed on her in the absence of her

express, informed consent based on their failure to properly train and supervise Dr.

Martinez.

### A) *Malesko and Minneci Are Inapplicable to Ashley's Claims*

Holy Cross's reliance on *Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001) and *Minneci v. Pollard*, 565 U.S. 118 (2012) is misplaced. Ashley is not attempting to extend *Bivens* liability to a corporation. Rather, Ashley seeks to hold only Dr. Martinez liable under a *Bivens* cause of action because he was acting as a federal agent, under the direction, control and constant surveillance of armed, uniformed federal agents, when he invasively searched her body cavities without a warrant and without her consent. She seeks to hold Holy Cross and Quantum Plus liable for negligently allowing those body cavity searches to be performed on her in violation of the applicable standard of care and the operative Holy Cross policy. Ashley is not attempting to create *Bivens* liability against Holy Cross or Quantum Plus or circumvent *Bivens*' parameters.

### B) *Vicarious Liability is Not Alleged and is Not Applicable to Ashley's Claims*

An employer in Arizona is vicariously liable for the negligent work-related actions of its employee only if the employee is acting "within the scope of employment" when the negligence occurs. *Engler v. Gulf Interstate Engineering, Inc.*, 230 Ariz. 55, ¶ 9, 80 P.3d 599, 601 (Ariz. 2012). While Ashley initially pled that Dr. Martinez may have been working in the course and scope of his employment, she has not alleged vicarious liability and Holy Cross, Quantum Plus and Dr. Martinez have all denied that Dr. Martinez was an employee or acting within the course and scope of his employment. CSOF-HC ¶ 46.

Vicarious liability is not part of this case and Holy Cross's attempt to use it as a basis for summary judgment is improper.

The distinction between Ashley's independent claims against Holy Cross and claims based on vicarious liability is illustrated by a basic tenet of principal/agent law. Arizona law provides that when a plaintiff sues both the agent and the principal for the negligence of the agent (which is not the case here), "the release of an employee from liability ... operates as a release of the employer." *De Graff v. Smith*, 62 Ariz. 261, 269, 157 P.2d 342, 345 (1945) (quoting 35 Am.Jur. § 534). The rationale for that rule is that a principal being sued for vicarious liability is not a "true joint tortfeasor[ ] under Arizona law.*" Law v. Verde Valley Med. Ctr.*, 217 Ariz. 92, 96, ¶ 16, 170 P.3d 701, 705 (App. 2007). Instead, the principal's liability is merely derivative of the direct liability of the agent, the true tortfeasor. *See Jamerson v. Quintero*, 233 Ariz. 389, 391–92 ¶¶ 14, 17, 313 P.3d 532, 535–36 (App. 2013). Thus, when an agent "is adjudicated to have no liability," there is no fault to attach or impute to the principal and "any vicarious liability of the principal necessarily falls away." *Id.; see also Law*, 217 Ariz. at 96, ¶ 13, 170 P.3d at 705. Importantly, this is not at all the dynamic at play in this case.

Here, Ashley's claims against Holy Cross and Quantum Plus are not "merely derivative" of Dr. Martinez's direct liability. They were each independently negligent in their failures to train and supervise Dr. Martinez on the standard of care (and Holy Cross policy) regarding obtaining and documenting informed consent. Of crucial importance in establishing the independence of the claims against Holy Cross and Quantum Plus: a release of Dr. Martinez would not necessarily bar Ashley's claim against Holy Cross and Quantum

Plus based on their negligent hiring, training and supervision. *See De Graff*, 62 Ariz. at 266, 157 P.2d at 344 (verdict in favor of the servant does not bar recovery against the master for negligence "on which, independently of the acts of the servant, liability may be predicated"); *Ford v. Revlon, Inc*., 153 Ariz. 38, 42, 734 P.2d 580, 584 (1987) (when "there is independent negligence on the part of the master, the master may be liable, apart from his derivative liability for his servant's wrongful acts").

### *C) Holy Cross and Quantum Plus were Independently Negligent*

Arizona follows the Restatement with regard to negligent hiring, training and supervision. *See Kassman v. Busfield Enters*., 131 Ariz. 163, 166, 639 P.2d 353, 356 (App. 1981) (citing RESTATEMENT (SECOND) AGENCY § 213). A master is liable for the tortious conduct of its servant if the master was negligent or reckless in hiring, supervising, or otherwise training the servant. *See* RESTATEMENT (SECOND) AGENCY § 213.

In Arizona, "[f]or an employer to be liable for negligent hiring, retention, or supervision of an employee, a court must first find that the employee committed a tort." *Kuehn v. Stanley*, 208 Ariz. 124, 130, 91 P.3d 346, 352 (App. 2004). The *Kuehn* case does not limit the agent's tort to one based solely on state common law. It simply requires the violation of a tort, which is exactly what Ashley alleges here as against Dr. Martinez. That point is proven in *Kassman*, which sets out the general rule concerning negligent training and supervision of servants found in RESTATEMENT (SECOND) OF AGENCY, § 213:

> "A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:
>
> (a) in giving improper or ambiguous orders of (sic) in failing to make proper regulations; or

(b) in the employment of improper persons or instrumentalities in work involving risk of harm to others: (sic)

(c) <u>in the supervision of the activity</u>; or

(d) <u>in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control</u>."

RESTATEMENT (SECOND) OF AGENCY, § 213 (emphasis added)

The rule set forth in subsections (c) and (d) states the basis for Ashley's claims against Holy Cross and Quantum Plus. The Restatement specifically contemplates activities by "servants or other agents", so the question of whether Dr. Martinez was an employee or an independent contractor is irrelevant to whether Holy Cross and Quantum Plus are negligent. That is because the *Bivens* claims for which Ashley is pursuing Dr. Martinez occurred at Holy Cross and Dr. Martinez was there because Quantum Plus placed him there. Holy Cross and Quantum Plus permitted or failed to prevent Dr. Martinez's tortious conduct at Holy Cross and with the instrumentalities under their control by their failure to provide and ensure Dr. Martinez complied with the policies on custodial examinations.

Moreover, Quantum Plus and Holy Cross cannot legitimately claim Ashley has not provided sufficient facts establishing their negligence in training and supervising Dr. Martinez's activities or in permitting or failing to prevent his tortious conduct toward her. The evidence is that neither Quantum Plus nor Holy Cross provided Dr. Martinez with the applicable policies relating to an individual in law enforcement custody or concerning the need to obtain <u>and document</u> express, informed consent prior to searching that individual for evidence of a crime.

Dr. Martinez was either completely unaware of Holy Cross's policies regarding consent or failed to follow them. Either fits squarely within a negligent training and supervision claim pursuant to Arizona law. Dr. Levine has opined that Quantum Plus and Holy Cross's conduct fell below the standard of care for a hospital and a staffing agency. It is that independent negligence for which Ashley seeks to hold Holy Cross and Quantum Plus liable.

## IV.   CONCLUSION

Ashley was brought to Holy Cross for a forensic evidence investigation, not medical treatment. She has established facts showing that Dr. Martinez was serving as a federal actor at the time he undertook to search her for alleged illegal drugs. Her Fourth and Fifth Amendment Constitutional tort claims are properly pursued against Dr. Martinez under *Bivens*. Her negligence claims against Holy Cross and Quantum Plus are based on their independent negligence in failing to ensure that Dr. Martinez was aware of and complied with Holy Cross policy and the standard of care by obtaining and documenting Ashley's express, informed consent. The Motion for Summary Judgement is, therefore, properly denied.

Filed this 8th day of December, 2017.

**MARCHETTI LAW, PLLC**


By:___/s/ Brian Marchetti_____
Brian Marchetti
*Attorney for Plaintiff*

1

## CERTIFICATE OF SERVICE

2

3         I hereby certify that on December 8, 2017, I electronically transmitted the attached
document to the Clerk's Office using the CM/ECF System for filing and transmittal of a
4         Notice of Electronic Filing to the CM/ECF registrants:

5         Laura V. Mac Ban
MAC BAN LAW OFFICES
6         1795 E. Skyline Drive, Suite 155
Tucson, Arizona 85718
7         *Attorneys for Defendants Holy Cross*
*Hospital, Inc.*
8

9         James R. Broening
Michelle L. Donovan
10        BROENING OBERG WOODS & WILSON
PO Box 20527
11        Phoenix, Arizona 85036
*Attorneys for Defendants Martinez*
12

13        Scott A. Holden
Carolyn Armer Holden
14        Michael J. Ryan
Holden and Armer, PC
15        4505 East Chandler Blvd., Suite 210
Phoenix, Arizona 85048
16        (480) 656-0460
*Attorneys for Defendant Quantum Plus, Inc.*
17

18

19

20

21

22

23

24

25

26

27

28