**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

ASHLEY CERVANTES, a single woman, )
)
            Plaintiff, )
)
    vs. ) NO. 4:16-CV-00334-CKJ
)
UNITED STATES OF AMERICA; UNITED )
STATES CUSTOMS AND BORDER )
PROTECTION AGENT SHALEKA LEGGETT )
AND "JOHN DOE" LEGGETT; UNKNOWN )
UNITED STATES CUSTOMS AND BORDER )
PROTECTION AGENTS; HOLY CROSS )
HOSPITAL, INC.; ASCENSION ARIZONA, )
INC.; PATRICK F. MARTINEZ AND "JANE )
DOE" MARTINEZ; JOHN DOES 1-5; JANE )
DOES 1-5; XYZ CORPORATIONS 1-5; ABC )
PARTNERSHIPS 1-5, )
)
           Defendants. )
)

VIDEOTAPED DEPOSITION OF ASHLEY CERVANTES

Tucson, Arizona

April 27, 2017

RAYNBO COURT REPORTING, LTD.

3625 West Gailey Drive
Tucson, Arizona   85741
520/744-2293

Reported by:  Raynbo Silva, RPR, CR
                Certified Reporter No. 50014

Page 2

1  DEPOSITION OF ASHLEY CERVANTES
2  Tucson, Arizona
3  April 27, 2017
4
5                INDEX
6                                          Page
7  Cross-Examination by Ms. Donovan:          6
8  Cross-Examination by Ms. Kroeger:         92
9  Cross-Examination by Ms. Holden:         131
10 Cross-Examination by Ms. MacBan:         151
11 Examination by Mr. Marchetti:            175
12 Recross-Examination by Ms. Donovan:      181
13 Recross-Examination by Ms. Holden:       191
14 Further Recross-Examination by Ms. Donovan:   191
15 Recross-Examination by Ms. Kroeger:      193
16              * * * *
17
18
19              EXHIBITS
20 Number   Description                     Page
21   1     Defendant Quantum Plus, LLC's First
           Supplemental Rule 26(a)(1) Disclosure
22         Statement:                       165
23              * * * *
24
25

Page 3

1  APPEARANCES:
2  BROENING, OBERG, WOODS & WILSON
      By MICHELLE L. DONOVAN, Attorney at Law
3     Post Office Box 20527
      Phoenix, Arizona  85036
4     Attorneys for Defendant Martinez
5  OFFICE OF THE UNITED STATES ATTORNEY
      By MELISSA M. KROEGER, Attorney at Law
6     405 West Congress Street, Suite 4800
      Tucson, Arizona  85701-5040
7     Attorneys for Defendant United States of America
      and Shamekia Leggett
8
   MacBAN LAW OFFICES
9     By LAURA V. MacBAN, Attorney at Law
      and MICHAEL L. LINTON, Attorney at Law
10    Skyline Esplanade
      1795 East Skyline Drive, Suite 155
11    Tucson, Arizona  85718
      Attorneys for Defendants Holy Cross Hospital, Inc.
12    and Ascension Arizona, Inc.
13 HOLDEN & ARMER, PC
      By CAROLYN ARMER HOLDEN, Attorney at Law
14    4505 East Chandler Boulevard, Suite 210
      Phoenix, Arizona  85048
15    Attorneys for Defendants Quantum Plus, LLC
      dba TeamHealth West
16
   MARCHETTI LAW, PLLC
17    By BRIAN MARCHETTI, Attorney at Law
      177 North Church Avenue
18    Tucson, Arizona  85701
      Attorney for Plaintiff
19
   ALSO PRESENT:  DAVID BOYAN, Videographer
20                CASSIDY JAMES, CBP Chief Counsel
21
22              * * * *
23
24
25

Page 4

1       BE IT REMEMBERED that pursuant to notice the
2  videotaped deposition of ASHLEY CERVANTES was taken at the
3  UNITED STATES ATTORNEY'S OFFICE, Assistant U.S. Attorneys,
4  405 West Congress Street, Suite 4800, in the City of Tucson,
5  County of Pima, State of Arizona, before Raynbo Silva, RPR,
6  CR, Certified Reporter No. 50014, in and for the County of
7  Pima, State of Arizona, on the 27th day of April, 2017,
8  commencing at the hour of 10:00 A.M. on said day on behalf
9  of the Defendants in a certain cause now pending in the
10 United Sates District Court, District of Arizona.
11
12
13              * * * *
14
15
16      THE VIDEOGRAPHER:  Going on record at 10:04.  The
17 date is April 27th, 2017.
18      We are at 405 West Congress Street, Suite 4800, in
19 Tucson, Arizona, for the deposition of Ashley Cervantes.
20      Case name is Cervantes versus United States,
21 et al., in the United States District Court, District of
22 Arizona, Case Number 4:16-CV-00334-CKJ.
23      My name is David Boyan.  The name of my company is
24 Graphics for Litigators.
25      Raynbo Silva is the court reporter of Raynbo Court

Page 5

1  Reporting.
2       Will counsel please introduce themselves?
3       MR. MARCHETTI:  Brian Marchetti on behalf of
4  plaintiff.
5       MS. DONOVAN:  Michelle Donovan on behalf of
6  Dr. Martinez.
7       MS. HOLDEN:  Carolyn Holden on behalf of Quantum
8  Plus.
9       MS. KROEGER:  Melissa Kroeger on behalf of the
10 United States and Officer Leggett.
11      MR. LINTON:  Mike Linton on behalf of Holy Cross
12 Hospital.
13      MS. MacBAN:  Laura MacBan on behalf of Holy Cross
14 Hospital.
15
16
17
18            ASHLEY CERVANTES,
19 having been called as an adverse party on cross-examination,
20 having been first duly sworn to state the truth, the whole
21 truth and nothing but the truth, testified on her oath as
22 follows:
23 . . . .
24 . . . .
25 . . . .

Page 18

1  once you're there?
2  A. No. Taxi.
3  Q. Taxi. So who drives you to the border to go to
4  your orthodontist appointments?
5  A. My mother does.
6  Q. So she drives you to the border. You cross;
7  correct?
8  A. Yeah.
9  Q. You walk over, and then you pick up a taxi on the
10 other side?
11 A. Yeah.
12 Q. And you tell the taxi to take you to this town?
13 A. Yeah.
14 Q. Once you get to this town do you tell the taxi
15 where to go or do you just say drop me here, I'll walk?
16 A. No. The taxi knows where he's going to get.
17 After that I just have to walk five minutes to go into the
18 orthodontist.
19 Q. When's your next appointment?
20 A. I have to go in on the 17th.
21 Q. This month? Of May?
22 A. May.
23 Q. I'm going to submit a request to your attorney to
24 when you go to that appointment to get the address for us.
25 Okay?

Page 19

1  A. Alrighty.
2  Q. Are you willing to do that?
3  A. Yes.
4  Q. Thank you.
5     What other health care providers do you see?
6  A. That's it.
7  Q. Do you have a primary care physician?
8  A. No.
9  Q. Do you know what a primary care physician is?
10 A. No.
11 Q. Do you have a doctor that you go to for yearly
12 checkups?
13 A. Checkups, no, I do not.
14 Q. Do you have any doctor that you go to on a yearly
15 basis for any sort of examination?
16 A. I used to have Dr. Green. She's a woman.
17 Q. And what kind of doctor is Dr. Green?
18 A. She's a physical, like when you get your checkups,
19 like what you said.
20 Q. Do you know Dr. Green's first name?
21 A. No. And I also know Dr. Bluck.
22 Q. B-L-U-C-K?
23 A. Uh-huh.
24 Q. What kind of doctor is Dr. Bluck?
25 A. The same.

Page 20

1  Q. And where is, let's start with Dr. Green, where is
2  Dr. Green located?
3  A. I have no idea. She used to work in Mariposa.
4  She doesn't work there anymore.
5  Q. So she used to work at Mariposa Health Center?
6  A. Uh-huh.
7  Q. Yes?
8  A. Yes.
9  Q. What about Dr. Bluck?
10 A. Same.
11 Q. Do you know Dr. Bluck's first name?
12 A. No, I do not.
13 Q. And so you would go there every year?
14 A. Yes.
15 Q. What other doctors do you treat with?
16 A. None.
17 Q. Do you go see an OB-GYN?
18 A. No.
19 Q. Have you ever?
20 A. No.
21 Q. Are you sexually active?
22 A. Yes.
23 Q. Since when?
24 A. Two months ago.
25 Q. That's the first time you became sexually active?

Page 21

1  A. No.
2  Q. When was the first time you became sexually
3  active?
4  A. When I was 16.
5  Q. And have you remained sexually active since 16?
6  A. No.
7  Q. Have there been periods where you have a boyfriend
8  and are and periods when you don't have a boyfriend and
9  you're not?
10 A. Yes.
11 Q. At the time of the events at issue in this case
12 did you have a boyfriend?
13 A. No, I did not.
14 Q. Do you know why the records suggest that you
15 crossed the border with a boyfriend?
16 A. No, I did not. That isn't correct. That's not
17 accurate.
18 Q. Do you have any understanding of any -- strike
19 that.
20    At the time that you were seeking to come back
21 into the United States on October 18th, 2014, were you by
22 yourself or were you with a small group or with anybody
23 else?
24 A. I crossed by myself. I crossed with my friend,
25 and my friend crossed first and I did. Then I crossed. So

**Page 22**

1  basically I crossed by myself.
2  Q. Who's your friend?
3  A. Orlando Rosas.
4  MS. MacBAN: Orlando --
5  Q. I'm sorry? What's the last name?
6  MS. MacBAN: What was it? Orlando?
7  THE WITNESS: Rosas.
8  Q. Rosas.
9  MS. MacBAN: Thank you.
10 Q. R-O-S-A-S or E-S?
11 A. S-A. Rosas.
12 Q. Okay. And do you think it's possible that they
13 had been referring to Orlando as your boyfriend?
14 A. Most likely.
15 Q. Okay. Where does Orlando live?
16 A. I have no idea.
17 Q. Are you no longer friends?
18 A. No.
19 Q. Did he move?
20 A. He got married. He moved.
21 Q. And how did you know Orlando?
22 A. I met him at a party.
23 Q. Do you have an estimate on the year?
24 A. I do not.
25 Q. Do you have an estimate of how long you knew him

**Page 23**

1  before you and he crossed the border?
2  A. I don't know.
3  Q. And I keep using the phrase cross the border, and
4  when I use that phrase I'm referring to reentering the
5  United States or going into Mexico from the Port of Entry at
6  Nogales. Okay?
7  A. Okay.
8  Q. On that topic have you ever crossed into Mexico at
9  any other border crossings?
10 A. No, I do not.
11 Q. How old is Orlando?
12 A. I have no idea.
13 Q. Do you have any guess as to whether he's your age?
14 A lot older? Younger?
15 A. He's older.
16 Q. And what were you and he doing in Mexico on
17 October 18th, 2014?
18 A. We crossed to get breakfast.
19 Q. And around what time was that?
20 A. Around 9:00.
21 Q. 9:00 A.M.?
22 A. (No audible response.)
23 Q. So you went into Mexico around 9:00 A.M. to get
24 breakfast?
25 A. (No audible response.)

**Page 24**

1  Q. Where were you getting breakfast?
2  A. At a seafood local little stand.
3  Q. Is it a stand that's consistently there?
4  A. Yes.
5  Q. Where is it?
6  A. It's when you cross five minutes towards the left
7  you just walk and there's a big sign that says seafood right
8  there.
9  Q. And how often did you go there?
10 A. Three times. Not that many.
11 Q. Three times within what sort of window of time?
12 Three times within a month? Year?
13 A. Before, yeah. Like a year before I went once, and
14 then I went again like twice the second year when the
15 incident happened.
16 Q. So you -- those three occasions that you went to
17 this seafood stand would it be fair that there were a couple
18 months of a gap in between each visit?
19 A. Yes.
20 Q. And how long did you and Orlando stay at the stand
21 for breakfast?
22 A. About half an hour.
23 Q. And what did you do next?
24 A. I crossed back. I waited in line for two hours or
25 almost two hours --

**Page 25**

1  Q. Okay. So --
2  A. -- to cross back into the U.S.
3  Q. If you left at about 9:00 A.M., had breakfast for
4  about a half an hour, that gets us to about 9:30, and
5  waiting in line for about two hours gets us to about 11:30
6  or 12:00. Does that sound about right to you?
7  A. About right.
8  Q. Do you have any explanation as to if that's the
9  case why the records reflect that you didn't attempt to
10 cross until 5 o'clock that evening?
11 A. I did not cross at 5 o'clock that evening. At
12 5 o'clock that evening they had me inside, handcuffed inside
13 a jail cell accusing me of smuggling drugs inside.
14 Q. Okay. Let's unpack that a little bit.
15    So it's your testimony that you got to the front
16 of the line in effect at approximately 11:30 or noon;
17 correct?
18 A. It was earlier than that.
19 Q. It was earlier than that?
20 A. Yes.
21 Q. So we're talking maybe closer to 11 o'clock?
22 A. Yeah. Closer to 11:00.
23 Q. Okay. I'm not going to ask you questions about
24 your interactions there. I'm going to leave that to the
25 U.S. attorney. But I am going to ask you just a couple of

**Page 38**

1 recent time that you went to Mexico?
2   A. It was March something I went to get my nails
3 done.
4   Q. So when you go get your braces done in Mexico is
5 that typically during the week during business hours?
6   A. Yes.
7   Q. Is it ever on a Saturday?
8   A. Not really. It's really rare if it's on a
9 Saturday because I didn't -- I couldn't get an appointment
10 earlier.
11   Q. And when you get your nails done, is it during
12 business hours?
13   A. Yes. It could be Saturday, Sunday.
14   Q. Sure. But it's at least during business hours?
15 It's not --
16   A. Yes.
17   Q. -- at 10 o'clock at night?
18   A. No. The latest is 9 o'clock they close.
19   Q. So how often do you go to Mexico in the last
20 several months to party?
21   A. To party not often. Getting my braces checked
22 twice a month.
23   Q. So if records do exist of how many times you've
24 crossed back into the United States from Mexico, there
25 should only be about two or three a month?

**Page 39**

1   A. Two or three.
2   Q. I'm not going to ask you specifics about your
3 interactions with Border Patrol, so I want you to fast
4 forward to the time you arrived at the hospital. Okay?
5   A. It was around 7 o'clock.
6   Q. If I tell you that the records reflect it was
7 5 o'clock, are you going to agree with the records?
8   A. I'm not going to agree with the records. That's
9 not accurate.
10   Q. Okay. Even the medical records?
11   A. Even the medical records.
12   Q. Does it change your opinion at all if I said the
13 medical records actually say 1700?
14   A. No. I remember that it was around 7 o'clock,
15 6:00. It was late.
16   Q. So when you got there, what was the first thing
17 that happened?
18   A. They got me off in handcuffs. I got down. They
19 filled out some papers, and they took me to a room.
20   Q. Okay. Let's break that down.
21     I assume you were driven to the hospital; correct?
22   A. Yeah. By the Customs.
23   Q. And when you got to the hospital, you got out of
24 the car and walked in?
25   A. Yes.

**Page 40**

1   Q. Did you walk up to an admission window with the
2 Border Patrol?
3   A. Yes.
4   Q. Did you do the talking?
5   A. No.
6   Q. So --
7   A. I couldn't even speak.
8   Q. You were told you're not allowed to speak?
9   A. Uh-huh, not right there because they were
10 speaking.
11   Q. Who told you you're not allowed to speak?
12   A. Leggett. She was an African-American woman.
13   Q. Okay. What did you have -- did you overhear any
14 discussion with the person at the admissions window?
15   A. No. They just said that they were sure that I had
16 a substance inside me and they were going to take them out
17 and that they needed some permission or something. And they
18 were just filling paper out. I don't know what they were
19 filling. They didn't let me see. I was handcuffed in the
20 chair waiting for them.
21   Q. So instead of actually walking up to the window
22 with them --
23   A. I --
24   Q. -- they told you to sit in a chair?
25   A. I walked up to the window after they gave them

**Page 41**

1 some papers and put me back in the chair.
2   Q. And you say you were handcuffed?
3   A. Yes.
4   Q. Were your hands in front or behind you?
5   A. Behind me.
6   Q. Do you -- did you sign any of the forms that were
7 presented to you?
8   A. I signed one form for x-rays.
9   Q. I'm going to hand you what's marked as Holy Cross
10 Hospital page 56.
11     Is that your signature where it says patient's
12 signature?
13   A. If you just give me a second to read this.
14   Q. Sure.
15   A. That's my signature, but I did not fill this out
16 (indicating).
17   Q. This is Holy Cross page 57. There are two places
18 for patient's signature. Will you verify that those are
19 your signatures?
20   A. Yes, these both are my signatures.
21   Q. Thank you.
22     MS. KROEGER: What page is that?
23     MS. DONOVAN: 57.
24     MS. KROEGER: The first one was 50 -- what was the
25 first one?

Page 42

1    MS. DONOVAN: 56.
2    Q. And on page 58 are those also your signatures?
3    A. This looks like my signature. This does not look
4 like my signature.
5    Q. The one on the left, does it look like a signature
6 that was crossed out that was maybe put in the wrong spot?
7    A. I do not know. That's not my signature. You can
8 see the difference.
9    Q. Did you read those forms?
10   A. Yeah. Can I read them again?
11   Q. Did you, did you read them before you signed them?
12   A. No. They just made me sign them.
13   Q. Did you ask to read them first?
14   A. Yeah. And they just said they were for x-rays.
15   Q. So you asked to read them, they said it was just
16 for x-rays, and you were satisfied and signed?
17   A. Yes. I thought it was just x-rays and I thought I
18 was going to get out of there. I was devastated.
19   Q. So after you signed these forms what happened
20 next?
21   A. They put me in a room. After that they -- I was
22 handcuffed. They told me they were just going to let one
23 hand go so I can put a pajama, I think they give you a
24 pajama to change into.
25       After that they sat me down. They opened up my

Page 43

1 legs, took my tampon on and proceeded to do an exam that was
2 extremely painful. And I never consented on none of that.
3    Q. Okay. So let's unpack that.
4        So you went to an exam room. Was the doctor
5 already there when you got to the room? Or did the doctor
6 come in after you were already in the room?
7    A. He come -- he came in after I was in the room. I
8 changed into my pajamas, the one they gave me.
9        The two officers were still in there. It was an
10 African-American woman and a Latina.
11   Q. Let's unpack that again.
12       So you were brought to the room. Did you have
13 that conversation about they were going to uncuff one of
14 your hands before or after the doctor came in?
15   A. No. That was before the doctor came in.
16   Q. Was anybody from the hospital in the room when you
17 got to the room?
18   A. There was a girl nurse.
19   Q. A female nurse?
20   A. A female nurse.
21   Q. Do you remember what she looked like?
22   A. I only remember she had really, really puffy,
23 curly hair.
24   Q. Was she white?
25   A. She was white.

Page 44

1    Q. Latina?
2    A. Latina.
3    Q. Latina?
4        Did you have any conversation with her?
5    A. No, I did not.
6    Q. Is she the one who gave you the hospital gown?
7    A. Yes.
8    Q. Did she just hand it to you --
9    A. She just handed it.
10   Q. -- or did she say anything to you while she handed
11 it to you?
12   A. She just handed it to me.
13   Q. Did she tell you, give you instructions on how to
14 wear it?
15   A. Yeah. She just said that it had to be like this
16 (indicating) and that I had to take all my clothes off.
17   Q. What do you mean like this?
18   A. Well, there was this one strap that they have, and
19 she told me that I had to put the strap right here and that
20 was going to be it.
21   Q. Okay. And it's your testimony that you were
22 required to take off all of your clothes?
23   A. All of my clothes. And the two officers were
24 still in there while I was taking my clothes off.
25   Q. And was the nurse still in there when that

Page 45

1 occurred?
2    A. Yes. The three of them were in there.
3    Q. And what were they doing?
4    A. Just staring at me.
5    Q. Were you on the table? Were you on --
6    A. I was --
7    Q. -- standing on the floor?
8    A. -- standing up next to the little bed.
9    Q. Okay. So you told us about uncuffing one of your
10 hands. Was the other hand still cuffed and attached to the
11 bed? Or --
12   A. It was cuffed. It was just the little cuff.
13   Q. So the cuff was on, but you weren't actually
14 tethered --
15   A. No.
16   Q. -- to the bed or anything like that?
17   A. Yeah.
18   Q. That's correct?
19   A. Yes.
20   Q. Now at some point Dr. Martinez came in; correct?
21   A. Yes.
22   Q. What did he look like?
23   A. He was tall. He had black hair.
24       That's all I can remember. I didn't really see
25 his face.

**Page 170**

1 records show that you're coming in at 2:00 or 3:00 or 4:00
2 or 5:00 in the morning, when do you sleep?
3    A. When I get home.
4    Q. So you're a day sleeper?
5    A. No.
6    Q. When do you sleep?
7    A. I sleep when I get home and rest.
8    Q. I'm just going to go through my notes. I should
9 be very close to done.
10     When you were at Holy Cross on October 18, 2014,
11 brought in by Border Protection I believe you testified
12 earlier about the registration process, that you were put in
13 a chair and it was the Border Protection handling the
14 paperwork?
15    A. Yes.
16    Q. And that person at registration was male or female
17 to your memory?
18    A. It was a female.
19    Q. What did she look like?
20    A. I do not remember. I just remember it was a
21 female.
22    Q. Next person that's taking -- we had a discussion
23 about your vital signs. Remember that? Vital signs are
24 your blood pressure, your heart rate, temperature, that type
25 of thing. Was that taken by a male or female?

**Page 171**

1    A. I believe it was a male.
2    Q. Do you -- can you describe the male?
3    A. No.
4    Q. Do you have any names?
5    A. He was just a little fat with a little beard.
6 That's all I remember.
7    Q. Okay. Do you remember any conversations you had
8 with him?
9    A. No. Other than what I had taken for my allergies
10 and stuff, I've had any infections or diseases or stuff like
11 that.
12    Q. If he testifies in this case that his memory, he
13 does remember you, his memory is that you shared with him
14 that you were a marijuana user, would you dispute that?
15    A. Yes.
16    Q. So if he remembers having that conversation with
17 you, you're saying that is false, that he's not telling the
18 truth?
19    A. Yes.
20    Q. The person who was chaperoning, we call it
21 chaperoning when an pelvic exam is going to be done, you
22 have a female come in to observe, the person chaperoning
23 from Holy Cross, can you describe that person?
24    A. The female? She had curly hair, like really
25 puffy, curly hair. She was not that skinny, not that fat.

**Page 172**

1 She was white, really white.
2    Q. Have an age bracket?
3    A. Late 20s, early 30s.
4    Q. Anything else you remember about her? What she
5 was wearing?
6    A. No.
7    Q. Any conversations you had with her?
8    A. No. No conversations.
9    Q. If -- she also remembers you. If she testifies
10 that while on the gurney with Dr. Martinez there you made
11 the comment that I must have been stopped because I smell
12 like marijuana and that alerted the dogs, something to that
13 effect, the acknowledging that you probably smelled like
14 marijuana?
15    A. It is ludicrous to smell. It's false.
16    Q. Patently false?
17    A. (No audible response.)
18    Q. Yes?
19    A. Yes.
20    Q. If a health care provider overheard you say that
21 you had smoked on the Mexico side of the border marijuana,
22 is that also patently false?
23    A. That's false.
24    Q. And I assume that you're going to say it's
25 patently false if the health care providers observed and

**Page 173**

1 listened to you consent verbally to the pelvic and rectal
2 exam?
3    A. That is false.
4    Q. And it's also false that Dr. Martinez never
5 explained to you what he was going to do or how he was going
6 to do it?
7     MR. MARCHETTI: Objection, form and foundation.
8    Q. That's your testimony, that he, that he did not
9 explain to you what he intended to do and how?
10    A. That's false. He did not explain it.
11    Q. And your memory is that you were on the gurney and
12 stirrups approximately 15 to 20 minutes while he did this
13 exam; correct?
14    A. Yes. Correct.
15    Q. And you never once said no, you don't have my
16 permission to do this; correct?
17    A. Correct.
18    Q. Is it your testimony that Dr. Martinez removed
19 your tampon?
20    A. Yes.
21    Q. Not you?
22    A. Not me.
23    Q. Is it -- did you remove your clothes and change to
24 a gown?
25    A. Yes.

Page 174

1  Q. Did you remove your own panties?
2  A. No. He did.
3  Q. Dr. Martinez removed your panties?
4  A. Yes.
5  Q. And your memory is that there were stirrups, the
6  metal brackets that hold the legs in place --
7  A. Yes.
8  Q. -- in this examining room; is that correct?
9  A. Yes.
10 Q. Is there any memory you have of any conversation
11 you want to tell me about involving Holy Cross health care
12 providers that we haven't discussed today?
13 A. I signed a paper for x-rays and that paper never
14 showed up.
15 Q. So okay, and I'll get to that.
16    My question is this. Do you have any memory of
17 any conversations with any health care providers at Holy
18 Cross on October 18, 2014, that you haven't told us about?
19 A. No.
20 Q. Now you want to let me know that there is a paper
21 that you haven't seen yet that you signed?
22 A. For x-rays.
23 Q. Can you describe it to me, what it said?
24 A. It just said x-rays on top. I remember it just
25 said clearly x-rays.

Page 175

1  Q. All right. And so what you're telling me is you
2  absolutely did consent to an x-ray?
3  A. To an x-ray.
4  Q. And you were willing to undergo radiation; fair?
5  A. X-ray.
6  Q. One other question we had about your church. Is
7  that on the Nogales side or Mexico side?
8  A. Nogales.
9  Q. What service do you typically attend?
10 A. Sundays, Thursday sometimes.
11 Q. I know. What time? Sometimes they have more than
12 one.
13 A. Thursdays they have it like around 5:00 to like
14 9:00. And then Sundays it's early in the morning, like
15 around 10:00 to 1:00.
16 Q. That's all I have. Thank you for your time.
17 A. Thank you.
18
19         EXAMINATION
20 BY MR. MARCHETTI:
21 Q. Okay, Ashley. I'm going to ask you some
22 questions, and then the attorneys might get to ask you some
23 follow-ups as well.
24 A. All right.
25 Q. All right?

Page 176

1     When you were at the border on October 18th, 2014,
2  after you were first stopped by the agent you described were
3  you scared?
4  A. Yes.
5  Q. And were you nervous?
6  A. Yes.
7  Q. When they brought you to the hospital, were you
8  scared?
9  A. Yes.
10 Q. And nervous?
11 A. Of course.
12 Q. Were you scared while you were sitting at the
13 hospital?
14 A. Yes, I was.
15 Q. Were you nervous while you were sitting in the
16 room?
17 A. Yes.
18 Q. Okay. Are you scared and nervous sitting here
19 today?
20 A. Yes, I am.
21 Q. Okay. You testified earlier that you -- there was
22 some questions about what you know or what you heard the
23 CBP agents discuss with Dr. Martinez.
24    Were you in constant contact with Dr. Martinez
25 from the moment you walked in the emergency room to the

Page 177

1  moment you left?
2  A. No, I was not.
3  Q. So you don't actually know who he spoke to?
4  A. No.
5     MS. DONOVAN: Form.
6  Q. Did you go to Holy Cross Hospital for medical
7  treatment or to have them search you for drugs?
8     MS. MacBAN: Form and foundation.
9     MS. DONOVAN: Form and foundation.
10    MS. KROEGER: Join.
11    THE WITNESS: Have them search me for drugs.
12 Q. Okay. So you were not there for treatment?
13 A. No, I was not.
14    MS. DONOVAN: Form.
15    MS. MacBAN: Foundation.
16    MS. DONOVAN: Brian, can we have one objection for
17 all?
18    MS. MacBAN: Yeah.
19    MS. DONOVAN: We're driving our court reporter
20 crazy.
21    MR. MARCHETTI: Yeah, that's fine.
22 Q. Do you believe Dr. Martinez touched you for your
23 benefit or to find out whether you had drugs in your body?
24 A. Whether I had drugs in my body.
25    MS. DONOVAN: Form and foundation.

**EXHIBIT 2**

STATE OF ALASKA )
) ss: AFFIDAVIT
MUNICIPALITY OF ANCHORAGE)

I, Patrick F. Martinez, M.D., declare and state under oath that the following facts are true and correct based upon my personal knowledge.

1. I am over the age of 18 years and am otherwise competent.
2. I have been licensed by the Arizona Medical Board as a physician since January 7, 1994.
3. In October of 2014, I was working as an independent contractor with Quantum Plus, Inc. d/b/a Team Health West as a family medicine physician to provide medical services in emergency departments.
4. Quantum Plus had a contract with Holy Cross Hospital to provide physicians to work in the Holy Cross Hospital emergency department.
5. On October 14, 2014, I performed a medical examination of Ashley Cervantes in the emergency department of Holy Cross Hospital in Tucson, Arizona.
6. Ashley Cervantes was brought to the emergency department at Holy Cross Hospital by agents of U.S. Custom and Border Protection agents for medical clearance due to their suspicion that Ashley Cervantes was attempting to transport drugs into the United States.
7. I met with and talked to Ashley Cervantes in an examination room. We discussed that she had been brought in to the emergency department for medical clearance based upon the agents' suspicion that she was attempting to transport drugs into the United States and that they suspected she was carrying the drugs inside her body.
8. Ashley Cervantes told me that she was not using drugs or carrying drugs and that she was on her period and that she had placed a tampon earlier. I discussed with Ashley Cervantes that I could perform a vaginal and rectal examination to confirm this.

9. Ashley Cervantes verbally agreed to the vaginal and rectal examination.

10. I acted as a reasonable and prudent physician when I performed the vaginal and rectal examination with a female chaperone to assess whether she had concealed any drugs within her vagina or rectum.

11. I did not find any evidence that Ashely Cervantes had concealed any drugs within these areas, and I noted that she was clear to be discharged.

12. I prepared an Emergency Provider Record to document my examination and assessment of Ashley Cervantes. A true and accurate copy of the Emergency Provider Record is attached as an exhibit to this Affidavit.

13. I was not employed by U.S. Customs and Border Patrol at the time of the examination, and I did not act for or on behalf of that agency.

14. I relied upon my education, training, and expertise as a physician to identify a reasonable and safe manner to examine Ashley Cervantes to determine whether she had concealed any drugs within her body.

FURTHER AFFIANT SAYETH NAUGHT.

Executed this __19__ day of February, 2018.

_____
Patrick Martinez, M.D.

On this __19__ day of February, 2018, before me, undersigned notary public, personally appeared Patrick Martinez, M.D., known to me to be the person whose name is subscribed to this Affidavit and acknowledged that he executed the same for the purposes therein stated.

_____

My Commission Expires: 01/27/2020

KATE SPANN
Notary Public, State of Alaska
My Commission Expires
January 27, 2020