1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

LAW OFFICES
BROENING OBERG WOODS & WILSON
PROFESSIONAL CORPORATION
POST OFFICE BOX 20527
PHOENIX, ARIZONA 85036
(602) 271-7700

Michelle L. Donovan (027958)
Cody M. Hall (013245)
Minute Entries/Orders to: cjg@bowwlaw.com

Attorneys for Defendant Martinez

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| ASHLEY CERVANTES, a single woman, | NO. 4:16-CV-00334-CKJ |
| Plaintiff, | |
| vs. | **DEFENDANT PATRICK F. MARTINEZ'S STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION AGENT SHALEKA LEGGETT and "JOHN DOE" LEGGETT; UNKNOWN UNITED STATES CUSTOMS AND BORDER PROTECTION AGENTS; HOLY CROSS HOSPITAL, INC.; ASCENSION ARIZONA, INC.; PATRICK F. MARTINEZ AND "JANE DOE" MARTINEZ; JOHN DOES 1-5; JANE DOES 1-5; XYZ CORPORATIONS 1-5; ABC PARTNERSHIPS 1-5, | *(Assigned to the Honorable Cindy Jorgenson)*<br><br>**(Oral Argument Requested)** |
| Defendants. | |

Defendant Patrick F. Martinez, M.D. ("Dr. Martinez"), through his counsel, submits his Statement of Facts in support his Motion for Summary Judgment, which was previously filed. This separate Statement of Facts is submitted pursuant to LRCiv 56.1 for the District Court of Arizona.

**Statement of Facts**

1.     Plaintiff was stopped by an agent of U.S. Customs and Border Patrol when she re-entered the United State from Nogales, Sonora, Mexico on October 18, 2014. (Deposition of Plaintiff, Exhibit 1, pp. 21:20-25:13)

2.     The CBP agent accused the plaintiff of possessing illegal drugs. Another CPB agent took the plaintiff to Holy Cross Hospital where the plaintiff agreed to an x-ray to check for the presence of drugs. (Exhibit 1, pp. 39:2-42:18; pp. 174:10-175:5)

3.     The plaintiff did not undergo an x-ray. Dr. Martinez instead performed a vaginal and rectal exam. (Affidavit of Dr. Martinez, Exhibit 2)

4.     The plaintiff testified that she never consented to the vaginal and rectal examination whereas Dr. Martinez has affirmed that the plaintiff agreed to the examination. (Exhibit 1, pp. 172:24-173:10; Affidavit of Dr. Martinez, Exhibit 2)

5.     Dr. Martinez is a licensed healthcare provider who examined the plaintiff in the emergency department of Holy Cross Hospital. (Exhibit 2)

6.     Dr. Martinez was a private physician working at a private hospital. He was not employed by Border Patrol, and he was not acting on behalf of Border Patrol. (Exhibit 2)

7.     Plaintiff's alleged in First Amended Complaint that Dr. Martinez was "a medical doctor employed by Holy Cross and/or TeamHealth and who, at all times material, practiced medicine at Holy Cross." (Plaintiff's First Amended Complaint ¶ 8)

RESPECTFULLY SUBMITTED this 20th day of February, 2018.

BROENING OBERG WOODS & WILSON, P.C.

By   _____
Michelle L. Donovan
Cody M. Hall
Post Office Box 20527
Phoenix, Arizona  85036
*Attorneys for Defendant Martinez*

2

1

2 **CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

3    I hereby certify that on February 20ᵗʰ 2018, I electronically transmitted the attached

4 document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

5 Notice of Electronic Filing to the CM/ECF registrants:

6 Matthew D. Davidson
**LAW OFFICES OF MATTHEW C. DAVIDSON, LTD.**
7 1859 N. Grand Avenue, Suite 1
Nogales, AZ 85621
8 *Attorneys for Plaintiff*

9
Brian Marchetti
10 **MARCHETTI LAW, P.L.L.C.**
290 N. Meyer Avenue
11 Tucson, AZ 85701
*Attorneys for Plaintiff*
12
Laura V. Mac Ban
13 Michael L. Linton
**MAC BAN LAW OFFICES**
14 Skyline Esplanade
1795 E. Skyline Drive, Suite 155
15 Tucson, AZ 85718
*Attorneys for Defendants Holly Cross*
16 *Hospital, Inc. and Ascension Arizona, Inc.*

17 Carolyn Armer Holden
18 Michael J. Ryan
**HOLDEN AND ARMER, PC**
19 4505 East Chandler Blvd., Suite 210
Phoenix, Arizona 85048
20 (480) 656-0460
*Attorneys for Defendants Quantum Plus, Inc. dba*
21 *Teamhealth West*

22

23

24 By _____

25

26

3

**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

ASHLEY CERVANTES, a single woman,  )
                                   )
                Plaintiff,         )
                                   )
         vs.                       )     NO. 4:16-CV-00334-CKJ
                                   )
UNITED STATES OF AMERICA; UNITED   )
STATES CUSTOMS AND BORDER          )
PROTECTION AGENT SHALEKA LEGGETT   )
AND "JOHN DOE" LEGGETT; UNKNOWN    )
UNITED STATES CUSTOMS AND BORDER   )
PROTECTION AGENTS; HOLY CROSS      )
HOSPITAL, INC.; ASCENSION ARIZONA, )
INC.; PATRICK F. MARTINEZ AND "JANE)
DOE" MARTINEZ; JOHN DOES 1-5; JANE )
DOES 1-5; XYZ CORPORATIONS 1-5; ABC)
PARTNERSHIPS 1-5,                  )
                                   )
                Defendants.        )
_____)


VIDEOTAPED DEPOSITION OF ASHLEY CERVANTES

Tucson, Arizona

April 27, 2017


RAYNBO COURT REPORTING, LTD.

3625 West Gailey Drive
Tucson, Arizona   85741
520/744-2293

Reported by:  Raynbo Silva, RPR, CR
              Certified Reporter No. 50014

2  (Pages 2-5)

ASHLEY CERVANTES
4/27/2017

2

1  DEPOSITION OF ASHLEY CERVANTES
2  Tucson, Arizona
3  April 27, 2017
4
5                    INDEX
6                              Page
7  Cross-Examination by Ms. Donovan:        6
8  Cross-Examination by Ms. Kroeger:       92
9  Cross-Examination by Ms. Holden:       131
10  Cross-Examination by Ms. MacBan:      151
11  Examination by Mr. Marchetti:     175
12  Recross-Examination by Ms. Donovan:    181
13  Recross-Examination by Ms. Holden:     191
14  Further Recross-Examination by Ms. Donovan:  191
15  Recross-Examination by Ms. Kroeger:    193
16                    * * * *
17
18
19                  EXHIBITS
20  Number   Description              Page
21    1    Defendant Quantum Plus, LLC's First
          Supplemental Rule 26(a)(1) Disclosure
22        Statement:              165
23                    * * * *
24
25

3

1  APPEARANCES:
2  BROENING, OBERG, WOODS & WILSON
   By MICHELLE L. DONOVAN, Attorney at Law
3  Post Office Box 20527
   Phoenix, Arizona  85036
4  Attorneys for Defendant Martinez
5  OFFICE OF THE UNITED STATES ATTORNEY
   By MELISSA M. KROEGER, Attorney at Law
6  405 West Congress Street, Suite 4800
   Tucson, Arizona  85701-5040
7  Attorneys for Defendant United States of America
    and Shamekia Leggett
8
   MacBAN LAW OFFICES
9  By LAURA V. MacBAN, Attorney at Law
    and MICHAEL L. LINTON, Attorney at Law
10  Skyline Esplanade
    1795 East Skyline Drive, Suite 155
11  Tucson, Arizona  85718
    Attorneys for Defendants Holy Cross Hospital, Inc.
12   and Ascension Arizona, Inc.
13  HOLDEN & ARMER, PC
    By CAROLYN ARMER HOLDEN, Attorney at Law
14  4505 East Chandler Boulevard, Suite 210
    Phoenix, Arizona  85048
15  Attorneys for Defendants Quantum Plus, LLC
     dba TeamHealth West
16
   MARCHETTI LAW, PLLC
17  By BRIAN MARCHETTI, Attorney at Law
    177 North Church Avenue
18  Tucson, Arizona  85701
    Attorney for Plaintiff
19
    ALSO PRESENT: DAVID BOYAN, Videographer
20         CASSIDY JAMES, CBP Chief Counsel
21                    * * * *
22
23
24
25

4

1     BE IT REMEMBERED that pursuant to notice the
2  videotaped deposition of ASHLEY CERVANTES was taken at the
3  UNITED STATES ATTORNEY'S OFFICE, Assistant U.S. Attorneys,
4  405 West Congress Street, Suite 4800, in the City of Tucson,
5  County of Pima, State of Arizona, before Raynbo Silva, RPR,
6  CR, Certified Reporter No. 50014, in and for the County of
7  Pima, State of Arizona, on the 27th day of April, 2017,
8  commencing at the hour of 10:00 A.M. on said day on behalf
9  of the Defendants in a certain cause now pending in the
10  United Sates District Court, District of Arizona.
11
12
13                    * * * *
14
15
16     THE VIDEOGRAPHER: Going on record at 10:04. The
17  date is April 27th, 2017.
18     We are at 405 West Congress Street, Suite 4800, in
19  Tucson, Arizona, for the deposition of Ashley Cervantes.
20     Case name is Cervantes versus United States,
21  et al., in the United States District Court, District of
22  Arizona, Case Number 4:16-CV-00334-CKJ.
23     My name is David Boyan.  The name of my company is
24  Graphics for Litigators.
25     Raynbo Silva is the court reporter of Raynbo Court

5

1  Reporting.
2     Will counsel please introduce themselves?
3     MR. MARCHETTI:  Brian Marchetti on behalf of
4  plaintiff.
5     MS. DONOVAN:  Michelle Donovan on behalf of
6  Dr. Martinez.
7     MS. HOLDEN:  Carolyn Holden on behalf of Quantum
8  Plus.
9     MS. KROEGER:  Melissa Kroeger on behalf of the
10  United States and Officer Leggett.
11     MR. LINTON:  Mike Linton on behalf of Holy Cross
12  Hospital.
13     MS. MacBAN:  Laura MacBan on behalf of Holy Cross
14  Hospital.
15
16
17
18          ASHLEY CERVANTES,
19  having been called as an adverse party on cross-examination,
20  having been first duly sworn to state the truth, the whole
21  truth and nothing but the truth, testified on her oath as
22  follows:
23  . . . .
24  . . . .
25  . . . .

RAYNBO COURT REPORTING, LTD.

ASHLEY CERVANTES
4/27/2017

18

1  once you're there?
2     A.  No.  Taxi.
3     Q.  Taxi.  So who drives you to the border to go to
4  your orthodontist appointments?
5     A.  My mother does.
6     Q.  So she drives you to the border.  You cross;
7  correct?
8     A.  Yeah.
9     Q.  You walk over, and then you pick up a taxi on the
10  other side?
11    A.  Yeah.
12    Q.  And you tell the taxi to take you to this town?
13    A.  Yeah.
14    Q.  Once you get to this town do you tell the taxi
15  where to go or do you just say drop me here, I'll walk?
16    A.  No.  The taxi knows where he's going to get.
17  After that I just have to walk five minutes to go into the
18  orthodontist.
19    Q.  When's your next appointment?
20    A.  I have to go in on the 17th.
21    Q.  This month?  Of May?
22    A.  May.
23    Q.  I'm going to submit a request to your attorney to
24  when you go to that appointment to get the address for us.
25  Okay?

19

1     A.  Alrighty.
2     Q.  Are you willing to do that?
3     A.  Yes.
4     Q.  Thank you.
5        What other health care providers do you see?
6     A.  That's it.
7     Q.  Do you have a primary care physician?
8     A.  No.
9     Q.  Do you know what a primary care physician is?
10    A.  No.
11    Q.  Do you have a doctor that you go to for yearly
12  checkups?
13    A.  Checkups, no, I do not.
14    Q.  Do you have any doctor that you go to on a yearly
15  basis for any sort of examination?
16    A.  I used to have Dr. Green.  She's a woman.
17    Q.  And what kind of doctor is Dr. Green?
18    A.  She's a physical, like when you get your checkups,
19  like what you said.
20    Q.  Do you know Dr. Green's first name?
21    A.  No.  And I also know Dr. Bluck.
22    Q.  B-L-U-C-K?
23    A.  Uh-huh.
24    Q.  What kind of doctor is Dr. Bluck?
25    A.  The same.

20

1     Q.  And where is, let's start with Dr. Green, where is
2  Dr. Green located?
3     A.  I have no idea.  She used to work in Mariposa.
4  She doesn't work there anymore.
5     Q.  So she used to work at Mariposa Health Center?
6     A.  Uh-huh.
7     Q.  Yes?
8     A.  Yes.
9     Q.  What about Dr. Bluck?
10    A.  Same.
11    Q.  Do you know Dr. Bluck's first name?
12    A.  No, I do not.
13    Q.  And so you would go there every year?
14    A.  Yes.
15    Q.  What other doctors do you treat with?
16    A.  None.
17    Q.  Do you go see an OB-GYN?
18    A.  No.
19    Q.  Have you ever?
20    A.  No.
21    Q.  Are you sexually active?
22    A.  Yes.
23    Q.  Since when?
24    A.  Two months ago.
25    Q.  That's the first time you became sexually active?

21

1     A.  No.
2     Q.  When was the first time you became sexually
3  active?
4     A.  When I was 16.
5     Q.  And have you remained sexually active since 16?
6     A.  No.
7     Q.  Have there been periods where you have a boyfriend
8  and are and periods when you don't have a boyfriend and
9  you're not?
10    A.  Yes.
11    Q.  At the time of the events at issue in this case
12  did you have a boyfriend?
13    A.  No, I did not.
14    Q.  Do you know why the records suggest that you
15  crossed the border with a boyfriend?
16    A.  No, I did not.  That isn't correct.  That's not
17  accurate.
18    Q.  Do you have any understanding of any -- strike
19  that.
20       At the time that you were seeking to come back
21  into the United States on October 18th, 2014, were you by
22  yourself or were you with a small group or with anybody
23  else?
24    A.  I crossed by myself.  I crossed with my friend,
25  and my friend crossed first and I did.  Then I crossed.  So

RAYNBO  COURT  REPORTING,  LTD.

ASHLEY CERVANTES
4/27/2017

---

22

1  basically I crossed by myself.
2      Q.   Who's your friend?
3      A.   Orlando Rosas.
4          MS. MacBAN:  Orlando --
5      Q.   I'm sorry?  What's the last name?
6          MS. MacBAN:  What was it?  Orlando?
7          THE WITNESS:  Rosas.
8      Q.   Rosas.
9          MS. MacBAN:  Thank you.
10     Q.   R-O-S-A-S or E-S?
11     A.   S-A.  Rosas.
12     Q.   Okay.  And do you think it's possible that they
13  had been referring to Orlando as your boyfriend?
14     A.   Most likely.
15     Q.   Okay.  Where does Orlando live?
16     A.   I have no idea.
17     Q.   Are you no longer friends?
18     A.   No.
19     Q.   Did he move?
20     A.   He got married.  He moved.
21     Q.   And how did you know Orlando?
22     A.   I met him at a party.
23     Q.   Do you have an estimate on the year?
24     A.   I do not.
25     Q.   Do you have an estimate of how long you knew him

---

23

1  before you and he crossed the border?
2      A.   I don't know.
3      Q.   And I keep using the phrase cross the border, and
4  when I use that phrase I'm referring to reentering the
5  United States or going into Mexico from the Port of Entry at
6  Nogales.  Okay?
7      A.   Okay.
8      Q.   On that topic have you ever crossed into Mexico at
9  any other border crossings?
10     A.   No, I do not.
11     Q.   How old is Orlando?
12     A.   I have no idea.
13     Q.   Do you have any guess as to whether he's your age?
14  A lot older?  Younger?
15     A.   He's older.
16     Q.   And what were you and he doing in Mexico on
17  October 18th, 2014?
18     A.   We crossed to get breakfast.
19     Q.   And around what time was that?
20     A.   Around 9:00.
21     Q.   9:00 A.M.?
22     A.   (No audible response.)
23     Q.   So you went into Mexico around 9:00 A.M. to get
24  breakfast?
25     A.   (No audible response.)

---

24

1      Q.   Where were you getting breakfast?
2      A.   At a seafood local little stand.
3      Q.   Is it a stand that's consistently there?
4      A.   Yes.
5      Q.   Where is it?
6      A.   It's when you cross five minutes towards the left
7  you just walk and there's a big sign that says seafood right
8  there.
9      Q.   And how often did you go there?
10     A.   Three times.  Not that many.
11     Q.   Three times within what sort of window of time?
12  Three times within a month?  Year?
13     A.   Before, yeah.  Like a year before I went once, and
14  then I went again like twice the second year when the
15  incident happened.
16     Q.   So you -- those three occasions that you went to
17  this seafood stand would it be fair that there were a couple
18  months of a gap in between each visit?
19     A.   Yes.
20     Q.   And how long did you and Orlando stay at the stand
21  for breakfast?
22     A.   About half an hour.
23     Q.   And what did you do next?
24     A.   I crossed back.  I waited in line for two hours or
25  almost two hours --

---

25

1      Q.   Okay.  So --
2      A.   -- to cross back into the U.S.
3      Q.   If you left at about 9:00 A.M., had breakfast for
4  about a half an hour, that gets us to about 9:30, and
5  waiting in line for about two hours gets us to about 11:30
6  or 12:00.  Does that sound about right to you?
7      A.   About right.
8      Q.   Do you have any explanation as to if that's the
9  case why the records reflect that you didn't attempt to
10  cross until 5 o'clock that evening?
11     A.   I did not cross at 5 o'clock that evening.  At
12  5 o'clock that evening they had me inside, handcuffed inside
13  a jail cell accusing me of smuggling drugs inside.
14     Q.   Okay.  Let's unpack that a little bit.
15         So it's your testimony that you got to the front
16  of the line in effect at approximately 11:30 or noon;
17  correct?
18     A.   It was earlier than that.
19     Q.   It was earlier than that?
20     A.   Yes.
21     Q.   So we're talking maybe closer to 11 o'clock?
22     A.   Yeah.  Closer to 11:00.
23     Q.   Okay.  I'm not going to ask you questions about
24  your interactions there.  I'm going to leave that to the
25  U.S. attorney.  But I am going to ask you just a couple of

---

ASHLEY CERVANTES
4/27/2017

|  | 38 |
|---|---|
| 1 | recent time that you went to Mexico? |
| 2 | A.  It was March something I went to get my nails |
| 3 | done. |
| 4 | Q.  So when you go get your braces done in Mexico is |
| 5 | that typically during the week during business hours? |
| 6 | A.  Yes. |
| 7 | Q.  Is it ever on a Saturday? |
| 8 | A.  Not really.  It's really rare if it's on a |
| 9 | Saturday because I didn't -- I couldn't get an appointment |
| 10 | earlier. |
| 11 | Q.  And when you get your nails done, is it during |
| 12 | business hours? |
| 13 | A.  Yes.  It could be Saturday, Sunday. |
| 14 | Q.  Sure.  But it's at least during business hours? |
| 15 | It's not -- |
| 16 | A.  Yes. |
| 17 | Q.  -- at 10 o'clock at night? |
| 18 | A.  No.  The latest is 9 o'clock they close. |
| 19 | Q.  So how often do you go to Mexico in the last |
| 20 | several months to party? |
| 21 | A.  To party not often.  Getting my braces checked |
| 22 | twice a month. |
| 23 | Q.  So if records do exist of how many times you've |
| 24 | crossed back into the United States from Mexico, there |
| 25 | should only be about two or three a month? |

|  | 39 |
|---|---|
| 1 | A.  Two or three. |
| 2 | Q.  I'm not going to ask you specifics about your |
| 3 | interactions with Border Patrol, so I want you to fast |
| 4 | forward to the time you arrived at the hospital.  Okay? |
| 5 | A.  It was around 7 o'clock. |
| 6 | Q.  If I tell you that the records reflect it was |
| 7 | 5 o'clock, are you going to agree with the records? |
| 8 | A.  I'm not going to agree with the records.  That's |
| 9 | not accurate. |
| 10 | Q.  Okay.  Even the medical records? |
| 11 | A.  Even the medical records. |
| 12 | Q.  Does it change your opinion at all if I said the |
| 13 | medical records actually say 1700? |
| 14 | A.  No.  I remember that it was around 7 o'clock, |
| 15 | 6:00.  It was late. |
| 16 | Q.  So when you got there, what was the first thing |
| 17 | that happened? |
| 18 | A.  They got me off in handcuffs.  I got down.  They |
| 19 | filled out some papers, and they took me to a room. |
| 20 | Q.  Okay.  Let's break that down. |
| 21 | I assume you were driven to the hospital; correct? |
| 22 | A.  Yeah.  By the Customs. |
| 23 | Q.  And when you got to the hospital, you got out of |
| 24 | the car and walked in? |
| 25 | A.  Yes. |

|  | 40 |
|---|---|
| 1 | Q.  Did you walk up to an admission window with the |
| 2 | Border Patrol? |
| 3 | A.  Yes. |
| 4 | Q.  Did you do the talking? |
| 5 | A.  No. |
| 6 | Q.  So -- |
| 7 | A.  I couldn't even speak. |
| 8 | Q.  You were told you're not allowed to speak? |
| 9 | A.  Uh-huh, not right there because they were |
| 10 | speaking. |
| 11 | Q.  Who told you you're not allowed to speak? |
| 12 | A.  Leggett.  She was an African-American woman. |
| 13 | Q.  Okay.  What did you have -- did you overhear any |
| 14 | discussion with the person at the admissions window? |
| 15 | A.  No.  They just said that they were sure that I had |
| 16 | a substance inside me and they were going to take them out |
| 17 | and that they needed some permission or something.  And they |
| 18 | were just filling paper out.  I don't know what they were |
| 19 | filling.  They didn't let me see.  I was handcuffed in the |
| 20 | chair waiting for them. |
| 21 | Q.  So instead of actually walking up to the window |
| 22 | with them -- |
| 23 | A.  I -- |
| 24 | Q.  -- they told you to sit in a chair? |
| 25 | A.  I walked up to the window after they gave them |

|  | 41 |
|---|---|
| 1 | some papers and put me back in the chair. |
| 2 | Q.  And you say you were handcuffed? |
| 3 | A.  Yes. |
| 4 | Q.  Were your hands in front or behind you? |
| 5 | A.  Behind me. |
| 6 | Q.  Do you -- did you sign any of the forms that were |
| 7 | presented to you? |
| 8 | A.  I signed one form for x-rays. |
| 9 | Q.  I'm going to hand you what's marked as Holy Cross |
| 10 | Hospital page 56. |
| 11 | Is that your signature where it says patient's |
| 12 | signature? |
| 13 | A.  If you just give me a second to read this. |
| 14 | Q.  Sure. |
| 15 | A.  That's my signature, but I did not fill this out |
| 16 | (indicating). |
| 17 | Q.  This is Holy Cross page 57.  There are two places |
| 18 | for patient's signature.  Will you verify that those are |
| 19 | your signatures? |
| 20 | A.  Yes, these both are my signatures. |
| 21 | Q.  Thank you. |
| 22 | MS. KROEGER:  What page is that? |
| 23 | MS. DONOVAN:  57. |
| 24 | MS. KROEGER:  The first one was 50 -- what was the |
| 25 | first one? |

ASHLEY CERVANTES
4/27/2017

---

**42**

1       MS. DONOVAN: 56.
2       Q.   And on page 58 are those also your signatures?
3       A.   This looks like my signature.  This does not look
4    like my signature.
5       Q.   The one on the left, does it look like a signature
6    that was crossed out that was maybe put in the wrong spot?
7       A.   I do not know.  That's not my signature.  You can
8    see the difference.
9       Q.   Did you read those forms?
10      A.   Yeah.  Can I read them again?
11      Q.   Did you, did you read them before you signed them?
12      A.   No.  They just made me sign them.
13      Q.   Did you ask to read them first?
14      A.   Yeah.  And they just said they were for x-rays.
15      Q.   So you asked to read them, they said it was just
16   for x-rays, and you were satisfied and signed?
17      A.   Yes.  I thought it was just x-rays and I thought I
18   was going to get out of there.  I was devastated.
19      Q.   So after you signed these forms what happened
20   next?
21      A.   They put me in a room.  After that they -- I was
22   handcuffed.  They told me they were just going to let one
23   hand go so I can put a pajama, I think they give you a
24   pajama to change into.
25           After that they sat me down.  They opened up my

---

**43**

1    legs, took my tampon on and proceeded to do an exam that was
2    extremely painful.  And I never consented on none of that.
3       Q.   Okay.  So let's unpack that.
4            So you went to an exam room.  Was the doctor
5    already there when you got to the room?  Or did the doctor
6    come in after you were already in the room?
7       A.   He come -- he came in after I was in the room.  I
8    changed into my pajamas, the one they gave me.
9            The two officers were still in there.  It was an
10   African-American woman and a Latina.
11      Q.   Let's unpack that again.
12           So you were brought to the room.  Did you have
13   that conversation about they were going to uncuff one of
14   your hands before or after the doctor came in?
15      A.   No.  That was before the doctor came in.
16      Q.   Was anybody from the hospital in the room when you
17   got to the room?
18      A.   There was a girl nurse.
19      Q.   A female nurse?
20      A.   A female nurse.
21      Q.   Do you remember what she looked like?
22      A.   I only remember she had really, really puffy,
23   curly hair.
24      Q.   Was she white?
25      A.   She was white.

---

**44**

1       Q.   Latina?
2       A.   Latina.
3       Q.   Latina?
4            Did you have any conversation with her?
5       A.   No, I did not.
6       Q.   Is she the one who gave you the hospital gown?
7       A.   Yes.
8       Q.   Did she just hand it to you --
9       A.   She just handed it.
10      Q.   -- or did she say anything to you while she handed
11   it to you?
12      A.   She just handed it to me.
13      Q.   Did she tell you, give you instructions on how to
14   wear it?
15      A.   Yeah.  She just said that it had to be like this
16   (indicating) and that I had to take all my clothes off.
17      Q.   What do you mean like this?
18      A.   Well, there was this one strap that they have, and
19   she told me that I had to put the strap right here and that
20   was going to be it.
21      Q.   Okay.  And it's your testimony that you were
22   required to take off all of your clothes?
23      A.   All of my clothes.  And the two officers were
24   still in there while I was taking my clothes off.
25      Q.   And was the nurse still in there when that

---

**45**

1    occurred?
2       A.   Yes.  The three of them were in there.
3       Q.   And what were they doing?
4       A.   Just staring at me.
5       Q.   Were you on the table?  Were you on --
6       A.   I was --
7       Q.   -- standing on the floor?
8       A.   -- standing up next to the little bed.
9       Q.   Okay.  So you told us about uncuffing one of your
10   hands.  Was the other hand still cuffed and attached to the
11   bed?  Or --
12      A.   It was cuffed.  It was just the little cuff.
13      Q.   So the cuff was on, but you weren't actually
14   tethered --
15      A.   No.
16      Q.   -- to the bed or anything like that?
17      A.   Yeah.
18      Q.   That's correct?
19      A.   Yes.
20      Q.   Now at some point Dr. Martinez came in; correct?
21      A.   Yes.
22      Q.   What did he look like?
23      A.   He was tall.  He had black hair.
24           That's all I can remember.  I didn't really see
25   his face.

---

ASHLEY CERVANTES
4/27/2017

---

**170**

1  records show that you're coming in at 2:00 or 3:00 or 4:00
2  or 5:00 in the morning, when do you sleep?
3      **A.  When I get home.**
4      Q.  So you're a day sleeper?
5      **A.  No.**
6      Q.  When do you sleep?
7      **A.  I sleep when I get home and rest.**
8      Q.  I'm just going to go through my notes.  I should
9  be very close to done.
10     When you were at Holy Cross on October 18, 2014,
11 brought in by Border Protection I believe you testified
12 earlier about the registration process, that you were put in
13 a chair and it was the Border Protection handling the
14 paperwork?
15     **A.  Yes.**
16     Q.  And that person at registration was male or female
17 to your memory?
18     **A.  It was a female.**
19     Q.  What did she look like?
20     **A.  I do not remember.  I just remember it was a**
21 **female.**
22     Q.  Next person that's taking -- we had a discussion
23 about your vital signs.  Remember that?  Vital signs are
24 your blood pressure, your heart rate, temperature, that type
25 of thing.  Was that taken by a male or female?

---

**171**

1      **A.  I believe it was a male.**
2      Q.  Do you -- can you describe the male?
3      **A.  No.**
4      Q.  Do you have any names?
5      **A.  He was just a little fat with a little beard.**
6  **That's all I remember.**
7      Q.  Okay.  Do you remember any conversations you had
8  with him?
9      **A.  No.  Other than what I had taken for my allergies**
10 **and stuff, I've had any infections or diseases or stuff like**
11 **that.**
12     Q.  If he testifies in this case that his memory, he
13 does remember you, his memory is that you shared with him
14 that you were a marijuana user, would you dispute that?
15     **A.  Yes.**
16     Q.  So if he remembers having that conversation with
17 you, you're saying that is false, that he's not telling the
18 truth?
19     **A.  Yes.**
20     Q.  The person who was chaperoning, we call it
21 chaperoning when a pelvic exam is going to be done, you
22 have a female come in to observe, the person chaperoning
23 from Holy Cross, can you describe that person?
24     **A.  The female?  She had curly hair, like really**
25 **puffy, curly hair.  She was not that skinny, not that fat.**

---

**172**

1      **She was white, really white.**
2      Q.  Have an age bracket?
3      **A.  Late 20s, early 30s.**
4      Q.  Anything else you remember about her?  What she
5  was wearing?
6      **A.  No.**
7      Q.  Any conversations you had with her?
8      **A.  No.  No conversations.**
9      Q.  If -- she also remembers you.  If she testifies
10 that while on the gurney with Dr. Martinez there you made
11 the comment that I must have been stopped because I smell
12 like marijuana and that alerted the dogs, something to that
13 effect, the acknowledging that you probably smelled like
14 marijuana?
15     **A.  It is ludicrous to smell.  It's false.**
16     Q.  Patently false?
17     **A.  (No audible response.)**
18     Q.  Yes?
19     **A.  Yes.**
20     Q.  If a health care provider overheard you say that
21 you had smoked on the Mexico side of the border marijuana,
22 is that also patently false?
23     **A.  That's false.**
24     Q.  And I assume that you're going to say it's
25 patently false if the health care providers observed and

---

**173**

1  listened to you consent verbally to the pelvic and rectal
2  exam?
3      **A.  That is false.**
4      Q.  And it's also false that Dr. Martinez never
5  explained to you what he was going to do or how he was going
6  to do it?
7      MR. MARCHETTI:  Objection, form and foundation.
8      Q.  That's your testimony, that he, that he did not
9  explain to you what he intended to do and how?
10     **A.  That's false.  He did not explain it.**
11     Q.  And your memory is that you were on the gurney and
12 stirrups approximately 15 to 20 minutes while he did this
13 exam; correct?
14     **A.  Yes.  Correct.**
15     Q.  And you never once said no, you don't have my
16 permission to do this; correct?
17     **A.  Correct.**
18     Q.  Is it your testimony that Dr. Martinez removed
19 your tampon?
20     **A.  Yes.**
21     Q.  Not you?
22     **A.  Not me.**
23     Q.  Is it -- did you remove your clothes and change to
24 a gown?
25     **A.  Yes.**

---

ASHLEY CERVANTES
4/27/2017

---

174

1    Q.  Did you remove your own panties?
2    A.  No.  He did.
3    Q.  Dr. Martinez removed your panties?
4    A.  Yes.
5    Q.  And your memory is that there were stirrups, the
6    metal brackets that hold the legs in place --
7    A.  Yes.
8    Q.  -- in this examining room; is that correct?
9    A.  Yes.
10   Q.  Is there any memory you have of any conversation
11   you want to tell me about involving Holy Cross health care
12   providers that we haven't discussed today?
13   A.  I signed a paper for x-rays and that paper never
14   showed up.
15   Q.  So okay, and I'll get to that.
16       My question is this.  Do you have any memory of
17   any conversations with any health care providers at Holy
18   Cross on October 18, 2014, that you haven't told us about?
19   A.  No.
20   Q.  Now you want to let me know that there is a paper
21   that you haven't seen yet that you signed?
22   A.  For x-rays.
23   Q.  Can you describe it to me, what it said?
24   A.  It just said x-rays on top.  I remember it just
25   said clearly x-rays.

---

175

1    Q.  All right.  And so what you're telling me is you
2    absolutely did consent to an x-ray?
3    A.  To an x-ray.
4    Q.  And you were willing to undergo radiation; fair?
5    A.  X-ray.
6    Q.  One other question we had about your church.  Is
7    that on the Nogales side or Mexico side?
8    A.  Nogales.
9    Q.  What service do you typically attend?
10   A.  Sundays, Thursday sometimes.
11   Q.  I know.  What time?  Sometimes they have more than
12   one.
13   A.  Thursdays they have it like around 5:00 to like
14   9:00.  And then Sundays it's early in the morning, like
15   around 10:00 to 1:00.
16   Q.  That's all I have.  Thank you for your time.
17   A.  Thank you.
18
19           EXAMINATION
20   BY MR. MARCHETTI:
21   Q.  Okay, Ashley.  I'm going to ask you some
22   questions, and then the attorneys might get to ask you some
23   follow-ups as well.
24   A.  All right.
25   Q.  All right?

---

176

1        When you were at the border on October 18th, 2014,
2    after you were first stopped by the agent you described were
3    you scared?
4    A.  Yes.
5    Q.  And were you nervous?
6    A.  Yes.
7    Q.  When they brought you to the hospital, were you
8    scared?
9    A.  Yes.
10   Q.  And nervous?
11   A.  Of course.
12   Q.  Were you scared while you were sitting at the
13   hospital?
14   A.  Yes, I was.
15   Q.  Were you nervous while you were sitting in the
16   room?
17   A.  Yes.
18   Q.  Okay.  Are you scared and nervous sitting here
19   today?
20   A.  Yes, I am.
21   Q.  Okay.  You testified earlier that you -- there was
22   some questions about what you know or what you heard the
23   CBP agents discuss with Dr. Martinez.
24       Were you in constant contact with Dr. Martinez
25   from the moment you walked in the emergency room to the

---

177

1    moment you left?
2    A.  No, I was not.
3    Q.  So you don't actually know who he spoke to?
4    A.  No.
5        MS. DONOVAN:  Form.
6    Q.  Did you go to Holy Cross Hospital for medical
7    treatment or to have them search you for drugs?
8        MS. MacBAN:  Form and foundation.
9        MS. DONOVAN:  Form and foundation.
10       MS. KROEGER:  Join.
11       THE WITNESS:  Have them search me for drugs.
12   Q.  Okay.  So you were not there for treatment?
13   A.  No, I was not.
14       MS. DONOVAN:  Form.
15       MS. MacBAN:  Foundation.
16       MS. DONOVAN:  Brian, can we have one objection for
17   all?
18       MS. MacBAN:  Yeah.
19       MS. DONOVAN:  We're driving our court reporter
20   crazy.
21       MR. MARCHETTI:  Yeah, that's fine.
22   Q.  Do you believe Dr. Martinez touched you for your
23   benefit or to find out whether you had drugs in your body?
24   A.  Whether I had drugs in my body.
25       MS. DONOVAN:  Form and foundation.

---

RAYNBO  COURT  REPORTING,  LTD.

**EXHIBIT 2**

STATE OF ALASKA          )
                          )      ss:      AFFIDAVIT
MUNICIPALITY OF ANCHORAGE)

I, Patrick F. Martinez, M.D., declare and state under oath that the following facts are true and correct based upon my personal knowledge.

1.  I am over the age of 18 years and am otherwise competent.

2.  I have been licensed by the Arizona Medical Board as a physician since January 7, 1994.

3.  In October of 2014, I was working as an independent contractor with Quantum Plus, Inc. d/b/a Team Health West as a family medicine physician to provide medical services in emergency departments.

4.  Quantum Plus had a contract with Holy Cross Hospital to provide physicians to work in the Holy Cross Hospital emergency department.

5.  On October 14, 2014, I performed a medical examination of Ashley Cervantes in the emergency department of Holy Cross Hospital in Tucson, Arizona.

6.  Ashley Cervantes was brought to the emergency department at Holy Cross Hospital by agents of U.S. Custom and Border Protection agents for medical clearance due to their suspicion that Ashley Cervantes was attempting to transport drugs into the United States.

7.  I met with and talked to Ashley Cervantes in an examination room. We discussed that she had been brought in to the emergency department for medical clearance based upon the agents' suspicion that she was attempting to transport drugs into the United States and that they suspected she was carrying the drugs inside her body.

8.  Ashley Cervantes told me that she was not using drugs or carrying drugs and that she was on her period and that she had placed a tampon earlier. I discussed with Ashley Cervantes that I could perform a vaginal and rectal examination to confirm this.

9. Ashley Cervantes verbally agreed to the vaginal and rectal examination.

10. I acted as a reasonable and prudent physician when I performed the vaginal and rectal examination with a female chaperone to assess whether she had concealed any drugs within her vagina or rectum.

11. I did not find any evidence that Ashely Cervantes had concealed any drugs within these areas, and I noted that she was clear to be discharged.

12. I prepared an Emergency Provider Record to document my examination and assessment of Ashley Cervantes. A true and accurate copy of the Emergency Provider Record is attached as an exhibit to this Affidavit.

13. I was not employed by U.S. Customs and Border Patrol at the time of the examination, and I did not act for or on behalf of that agency.

14. I relied upon my education, training, and expertise as a physician to identify a reasonable and safe manner to examine Ashley Cervantes to determine whether she had concealed any drugs within her body.

FURTHER AFFIANT SAYETH NAUGHT.

Executed this ___17___ day of February, 2018.

_____
Patrick Martinez, M.D.

On this ___19___ day of February, 2018, before me, undersigned notary public, personally appeared Patrick Martinez, M.D., known to me to be the person whose name is subscribed to this Affidavit and acknowledged that he executed the same for the purposes therein stated.

_____

My Commission Expires: 01/27/2020

KATE SPANN
Notary Public, State of Alaska
My Commission Expires
January 27, 2020

| 24 | **General Adult** |
|---|---|

TIME SEEN _____ ROOM _____ _____ EMS Arrival
HISTORIAN   patient   family   EMS
UNABLE TO OBTAIN HISTORY DUE TO _____

**HPI**

chief complaint _____ _____ _____
_____ _____ _____
_____ _____ _____
onset/duration _____ _____ _____
_____ _____ _____

| timing | severity | modifying factors |
|---|---|---|
| still present | mild | none |
| better | moderate | |
| gone now | severe | |
| worse | | |

context _____ _____
recent trauma history _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
quality _____
_____ _____
location _____

_____
_____
_____

Similar symptoms previously _____

Recently seen / treated by doctor _____

*Circle or check affirmatives  backslash (\) negatives*

**Carondelet Holy Cross Hospital**
**EMERGENCY PROVIDER RECORD**

10198302431

**ROS**
CONST
fever / chills / sweaty _____
recent illness _____
weakness / weight loss _____
EYES / ENT
vision change / problems _____
sore throat / dental problems _____
nasal drainage / congestion _____
CVS / PULMONARY
chest pain _____
hurts to breathe / short of breath _____
cough  bloody / productive _____
GI / GU
abdominal pain _____
nausea / vomiting _____
last BM _____
diarrhea / black / bloody stools _____
problems urinating _____
painful urination _____

FEMALE GENITAL
LNMP _____ preg  post menop
MS / SKIN / LYMPH
calf / leg pain _____
neck / back pain _____
joint pain _____
leg / ankle swelling _____
rash _____
swollen glands _____
NEURO / PSYCH
headache _____
fainting / dizzy _____
lost feeling / power _____
difficulty walking  cane walker _____
difficulty with speech _____
confusion / dementia _____
depression / anxiety _____
all systems neg except as marked

**PAST HX**
cardiac disease _____          hyperlipidemia _____
  A fib  ongoing     CHF  MI     immunosuppressed  AIDS  steroids
diabetes Type I    Type 2     kidney disease  calculi  UTI  dialysis
  diet / oral / insulin  neuropathy     lung disease   asthma   COPD
eye / sinus disease  glaucoma     neuro / psych problems _____
GI disease     CVA / TIA  bleed  deficit _____
  GERD / liver disease / cholelithiasis     seizure disorder / depression _____
  hepatitis  pancreatitis  ulcer     skin disorder  MRSA _____
hypertension _____
_____ old records reviewed / summary _____
_____

PERC Rule.  ≥ 50yo / HR ≥ 100 / RA SAO2 ≤ 94 / prior DVT  PE / surg  trauma ≤ 4wks /
hemoptysis / hormone rx / unilat leg swelling / clin susp PE      (all neg < 2% risk PE)
Wells criteria for PE
3 pts each  clinically suspect DVT / most likely dx is PE
1.5 pts each  HR >100 / immobilization or surgery past 4 weeks / prior DVT or PE
1 pt each  hemoptysis / cancer treatment in the past 6 mos
LOW(0-2pts) (3.6%)  MOD(3-6pts) (20.5%)  HIGH(> 6pts) (66%)   W  II  PE

Surgeries / Procedures   none
appendectomy _____     endoscopy  upper / lower _____
cardiac bypass / stent / pacemaker   hysterectomy / BTL / C section _____
cholecystectomy _____     indwelling device  line / port _____
_____     foley catheter / dialysis graft _____

Imaging    prior CT / MRI / US  date _____

Medications  none    see nurses note     Allergies  NKDA
ASA  clopidogrel  warfarin  LMWH _____     see nurses note
NSAID  acetaminophen  BCP  narcotic     antibiotic _____
recent antibiotic _____

**SOCIAL HX**  smoker _____     drugs _____
alcohol (recent / heavy / occasional) _____   occupation _____
living situation  alone  family  friend  group  care facility _____

**FAMILY HX** _____

Pg 1 of 2

TXMP0445 rev 04.10 2012

© 1996–2010 T-System, Inc

CERVANTES  ASHLEY
FN#H017321078        10/18/14
Martinez   Trick  F   19
F 05/17/95   reg -DB5J~1

☐ Nursing Assessment Reviewed  ☑ Initial Vital Signs Reviewed  ☐ Telemetry

BP _____ HR _____ RR _____ Temp _____

Pulse Ox _____ % _____ RA _____ O₂ Interp __ nml __ hypoxic _____

## PHYSICAL EXAM

EXAM LIMITED BY _____

**General Appearance** ___ mild / moderate / severe distress ___
___ appears well ___ anxious / lethargic ___
___ alert

**HEENT** ___ trauma  Raccoon eyes / Bottles sgn ___
___ head atraumatic ___ scleral icterus / pale conjunctivae ___
___ eyes nml inspection ___ EOM palsy / anisocoria ___
___ PERRL ___ purulent nasal drainage ___
___ visual fields nml ___ dental decay / gum disease ___
___ ENT inspection nml ___ pharyngeal erythema / exudate ___
___ pharynx nml ___ oral lesions / dry mucous membranes ___
___ no signs of dehydration

**NECK** ___ thyromegaly / lymphadenopathy ___
___ nml inspection ___ stiff neck / Kernig s / Brudzinski s sign ___
___ thyroid nml ___ carotid bruit ___

**RESPIRATORY** ___ see diagram ___
___ chest non tender ___ wheezes / rales / rhonchi ___
___ no resp distress
___ breath sounds nml

**CVS** ___ irregularly regular rhythm ___
___ reg rate & rhythm ___ extrasystoles ( occasional / frequent ) ___
___ no murmur ___ tachycardia / bradycardia ___
___ no gallop ___ PMI displaced laterally ___
___ JVD present ___
___ murmur  grade ___ /6  sys / dias ___
___ gallop ( S3 / S4 ) ___
___ friction rub ___
___ decreased pulse(s) ___
  R  carotd ___ fem ___ dors ped ___
  L  carotd ___ fem ___ dors ped ___

Tenderness
R=rebound
s=mild
mod=moderate
sv=severe

**ABDOMEN / GI** ___ tenderness / guarding / rebound ___
___ non-tender ___ abnml bowel sounds ___
___ no organomegaly ___ hepatomegaly / splenomegaly / mass ___
___ nml bowel sounds ___ bruit ___
___ no distension

**FEMALE GENITAL** ___ vaginal bleeding / discharge ___
___ external exam nml ___ cervical motion tenderness ___
___ speculum exam nml ___ adnexal tenderness / mass ( R /L ) ___
___ bimanual exam nml ___ enlarged / tender uterus ___

**MALE GENITAL** ___ tenderness / swelling  testicular / inguinal ___
___ nml inspection

**RECTAL** ___ black / bloody / heme pos stool ___
___ non tender ___ tenderness / mass / nodule ___
___ prostate exam nml ___ heme pos stool ___

**BACK** ___ CVA tenderness ( R / L ) ___
___ nml inspection

**EXTREMITIES** ___ pedal edema ___
___ non tender ___ calf tenderness ___
___ full ROM ___ joint swelling ___
___ nml appearance
___ no pedal edema

**NEURO** ___ disoriented to person / place / time ___
___ oriented x3 ___ facial droop ___
___ CN s nml as tested ___ weakness / sensory loss ___
___ sensation nml ___ slurred / abnml speech ___
___ motor nml

**PSYCH** ___ depressed mood / flat affect ___
___ mood / affect nml

10198302432

---

**SKIN** ___ cyanosis / diaphoresis / pallor _____
___ no embolic lesions ___ skin rash / abscess / cellulitis _____
___ color nml no rash ___ decubitus _____
___ warm dry

## LABS, EKG & XRAYS

*Normal lab value ranges are included on the original lab report

| CBC | | Chem | | Creat | CKMB |
|---|---|---|---|---|---|
| nml  except | platelets | nml  except | Gluc | | Troponin |
| WBC | segs | | Na | BNP | UA |
| Hgb | bands | | K | D Dimer | nml  except |
| Hct | lymphs | | BUN | PT | |
| | | | | INR | |

Rhythm Strip  Rate _____ Rhythm  NSR / PVC _____

EKG  interp by ED provider  Rate _____ NSR ___ A fib _____
___ nml interval ___ nml axis ___ nml QRS ___ non-specific ST/TW changes
___ dagnosis __ nml __ abnml _____

Repeat EKG:___ unchanged  Old EKG: ___ unchanged  date _____

CXR  interpreted by ED provider unless noted otherwise
___ nml / NAD ___ no infiltrates ___ nml heart size ___ nml mediastinum
___ Old CXR ___ unchanged  date _____

CT Scan / MRI / Ultrasound
___ chest ___ abdomen ___ other ___ contrast / non-contrast
___ nml / NAD

## PROGRESS ☐ see additional template # 94  51a ___
Time _____   unchanged   improved   re examined _____

☐ patient ambulating / mentating at pre event baseline _____
Discharge VS  BP _____ HR _____ RR _____ Temp _____
___ Discussed with D _____ Time _____
___ will see patient m  ED / hospital / office
___ Counseled patient / family regarding  Additional history from
___ lab / rad results done  as need for follow up  family caretaker paramedics
___ prior records ordered ___ holding orders written
☐ Rx given _____

☐ CRITICAL CARE  (excluding time for other separate services)
  TIME  ☐ 30-74 min  ☐ 75-104 min _____ min

## CLINICAL IMPRESSION

Congestive Heart Failure   ♦Pneumonia
Hypokalemia   Pulmonary Embolism
♦Myocardial Infarction  acute   UTI / Pyelonephritis
___ hedcer ___ cedicalac ___
Present On Admission on decubitus / UTI w/ Foley _____

Disposition Order Time _____
DISPOSITION  ☑ home ☐ admitted ☐ OBS ☐ DOA
  ☐ AMA (see AMA template #73) ☐ transferred _____
CONDITION  ☐ unchanged ☐ improved ☑ stable _____
Care transferred to _____  MD / DO / MLP  Time _____
_____ NP / PA

Date _____ Time _____ IDX Provider # _____
☐ I was personally available for consultation in the emergency department. I have
reviewed the chart and agree with the documentation as recorded by the MLP
including the assessment, treatment plan and disposition
☐ I personally evaluated and examined the patient in conjunction with the MLP and
agree with the assessment, treatment plan and disposition of the patient as recorded by
the MLP
_____ scribing for _____
☐ I have reviewed the information recorded by the scribe for accuracy and agree
with its accuracy

Patrick F  Martinez  M D
IDX #17501 _____ MD / DO
Date _____ Time _____ IDX Provider # _____
☑ Template Complete ☐ Written Addendum

General Adult 24  Pg 2 of 2  Rev 01 / 11  ♦ Quality Measure Initiative

CERVANTES  ASHLEY
FIN H017321878   10 / 8/14
Martinez Patrick F  39
F 05/17/95  MR# H085351

© 1996 - 2010 T-System, Inc

TSBankhealth  form 33  9918