# Exhibit List

1. Deposition of Ashley Cervantes

2. USA's Response to Discovery Requests

3. Declaration of Dr. Michael Levine, MD
   a) Curriculum Vitae
   b) Holy Cross Hospital 2nd Supp. Disclosure (Holy Cross policy)
   c) Holy Cross Hospital Initial Disclosure (medical records)
   d) Holy Cross Hospital 2nd Supp. Disclosure (Holy Cross policy)

4. Deposition of Shamekia Leggett

5. Quantum Plus Responses to Discovery Requests

6. Dr. Martinez Responses to Discovery Requests

Exhibit 1

Deposition of Ashley Cervantes

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


ASHLEY CERVANTES, a single woman,  )
                                   )
                 Plaintiff,    )
                                   )
         vs.            )   NO. 4:16-CV-00334-CKJ
                                   )
UNITED STATES OF AMERICA; UNITED   )
STATES CUSTOMS AND BORDER          )
PROTECTION AGENT SHALEKA LEGGETT   )
AND "JOHN DOE" LEGGETT; UNKNOWN    )
UNITED STATES CUSTOMS AND BORDER   )
PROTECTION AGENTS; HOLY CROSS      )
HOSPITAL, INC.; ASCENSION ARIZONA, )
INC.; PATRICK F. MARTINEZ AND "JANE)
DOE" MARTINEZ; JOHN DOES 1-5; JANE )
DOES 1-5; XYZ CORPORATIONS 1-5; ABC)
PARTNERSHIPS 1-5,                  )
                                 )
               Defendants.   )
_____)


VIDEOTAPED DEPOSITION OF ASHLEY CERVANTES

Tucson, Arizona

April 27, 2017


RAYNBO COURT REPORTING, LTD.

3625 West Gailey Drive
Tucson, Arizona   85741
520/744-2293


Reported by:  Raynbo Silva, RPR, CR
              Certified Reporter No. 50014

1          BE IT REMEMBERED that pursuant to notice the

2    videotaped deposition of ASHLEY CERVANTES was taken at the

3    UNITED STATES ATTORNEY'S OFFICE, Assistant U.S. Attorneys,

4    405 West Congress Street, Suite 4800, in the City of Tucson,

5    County of Pima, State of Arizona, before Raynbo Silva, RPR,

6    CR, Certified Reporter No. 50014, in and for the County of

7    Pima, State of Arizona, on the 27th day of April, 2017,

8    commencing at the hour of 10:00 A.M. on said day on behalf

9    of the Defendants in a certain cause now pending in the

10   United Sates District Court, District of Arizona.

11

12

13                            * * * *

14

15

16          THE VIDEOGRAPHER:  Going on record at 10:04.  The

17   date is April 27th, 2017.

18          We are at 405 West Congress Street, Suite 4800, in

19   Tucson, Arizona, for the deposition of Ashley Cervantes.

20          Case name is Cervantes versus United States,

21   et al., in the United States District Court, District of

22   Arizona, Case Number 4:16-CV-00334-CKJ.

23          My name is David Boyan.  The name of my company is

24   Graphics for Litigators.

25          Raynbo Silva is the court reporter of Raynbo Court

1    Reporting.

2              Will counsel please introduce themselves?

3              MR. MARCHETTI:  Brian Marchetti on behalf of

4    plaintiff.

5              MS. DONOVAN:  Michelle Donovan on behalf of

6    Dr. Martinez.

7              MS. HOLDEN:  Carolyn Holden on behalf of Quantum

8    Plus.

9              MS. KROEGER:  Melissa Kroeger on behalf of the

10   United States and Officer Leggett.

11             MR. LINTON:  Mike Linton on behalf of Holy Cross

12   Hospital.

13             MS. MacBAN:  Laura MacBan on behalf of Holy Cross

14   Hospital.

15

16

17

18                       ASHLEY CERVANTES,

19   having been called as an adverse party on cross-examination,

20   having been first duly sworn to state the truth, the whole

21   truth and nothing but the truth, testified on her oath as

22   follows:

23   .  .  .  .

24   .  .  .  .

25   .  .  .  .

1  before you and he crossed the border?

2      A.   I don't know.

3      Q.   And I keep using the phrase cross the border, and

4  when I use that phrase I'm referring to reentering the

5  United States or going into Mexico from the Port of Entry at

6  Nogales.  Okay?

7      A.   Okay.

8      Q.   On that topic have you ever crossed into Mexico at

9  any other border crossings?

10     A.   No, I do not.

11     Q.   How old is Orlando?

12     A.   I have no idea.

13     Q.   Do you have any guess as to whether he's your age?

14 A lot older?  Younger?

15     A.   He's older.

16     Q.   And what were you and he doing in Mexico on

17 October 18th, 2014?

18     A.   We crossed to get breakfast.

19     Q.   And around what time was that?

20     A.   Around 9:00.

21     Q.   9:00 A.M.?

22     A.   (No audible response.)

23     Q.   So you went into Mexico around 9:00 A.M. to get

24 breakfast?

25     A.   (No audible response.)

1      Q.    Where were you getting breakfast?

2      A.    At a seafood local little stand.

3      Q.    Is it a stand that's consistently there?

4      A.    Yes.

5      Q.    Where is it?

6      A.    It's when you cross five minutes towards the left

7  you just walk and there's a big sign that says seafood right

8  there.

9      Q.    And how often did you go there?

10     A.    Three times.  Not that many.

11     Q.    Three times within what sort of window of time?

12 Three times within a month?  Year?

13     A.    Before, yeah.  Like a year before I went once, and

14 then I went again like twice the second year when the

15 incident happened.

16     Q.    So you -- those three occasions that you went to

17 this seafood stand would it be fair that there were a couple

18 months of a gap in between each visit?

19     A.    Yes.

20     Q.    And how long did you and Orlando stay at the stand

21 for breakfast?

22     A.    About half an hour.

23     Q.    And what did you do next?

24     A.    I crossed back.  I waited in line for two hours or

25 almost two hours --

1     Q.    Okay.  So --

2     A.    -- to cross back into the U.S.

3     Q.    If you left at about 9:00 A.M., had breakfast for

4  about a half an hour, that gets us to about 9:30, and

5  waiting in line for about two hours gets us to about 11:30

6  or 12:00.  Does that sound about right to you?

7     A.    About right.

8     Q.    Do you have any explanation as to if that's the

9  case why the records reflect that you didn't attempt to

10  cross until 5 o'clock that evening?

11     A.    I did not cross at 5 o'clock that evening.  At

12  5 o'clock that evening they had me inside, handcuffed inside

13  a jail cell accusing me of smuggling drugs inside.

14     Q.    Okay.  Let's unpack that a little bit.

15          So it's your testimony that you got to the front

16  of the line in effect at approximately 11:30 or noon;

17  correct?

18     A.    It was earlier than that.

19     Q.    It was earlier than that?

20     A.    Yes.

21     Q.    So we're talking maybe closer to 11 o'clock?

22     A.    Yeah.  Closer to 11:00.

23     Q.    Okay.  I'm not going to ask you questions about

24  your interactions there.  I'm going to leave that to the

25  U.S. attorney.  But I am going to ask you just a couple of

1 questions about timing.  Okay?

2      A.    Okay.

3      Q.    So when you had an interaction with the Border

4 Patrol starting about 11:00 A.M. how long was it between

5 that point and when you went to the hospital?

6      A.    I went to the hospital like around 7 o'clock.

7 Say, 11:00, 12:00, 1:00, 2:00, 3:00, 4:00.  Six hours.

8      Q.    Okay.  While you were in Mexico before you came

9 back did you and Orlando meet up with anybody else?

10      A.    No.

11      Q.    Was anybody at the seafood stand smoking

12 marijuana?

13      A.    No.

14      Q.    Was there -- strike that.

15            Does Orlando smoke marijuana?

16      A.    I do not know.

17      Q.    Has he ever smoked marijuana in front of you?

18      A.    No.

19      Q.    Did you consume any drugs in Mexico?

20      A.    No.

21      Q.    Have you ever consumed drugs in Mexico?

22      A.    No.

23      Q.    Have you ever consumed any prescription

24 medications that were not prescribed to you while in Mexico?

25      A.    No.

1      Q.    Do you have any understanding as to why the

2  medical records reflect that you made a statement after the

3  events at the hospital that you were with people who were

4  using marijuana and that you thought you smelled like it?

5      A.    I do not know why they said that.

6      Q.    All right.  Do you deny that you said that?

7      A.    I deny I said that.

8      Q.    Now around the time frame of October 18th, 2014,

9  you told us you would go into Mexico about four times a

10 month, correct, before the events?

11     A.    Yes.  Correct.

12     Q.    And who would you go with?

13     A.    My mother.

14     Q.    For what purpose?

15     A.    The same thing, braces and food, buying other

16 stuff, food, candies.

17     Q.    Did you ever go -- strike that.

18           Did you ever stay overnight on those trips?

19     A.    In Mexico?

20     Q.    Yes.

21     A.    On those trips?  Not with my mother, no.

22     Q.    Did you ever stay overnight in Mexico when you

23 went with anybody else?

24     A.    Yes.

25     Q.    And start with who you would have gone to Mexico

```
1  some papers and put me back in the chair.

2       Q.   And you say you were handcuffed?

3       A.   Yes.

4       Q.   Were your hands in front or behind you?

5       A.   Behind me.

6       Q.   Do you -- did you sign any of the forms that were

7  presented to you?

8       A.   I signed one form for x-rays.

9       Q.   I'm going to hand you what's marked as Holy Cross

10 Hospital page 56.

11           Is that your signature where it says patient's

12 signature?

13      A.   If you just give me a second to read this.

14      Q.   Sure.

15      A.   That's my signature, but I did not fill this out

16 (indicating).

17      Q.   This is Holy Cross page 57.  There are two places

18 for patient's signature.  Will you verify that those are

19 your signatures?

20      A.   Yes, these both are my signatures.

21      Q.   Thank you.

22           MS. KROEGER:  What page is that?

23           MS. DONOVAN:  57.

24           MS. KROEGER:  The first one was 50 -- what was the

25 first one?
```

1              MS. DONOVAN:   56.

2         Q.    And on page 58 are those also your signatures?

3         A.    This looks like my signature.   This does not look

4    like my signature.

5         Q.    The one on the left, does it look like a signature

6    that was crossed out that was maybe put in the wrong spot?

7         A.    I do not know.   That's not my signature.   You can

8    see the difference.

9         Q.    Did you read those forms?

10        A.    Yeah.   Can I read them again?

11        Q.    Did you, did you read them before you signed them?

12        A.    No.   They just made me sign them.

13        Q.    Did you ask to read them first?

14        A.    Yeah.   And they just said they were for x-rays.

15        Q.    So you asked to read them, they said it was just

16   for x-rays, and you were satisfied and signed?

17        A.    Yes.   I thought it was just x-rays and I thought I

18   was going to get out of there.   I was devastated.

19        Q.    So after you signed these forms what happened

20   next?

21        A.    They put me in a room.   After that they -- I was

22   handcuffed.   They told me they were just going to let one

23   hand go so I can put a pajama, I think they give you a

24   pajama to change into.

25              After that they sat me down.   They opened up my

1  legs, took my tampon on and proceeded to do an exam that was

2  extremely painful.  And I never consented on none of that.

3      Q.    Okay.  So let's unpack that.

4            So you went to an exam room.  Was the doctor

5  already there when you got to the room?  Or did the doctor

6  come in after you were already in the room?

7      A.    He come -- he came in after I was in the room.  I

8  changed into my pajamas, the one they gave me.

9            The two officers were still in there.  It was an

10 African-American woman and a Latina.

11     Q.    Let's unpack that again.

12           So you were brought to the room.  Did you have

13 that conversation about they were going to uncuff one of

14 your hands before or after the doctor came in?

15     A.    No.  That was before the doctor came in.

16     Q.    Was anybody from the hospital in the room when you

17 got to the room?

18     A.    There was a girl nurse.

19     Q.    A female nurse?

20     A.    A female nurse.

21     Q.    Do you remember what she looked like?

22     A.    I only remember she had really, really puffy,

23 curly hair.

24     Q.    Was she white?

25     A.    She was white.

1      Q.   Latina?

2      A.   Latina.

3      Q.   Latina?

4           Did you have any conversation with her?

5      A.   No, I did not.

6      Q.   Is she the one who gave you the hospital gown?

7      A.   Yes.

8      Q.   Did she just hand it to you --

9      A.   She just handed it.

10     Q.   -- or did she say anything to you while she handed

11 it to you?

12     A.   She just handed it to me.

13     Q.   Did she tell you, give you instructions on how to

14 wear it?

15     A.   Yeah.  She just said that it had to be like this

16 (indicating) and that I had to take all my clothes off.

17     Q.   What do you mean like this?

18     A.   Well, there was this one strap that they have, and

19 she told me that I had to put the strap right here and that

20 was going to be it.

21     Q.   Okay.  And it's your testimony that you were

22 required to take off all of your clothes?

23     A.   All of my clothes.  And the two officers were

24 still in there while I was taking my clothes off.

25     Q.   And was the nurse still in there when that

1  occurred?

2      A.   Yes.  The three of them were in there.

3      Q.   And what were they doing?

4      A.   Just staring at me.

5      Q.   Were you on the table?  Were you on --

6      A.   I was --

7      Q.   -- standing on the floor?

8      A.   -- standing up next to the little bed.

9      Q.   Okay.  So you told us about uncuffing one of your

10 hands.  Was the other hand still cuffed and attached to the

11 bed?  Or --

12     A.   It was cuffed.  It was just the little cuff.

13     Q.   So the cuff was on, but you weren't actually

14 tethered --

15     A.   No.

16     Q.   -- to the bed or anything like that?

17     A.   Yeah.

18     Q.   That's correct?

19     A.   Yes.

20     Q.   Now at some point Dr. Martinez came in; correct?

21     A.   Yes.

22     Q.   What did he look like?

23     A.   He was tall.  He had black hair.

24          That's all I can remember.  I didn't really see

25 his face.

1      Q.    Did you notice if he was fat?  Thin?

2      A.    He was thin.

3      Q.    Was he -- did he have facial hair?

4      A.    No, he did not.  He looked like he was around late

5  30s, early 40s.

6      Q.    What did he say to you?

7      A.    Nothing.

8      Q.    It's your testimony that Dr. Martinez did not say

9  anything to you?

10      A.    No.  He just said if I was carrying something

11  inside me, and I said no.  And he proceeded to do -- I had a

12  tampon inside of me.  He opened up my legs.  He took the

13  tampon out, and then he proceeded to do some really weird

14  exam on me.  I never experienced that before.

15      Q.    So after you changed into the gown --

16      A.    Yes.

17      Q.    -- did somebody instruct you to sit back on the

18  bed?

19      A.    No.  I sat down, and then he came.

20      Q.    Okay.  So he --

21      A.    It was a girl nurse that was right there.  It was

22  just -- it's kind of logical to sat down on the bed.  I sat

23  down.

24      Q.    Now let's take a step, let's take a step back.

25            What did you do to prepare for today?

1      A.   Nothing at all.  I speak to Jesus.

2      Q.   Did you speak to your attorney?

3      A.   No, I did not.  This was the first time I see him

4  in awhile.

5      Q.   So you had no discussion with your attorney?

6      A.   No, I did not.

7      Q.   Have you been provided any documents from any of

8  the other -- strike that.

9          Have you been provided any documents for you to

10  review since this case has been pending?

11      A.   No, I did not.  I just got the ones that I signed

12  in the first days after I went to get everything to pick up

13  my copies from the hospital and when I signed in and when I

14  got my attorneys, when I like went in, the papers, only that

15  papers and the ones from my counselor.

16      Q.   Okay.  I'm not sure I understand exactly what

17  you're saying.

18          Have you ever reviewed your medical records from

19  the hospital?  Let's start there.

20      A.   No.

21      Q.   Have you ever reviewed the complaint that has been

22  filed on your behalf by your attorney?

23      A.   No.

24      Q.   Do you know if you have ever reviewed the

25  disclosure statement prepared by your attorney?

1      Q.   So it may have happened, you just don't remember?

2      A.   I don't remember.  I don't know.

3      Q.   You understand you're under oath today; correct?

4      A.   Yes.

5      Q.   You understand that is the same as if we're

6    sitting in a courtroom with a judge; correct?

7      A.   Yes.

8      Q.   Back to your -- back to Holy Cross during the

9    events at issue in this case, you told us that you told

10   Dr. Martinez when he walked in that you did not have drugs;

11   correct?

12     A.   Yes.

13     Q.   What did he say in response?

14     A.   Nothing.  He proceeded to do what he did.

15     Q.   Who else was in the room at that time?

16     A.   The two officers, the African-American, the

17   Latina, and the nurse.

18     Q.   Where was everybody standing?

19     A.   Next to him.

20     Q.   Okay.  So Dr. Martinez was at the foot of the bed?

21     A.   Yes.

22     Q.   And it's your testimony that the two officers and

23   the nurse were also at the foot of the bed?

24     A.   Yes.  They were right next to him.

25     Q.   It's your testimony that they were watching his

1  exam?

2      A.   Most likely, yes.

3      Q.   Now in order to do the exam what kind of bed were

4  you on?

5      A.   It was a big bed.  I do not know.  It was just a

6  bed.

7      Q.   Did -- were stirrups used?

8      A.   Where you put your legs up?

9      Q.   Yes.

10      A.   Yes.

11           MR. MARCHETTI:  Can we take a quick bathroom

12  break?

13           MS. DONOVAN:  Sure.

14           THE VIDEOGRAPHER:  The time is 10:55.  We're going

15  off record.

16           (Whereupon a recess was taken from 10:55 A.M. to

17  11:01 A.M.)

18           THE VIDEOGRAPHER:  The time is 11:01.  We're back

19  on record.

20      Q.   Ms. Cervantes, we just had an opportunity to take

21  a short break.

22           Is there any testimony that you would like to

23  change after taking this break?

24      A.   Yes.

25      Q.   What would you like to change?

1     A.   I was nervous, and I said I wasn't -- I didn't

2  meet with my lawyer.  I met with him two days ago.

3     Q.   And how long did you meet?

4     A.   For about an hour -- half an hour, hour.

5     Q.   And what documents did your lawyers give you to

6  look at?

7     A.   The same one.

8     Q.   The disclosure statement?

9     A.   Yes.

10    Q.   Did you look at the complaint?

11    A.   Which one's the complaint?

12    Q.   The complaint -- well, I have writing all over

13  mine.

14         Do you have a clean one?

15         MR. MARCHETTI:  No.

16    Q.   All right.  The complaint is the document that is

17  filed with the court that lays out your allegations against

18  all the defendants.  It is -- the front looks the same

19  except it says first amended complaint and there's

20  78 numbered sentences.

21         Does that sound familiar at all to you?

22    A.   No.

23    Q.   Okay.  Now you told us earlier that you became

24  sexually active at the age of 16; correct?

25    A.   Yes.

1    Q.    And how do you define sexually active?

2    A.    I lost my virginity.

3    Q.    And you told us about some Benadryl and --

4    A.    Claritin.

5    Q.    -- Claritin that you take for allergies.

6          Is there any other medication that you take?

7    A.    It's the Allegra.

8    Q.    Allegra?

9    A.    Allegra, yeah.

10   Q.    What about birth control?  Do you take birth

11   control pills?

12   A.    No.

13   Q.    What do you use for birth control?

14   A.    I do not -- I use protection.  I do not use birth

15   control.

16   Q.    Okay.  Poor question.  Thank you for clarifying.

17         By protection are you referring to condoms?

18   A.    Condoms.

19   Q.    And has that been true since the age of 16?

20   A.    Yes.

21   Q.    Now you told us about an orthodontist in Mexico.

22         What other physicians do you see in Mexico?

23   A.    None.

24   Q.    Do you see a dentist in Mexico?

25   A.    Yeah.  The dentist.

1      Q.    Do you see an eye doctor?

2      A.    No.

3      Q.    Do you have glasses or contacts?

4      A.    No.

5      Q.    Lucky you.

6            Do you ever see -- go to urgent care in Mexico?

7      A.    No.

8      Q.    Have you ever been prescribed any medication by

9  any physician in Mexico?

10     A.    No.

11     Q.    So back to your exam with Dr. Martinez, you told

12 us that he came into the room, and what did he say?

13     A.    He asked me if I had drugs inside of me and I told

14 him no.

15     Q.    And then what did he say?

16     A.    Nothing at all.

17     Q.    What happened?

18     A.    He proceeded to take my tampon on and then made

19 the exam he made, and that's about it.  He told the other

20 two ladies that I had nothing.

21     Q.    Now is it your testimony that there was no

22 discussion or instruction to even position you for the exam?

23     A.    Yeah.  They didn't tell me anything.  He just

24 grabbed them, put them and he proceeded to do everything.

25 He didn't even -- he couldn't even stare at me in the eye.

1          MS. HOLDEN:  For the record can you tell me what

2     grab them means, please?

3     A.   He put my legs up and put my leg, one leg over

4     here in this -- I don't know what it's called to put --

5     Q.   The stirrup?

6     A.   Yeah.  And then the other leg.

7     Q.   Okay.  And did you lay back at that time?

8     A.   Yeah.  I laid back.

9     Q.   Okay.  Did, did anybody else in the room say

10    anything?

11    A.   No.

12    Q.   Are you aware that the eyewitness testimony from

13    several different witnesses will disagree with you?

14    A.   Yeah.

15         MR. MARCHETTI:  Objection, form and foundation.

16    Q.   You are aware of that?

17    A.   I'm aware.

18    Q.   What did -- how long did the entire exam take?

19    A.   20 minutes.

20    Q.   So it's your testimony that you were laying back

21    with your feet up in stirrups for 20 minutes?

22    A.   Probably 15.

23    Q.   Now when this was occurring did you say anything?

24    A.   No.  I didn't know what they were doing until I

25    felt something inside and I was in shock.  I couldn't even

1  speak.

2      Q.   You had no idea what they were doing when your

3  feet were in stirrups, you were in a gown and undressed?

4      A.   Yeah.

5      Q.   You had no idea what was happening?

6      A.   No.

7      Q.   That's your testimony?

8      A.   That's my testimony.

9      Q.   Did you say anything when the exam started, what

10 are you doing?

11     A.   Yeah.  They didn't tell me anything.  He proceeded

12 to do that.

13     Q.   So it's your testimony that you said what are you

14 doing and nobody responded?

15     A.   Yes.

16     Q.   Did you say I thought I was just here for an

17 x-ray?

18     A.   No.

19     Q.   When you were asked to take your clothes off, did

20 you ask why you had to take your clothes off?

21     A.   No.

22     Q.   You had had x-rays in the past; correct?

23     A.   Yes.

24     Q.   And you didn't have to take your clothes off then;

25 did you?

1      A.    Yes.

2      Q.    You did?

3      A.    Yeah.  They put me in a gown the first time I went

4  for x-rays for my elbow and my knee.

5      Q.    So after this exam Dr. Martinez told the officers

6  there were no drugs?

7      A.    Uh-huh.

8      Q.    What happened then?

9      A.    Then he proceeded to put two fingers up my rectum

10 and I started crying.

11     Q.    After he said that there were no drugs?

12     A.    Yes.  In my vagina.

13     Q.    Understood.  So when this 15 minutes that you were

14 telling us about, was that the vaginal exam or was that the

15 rectal exam or both?

16     A.    That was the vaginal and the rectum.  It was both

17 in those 15 minutes.

18     Q.    Did you -- strike that.

19           When he walked into the room, did he already have

20 gloves on?

21     A.    No.

22     Q.    Did you see him put gloves on before the exam?

23     A.    I saw him putting some gloves on.

24     Q.    Did you see him do anything else?

25     A.    No.

1    Q.    Did he apply lubricant to his hands?

2    A.    No.  I didn't see him.

3    Q.    Do you know one way or another if he did?

4    A.    No.

5    Q.    And at this point you had been sexually active for

6   at least three years; correct?

7    A.    I wasn't sexually active for eight months when

8   that happened.

9    Q.    But you had lost your virginity --

10    A.    Uh-huh.

11    Q.    -- three years ago?

12    A.    Three years ago.

13    Q.    Three years prior to the exam --

14    A.    The exam.

15    Q.    -- we're talking about?

16    A.    Exactly.

17    Q.    We're stepping on each other a little bit.

18    A.    Sorry.

19    Q.    It's okay.  It happens.  I told you it would.

20   I'll try to do better, too, because I am also stepping on

21   you some.  Okay?

22         Now it's your testimony that Dr. Martinez used two

23   fingers in your rectum?

24    A.    Yes.

25    Q.    How many fingers did he use in your vagina?

1  car, but I'm sure it was a Customs car.  And then they took

2  me to the hospital handcuffed.

3       Q.   When you say you went back into the room, are you

4  talking about the room with the gray --

5       A.   Yes.

6       Q.   -- bench?

7       A.   Yes.

8       Q.   All right.  How long were you in the room with

9  the -- were you cuffed then again to the bench?

10      A.   Yes, I was.

11      Q.   And how long were you in that room before you left

12  for the hospital?

13      A.   Probably like 45 minutes towards an hour, so they

14  said they had to get some permission to leave, a warrant.

15      Q.   And you say they said.  Who are you talking about?

16      A.   The ladies.

17      Q.   Okay.  The --

18      A.   Customs.

19      Q.   Do you remember which ladies said that?

20      A.   The African-American and the Latina.

21      Q.   They said that they were waiting?

22      A.   On a warrant so they could take me to the

23  hospital.

24      Q.   Okay.  So then you said you were cuffed back to

25  the bench?

1       A.   Yes.

2       Q.   Did the officers stay with you when you were

3   cuffed to the bench?

4       A.   Yeah.  They were right there.

5       Q.   Both officers?

6       A.   Yeah.  They were right there.

7       Q.   And you said you were in there for 45 minutes?

8       A.   Yeah.

9       Q.   All right.  And then after 45 minutes you were led

10  by the officers to a vehicle?

11      A.   Yes.  It looked like a police vehicle.

12      Q.   And you were still in handcuffs?

13      A.   Yes.

14      Q.   And at that point you were transported to the

15  hospital?

16      A.   Yes.

17      Q.   How long did it take to get to the hospital?

18      A.   It takes like about eight minutes to get there,

19  not even.  It's really close to the hospital.  The border's

20  really close to the hospital.

21      Q.   In the 40 minutes when you were waiting before you

22  left for the hospital did either officer say anything to

23  you?

24      A.   They were in the car, and they were just speaking

25  to each other.

1       Q.    Before the car when you were in the --

2       A.    Bench?

3       Q.    -- when you were in the room with the bench did

4   either officer speak with you?

5       A.    No.

6       Q.    Did anyone speak with you?

7       A.    No.

8       Q.    Did you speak to anyone?

9       A.    No.

10      Q.    Did you sign anything at any time when you were at

11  the port before you left for the hospital?

12      A.    No.  I requested to make a phone call and they

13  denied it.

14      Q.    Were you asked to sign anything at any time while

15  you were at the --

16      A.    No.

17      Q.    -- port before you left for the hospital?

18      A.    No.

19      Q.    Did the officers tell you why they were taking you

20  to the hospital?

21      A.    Yes.

22      Q.    What did they say?

23      A.    Told me I was going to go into the hospital to get

24  checked to see if I did have or did not have anything.  They

25  said that there were going to be x-rays.

1      Q.    Which officer said that to you?

2      A.    Latina.

3      Q.    The Latina officer told you that she --

4      A.    Yeah.

5      Q.    -- was taking you to the hospital to get an x-ray?

6      A.    Yes.

7      Q.    You testified earlier that you have crossed over

8   into Mexico at the same port since October 18th, 2014?

9      A.    Yes.

10     Q.    Have you seen any of the officers that you

11  described to me today in any of your subsequent crossings?

12     A.    No.  Thank God I have not.

13     Q.    You also testified earlier that you have

14  Blue Cross/Blue Shield coverage through your mother?

15     A.    Yes.

16     Q.    Do you have an insurance card?

17     A.    No.

18           MS. KROEGER:  I'll pass to someone else.

19           MS. HOLDEN:  Oh, I have questions.

20           MS. MacBAN:  I do, too.

21           MS. HOLDEN:  Oh.  Do you want to go first?

22           MS. MacBAN:  You're fine.  It doesn't matter.

23           MS. HOLDEN:  Oh, well, okay.  Sorry about that.

24  . . . .

25  . . . .

1     A.   I believe it was a male.

2     Q.   Do you -- can you describe the male?

3     A.   No.

4     Q.   Do you have any names?

5     A.   He was just a little fat with a little beard.

6  That's all I remember.

7     Q.   Okay.  Do you remember any conversations you had

8  with him?

9     A.   No.  Other than what I had taken for my allergies

10 and stuff, I've had any infections or diseases or stuff like

11 that.

12    Q.   If he testifies in this case that his memory, he

13 does remember you, his memory is that you shared with him

14 that you were a marijuana user, would you dispute that?

15    A.   Yes.

16    Q.   So if he remembers having that conversation with

17 you, you're saying that is false, that he's not telling the

18 truth?

19    A.   Yes.

20    Q.   The person who was chaperoning, we call it

21 chaperoning when an pelvic exam is going to be done, you

22 have a female come in to observe, the person chaperoning

23 from Holy Cross, can you describe that person?

24    A.   The female?  She had curly hair, like really

25 puffy, curly hair.  She was not that skinny, not that fat.

1  She was white, really white.

2      Q.   Have an age bracket?

3      A.   Late 20s, early 30s.

4      Q.   Anything else you remember about her?  What she

5  was wearing?

6      A.   No.

7      Q.   Any conversations you had with her?

8      A.   No.  No conversations.

9      Q.   If -- she also remembers you.  If she testifies

10 that while on the gurney with Dr. Martinez there you made

11 the comment that I must have been stopped because I smell

12 like marijuana and that alerted the dogs, something to that

13 effect, the acknowledging that you probably smelled like

14 marijuana?

15     A.   It is ludicrous to smell.  It's false.

16     Q.   Patently false?

17     A.   (No audible response.)

18     Q.   Yes?

19     A.   Yes.

20     Q.   If a health care provider overheard you say that

21 you had smoked on the Mexico side of the border marijuana,

22 is that also patently false?

23     A.   That's false.

24     Q.   And I assume that you're going to say it's

25 patently false if the health care providers observed and

ASHLEY CERVANTES
4/27/2017

1  listened to you consent verbally to the pelvic and rectal

2  exam?

3       A.    That is false.

4       Q.    And it's also false that Dr. Martinez never

5  explained to you what he was going to do or how he was going

6  to do it?

7            MR. MARCHETTI:   Objection, form and foundation.

8       Q.    That's your testimony, that he, that he did not

9  explain to you what he intended to do and how?

10      A.    That's false.  He did not explain it.

11      Q.    And your memory is that you were on the gurney and

12  stirrups approximately 15 to 20 minutes while he did this

13  exam; correct?

14      A.    Yes.  Correct.

15      Q.    And you never once said no, you don't have my

16  permission to do this; correct?

17      A.    Correct.

18      Q.    Is it your testimony that Dr. Martinez removed

19  your tampon?

20      A.    Yes.

21      Q.    Not you?

22      A.    Not me.

23      Q.    Is it -- did you remove your clothes and change to

24  a gown?

25      A.    Yes.

1     Q.   Did you remove your own panties?

2     A.   No.  He did.

3     Q.   Dr. Martinez removed your panties?

4     A.   Yes.

5     Q.   And your memory is that there were stirrups, the

6 metal brackets that hold the legs in place --

7     A.   Yes.

8     Q.   -- in this examining room; is that correct?

9     A.   Yes.

10    Q.   Is there any memory you have of any conversation

11 you want to tell me about involving Holy Cross health care

12 providers that we haven't discussed today?

13    A.   I signed a paper for x-rays and that paper never

14 showed up.

15    Q.   So okay, and I'll get to that.

16        My question is this.  Do you have any memory of

17 any conversations with any health care providers at Holy

18 Cross on October 18, 2014, that you haven't told us about?

19    A.   No.

20    Q.   Now you want to let me know that there is a paper

21 that you haven't seen yet that you signed?

22    A.   For x-rays.

23    Q.   Can you describe it to me, what it said?

24    A.   It just said x-rays on top.  I remember it just

25 said clearly x-rays.

1    Q.    All right.  And so what you're telling me is you

2    absolutely did consent to an x-ray?

3    A.    To an x-ray.

4    Q.    And you were willing to undergo radiation; fair?

5    A.    X-ray.

6    Q.    One other question we had about your church.  Is

7    that on the Nogales side or Mexico side?

8    A.    Nogales.

9    Q.    What service do you typically attend?

10    A.    Sundays, Thursday sometimes.

11    Q.    I know.  What time?  Sometimes they have more than

12    one.

13    A.    Thursdays they have it like around 5:00 to like

14    9:00.  And then Sundays it's early in the morning, like

15    around 10:00 to 1:00.

16    Q.    That's all I have.  Thank you for your time.

17    A.    Thank you.

18

19                         EXAMINATION

20    BY MR. MARCHETTI:

21    Q.    Okay, Ashley.  I'm going to ask you some

22    questions, and then the attorneys might get to ask you some

23    follow-ups as well.

24    A.    All right.

25    Q.    All right?

1          When you were at the border on October 18th, 2014,

2    after you were first stopped by the agent you described were

3    you scared?

4         A.   Yes.

5         Q.   And were you nervous?

6         A.   Yes.

7         Q.   When they brought you to the hospital, were you

8    scared?

9         A.   Yes.

10        Q.   And nervous?

11        A.   Of course.

12        Q.   Were you scared while you were sitting at the

13   hospital?

14        A.   Yes, I was.

15        Q.   Were you nervous while you were sitting in the

16   room?

17        A.   Yes.

18        Q.   Okay.  Are you scared and nervous sitting here

19   today?

20        A.   Yes, I am.

21        Q.   Okay.  You testified earlier that you -- there was

22   some questions about what you know or what you heard the

23   CBP agents discuss with Dr. Martinez.

24          Were you in constant contact with Dr. Martinez

25   from the moment you walked in the emergency room to the

1  moment you left?

2     A.   No, I was not.

3     Q.   So you don't actually know who he spoke to?

4     A.   No.

5        MS. DONOVAN:  Form.

6     Q.   Did you go to Holy Cross Hospital for medical

7  treatment or to have them search you for drugs?

8        MS. MacBAN:  Form and foundation.

9        MS. DONOVAN:  Form and foundation.

10       MS. KROEGER:  Join.

11       THE WITNESS:  Have them search me for drugs.

12    Q.   Okay.  So you were not there for treatment?

13    A.   No, I was not.

14       MS. DONOVAN:  Form.

15       MS. MacBAN:  Foundation.

16       MS. DONOVAN:  Brian, can we have one objection for

17  all?

18       MS. MacBAN:  Yeah.

19       MS. DONOVAN:  We're driving our court reporter

20  crazy.

21       MR. MARCHETTI:  Yeah, that's fine.

22    Q.   Do you believe Dr. Martinez touched you for your

23  benefit or to find out whether you had drugs in your body?

24    A.   Whether I had drugs in my body.

25       MS. DONOVAN:  Form and foundation.

1              MS. MacBAN:  Join.

2              MR. MARCHETTI:  Who wants to object?

3              MS. MacBAN:  Whoever says it first.

4              MS. DONOVAN:  Well, why don't we try to have a

5    pause between before Ms. Cervantes answers because you're

6    asking a question and the second you're done she's answering

7    so we're not actually getting our objections out.

8              MR. MARCHETTI:  Sure.

9              MS. DONOVAN:  So if you could pause to let us

10   state our objection, that might make it go smoother.

11             When it comes to Dr. Martinez, I will do the

12   objecting.

13             MR. MARCHETTI:  Fair enough.

14        Q.   Do you think Dr. Martinez did anything wrong?

15        A.   Yes.

16             MS. DONOVAN:  Form and foundation.

17        Q.   What do you think Dr. Martinez did wrong?

18             MS. DONOVAN:  Form and foundation.

19             THE WITNESS:  He wasn't being ethical.  He -- all

20   of the examinations he did to find substance inside me, not

21   for my wellness, not for anything for his benefit or for the

22   government's benefit.

23             MS. DONOVAN:  Form.

24             MS. HOLDEN:  Belated.  It was the uh.

25        Q.   I only have a few more questions, so they're going

1  to object to every one, but let them object and then you can

2  answer.  Okay?

3        MS. DONOVAN:  You can just give us a standing

4  objection if you want --

5        MR. MARCHETTI:  Yeah, that's fine.  I know.

6        MS. DONOVAN:  -- form and foundation --

7        MR. MARCHETTI:  I stipulate that the defense

8  lawyers will object to everything I say.

9        MS. DONOVAN:  Form and foundation --

10       MR. MARCHETTI:  From this point forward, yeah.

11       MS. DONOVAN:  -- for all the questions that are

12  coming.

13     Q.   When you went to treat with Dr. Bejarano because

14  you testified that you don't drive how did you get to his

15  office?

16     A.   My mother.

17     Q.   And did your mother go into your counseling

18  sessions with you and Dr. Bejarano?

19     A.   No.

20     Q.   Did you kind of do the negotiations with

21  Dr. Bejarano as to what the charges were or did your mom

22  handle that?

23     A.   My mom handled it.

24     Q.   Okay.  So you testified earlier that you thought

25  Dr. Bejarano's payments in the case might be tied to the

1      Q.    Whether or not he had a medical reason to do it or

2  whether he performed the examination because, as he will

3  testify, you told him you wanted to undergo the examination

4  to end the whole ordeal, as you sit here today -- strike all

5  that.  That's a terrible question.

6           Your attorney asked if you were scared and nervous

7  to be here today, and you told him yes.

8           Have we been courteous to you today?

9      A.    I do not trust anybody anymore and especially the

10  people that are with the people that damaged me.  I am

11  nervous and I am scared.

12     Q.    That wasn't the question I asked.

13           Have we been courteous to you today?

14     A.    No.

15     Q.    No?  What was discourteous about our conversation

16  today?

17     A.    Making me remember everything.

18     Q.    You understand, ma'am, that by filing a lawsuit we

19  have an obligation to our clients to explore these issues

20  with you; correct?

21     A.    Yes.

22     Q.    So the reason we're here today even having this

23  conversation is a result of the lawsuit you filed; are you

24  aware of that?

25     A.    Yes, I am aware of that.

1      Q.   So in terms of that, simply by us being here and

2  asking you questions about the events, we are being

3  discourteous to you; is that your testimony?

4      A.   Yeah, I believe so.

5      Q.   Now you said you were scared and nervous when you

6  went to the hospital.  Why was that?

7      A.   I did not know what was going to happen to me.  I

8  had already been sitting down for hours.

9      Q.   But you had done nothing wrong; correct?

10     A.   Correct.

11     Q.   Did that do nothing to calm your nerves?

12     A.   Yeah.  But I was still scared and nervous.

13     Q.   After the exam was performed and you were told

14  that you didn't have drugs, did you ask to be released at

15  that time?

16     A.   Yes.

17     Q.   What were you told?

18     A.   That they were going to take me back in handcuffs

19  to where they brought me from, which is the Customs and

20  Border, like by the border.

21     Q.   With respect to handcuffs, you told us that you

22  were first let out of the handcuffs when they had you change

23  into the hospital gown; correct?

24     A.   Yes.  Correct.

25     Q.   And I believe you also told us that the

1  handcuffs -- your hands were behind your back; is that

2  correct?

3       A.   Correct.

4       Q.   If that's true, how did you sign the forms for the

5  hospital?

6       A.   It was on the side.  They made me sign it like

7  this (indicating).

8       Q.   But you were still cuffed?

9       A.   Yes.

10      Q.   So if your arms were behind you, both of them

11  cuffed --

12      A.   No.  There was one cuffed.  The other one wasn't

13  cuffed.  And I signed it with this one.

14      Q.   So you were actually uncuffed prior to being in

15  the exam room so you could sign the forms?

16      A.   Yeah.

17      Q.   Were you ever uncuffed at any other time?

18      A.   No.

19      Q.   And when you talk about being cuffed, are you

20  talking about the handcuffs being on one arm, both arms or

21  both --

22      A.   One arms, both arms.  They're still on me.

23      Q.   Okay.  Let's talk about the times that the cuffs

24  were on both arms.  What time periods were those?

25      A.   All the way where I was in there, when I was in

1    they had already told me don't speak, just let us do our job

2    from the African-American woman.

3              MS. DONOVAN:  That's all I have.  Thank you.

4              MR. MARCHETTI:  Melissa, anything?

5              MS. KROEGER:  Yes.

6

7                        RECROSS-EXAMINATION

8    BY MS. KROEGER:

9        Q.    We talked earlier about when you were at the port

10   you received a pat-down?

11       A.    Yes.

12       Q.    Is that a yes?

13       A.    Yes.

14       Q.    Did you receive more than one pat-down before you

15   went to the hospital?

16       A.    Yes.

17       Q.    I think you told me that the first pat-down

18   occurred before you saw any dogs; is that right?

19       A.    Yes.  That's correct.

20       Q.    When did the second pat-down occur?

21       A.    In the rest room, in the, in the Customs ladies

22   rest room they told me to squat and they patted me down --

23       Q.    Okay.

24       A.    -- again.

25       Q.    You told me that when you went to the rest room

1  that there was a canine handler I believe with you?

2      A.   They brought her in.

3      Q.   Did the pat-down occur before or after the canine

4  sniff that you told me about in the rest room?

5      A.   Before.  And then the canine sniffed me around.

6      Q.   Okay.  So you had been waiting in the room with

7  the bench you said for about six to eight hours; correct?

8      A.   Correct.

9      Q.   And then you went into the bathroom with the

10  canine and the canine handler; correct?  Is that --

11      A.   I went into the rest room, and then the canine and

12  the dog came.  They patted me down, and then the canine came

13  in.

14      Q.   Right.  When you first went into the rest room,

15  who was with you?

16      A.   Both officers.

17      Q.   So just the African-American officer and the Latin

18  officer?

19      A.   Yes.

20      Q.   All right.  And then at that point they did a

21  pat-down?

22      A.   Uh-huh.  African-American officer did the

23  pat-down, and then the other lady with the canine came in.

24      Q.   I think you also told me that you used the rest

25  room and reinserted a tampon?

1     A.    I didn't use the rest room.  I just went in there

2  to reinsert the tampon.  That's when they gave me classes on

3  how to insert a tampon the proper way.

4     Q.    Did you insert the tampon before or after the

5  pat-down?

6     A.    After the pat-down.

7     Q.    Can you tell me what happened during this second

8  pat-down?

9     A.    I just did.

10    Q.    Well, can you walk me through exactly where the

11  officer put her hands on your body?

12    A.    We came in.  She told me can you squat for me a

13  little bit?  And I squatted a little.  She started to pat me

14  down, went like that to my vagina, back of my booty,

15  every -- she had already -- they had already done that.

16  They didn't find anything.  Like a few seconds in came in

17  the canine and the lady officer.  And the one that patted me

18  down was the African-American this time.  It wasn't the

19  other one.

20    Q.    Was there anything different about the third and

21  second pat-downs?

22    A.    Yes, there was.

23    Q.    What's the difference?

24    A.    She patted my vagina way too hard.

25    Q.    You were wearing your skirt --

Exhibit 2


USA's Response to Discovery Requests

1   ELIZABETH A. STRANGE
    Acting United States Attorney
2   District of Arizona
    Michael A. Ambri (#021653)
3   Melissa Marcus Kroeger (#025209)
    Assistant U.S. Attorneys
4   405 W. Congress Street, Suite 4800
    Tucson, Arizona 85701-5040
5   Telephone: (520) 620-7300
    Fax: (520) 620-7138
6   Michael.Ambri@usdoj.gov
    Melissa.Kroeger@usdoj.gov
7
    *Attorneys for Defendant United States of America*
8   *and Shamekia Leggett*

9                    IN THE UNITED STATES DISTRICT COURT

10                       FOR THE DISTRICT OF ARIZONA

11

12  | Ashley Cervantes, | 4:16-CV-00334-CKJ |
    |---|---|
13  | Plaintiff, | **DEFENDANT UNITED STATES OF AMERICA'S RESPONSES TO** |
14  | v. | **PLAINTIFF'S DISCOVERY REQUESTS** |
    | United States of America, et al. | |
15  | | |
16  | Defendants. | |

17          Pursuant to Rules 33, 34 and 36, Federal Rules of Civil Procedure, Defendant

18  United States of America responds to Plaintiff's Discovery Requests as follows:

19                       **REQUESTS FOR ADMISSION**

20  **RFA No. 1:** Admit Ashley was taken into custody by the USA on October 18, 2014.

21          Admit ___X___ Deny _____

22  **RFA No. 2:** Admit Ashley was entitled to her constitutional rights, as provided by the

23  Fourth Amendment to the United States Constitution, during her interactions with the USA

24  and its agents/employees on October 18, 2014.

25          Admit _____ Deny _____

26  **Objection: Defendant objects to this request on the ground that it calls for a**

27  **conclusion of law. *See Benson Tower Condo. Owners Ass'n v. Victaulic Co.*, 105 F.**

28  **Supp. 3d 1184, 1196 (D. Or. 2015), *quoting* Moore's Federal Practice § 36.10[8] at 36-**

26 (3d ed. 2008) ("pure requests for opinions of law" and "legal conclusions" are not appropriate under Rule 36).

**RFA No. 3:** Admit Ashley was entitled to her constitutional rights as provided by the Fifth Amendment to the United States Constitution during her interactions with the USA and its agents/employees on October 18, 2014.

Admit _____ Deny _____

**Objection: Defendant objects to this request on the ground that it calls for a conclusion of law.** *See Benson Tower Condo. Owners Ass'n v. Victaulic Co.*, **105 F. Supp. 3d 1184, 1196 (D. Or. 2015),** *quoting* **Moore's Federal Practice § 36.10[8] at 36-26 (3d ed. 2008) ("pure requests for opinions of law" and "legal conclusions" are not appropriate under Rule 36).**

**RFA No. 4:** Admit Ashley was not advised of her Constitutional rights, aka "Mirandized" while she was at the Port of Entry or at Holy Cross Hospital on October 18, 2014.

Admit _____ Deny _____

**Objection: Defendant objects to this request on the ground that it calls for a conclusion of law and is compound.** *See Benson Tower Condo. Owners Ass'n v. Victaulic Co.*, **105 F. Supp. 3d 1184, 1196 (D. Or. 2015),** *quoting* **Moore's Federal Practice § 36.10[8] at 36-26 (3d ed. 2008) ("pure requests for opinions of law" and "legal conclusions" are not appropriate under Rule 36). Defendant further objects that the request is irrelevant, as** *Miranda* **does not apply to border searches.** *See United States v. Duncan*, **693 F.2d 971, 979 (9th Cir. 1982) ("This court has often considered the problem of Miranda warnings in the context of border searches. It is the rule of this Circuit "that Miranda warnings need not be given in border crossing situation 'unless and until the questioning agents have probable cause to believe that the person questioned has committed an offense.'"). Moreover,** *Miranda* **and the Fifth Amendment apply only to testimonial self-incrimination and not to the production of**

- 2 -

incriminating physical evidence. *United States v. Thompson*, 475 F.2d 1359, 1364 (5th Cir. 1973).

**RFA No. 5:** Admit the Personal Search Handbook, a copy of which is attached hereto, sets out the operative and applicable policies in effect on October 18, 2014 relating to the search of a person by the USA's agents/employees.

Admit _____ Deny _____

**Objection: Defendant objects to this request as vague and ambiguous in its use of the phrase "operative and applicable policies." Subject to and without waiving these objections, Defendant responds that the Personal Search Handbook describes "U.S. Customs and Border Protection (CBP) policy for the conduct of searches of persons at the border by CBP officers using border search authority" (Personal Search Handbook, at ix), but it does not reflect all standards and applicable law that may apply to the search of a person. As set forth in the Personal Search Handbook:**

> **This Handbook does not limit the search authority of CBP officers. The goal is to assist CBP officers in performing their enforcement duties in a manner that will ensure personal integrity and will also permit officers to perform a professional service for the public. This Handbook is not intended to create or confer any rights, privileges, or benefits upon any private person, but is merely for internal guidance.**

*See* **Personal Search Handbook, at ix. Accordingly, Defendant admits only that the Personal Search Handbook was in effect on October 18, 2014. Defendant otherwise denies this Request.**

**RFA No. 6:** Admit the policies set out in the attached Personal Search Handbook applied to Ashley on October 18, 2014.

Admit _____ Deny __X____

**RFA No. 7:** Admit the USA's policies in effect on October 18, 2014 set forth a requirement that agents of the USA must document their observations concerning a person's maturity, intelligence, education, and training in the TECS or ID ENT/ENFORCE report as part of obtaining consent for an X-ray or body cavity search.

Admit _____ Deny ___X___

**Objection: Defendant objects to this request as vague and ambiguous in its use of the term "requirement." As set forth in the text of the Personal Search Handbook:**

> **This Handbook does not limit the search authority of CBP officers. The goal is to assist CBP officers in performing their enforcement duties in a manner that will ensure personal integrity and will also permit officers to perform a professional service for the public. This Handbook is not intended to create or confer any rights, privileges, or benefits upon any private person, but is merely for internal guidance.**

*See* **Personal Search Handbook, at ix.**

**RFA No. 8:** Admit the USA's policies in effect on October 18, 2014 set forth a requirement that involuntary body cavity searches require a court order.

Admit _____ Deny ___X___

**Objection: Defendant objects to this request as vague and ambiguous in its use of the term "requirement." As set forth in the text of the Personal Search Handbook:**

> **This Handbook does not limit the search authority of CBP officers. The goal is to assist CBP officers in performing their enforcement duties in a manner that will ensure personal integrity and will also permit officers to perform a professional service for the public. This Handbook is not intended to create or confer any rights, privileges, or benefits upon any private person, but is merely for internal guidance.**

*See* **Personal Search Handbook, at ix.**

**RFA No. 9:** Admit a court order and/or search warrant was not obtained concerning Ashley on October 18, 2014.

Admit ___X___ Deny _____

**RFA No. 10:** Admit Ashley was brought to Holy Cross Hospital on October 18, 2014 by agents of the USA for a forensic evidence search of her person.

Admit _____ Deny _____

**Objection: Defendant objects to this request on the ground that it calls for a conclusion of law.** *See Benson Tower Condo. Owners Ass'n v. Victaulic Co.*, **105 F.**

Supp. 3d 1184, 1196 (D. Or. 2015), *quoting* **Moore's Federal Practice § 36.10[8] at 36-26 (3d ed. 2008) ("pure requests for opinions of law" and "legal conclusions" are not appropriate under Rule 36). Defendant further objects to the request as vague and ambiguous as to the meaning of "forensic evidence search."**

**RFA No. 11:** Admit Ashley was not brought to Holy Cross Hospital on October 18, 2014 by agents of the USA for medical treatment.

Admit _____ Deny _____

**Objection: Defendant objects to this request on the ground that it calls for a conclusion of law. *See Benson Tower Condo. Owners Ass'n v. Victaulic Co.*, 105 F. Supp. 3d 1184, 1196 (D. Or. 2015), *quoting* Moore's Federal Practice § 36.10[8] at 36-26 (3d ed. 2008) ("pure requests for opinions of law" and "legal conclusions" are not appropriate under Rule 36).**

**RFA No. 12:** Admit Ashley did not possess illegal drugs or contraband at any time while in the custody and/or control of the USA on October 18, 2014.

Admit _____ Deny _____

**Objection: Defendant objects to this request on the ground that it calls for speculation. Subject to and without waiving this objection, Defendant further responds that two canines alerted to the presence of a trained odor on Plaintiff's person while she was at the Port of Entry. Defendant admits only that Defendant found no illegal drugs or contraband on Plaintiff's person on October 18, 2014. Defendant otherwise denies this Request.**

## INTERROGATORIES

**No. 1:** If your response to any of the Requests for Admission above is anything other than an unqualified admission, state the legal and factual bases supporting your qualifications and/or denials of the Requests. Identify all documents supporting any such qualifications and/or denial(s).

**Response:** *See* **Objections to Request for Admissions 2, 3, 4, 7, 8, 10, 11, and 12, above.**

**As to RFA 6, as set forth in the text of the Personal Search Handbook, the Handbook "is not intended to create of confer any rights, privileges, or benefits upon any private person, but is merely for internal guidance." *See* Personal Search Handbook, at ix.**

**No. 2:** Identify each and every person who interacted with Ashley on October 18, 2014 while she was at the Port of Entry or at Holy Cross Hospital.

**Response:** *See* **Defendants' Initial Disclosure Statement and supplements thereto.**

**No. 3:** Provide the name, title and employer for each and every individual who spoke with Ashley on October 18, 2014 and/or was involved in the decision-making process concerning her detention and transport to Holy Cross Hospital. For each individual, describe the role they played in Ashley's detention and/or transport.

**Response: Defendant objects to this request as unduly burdensome, irrelevant, and not proportional to the needs of the case. Defendant does not have information concerning "each and every person who spoke with Ashley on October 18, 2014." Subject to and without waiving these objections, for employees of U.S. Customs and Border Patrol who may have responsive information, *see* Defendants' Initial Disclosure Statement and supplements thereto. Defendant further responds as follows:**

**Officer Harkins was working in the pedestrian area conducting post roving operation at The Port of Nogales on October 18, 2014. He communicated with Ms. Cervantes in the pedestrian inspection area, and based on her nervous behavior, he recommended that she be escorted to the secondary inspection area.**

**Officer Hernandez was assigned as a shift supervisor at The Port of Nogales on October 18, 2014 and approved a pat down of Ms. Cervantes, to be conducted by**

Officer Gracia and witnessed by Officer Leggett.   Officer Hernandez communicated with Chief Robert S. Reed about the pat down and subsequent canine alert to a trained odor.

Officer Gracia conducted a pat down of Ms. Cervantes, which was supervised by Officer Leggett.  During the pat down, Officer Gracia asked if Ms. Cervantes was hiding anything on her body or inside her body.  Ms. Cervantes responded that she was menstruating and that she was wearing a tampon.  Ms. Cervantes proceeded to show Officer Gracia and Officer Leggett the string of the tampon, which was unusually long and possibly blocked by another object from correct insertion.  After two canines alerted to a trained odor on Ms. Cervantes, Officer Gracia and Officer Leggett were instructed to transport Ms. Cervantes to Holy Cross Hospital for examination.  After the examination at Holy Cross Hospital, Ms. Cervantes admitted to Officer Gracia that she had smoked marijuana earlier that day.

Officer Leggett supervised Officer Gracia's pat down of Ms. Cervantes. During the pat down, Ms. Cervantes showed Officer Gracia and Officer Leggett the string of her tampon, which was unusually long and possibly blocked by another object from correct insertion.  After two canines alerted to a trained odor on Ms. Cervantes, Officer Gracia and Officer Leggett were instructed to transport Ms. Cervantes to Holy Cross Hospital for examination.

Officer Nunez, along with his then assigned Narcotic Human Detector Dog, Kenza, conducted a canine sniff of Ms. Cervantes on October 18, 2014 following her pat down.  During the canine sniff, Kenza alerted to the presence of a trained odor on Ms. Cervantes.

Officer Whitten conducted a canine sniff of Ms. Cervantes on October 18, 2014 with her assigned canine, Sarik.  Sarik alerted to the presence of a trained odor on Ms. Cervantes.

Chief Robert S. Reed communicated with above Officers about their search of

**Ms. Cervantes and requested that Officer Whitten conduct a second canine sniff of Ms. Cervantes prior to elevating her search.  After the second canine alerted to the presence of a trained odor on Ms. Cervantes, Chief Reed sought and obtained approval to transport Ms. Cervantes to Holy Cross Hospital for further examination.**

**Joyce Jarvis was the Assistant Port Director on October 18, 2014.  She communicated with Chief Robert S. Reed and Acting Port Director Guadalupe Ramirez about Chief Reed's request to transport Ms. Cervantes to Holy Cross Hospital for examination, and ultimately communicated the Acting Port Director's approval to Chief Reed.**

**Guadalupe Ramirez was the acting Port Director on October 18, 2014 and provided approval to transport Ms. Cervantes to Holy Cross Hospital for examination.**

**No. 4:** Describe in detail the facts that you contend supported not obtaining a court order and/or search warrant concerning Ashley on October 18, 2014.

**Response:  As set forth in the Incident Log produced with Defendants' Initial Disclosure Statement at CBP 50-52, Plaintiff provided consent to an internal search of her person.  *See also* the Deposition of Ashley Cervantes, at 174:20-175:5, 190:9-11, wherein Plaintiff testified that she provided consent to a search of her person by x-ray.**

**No. 5:** Describe in detail the facts surrounding any and all interactions between Ashley and any drug detector dogs/K9s on October 18, 2014, including identifying the names of the dogs and their handlers and whether the dog alerted.

**Response:  Two canines alerted to the presence of a trained odor on Plaintiff while she was at the Port of Entry on October 18, 2014.  First, Officer Nunez, along with his then assigned Narcotic Human Detector Dog, Kenza, conducted a canine sniff of Ms. Cervantes on October 18, 2014 following her pat down.  During the canine sniff, Kenza alerted to the presence of a trained odor on Ms. Cervantes.  Next, Officer**

**Whitten conducted a canine sniff of Ms. Cervantes on October 18, 2014 with her assigned canine, Sarik. Sarik alerted to the presence of a trained odor on Ms. Cervantes.**

<u>**REQUESTS FOR PRODUCTION**</u>

**RFP No. 1**: For each person identified in response to Interrogatory Nos. 2 and 3, above, please provide that individual's complete employment file. Plaintiff is not requesting any personally identifiable information such as home addresses or social security numbers. She is requesting documentation concerning and relating to their training on the Fourth and Fifth amendments to the U.S Constitution and on any and all policies relating to the search of individuals in the custody of law enforcement.

**Response: Defendant objects to this request because it seeks information protected by the Privacy Act of 1974, 5 U.S.C. § 552a. Defendant further objects to this request as unduly burdensome, irrelevant, and not proportional to the needs of the case. Subject to and without waiving these objections, Defendant responds that its employment files do not contain training materials. As such, Defendant does not have documents responsive to this request.**

**RFP No. 2**: Provide any and all training materials/policies/guidelines which govern the interactions between Ashley and the agents/detector dogs/handlers with whom she interacted on October 18, 2014.

**Response: Defendant objects to this request on the grounds that it seeks records protected by the Privacy Act of 1974, 5 U.S.C. § 552a. Defendant further objects to this request on the grounds that it seeks records regarding law enforcement activities which contain information that is law enforcement sensitive. *See* 19 C.F.R. 103.23(b)(5). Defendant further objects to this request as vague and ambiguous as to the meaning of "training materials … which govern interactions" with Plaintiff, and also vague and ambiguous as to the meaning of "agents." Defendant further objects that the request is overly broad in scope and unduly burdensome, irrelevant, and not proportional to the needs of the case.**

**Subject to and without waiving these objections, see the July 2004 Personal Search Handbook. Defendant further identifies the Canine Enforcement Program Handbook, which Defendant will produce following entry of a Protective Order.**

**RFP No. 3**: Provide any and all reports and/or narratives, including but not limited to audio recordings and/or transcripts of audio recordings, authored by any of the agents/handlers with whom Ashley interacted on October 18, 2014.

**Response: Defendant objects to this request to the extent it seeks attorney-client communications and documents protected by the attorney work product doctrine. Defendant is not producing documents that contain attorney-client communications and documents prepared in anticipation of litigation in response to this request. Defendant further objects to this request as vague and ambiguous as to the meaning of "agents." Subject to and without waiving these objections, see the Incident Log previously produced with Defendants' Initial Disclosure Statement at CBP 50-52.**

**RFP No. 4:** Provide all records, documents, transcripts, certifications, notes, memoranda or other documents, as well as any such information contained in any magnetic storage devices (e.g. computer hard drives, magnetic tape, floppy disks, and any other such storage media) concerning the following:

a. Any and all training, testing or certification of the detector dogs allegedly utilized in this case.

**Response: Defendant objects to this request on the grounds that it seeks records regarding law enforcement activities which contain information that is law enforcement sensitive. *See* 19 C.F.R. 103.23(b)(5). Defendant further objects to this request as unduly burdensome, irrelevant, and not proportional to the needs of the case. Documents reflecting The Canine Center, Front Royal, Virginia curriculum are highly sensitive and their protection is critical to law enforcement activity. Defendant is not producing Canine Center documents in response to this request.**

**Subject to and without waiving the above objections, Defendant will supplement this response following entry of a Protective Order with the following responsive documents:**

**Detection Team Certification Score Sheet;**

**Detection Team Certifications for Officer Nunez and Canine Kenza;**

**Detection Team Certifications for Officer Whitten and Canine Sarik;**

**Detection Canine Student Performance Standards Score Sheet for Officer Whitten and Canine Sarik (records retained for 90 days and available for the preceding 90 days).**

**Detector Dog Training Record for Officer Whitten and Canine Sarik (records retained for 90 days and available for the preceding 90 days).**

b.       Any and all records of the job performance of the detector dogs allegedly utilized in this case, including, but not limited to, all records showing the number of times the dog has been exposed to suspected illegal material and the number of occasions on which those dogs have correctly alerted and the number of occasions on which the dogs have incorrectly alerted. This request includes records of real exposures and simulated exposures conducted for testing purposes, and includes, but is not limited to, K-9 Narcotics Search forms, Detector Dog Utilization forms, and any other similar forms, whether relating to real or simulated situations and whether relating to closed or active cases of any government agency using the dogs.

**Response:   Defendant objects to this request on the grounds that it seeks records regarding law enforcement activities which contain information that is law enforcement sensitive. *See* 19 C.F.R. 103.23(b)(5). Defendant further objects to this request as unduly burdensome, irrelevant, and not proportional to the needs of the case. Documents reflecting The Canine Center, Front Royal, Virginia curriculum are**

**highly sensitive and their protection is critical to law enforcement activity. Defendant is not producing Canine Center documents in response to this request.**

**Subject to and without waiving the above objections, Defendant will supplement this response following entry of a Protective Order with the following responsive documents:**

**Detection Team Certification Score Sheet;**

**Detection Team Certifications for Officer Nunez and Canine Kenza;**

**Detection Team Certifications for Officer Whitten and Canine Sarik;**

**Detection Canine Student Performance Standards Score Sheet for Officer Whitten and Canine Sarik (records retained for 90 days and available for the preceding 90 days);**

**Detector Dog Training Record for Officer Whitten and Canine Sarik (records retained for 90 days and available for the preceding 90 days);**

**Canine Tracking System Activity Reports;**

**Canine Enforcement Team Utilization Reports.**

c.    With regard to the handlers of the detector dogs in this case, the following: Any and all information concerning the handler's education and training in handling and interpreting signals given by detector dogs, including, but not limited to, the name and location of any school or class attended by the handler, the length of the training or education and interim and final grades, if any, received by the handler, any certification received by the handler, and any training or education the handler has received since being certified; and any and all information concerning the experience of the handler since he began handling detector dogs, including, but not limited to, records of all actual and simulated exposures of any detector dogs being handled by those handlers to suspected controlled substances or items of property which might

contain controlled substances, and records evaluating the accuracy of either the dog or the handler on those occasions.

**Response:  Defendant objects to this request on the grounds that it seeks information protected by the Privacy Act of 1974, 5 U.S.C. § 552a.  Defendant further objects to this request on the grounds that it seeks records regarding law enforcement activities which contain information that is law enforcement sensitive.  *See* 19 C.F.R. 103.23(b)(5).  Defendant further objects to this request as unduly burdensome, irrelevant, and not proportional to the needs of the case.  Documents reflecting The Canine Center, Front Royal, Virginia curriculum are highly sensitive and their protection is critical to law enforcement activity.  Defendant is not producing Canine Center documents in response to this request.**

**Subject to and without waiving the above objections, Defendant will supplement this response following entry of a Protective Order with the following responsive documents:**

**Detection Team Certification Score Sheet;**

**Detection Team Certifications for Officer Nunez and Canine Kenza;**

**Detection Team Certifications for Officer Whitten and Canine Sarik;**

**Detection Canine Student Performance Standards Score Sheet for Officer Whitten and Canine Sarik (records retained for 90 days and available for the preceding 90 days);**

**Detector Dog Training Record for Officer Whitten and Canine Sarik (records retained for 90 days and available for the preceding 90 days);**

**Canine Tracking System Activity Reports;**

**Canine Enforcement Team Utilization Reports.**

d.       All training standards and manuals pertaining to the dogs and the dog handlers. These materials should describe the "scoring" system used and implemented to score and/or certify the dog.

**Response:  Defendant objects to this request on the grounds that it seeks records regarding law enforcement activities which contain information that is law enforcement sensitive. *See* 19 C.F.R. 103.23(b)(5).  Defendant further objects to this request as unduly burdensome, irrelevant, and not proportional to the needs of the case.  Documents reflecting The Canine Center, Front Royal, Virginia curriculum are highly sensitive and their protection is critical to law enforcement activity.  Defendant is not producing Canine Center documents in response to this request.**

**Subject to and without waiving the above objections, Defendant will supplement this response following entry of a Protective Order with the following responsive documents:**

**Detection Team Certification Score Sheet;**

**Detection Team Certifications for Officer Nunez and Canine Kenza;**

**Detection Team Certifications for Officer Whitten and Canine Sarik;**

**Detection Canine Student Performance Standards Score Sheet for Officer Whitten and Canine Sarik (records retained for 90 days and available for the preceding 90 days);**

**Detector Dog Training Record for Officer Whitten and Canine Sarik (records retained for 90 days and available for the preceding 90 days);**

**Canine Enforcement Program Handbook.**

**RFP No. 5:** Provide any and all materials related to the certification process, including but not limited to "green sheets" and relating to who certifies the detector dogs, were did the detector dogs come from, were there any monies paid to private entities for the dogs or in relation to the certifying process.

1  **Response:   Defendant objects to this request on the grounds that it seeks**
2  **information protected by the Privacy Act of 1974, 5 U.S.C. § 552a.  Defendant further**
3  **objects to this request on the grounds that it seeks records regarding law enforcement**
4  **activities which contain information that is law enforcement sensitive.  *See* 19 C.F.R.**
5  **103.23(b)(5).   Defendant further objects to this request as unduly burdensome,**
6  **irrelevant, and not proportional to the needs of the case.  Documents reflecting The**
7  **Canine Center, Front Royal, Virginia curriculum are highly sensitive and their**
8  **protection is critical to law enforcement activity.  Defendant is not producing Canine**
9  **Center documents in response to this request.**

10  **Subject to and without waiving the above objections, Defendant will**
11  **supplement this response following entry of a Protective Order with the following**
12  **responsive documents:**

13  **Detection Team Certification Score Sheet;**

14  **Detection Team Certifications for Officer Nunez and Canine Kenza;**

15  **Detection Team Certifications for Officer Whitten and Canine Sarik;**

16  **Detection Canine Student Performance Standards Score Sheet for Officer**
17  **Whitten and Canine Sarik (records retained for 90 days and available for the**
18  **preceding 90 days).**

19  **Detector Dog Training Record for Officer Whitten and Canine Sarik (records**
20  **retained for 90 days and available for the preceding 90 days).**

21  Dated this 15th day of June, 2017.

22  ELIZABETH A. STRANGE
   Acting United States Attorney
23  District of Arizona

24  *s/ Melissa Marcus Kroeger*
   MELISSA MARCUS KROEGER
25  Assistant U.S. Attorney

26

27

28

Exhibit 3

Declaration of Dr. Michael Levine, MD

**LAW OFFICES OF MATTHEW C. DAVIDSON, LTD**
1859 N Grand Ave, Suite 1
Nogales, AZ 85621-1386
(520) 281-0433
Matthew C. Davidson
State Bar No. 015021

**MARCHETTI LAW, PLLC**
290 N. Meyer Avenue
Tucson, Arizona 85701
(520) 334-2067
Brian Marchetti, brian@yourtucsonlawfirm.com
State Bar No. 027193

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| ASHLEY CERVANTES, a single woman,<br><br>Plaintiff<br><br>v.<br><br>UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION AGENT SHAMEKA LEGGETT and "JOHN DOE" LEGGETT; UNKNOWN UNITED STATES CUSTOMS AND BORDER PROTECTION AGENTS; HOLY CROSS HOSPITAL, INC; PATRICK F. MARTINEZ AND "JANE DOE" MARTINEZ; QUANTUM PLUS, INC., dba TEAMHEALTH WEST<br><br>Defendants | 4:16-CV-00334-CKJ<br><br>**DECLARATION OF MICHAEL LEVINE, M.D.** |

Pursuant to 28 U.S.C. § 1746, Dr. Michael Levine, MD, provides the following declaration:

1.     A copy of my CV is attached as Exhibit A.

2.     I earned my medical degree from the Chicago Medical School and completed a residency in Emergency Medicine at Harvard. I received my Board Certification in Emergency Medicine in 2009 and am currently licensed to practice medicine in the State of Arizona and in the State of California.

3.     I presently serve as an Associate Professor of Emergency Medicine at the University of Southern California ("USC"). Currently, I perform between ten and fourteen shifts in USC's Emergency Department per month, during which I am engaged in the active clinical practice of emergency medicine. I also train residents in my role as an Associate Professor.

4.     During the year immediately preceding October 2014, I devoted a majority of my professional time to the active clinical practice of emergency medicine and to the instruction of students in an accredited emergency medicine residency.

5.     Throughout my medical career, I have worked in and around the emergency departments of a number of hospitals. I have encountered innumerable situations in which law enforcement officers brought an individual into the emergency department for the purposes of conducting a search and/or seizure of evidence.

6.     Based on my training and experience, I am acutely aware of the role and responsibility a medical doctor plays in the provision of law enforcement searches. I have personally performed countless searches based on a warrant or the express, informed consent of the individual. I am also aware of the role medical practice staffing agencies play in staffing an emergency department and of the relationship as between the physician,

staffing agency and hospital. Further, I am aware and have been involved in all phases of the development of policy, practices and procedures concerning emergency departments.

7. The standard of care for a hospital emergency department, any entity engaged in staffing an emergency department, and any medical doctor working in an emergency department is not to participate in law enforcement searches without a search warrant or the express, informed consent of the individual to be searched. That standard of care requires a hospital, staffing agency and emergency department physicians to ensure that individuals who are accompanied by law enforcement are treated with dignity and respect and are educated about their rights prior to an examination for forensic evidence collection.

8. Absent a search warrant or the express, informed consent of the individual, a doctor must not undertake, and a hospital must not allow, a forensic evidence collection examination of any kind. If an examination is undertaken based on the individual's consent, that consent must be given knowingly and freely and only after the doctor has adequately explained the examination(s) to be conducted and advised the individual of their right to withhold consent.

9. The standard of care further requires a doctor and/or emergency department staff member to document the method and manner in which the consent was sought and obtained. A hospital and staffing agency must ensure that all doctors and staff are aware of the extreme limitations on examining an individual to collect evidence absent a warrant or express, informed consent. These standards of care are a bedrock principal of emergency care and the standard is so explicit that a specific written policy is unnecessary. That said, the Carondelet Health Network appears to have written policies in effect at the time

Plaintiff was brought in to the Holy Cross Emergency Department by agents of the United States.

10.     I have reviewed the "Consent for Treatment" policy disclosed by Holy Cross, a true and correct copy of which is attached as Exhibit B, and it is in accord with standard policy I would expect to be present and implemented at any medical facility in the United States. The "Consent for Treatment" sets out the principles and practices underlying the method and manner in which consent must be obtained and documented.

11.     As set out in section I of the "Consent for Treatment" policy, a signature on the Conditions for Admission form provides the hospital with, at most, consent only for an anticipated course of treatment. Based on the hospital's own policy, a patient must give express permission for a specific invasive or diagnostic test by signing an additional consent form. Moreover, the hospital's own policy requires that additional consent forms be signed before any non-emergent procedures are performed, and that signed form must be placed in the patient's medical records.

12.     Section II of the "Consent for Treatment" policy sets out the requirement that consent be obtained for all invasive procedures with few exceptions unrelated to this case. Section III of the "Consent for Treatment" policy sets out the hospital's definition of "consent" and "informed consent" which I believe are consistent with the generally accepted uses and definitions of those terms in medicine.

13.     Section V of the "Consent for Treatment" policy details the roles and responsibilities of the health care professionals who interact with a patient during the process of obtaining and documenting consent.

14. In the medical documentation I have reviewed associated with Plaintiff's time at Holy Cross Hospital on October 18, 2014, a true and correct copy of the relevant pages of which are attached as Exhibit C, there are no documented references to any discussion with Ashley about the examinations to be performed or her right to refuse them. There are also no documented references to her providing her express, informed consent for any examination, let alone the pelvic and rectal examinations that were performed. At most, Holy Cross secured Ashley's general consent for admission.

15. I also reviewed the Carondelet Health Network "Care of Inmates, Law Offenders, or Persons in Custody of Law Enforcement" policy, a true and correct copy of which is attached as Exhibit D. As set out in section I of that policy, employees or anyone involved in interacting with an in-custody patient are required to have completed an education/training module related to the care of incarcerated persons. I have not been provided with proof of completion of such training.

16. I have reviewed pages from Ashley's deposition, the medical records provided by Holy Cross Hospital on December 14, 2016 (Exhibit C) and the policies discussed above (Exhibits B and D).

17. This claim involves a scenario in which Ashley, a U.S. Citizen, was detained by federal law enforcement while she was reentering the United States after travelling to Mexico. Ashley was apparently detained at the Port of Entry by federal law enforcement agents for at least a few hours after her reentry. While Ashely was still in the custody of the federal agents, she was transported to Holy Cross Hospital. As set out in the United States Public Health Services Division of Immigration Health Services' Treatment Authorization

Request ("TAR") included in the records Holy Cross provided (Exhibit C), Ashley was "diagnosed" as an alleged "potential internal carrier of foreign substance" and the "course of treatment" was identified as "request for X-Ray".

18.     I understand that no warrant was issued for Ashley's detention or transportation to Holy Cross or for a search of Ashley while she was at Holy Cross.

19.     Based on the Holy Cross records, Ashley did not present to the emergency department for medical care or in an emergent situation. The Holy Cross charts indicate that Ashley's vitals were near normal, and she did not complain of any pain. The records do not document that Ashley presented with any symptoms consistent with internal drug smuggling or that she exhibited any symptoms of feeling sick or unwell. As set out in those records, Ashley denied using or carrying drugs. She was, however, apparently in the midst of her menstrual cycle.

20.     Based on the Holy Cross records, Ashley may have signed a Condition of Admissions form, which contains a general consent provision, set out in paragraph 2 of the document, that references X-rays. I find no evidence in the Holy Cross records that Ashley underwent an X-ray. The records from Holy Cross also include "consent" forms, denoted as Appendix E and Appendix F, which are apparently United States Customs and Border Protection forms. Those forms are blank and are unsigned. I have seen no evidence that Ashley consented to any examination in writing. I also have seen no evidence that she provided oral consent for any examination while at Holy Cross Hospital. I understand from her deposition that she denies providing consent for a pelvic or rectal examination. Regardless, Dr. Martinez performed vaginal and rectal exams on Ashley while she was at

Holy Cross. There is no indication in the Holy Cross records that Ashley expressly provided her knowing and informed consent for a pelvic and/or rectal exam.

21.     Ashley was not a patient for medical purposes. For that reason, the Consent of Admission form is not applicable. Nor is it sufficient to permit for a rectal or pelvic exam to search Ashley for evidence of contraband. Holy Cross Hospital and Quantum Health Plus, through their agents and employees, including Dr. Martinez, fell below the standard of care by failing to obtain Ashley's informed, express consent for a pelvic and/or rectal exam. Holy Cross Hospital and Quantum Health Plus, through their agents and employees, including but not limited to Dr. Martinez, further fell below the standard of care by negligently failing to have appropriate and trained staffing and failing to have policies and procedures in place in the emergency department to ensure the internal policy was followed.

22.     It is my opinion, based on the medical documentation I have reviewed, that Dr. Patrick Martinez, MD, did not adequately obtain and document an express, informed and voluntary consent from Ashley Cervantes for the forensic evidence collection procedures he performed on her.

23.     It is also my opinion that Holy Cross and Quantum Plus, the staffing agency that facilitated Dr. Martinez's work in the Emergency Department, failed to ensure the "Consent for Treatment" policy was followed.

24.     Plaintiff was brought to Holy Cross for the forensic collection of evidence only, not for a medical emergency or for medical treatment. EMTALA applied to this situation only to the extent necessary to perform a Medical Screening Examination to determine and rule out an imminent condition threatening her life or limb. That type of an

exam can be performed by a nurse or non-doctor during the triage/initial admission process. EMTALA does not provide any basis for the pelvic or rectal examinations which Plaintiff underwent. Therefore, the "Consents in an Emergency" exemptions set out in section IV of the "Consent for Treatment" policy do not apply to Plaintiff.

25. I declare and state under penalty of perjury that the foregoing is true and correct.

Executed on ___30 Nov 2017___

_____
Michael Levine, M.D.



Exhibit 3-A

# CURRICULUM VITAE

## Michael Levine

| | |
|---|---|
| ADDRESS: | 3032 Haddington Drive. Los Angeles, CA 90064<br>Telephone:  (818) 426-0300<br>e-mail:  michael.levine@bannerhealth.com;<br>　　　　mdlevine@usc.edu |
| EDUCATION: | National Oceanic and Atmospheric Administration/Undersea and Hyperbaric Medicine Society Physicians Training in Diving Medicine. 2012 |
| | Fellowship in medical toxicology.  Banner Good Samaritan Medical Center.  Phoenix, AZ.  2008-2010. |
| | Chief Resident. Brigham and Women's Hospital/Massachusetts General Hospital.  The Harvard Affiliated Emergency Medicine Residency.  Boston, MA. 7/1/2007-6/30/2008 |
| | Residency in Emergency Medicine.  Brigham and Women's Hospital/Massachusetts General Hospital.  The Harvard Affiliated Emergency Medicine Residency.  Boston, MA. 7/1/2004-6/30/2008 |
| | Finch University and the Chicago Medical School. Degree:  Medical Doctorate 2004 |
| | University of Southern California Degree:  BS Gerontology.  December, 1999 |
| | UCLA Center for Prehospital Care EMT Certification.  1996 |
| BOARD CERTIFICATIONS | American Board of Emergency Medicine, Medical Toxicology. 2010 |
| | American Board of Emergency Medicine.  2009 |
| MEDICAL LICENSES: | Physician.  Arizona Medical Board.  License #37870.  2007-current. |
| | Physician and Surgeon.  The Medical Board of California. License #A97381.  2006-current. |
| | Controlled Substance Registration Certificate.  Department of Justice.  License.  FL0046234.  2006-current. |
| | Physician.  Commonwealth of Massachusetts Board of Registration in Medicine.  License #230370.  2006-2012. |

Controlled Substance Registration Certificate.  Department of Justice.  License.  FL0830403.  2008-current.

HONORS/AWARDS:

Fellow, American College of Medical Toxicology. 19 March, 2016

Faculty Teaching Award.  2nd year medical school class. University of Southern California.  14 August, 2015

University of Arizona School of Medicine.  Academic Excellence Day.  First place, oral presentation of research. May, 2010

Brigham and Women's Hospital. Department of Emergency Medicine. Physician Assistant Award for teaching.  2008

Richard C. Wuerz, M.D. Scholarship for Emergency Medicine Research.  Brigham and Women's/Massachusetts General Hospital's Harvard Affiliated Emergency Medicine Residency.  2007

Richard C. Wuerz, M.D. Scholarship for Emergency Medicine Research.  Brigham and Women's/Massachusetts General Hospital's Harvard Affiliated Emergency Medicine Residency.  2006

American College of Medical Toxicology's Michael P. Spadafora Medical Toxicology Scholarship.  2006

Emergency Medicine Clerkship award, Chicago Medical School.  2004

Board of Trustees Scholarship Award, Chicago Medical School.  2004

Alpha Omega Alpha (AOA), Medical Honor Society

Phi Beta Kappa

Phi Kappa Phi Honor Society

Golden Key National Honor Society

PROFESSIONAL ORGANIZATIONS:

American Academy of Clinical Toxicology (AACT)

American Academy of Emergency Medicine (AAEM)

American College of Emergency Physicians (ACEP)

American College of Medical Toxicology (ACMT)

California Chapter American College of Emergency Physicians (CalACEP)

Society for Academic Emergency Medicine (SAEM)

EMPLOYMENT:

University of Southern California.  Los Angeles, CA 2011-current

North Valley Emergency Specialists.  Emergency Medicine Physician, Thunderbird Medical Center. Phoenix, AZ. 2008-2011.

Emergent Medical Associates.  Emergency Medicine physician, Encino Medical Center.  Encino, CA. 2008-2010 Banner Health.  July 2008-current

Brigham and Women's Hospital.  Boston, MA.  June 2004 - June 2008

Encino Hospital.  Department of Emergency Medicine. Emergency Dept. Tech.  Dec, 1999 – July, 2000

ACADEMIC POSITIONS:

2015-current.  Division Chief.  Division of Medical Toxicology. Department of Emergency Medicine. University of Southern California. Los Angeles, CA.

Assistant professor of emergency medicine.  University of Southern California.  Los Angeles, CA

Director of hyperbaric medicine.  University of Southern California.  Catalina Island.

COMMITTEES:

2016-current.  Vice Chairman. Pharmacy and Therapeutics Committee.  LA County-USC Medical Center.  Los Angeles, CA

2015-current.  Member, Pharmacy and Therapeutics Committee.   USC-Verdugo Hills Medical Center.  Glendale, CA.

2013-current.  Chairman. Medication Safety Subcommittee; Pharmacy and Therapeutics Committee.  LA County-USC Medical Center.  Los Angeles, CA.

2013-2015.  Member.  Pharmacy and Therapeutics Committee.  LA County-USC Medical Center.  Los Angeles, CA.

2013-current.  Member.  Antimicrobial subcommittee; Pharmacy and Therapeutics Committee.  University of Southern California.  Los Angeles, CA.

2012-2014.  Member.  Clinical Translational and Science Institute.  University of Southern California.  Pilot Funding Review Committee.

2011-current.  Member.  American College of Medical Toxicology. Research Committee.

2011-current.  Member.  University of Southern California, Department of Emergency Medicine Research Committee

2010-current.  Member.  American College of Medical Toxicology. Toxicology Investigator's Consortium (ToxIC).

2011-current.  Member.  Institutional Review Board 2; Health Science Campus.  University of Southern California.

2011.  Member.  Pharmacy and Therapeutics (P&T) committee.  Banner Good Samaritan Medical Center.  Phoenix, AZ

2010-2011.  Chairman.  Delirium work-group; subgroup on alcohol withdrawal.  Banner Health.

2010-2011.  Member.  Institutional Review Board.  Banner Health

| | |
|---|---|
| JOURNAL EDITORIAL BOARD | Journal of Medical Toxicology (2016-curent) |
| JOURNAL/PEER REVIEWER | Expert Reviews in Clinical Pharmacology (2015-current) |
| | Academic Emergency Medicine (2014-current) |
| | Neuropsychiatric Disease and Treatment (2013) |
| | British Medical Journal (2014-2015) |
| | Clevland Clinic Journal (2013) |
| | New England Journal of Medicine (2012) |
| | Clinical Toxicology (2012-current) |
| | CNS drugs (2012-current) |
| | Critical Care Medicine (2012-current) |
| | BMC Psychiatry (2012-current) |
| | International Journal of Emergency Medicine (2012) |
| | Western Journal of Emergency Medicine (2011-current) |

Journal of Medical Toxicology (2008-current)

Journal of Emergency Medicine (2008-current)

Journal of Addiction Medicine (2007)

ORAL RESEARCH PRESENTATION AT REGIONAL OR NATIONAL CONFERENCES:

"Prospective cohort study of intravenous lipid emulsion for resuscitating critically-ill poisoned patients." Presented at the American College of Medical Toxicology's Annual Scientific Meeting. 18 March, 2016. Huntington Beach, CA

"Failure of Aminocaproic acid and Tranexamic acid to reverse dabigatran-induced coagulopathy." Presented at the Western Regional meeting for the Society of Academic Emergency Medicine. 15 March, 2014. Irvine, CA.

"Risk of intracranial injury in patients with minor head trauma with pre-injury use of clopidogrel." Presented at the Western Regional meeting for the Society of Academic Emergency Medicine." 23 March, 2013. Long Beach, CA."

"Cost savings associated with poison center consultation on EMS dispatch." Presented at the Western Regional meeting for the Society of Academic Emergency Medicine. 23 March, 2013. Long Beach, CA

"Assessing the prevalence of pancreatitis following resuscitative use of intravenous lipid emulsion." Presented at the North American Congress of Clinical Toxicology. 5 October, 2012. Las Vegas, NV

"Hypoglycemia following accidental pediatric sulfonylurea ingestions." Presented at the Western regional meeting of the Society of Academic Emergency Medicine. 20 March, 2010. Sonoma, CA

"Effect of calcium in digoxin toxicity." 13 May, 2008. Presented at the Massachusetts College of Emergency Physicians (MACEP) annual meeting. Waltham, MA

"Hyperglycemia following calcium channel blocker overdose." 9 May, 2007. Presented at the Massachusetts College of Emergency Physicians (MACEP) annual meeting. Waltham, MA

LECTURES:

"Toxicology Board Review." Grand Rounds, Department of Emergency Medicine, University of Southern California. Los Angeles, CA. 16 February, 2017.

"Toxin-induced seizures." Grand Rounds, Department of Emergency Medicine. University of Southern California. Los Angeles, CA. 27 October, 2016.

"Marijuana: Health benefits, health risks." Grand Rounds. Department of Pediatrics. LA County-USC Medical Center. Los Angeles, CA. 25 October, 2016.

"Envenomations" Presented at the American College of Medical Toxicology's Board Review Course. 30 September, 2016. Salt Lake City, Utah.

"Plants and herbals." Presented at the American College of Medical Toxicology's Board Review Course. 30 September, 2016. Salt Lake City, Utah.

"Opioid addiction and withdrawal." Grand Rounds. Citrus Valley Medical Center. Covina, CA. 20 September, 2016

"Recognizing and managing intoxications with drugs of abuse" Grand Rounds. Department of Pediatrics. LA County-USC Medical Center. Los Angeles, CA. 20 September, 2016.

"Cardiovascular toxins." Grand Rounds, Department of Emergency Medicine, University of Southern California. Los Angeles, CA. 15 September, 2016

"Envenomations." Grand Rounds, Providence Saint Joseph's Medical Center. Burbank, CA. 15 September, 2016

"Emerging drugs of Abuse." EDAP course. LA County-USC Medical Center. 14 September, 2016

"Toxidromes." Grand Rounds, Department of Medicine, Huntington Memorial Hospital. 13 September, 2016.

"Heavy metal toxicity." Grand Rounds, Department of Emergency Medicine, University of Southern California. Los Angeles, CA. 19 July, 2016.

"Novel Antidotes." University of Arizona/Banner University Medical Center. Pick your Poison: Current trends in toxicology. Phoenix, AZ. 22 April, 2016.

"Emerging Recreational Drugs." West Coast Training Conference. Los Angeles, CA. 22 April, 2016

"Acetaminophen toxicity." Grand Rounds, Department of Emergency Medicine, University of Southern California. Los Angeles, CA. 14 April, 2016

"Cardiovascular drug toxicity." Department of Medicine, Huntington Memorial Hospital, Pasadena, CA. 14 April, 2016

"Palytoxin and other marine toxins: Human exposure and toxicity."  American College of Medical Toxicology's Annual Scientific Meeting.  Huntington Beach, CA.  20 March, 2016

"Envenomations."  Grand Rounds, Department of Emergency Medicine, University of Southern California.  Los Angeles, CA.  10 March, 2016.

"Cardiovascular toxins,"  Grand Rounds, Department of Pediatric Emergency Medicine, Children's Hospital, Los Angeles.  9 March, 2016

"Psychiatric Drug toxicities."  Grand Rounds, Department of Medicine, Huntington Memorial Hospital.  Pasadena, CA.  3 March, 2016

"Drug induced seizures." Grand Rounds, Department of Emergency Medicine, Children's Hospital, Los Angeles, Los Angeles, CA.  24 February, 2016

"Pediatric toxicology in the ICU." Society of Critical Care Medicine, Pediatric Pre-conference.  Orlando, FL.  19 February, 2016.

"Toxicology: Board review for emergency physicians." Grand Rounds.  Department of Emergency Medicine, University of Southern California. Los Angeles, CA.  10 February, 2016

"Antidotes."  Noon conference, Department of Medicine, Huntington Memorial Hospital. Passadena, CA.  2 February, 2016.

"Toxin induced hemoglobinopathies."  Department of Emergency Medicine, Children's Hospital, Los Angeles.  Los Angeles, CA.  2 December 2015

"Psychiatric Drug Toxicity."  Department of Emergency Medicine, Children's Hospital, Los Angeles.  Los Angeles, CA.  2 December, 2015

"Introduction to Toxicology, Nursing Education, USC-Verdugo Hills Medical Center. Glendale, CA. 1 December, 2015

"Decompression sickness." Grand Rounds. Department of Emergency Medicine. University of Southern California. Los Angeles, CA. 5 November, 2015.

"Toxicology Emergencies."  USC Verdugo Hills Medical Center. Glendale, CA. 30 October, 2015.

"Emerging Drugs of Abuse."  Glendale Fire Department. Glendale, CA.  20-22 October, 2015.

"Toxic Alcohols." Noon Conference. Department of Medicine. Huntington Memorial Hospital. Passadena, CA. 15 October, 2015.

"Toxidromes." Grand Rounds. Department of Medicine. Huntington Memorial Hospital. Passadena, CA. 12 October, 2015

"Toxic Alcohols." Grand Rounds. Department of Emergency Medicine. University of Southern California. Los Angeles, CA. 24 September, 2015.

"Psychiatric drug toxicity." Grand Rounds. Department of Emergency Medicine. University of California, Los Angeles. Los Angeles, CA. 4 August, 2015.

"Thrombotic and hemostatic drugs: an update." Grand Rounds. Department of Emergency Medicine. University of Oklahoma. Tulsa, OK. 30 July, 2015.

"Psychiatric drug toxicity." Grand Rounds. Department of Emergency Medicine. University of Oklahoma. Tulsa, OK. 30 July, 2015.

"Thrombotic and hemostatic drugs: an update" Grand Rounds. USC-Verdugo Hills Medical Center. Glendale, CA. 16 July, 2015

"Acute NSAID toxicity." Grand Rounds, Department of Emergency Medicine. University of Southern California. Los Angeles, CA. 16 July, 2015.

"Thrombotic and hemostatic drugs: an update." Grand Rounds. Citrus Valley Medical Center. 23 June, 2015. Covina, CA

"Toxic Gases." West Coast Training Conference. Los Angeles, CA. 5 June, 2015

"Intravenous lipid emulsion." Western Toxicology Fellows' conference. San Diego, CA 16 April, 2015.

"Reptile Envenomations." Los Angeles Zoo Reptile staff and zoo curator staff. Los Angeles, CA, 18 February, 2015

"Psychiatric Drug Toxicity." 25 February, 2015. Department of Pediatric Emergency Medicine. Children's Hospital, Los Angeles. Los Angeles, CA

"Diabetic Medications." 25 February, 2015. Department of Pediatric Emergency Medicine. Children's Hospital, Los Angeles. Los Angeles, CA.

"Analgesic toxicity" 4 February, 2015. Department of Medicine, Section of pulmonary and critical care. University of Southern California. Los Angeles, CA

"Cardiovascular toxins" 8 January, 2015. Grand Rounds, Department of Emergency Medicine, University of Southern California, Los Angeles, CA

"Anticholinergics and sympathomimetics." 13 November, 2014. Grand Rounds, Department of Emergency Medicine, University of Southern California, Los Angeles, CA

"Opiates." 20 November, 2014. Grand Rounds, Department of Emergency Medicine, University of Southern California, Los Angeles, CA

"Analgesic toxicity." 14 May, 2014. Grand Rounds, Department of Medicine, Section of pulmonary and critical care. University of Southern California. Los Angeles, CA

"Psychiatric drug toxicity." 8 May, 2014. Grand Rounds, Department of Medicine, Section of pulmonary and critical care. University of Southern California. Los Angeles, CA

"You took what? Emerging drugs of abuse." 31 March, 2014. Resuscitation conference. Las Vegas, NV.

"Sodium channel blocking plants" 27 March, 2014. Natural Toxins Academy. American College of Medical Toxicology. Phoenix, AZ.

"Drug induced rigidity in the psychiatric patient." 20 March, 2014. Grand Rounds, Department of Emergency Medicine, University of Southern California, Los Angeles, CA

"Envenomations." 13 March, 2014. Grand Rounds. USC Verdugo Hills Hospital. Glendale, CA.

"Psychiatric drug toxicity." 13 February, 2014. Grand Rounds. USC Verdugo Hills Hospital. Glendale, CA.

"Antidotes." 6 February, 2014. All LA conference. Los Angeles, CA

"Analgesic toxicity." 16 January, 2014. Grand Rounds. USC Verdugo Hills Hospital. Glendale, CA

"Pulmonary embolism." 16 January, 2014. Grand Rounds. Department of Emergency Medicine. University of Southern California. Los Angeles, CA

"Stopping the shakes: advanced concepts in alcohol withdrawal management," 5 December, 2013. Grand Rounds. Department of Emergency Medicine. University of Southern California. Los Angeles, CA

"Alcohol withdrawal and toxic alcohols." 25 November, 2013. Grand Rounds. Department of Emergency Medicine. Olive View UCLA Medical Center. Sylmar, CA

"Psychiatric Drug toxicity."  29 October, 2013.  Grand Rounds.  Department of Emergency Medicine.  Brigham and Women's Hospital.  Boston, MA

"Spine injuries."  24 October, 2013.  Grand Rounds. Department of Emergency Medicine.  University of Southern California.  Los Angeles, CA.

"Psychiatric drug toxicity."  3 October, 2013.  Grand Rounds.  Department of Emergency Medicine.  UCSF-Fresno.  Fresno, CA.

"Psychiatric drug toxicity."  26 September, 2013. Department of Emergency Medicine.  Grand Rounds. University of Southern California.  Los Angeles, CA.

"Dangerous ingestions in the pediatric population." Department of Pediatrics.  Grand Rounds.  Olive View-UCLA Medical Center.  Sylmar, CA. 14 August, 2013

"Salicylate toxicity."  8 August, 2013 Grand Rounds. University of Oklahoma.  Tulsa, OK.

"Drug induced rigidity."  8 August, 2013.  Grand Rounds. University of Oklahoma.  Tulsa, OK.

"Dangerous ingestions in the pediatric population." 10 May, 2013.  EDAP course.  LA County-USC Medical Center.  Los Angeles, CA.

"Pitfalls in the management of the poisoned patient."  25 April, 2013.  Department of Emergency Medicine.  Grand Rounds.  University of Southern California.  Los Angeles, CA.

"Teratogens."  Presented at the Western Toxicology Fellows' Conference.  11 April, 2013.  Phoenix, AZ.

"Stopping the shakes:  Advanced concepts in alcohol withdrawal management.  14 March, 2013.  Presented at "Alcohol Abuse Academy:  Current Perspectives on Impairment, Dependence, and Withdrawal."  Sponsored by the American College of Medical Toxicology.  San Juan, Puerto Rico.

"Toxicology Board Review for the Emergency Physician." Grand Rounds.  University of Oklahoma.  Tulsa, OK.  7 February, 2013.

"Envenomations."  Grand Rounds.  31 January, 2013. Department of Emergency Medicine.  Grand Rounds. University of Southern California.  Los Angeles, CA.

"Thrombostatic and Hemostatic Drug Toxicities."  22 January, 2013.  Department of Emergency Medicine. Grand Rounds. Olive View Medical Center.  Sylmar, CA.

"Neck trauma."  17 January, 2013.  Department of Emergency Medicine, Grand Rounds.  University of Southern California. Los Angeles, CA

"Acetaminophen Toxicity."  28 November, 2012.   Department of Emergency Medicine, Grand Rounds.  University of Oklahoma.  Tulsa, OK

"Cocaine Toxicity:  An algorithmic approach."  9 November, 2012.  Essentials of Emergency Medicine.  Las Vegas, NV

"Ethylene Glycol Toxicity."  9 November, 2012.  Essentials of Emergency Medicine.  Las Vegas, NV

"Best Tox Papers, part II."  9 November, 2012.  Essentials of Emergency Medicine.  Las Vegas, NV

"Alternative Drug Routes"  8 November, 2012.  Essentials of Emergency Medicine.  Las Vegas, NV

"Sedating the Agitated Patient"  8 November, 2012. Essentials of Emergency Medicine.  Las Vegas, NV

"Aquatic toxicities."  18 October, 2012.  Department of Emergency Medicine.  Grand Rounds.  University of Southern California.  Los Angeles, CA

"Cardiovascular toxins"  20 September, 2012.  Department of Emergency Medicine.  Ground Rounds.  University of Southern California.  Los Angeles, CA

"Toxic Gases."  26 July, 2012.  Los Angeles County Medical Examiner's Office.  Ground Rounds.  Los Angeles, CA

"Sympathomimetics."  19 July, 2012.  Department of Emergency Medicine.  Ground Rounds.  University of Southern California.  Los Angeles, CA

"Toxic alcohols."  3 May, 2012.  Department of Emergency Medicine.  Grand Rounds.  University of Oklahoma.  Tulsa, OK.

"Toxicology in the Emergency Department."  2 May, 2012. School of Pharmacy.  University of Oklahoma.  Tulsa, OK.

"Psychiatric drug toxicity."  5 April, 2012.  Department of Emergency Medicine.  Grand Rounds.  University of Southern California.  Los Angeles, CA

"Critical care gone awry."  18 March, 2012.  Presented at the American College of Medical Toxicology's Spring Conference.  San Diego, CA.

"No harm intended:  Opioid use in chronic pain and the non-narcotic option."  15 March, 2012.  Presented at "Prescription Opioid Misuse Academy:  The dark side of prescription opioids."  Sponsored by the American College of Medical Toxicology.  San Diego, CA

"Hard conversations with drug-seeking patients."  15 March, 2012.  Presented at "Prescription Opioid Misuse Academy:  The dark side of prescription opioids."  Sponsored by the American College of Medical Toxicology.  San Diego, CA

"Cocaine associated chest pain."  12 January, 2012. Department of Emergency Medicine.  Grand Rounds. University of Southern California.  Los Angeles, CA.

"Drug induced seizures."  10 November, 2011.  Department of Emergency Medicine.  Grand Rounds.  University of Southern California.  Los Angeles, CA.

"Toxicity of diabetic medications."  4 November, 2011. Grand Rounds.  LA-County Coroner's Office/Office of the Medical Examiner.  Los Angeles, CA

"Toxicity of Diabetic Medications."  3 November, 2011. Grand Rounds.  Department of Emergency Medicine, University of Southern California, Los Angeles, CA

"Acetaminophen toxicity."  13 October, 2011.  Department of Emergency Medicine.  Grand rounds.  University of Oklahoma.  Tulsa, OK.

"Drug induced seizures."  9 October, 2011.  EM in the 21st century.  Harvard CME course.  Boston, MA.

"Toxicity of diabetic medications."  8 September, 2011. Grand Rounds.  Department of Emergency Medicine. University of Southern California.  Los Angeles, CA.

"Acetaminophen and salicylates."  Grand Rounds. Department of Pediatrics. 1 June, 2011.  Phoenix Children's Hospital. Phoenix, AZ.

"Geriatric toxicology."  Grand Rounds.  Banner Boswell Medical Center/Sun Health Research Institute.  24 May, 2011. Sun City, AZ

"Hematologic toxins.  New drugs and updates on old drugs." Western Toxicology Fellows conference.  14 April, 2011. Sacramento, CA.

"Cardiovascular toxins."  24 March, 2011.  Department of emergency medicine.  Grand rounds.  University of Oklahoma.  Tulsa, OK

"Emergency use of chelators"  17 March, 2011.  Presented at "Update on new antidotes and drug safety in the emergency department."  Sponsored by the American College of Medical Toxicology.  Clearwater, FL

"Intravenous lipid therapy:  is it the panacea for lipophilic poisons."  17 March, 2011.  Presented at "Update on new antidotes and drug safety in the emergency department." Sponsored by the American College of Medical Toxicology. Clearwater, FL

"Vitamin K in warfarin toxicity:  When a pressure bandage just ain't enough.  17 March, 2011.  Presented at "Update on new antidotes and drug safety in the emergency department." Sponsored by the American College of Medical Toxicology. Clearwater, FL

"Bites and Stings."  27 February, 2011.  Snowbird EMS conference.  Lincoln, NH

"Toxic gases."  27 February, 2011.  Snowbird EMS conference.  Lincoln, NH

"Drug induced rigidity in the psychiatric patient."  25 February, 2011.  Grand Rounds.  Department of psychiatry. Banner Good Samaritan Medical Center.  Phoenix, AZ

"Lead toxicity."  17 February, 2011.  Grand Rounds. Department of Medicine.  Phoenix Children's Hospital. Phoenix, AZ

"Cardiovascular toxins."  14 February, 2011.  Banner Good Samaritan Medical Center. Department of medicine.  Phoenix, AZ

"Anticonvulsants: Interactions and adverse side effects."  13 December, 2010.  University of Arizona, College of Medicine. Phoenix, AZ.

"Toxicology pearls:  Pitfalls in management."  10 October, 2010.  EM in the 21st century; Harvard CME  Course.  Boston, MA

"Drugs of abuse:  Not as designed."  7 October, 2010. American College of Medical Toxicology.  Pre-meeting symposium for the North American Congress of Clinical Toxicology.  Denver, CO.

"Endocrine Drugs."  15 September, 2010.  Department of emergency medicine.  Maricopa Medical Center. Phoenix, AZ.

"Bites and stings."  18 August, 2010.  Grand Rounds.  Yavapai Regional Medical Center.  Prescott, AZ.

"Toxin-induced seizures"  11 August, 2010.  Department of emergency medicine.  Maricopa Medical Center.  Phoenix, AZ

"Bites and stings."  9 August, 2010.  Grand Rounds. Department of internal medicine.  Banner Good Samaritan Medical Center.  Phoenix, AZ.

"Environmental emergencies."  30 June, 2010.  Department of Emergency Medicine.  Maricopa Medical Center.  Phoenix, AZ.

"The pill to kill:  Fatal ingestions in the pediatric population." Lecture for Peace Through Health; sponsored by Brigham and Women's Hospital under a grant via US State Department.  16 June, 2010.  Boston, MA

"Hand injuries."  28 April, 2010.  Department of emergency medicine.  Maricopa Medical Center.  Phoenix, AZ.

"Spine injuries."  28 April, 2010.  Department of emergency medicine.  Maricopa Medical Center.  Phoenix, AZ.

"Rodenticides"  14 April, 2010.  Department of emergency medicine.  Maricopa Medical Center.  Phoenix, AZ

"Killer bees."  Presented at "Bites, stings, and Arizona desert poisonings for the desert enthusiast.  A conference sponsored by the American College of Medical Toxicology and the Banner Good Samaritan Poison and Drug Information Center. 13 March, 2010.  Scottsdale, AZ

"Heat illness."  Presented at "Bites, stings, and Arizona desert poisonings for the desert enthusiast.  A conference sponsored by the American College of Medical Toxicology and the Banner Good Samaritan Poison and Drug Information Center. 13 March, 2010.  Scottsdale, AZ.

"Intravenous lipid therapy:  is it the panacea for lipophilic poisons. 11 March, 2010.  Presented at "Update on new antidotes and drug safety in the emergency department." Sponsored by the American College of Medical Toxicology, Arizona College of Emergency Physicians, and the Arizona Pharmacy Alliance. Scottsdale, AZ.

"Vitamin K in warfarin toxicity:  When a pressure bandage just ain't enough. 11 March, 2010.  Presented at "Update on new antidotes and drug safety in the emergency department." Sponsored by the American College of Medical Toxicology, Arizona College of Emergency Physicians, and the Arizona Pharmacy Alliance. Scottsdale, AZ.

"Management of common toxicities"  3 February, 2010. Grand Rounds, Department of internal medicine.  Banner Del E. Webb Medical Center.  Sun City, AZ

"Cardiology literature update." 20 January, 2010. Department of emergency medicine. Maricopa Medical Center, Phoenix, AZ

"Toxin induced peripheral neuropathies" 1 December, 2009. Department of Internal Medicine. Banner Good Samaritan Medical Center. Phoenix, AZ

"Management of common toxicities" 17 November, 2009. Grand Rounds, Department of internal medicine. Providence Tarzana Medical Center. Tarzana, CA

"Serotonin Syndrome." 21 October, 2009. Department of emergency medicine. Maricopa Medical Center. Phoenix, AZ

"Infectious diseases in the toxicology setting." 1 September, 2009 Department of internal medicine. Banner Good Samaritan Medical Center. Phoenix, AZ.

"The pill to kill: Fatal ingestions in the pediatric population." 27 August, 2009. Grand Rounds. Department of emergency medicine. University of Oklahoma. Tulsa, OK.

"Ethanol." 8 July, 2009. Department of Emergency Medicine. Maricopa Medical Center. Phoenix, AZ

"Allergy and immunology." 9 June, 2009. Department of internal medicine. Banner Good Samaritan Medical Center. Phoenix, AZ

"Aquatic toxicities." 3 June, 2009. Department of emergency medicine. Maricopa Medical Center. Phoenix, AZ

"Lead toxicity" 19 March, 2009. Department of medicine. Phoenix Children's Hospital. Phoenix, AZ.

"Toxicologic issues with gastrointestinal presentations." 5 January, 2009. Department of internal medicine. Banner Good Samaritan Medical Center. Phoenix, AZ.

"Anticholinergic toxicity." 15 October, 2008. Department of emergency medicine, Maricopa Medical Center. Phoenix, AZ

"The Pill to kill: Fatal ingestions in the pediatric population" 12 October, 2008. EM in the 21st century; Harvard CME Course. Boston, MA.

"Salicylate Toxicity." 8 October, 2008. Department of emergency medicine. Maricopa Medical Center. Phoenix, AZ

"Toxicologic issues in the infectious disease setting." 2 September, 2008. Department of internal medicine. Banner

Good Samaritan Medical Center.  Phoenix, AZ

MEDIA INTERVIEWS

19 August, 2016.  LA Daily News.  Synthetic cannabinoids

5 August, 2016.  KPCC .  Southern California Public Radio, "Kratom"

1 August, 2015.  "Bee venom."  Pasadena Star-News

22 November, 2013.  "The Doctors"  Interview on Brittney Murphy's death.

1 April, 2013.  Reuters News.  Comment on article in JAMA Medicine on methemoglobinemia

8 January, 2013.  CBS This Morning.  Testing for cyanide.

KTVK, Arizona Family Channel.  Drinking automobile products.  14 February, 2011.

Cronkite News/PBS.  Bath salts.  31 January, 2011

Telemundo News, Phoenix.  K2.  30 November, 2010

Arizona Republic.  Alternative therapies.  23 November, 2010

KSAZ, Fox News.  Phoenix.  Caffeine in alcoholic beverages.  17 November, 2010

KNXV, ABC News.  Phoenix.  Alternative medications.  3 November, 2010

KNXV, ABC News.  Phoenix.  K2.  29 October, 2010

KNXV, ABC News.  Phoenix.  Poisonous plants.  12 October, 2010

KNXV, ABC News.  Phoenix.  K2.  14 September, 2010

KTXV, ABC News.  Phoenix.  K2.  5 March, 2010

KTXV, ABC News, Phoenix.  Ethanol.  30 December, 2009

KTAR News Radio.  Phoenix.  Ethanol.  30 December, 2009

KTVK, Arizona Family Channel.  Heat deaths following sweat lodge deaths.  12 October, 2009.  5 PM

KNXV, ABC News, Phoenix.  Heat illness in athletes.  24 July, 2009.  10 PM

Telemundo News, Phoenix.  Scorpion envenomations.  15 July, 2009.  10 PM

KPNX, NBC News, Phoenix.  Ethanol intoxication.  10 PM. 9 July, 2009. 10 PM

KTAR News Radio.  Phoenix.  Inhalant Abuse.  6 July, 2009

KPHO, CBS News, Phoenix.  Rattlesnake bites.  10 PM.  4 May, 2009

KNXV, ABC News.  Phoenix.  Rattlesnake bites. 10 PM.  4 May, 2009

KTVK, Arizona Family Channel.  Hypothermia.  15 January, 2009.

KTAR News Radio.  Phoenix.  Caffeine toxicity.  7 January, 2009.

KSAZ, Fox News, Phoenix.  Hangovers.  9 PM.  31 December, 2008

KTAR News Radio.  Phoenix.  Poisonous plants.  23 December, 2008

STUDY PUBLICATIONS:

Papers:

**Levine M**, Stellpflug S, Pizon A, et. al.  Estimating the impact of adopting the revised United Kingdom acetaminophen treatment nomogram in the US population. Clin Toxicol.  2017; accepted for publication.

Traub SJ, **Levine MD**.  Acute neurotoxicology of drugs of abuse.  Handb Clin Neurol.  2017; 141:485-505.

**Levine M**, Flores J, Seabury SA, et. al.  Impact of the use of a regional poison center in an urban EMS dispatch system.  J Med Toxicol. 2017; 13:47-51.

Gosselin S, Hoegberg LCG, Hoffman RS, Graudins A, Stork CM, Thomas SHL, Stellpflug SJ, Hayes B, **Levine, M**, et. al.  Evidence-based recommendations on the use of intravenous lipid emulsion therapy in poisoning.  Clin Toxicol.  2016; 54:899-23

**Levine M**, Huang M, Henderson SO, et. al.  Aminocaproic acid and tranexamic acid fail to reverse dabigatran-induced coagulopathy. Am J Ther.  2016; 23:e1619-22.

**Levine M**, Sanko S, Eckstein M.  Assessing the risk of prehospital administration of naloxone with subsequent refusal of care. Prehosp Emerg Care. 2016; 20:566-9

Marshall A, **Levine M**, Howell ML, et. al. Dose-related pulmonary complication rates after fresh frozen plasma administration for warfarin reversal. J Thromb Haemost. 2016; 14:324-30

**Levine M**, Hoffman RS, Lavergne V, et. al. A systematic review of lipid emulsion therapy for non-local anesthetics. Clin Toxicol. 2016; 54:194-221.

**Levine M**, O'Connor AD, Padilla-Jones A, et. al. Comparison of prothrombin time and aspartate aminotransferase in predicting hepatotoxicity after acetaminophen overdose. J Med Toxicol. 2016; 12:100-6.

**Levine M**, Huang M, Henderson SO, et. al. Aminocaproic acid and tranexamic acid fail to reverse dabigatran-induced coagulopathy. Am J Ther. 2015; publication in press.

Gosselin S, Morris M, Miller-Nesbitt A, et. al. Methodology for AACT evidence-based recommendations on the use of intravenous lipid emulsion therapy in poisoning. Clin Toxicol. 2015; 53:557-64.

O'Connor AD, Padilla-Jones A, Gerkin RD, **Levine M**. Prevalence of rhabdomyolysis in sympathomimetic toxicity: a comparison of stimulants. J Med Toxicol. 2015; 11:195-200

Froberg BA, **Levine M**, Beuhler MC, et. al. Acute methylenedioxypyrovalerone toxicity. J Med Toxicol. 2015; 11:185-94

Curry SC, Padilla-Jones A, O'Connor AD, et. al. Prolonged acetaminophen-protein adduct elimination during renal failure, lack of adduct removal by hemodiafiltration, and urinary adduct concentrations after acetaminophen overdose. J Med Toxicol. 2015; 11:169-78.

Harter K**, Levine M**, Henderson SO. Anticoagulation drug therapy: A review. West J Emerg Med. 2015; 16:11-17.

**Levine M**, Goldstein JN. Bleeding complications of targeted oral anticoagulants. Hematology Am Soc Hematol Educ Program. 2014; 1:504-9.

**Levine M**. Pediatric envenomations: don't get bitten by an unclear plan of care. Pediatr Emerg Med Pract. 2014; 11:1-12.

**Levine M**, Abdi A, Rose E. Diphenhydramine overdose with intraventricular conduction delay treated with hypertonic sodium bicarbonate and IV lipid emulsion. West J Emerg Med. 2014; 15:855-8.

**Levine M**, Goldstein JN. Emergency reversal of anticoagulation: novel agents. Curr Neurol Neurosci Rep. 2014; 14:471-8.

**Levine M**, Pizon AF, Padilla-Jones A, et. al. Warfarin overdose: a 25 year experience. J Med Toxicol. 2014; 10:156-64

Ruha AM, **Levine M**. Central nervous system toxicity. Emerg Med Clin North Am. 2014; 32:205-21

**Levine M**, Ruha AM, Padilla-Jones A, et.al. Bleeding following rattlesnake envenomation in patients with pre-envenomation use of antiplatelet or anticoagulant medications. Acad Emerg Med. 2014; 21:301-7.

**Levine M**, Skolnik AB, Ruha AM, et. al. Complications following antidotal use of intravenous lipid emulsion therapy. J Med Toxicol. 2014; 10:10-4.

**Levine M**, Wyler B, LoVecchio F, et. al. Risk of intracranial injury after minor head trauma in patients with pre-injury use of clopidogrel. Am J Emerg Med. 2014; 32:71-4.

**Levine M**, O'Connor AD, Tasset M. Methemoglobinemia following a mediastinal stab wound. J Emerg Med. 2013; 45:e153-6.

**Levine M**, Curry SC, Padilla-Jones A, Ruha AM. Critical care management of verapamil and diltiazem overdose with a focus on vasopressors: A 25 year experience at a single center. Ann Emerg Med. 2013; 62:252-8.

**Levine M**, Levitan R, Skolnik A. Compartment syndrome following "Bath Salts" Use: A case series. Ann Emerg Med. 2013; 61:480-3.

**Levine M**, Froberg B, Ruha AM, et. al. Assessing the toxicity and associated costs among pediatric patients admitted with unintentional poisonings of attention deficit-hyperactivity disorder drugs in the United States. Clin Toxicol (Phila). 2013; 51:147-50.

Bosak A, LoVecchio F, **Levine M**. Recurrent Seizures and Serotonin Syndrome Following 2C-I ingestion. J Med Toxicol. 2013; 9:196-8.

**Levine M**, Mihalic J, Ruha AM, French RE, Brooks DE. Heavy metal contaminants in yerberia shop products. J Med Toxicol. 2013; 9:81-4.

**Levine M**, Swenson S, McCormick T, Henderson SO, Thomas SH, Markland FS. Reversal of thienopyridine-induced platelet dysfunction following desmopressin administration. J Med Toxicol. 2013; 9:139-43.

McCormick T, **Levine M**, Knox O, Claudius I. Ethanol ingestion in two infants under two months old; a previously unreported cause of an ALTE. Pediatrics. 2013; 131:e604-7.

Wiegand TJ, Wax PM, Schwartz T, et. al. The Toxicology Investigators Consortium case registry—the 2011 experience. J Med Toxicol. 2012; 8:360-77.

**Levine M**, O'Connor AD. Obstetrical toxicology: Teratogens. Emerg Med Clin N Am. 2012; 30:977-90.

**Levine M**, LoVecchio F, Ruha AM, Chu G, Roque P. Influence of drug use on morbidity and mortality in heat stroke. J Med Toxicol. 2012; 8:252-7.

**Levine M**, Brooks DE, Franken A, Graham R. Delayed onset seizure and cardiac arrest following amitriptyline overdose, treated with intravenous lipid emulsion therapy. Pediatrics. 2012; e432-8.

**Levine M**, Ruha AM. Clinical overdose of atypical antipsychotics: clinical presentation, mechanisms of toxicity, and management. CNS Drugs. 2012; 26 (7): 601-611

**Levine M**, Brown DFM. Succinylcholine-induced hyperkalemia in a patient with multiple sclerosis. J Emerg Med. 2012; 43:279-82.

**Levine M**, Curry SC, Ruha AM, Pizon AF, Boyer E, Burns J, Bilin D, Gerkin RD. Ethylene glycol elimination kinetics and outcomes in patients managed without hemodialysis. Ann Emerg Med. 2012; 59:527-31.

**Levine M**, Ruha AM, Goldstein JN. Can asymptomatic patients with a supratherapeutic INR be safely treated as outpatients? Ann Emerg Med. 2012; 59:318-20.

**Levine M**, Ruha AM, Graeme K, Brooks DE, Canning J, Curry SC. Toxicology in the ICU; part 3: Natural Toxins. Chest. 2011;140:1357-70.

Brooks DE, **Levine M**, O'Connor AD, et. al. Toxicology in the ICU; part 2: Specific toxins. Chest. 2011; 140:1072-85.

**Levine M**, Brooks DE, Truitt CA, et. al. Toxicology in the ICU; part 1: A general overview and approach to treatment. Chest. 2011; 140:795-806.

**Levine M**, Ruha AM, LoVecchio F, et. al. Hypoglycemia following accidental pediatric sulfonylurea ingestions. Peds Emerg Care. 2011; 27:846-9.

**Levine M**, Adler J. Acute diaphragmatic rupture in a patient with Ehlers-Danlos syndrome. J Emerg Med. 2011; 41:366-8.

Canning J, **Levine M**. Case Files of the Medical Toxicology Fellowship at Banner Good Samaritan Medical Center in Phoenix, AZ: Methemoglobinemia following Dapsone Exposure. J Med Toxicol. 2011; 7:139-146.

**Levine M**, LoVecchio F, Tafoya P, et. al. Paliperidone overdose with delayed onset of toxicity. Ann Emerg Med. 2011; 58:80-2.

**Levine M**, Nikkanen H, Pallin DJ. The effects of intravenous calcium in patients with digoxin toxicity. J Emerg Med. 2011; 40:41-6.

**Levine M**, Canning J, Chase R, Ruha AM. Cardiomyopathy following Latrodectus envenomation. West J Emerg Med. 2010; 11:521-3.

**Levine M**, Khaurana A, Ruha AM. Polyuria, acidosis, and coma following massive ibuprofen ingestion. J Med Toxicol. 2010; 6:315-7.

Gresham C, **Levine M**, Ruha AM. Case files of the medical toxicology fellowship at Banner Good Samaritan Medical Center in Phoenix, AZ: A Non-warfarin anticoagulant overdose. J Med Toxicol. 2009; 5:242-9.

**Levine M**, Boyer EW, Pozner CN et. al. Assessment of hyperglycemia following calcium channel blocker overdoses involving diltiazem or verapamil 2007; Crit Care Med. 2007; 35:2071-5.

Katzin LW, **Levine M**, and Singhal AB. Dural puncture headache, postpartum angiopathy, pre-eclampsia and cortical vein thrombosis after an uncomplicated pregnancy. Cephalgia. 2007; 27:461-4.

**Levine M**, Nikkanen H, Nadel ES, et. al. Weakness and Mental Status Change. Case Presentations of the Harvard Affiliated Emergency Medicine Residency. J Emerg Med. 2006; 30:341-4.

**Levine M**, Iliescu ME, Margellos-Anast H, Estarziau M, Ansell DA. The effects of cocaine and heroin use on Intubation rates and hospital utilization in patients with acute asthma exacerbation. Chest. 2005; 128:1951-7.

Pozner CN, **Levine M**, Zane R. The cardiovascular effects of cocaine. J Emerg Med. 2005; 29:173-8.

**Levine M**, Wong D, Brown DF, Nadel ES. Chest pain and arthritis. Case Presentations of the Harvard Affiliated Emergency Medicine Residency. J Emerg Med. 2005; 29: 91-5.

**Levine M**, Traub S, Burns MJ. The pharmacology and toxicology of aripiprazole. Int J Med Toxicol. 2004; 7:5.

Pozner CN, Zane R, Nelson SJ, **Levine M**.  International EMS systems:  The United States:  past, present, and future.  Resuscitation.  2004; 239-44.

Pozner C,  **Levine M**, Shapiro N, Hanrahan JP.  Concordance of field and Emergency Department assessment in the prehospital management of patients with dyspnea.  Prehosp Emerg Care.  2003; 7:440-4.

**Levine M**, Siegel LB. A swollen joint:  Why all the fuss?  Am J Therap. 2003; 10:219-24.

Li J, Brown J, **Levine M**.  Mild head injury, anticoagulants, and risk of intracranial injury.  Lancet.  2001; 357:771-2.

**Levine M**, Burns M.  The pharmacology and toxicology of nateglinide.  Int J Med Toxicol.  2001; 4:25.

Li J, Kennedy D, **Levine M**, Kumar A, Mullen J.  Absent hematuria and expensive computerized tomography:  Case characteristics of emergency urolithiasis.  J Urol.  2001; 165:782-4.

Editorials/Letters to the Editor:

**Levine M**, Spyres M.  Fire-related inhalational injury.  N Engl J Med.  2016; 375:1905.

**Levine M**, O'Connor AD, Padilla-Jones A, et. al. Comparison of Prothrombin Time and Aspartate Aminotransferase in Predicting Hepatotoxicity After Acetaminophen Overdose: A Response.  J Med Toxicol.  2016; 12:218

Ruha AM, Curry SC, **Levine M**.  In reply:  Critical care management of verapamil and diltiazem overdose with a focus on vasopressors:  A 25 year experience at a single center.  Ann Emerg Med.  2014; 63:93.

**Levine M**, Curry S, Ruha AM, et. al.  In reply:  Critical care management of verapamil and diltiazem overdose with a focus on vasopressors:  A 25 year experience at a single center.  Ann Emerg Med.  2014; 63:90-1.

**Levine M**, Curry SC, Ruha AM, Pizon AF.  Ethylene glycol elimination kinetics and outcomes in patients managed without hemodialysis.  In reply.  Ann Emerg Med.  2012; 60:540-1.

O'Connor AD, Ruha AM, **Levine M**.  Pressure immobilization bandages not indicated in the pre-hospital management of North American snakebites.  J Med Toxicol.  2011; 7:251

Canning JE, **Levine M**, Smith J, Truitt CA.  Articles you may have missed.  J Med Toxicol.  2010; 6:367-9.

**Levine M**, Ruha AM.  Images in Clinical Medicine: Rattlesnake Envenomation.  N Engl J Med.  2010; 362:2212.

**Levine M,** Lovecchio F.  Diphenhydramine-induced Brugada pattern.  Resuscitation.  2010; 81:503-4.

**Levine M**, Nikkanen H, Pallin DJ.  Response to letter to the editor. J Emerg Med.  2010; 39:102-3.

**Levine M**, Ruha AM.  Buprenorphine withdrawal in a toddler.  Ann Emerg Med.  2009; 54:477-8.

**Levine M**, Boyer EW, Pozner CN, et. al.  Inclusion of patients who overdose with dihydropyridine calcium channel blockers would potentially increase clinical utility of hyperglycemia.  Crit Care Med.  2008; 36:662-3.

**Levine M**.  Re: Critical review and recommendations for nesiritide use in the Emergency Department.  J Emerg Med.  2007; 32:207-9.

**Levine MD**, Boyer E.  Hyperinsulinemia-euglycemia therapy: a useful tool in treating calcium channel blocker poisoning.  Crit Care.  2006; 10:149.

Abstracts:

**Levine M**, Ruha AM, Kleinschmidt K.  Rattlesnake envenomation in pediatric and adult patients.  Acad Emerg Med.  2016; 23:S108

**Levine M**, Brent J, Wax P, etl. Al.  Prospective cohort study of intravenous lipid emulsion for resuscitating critically ill poisoned patients.  J Med Toxicol.  2016; 12:4

**Levine M**, Skolnik A, Spyres M, et. al.  Assessment of bleeding risk in patients with intentional overdoses of novel anticoagulants and antiplatelet agents.  J Med Toxicol.  2016; 12:25

Chang J, Vohra R, **Levine M**.  Acetaminophen poisoning: effect of a toxicology consultation service on length of stay on a single academic medical center.  J Med Toxicol.  2016; 12:9

**Levine M**, Pizon AF, Stellpflug SJ, et. al.  Hypoglycemia in acetaminophen-induced hepatic failure: What is the significance?  Ann Emerg Med.  2015; 66:S140

**Levine M**, Marshall A, Howell ML, et. al.  Thromboembolism after emergency warfarin reversal with fresh frozen plasma.  Ann Emerg Med.  2015; 66:S148

**Levine M**, Thomas SH, Pizon AF, et. al.  Estimating the financial impact of adopting the revised United Kingdom acetaminophen treatment nomogram in the US population.  Clin Toxicol.  2015; 53:754

**Levine M**, McCormick T, Santillanes G, et. al. Proceduraal sedation using intranasal ketamine in pediatric patients. Acad Emerg Med. 2015; 22:S232.

**Levine M**, Sanko SG, Eckstein MK. Risk of death in prehospital patients who receive naloxone and sign out against medical advice. Acad Emerg Med. 2015; 22:S257

**Levine M**, Finkelstein Y, Rhyee SH, et. al. Antidotal therapy by intravenous lipid emulsion: observations from the Toxicology Investigators Consortium (ToxIC). J Med Toxicol. 2015; 11:26

**Levine M**, Pizon AF, Stellpflug SJ, et. al. Estimating the impact of adopting the revised UK acetaminophen treatment nomogram in the US population. J Med Toxicol. 2015; 11:26

**Levine M**, Brooks DE. Clinical characteristics and treatment practices in patients with acute insulin overdose. J Med Toxicol. 2015; 11:26-7

Tabatabai R, Harter K, Lam CN, **Levine M**. Emergency Medicine practice patterns in the treatment of hyperkalemia. Ann Emerg Med. 2014; 64:S142.

Joseph D, Joseph M, **Levine M**. Stress induced cardiomyopathy after ingestion of Garcinia cambogia. Clin Toxicol. 2014; 52:739-40.

**Levine M**, Huang M, Carmelli G, et. al. Failure of aminocaproic acid and tranexamic acid to reverse dabigatran-induced coagulopathy. Acad Emerg Med. 2014; 21:S179

Bosak AB, Heise CW, **Levine M**, et, al. Clinical presentations with different glyphosate-containing herbicides. J Med Toxicol. 2014; 10:72

Tran A, Grimaldi L, Shah A, Menon S, **Levine M**. Inverse Takotubo cardiomyopathy after methamphetamine use. J Med Toxicol. 2014; 10:97

**Levine M**, Iwanicki J, Leikin JD, et. al. Intravenous lipid emulsion therapy use in the Toxicology Investiators Consortium (ToxIC). J Med Toxicol. 2014; 140:85

Jhun P, **Levine M**, Schoenberger J. Teaching common clinical procedures to emergency medicine residents: efficacy of simulation task trainers versus fresh tissue cadavers. Ann Emerg Med. 2013; 62:S178

**Levine M**, O'Connor AD, Padilla-Jones A, et. al. Prevalence of rhabdomyolysis in sympathomimetic toxicity: a comparison of stimulants. Clin Toxicol. 2013; 51:678-9.

**Levine M**, Bosak A, Yee B, et. al. Carbamazepine induced seizures and ventricular dysrhythmias. Clin Toxicol. 2013; 51:653-4.

**Levine M**, Ruha AM, Froberg BA, et. al. Increasing prevalence of ADHD drug toxicity. Ann Emerg Med. 2012; 60:S124

**Levine M**, Swenson S, McCormick T, et. al. Clopidogrel-induced platelet dysfunction following desmopresin administration in an overdose model. Ann Emerg Med. 2012; 60:S123-4.

**Levine M**, Skolnik A, Levitan R, Pizon AF. Assessing the prevalence of pancreatitis following resuscitative use of intravenous lipid emulsion. Clin Toxicol. 2012; 50:681

**Levine M**, Ruha AM, Pizon AF, et. al. Case series of patients presenting with warfarin overdose. Clin Toxicol. 2012; 50:682-3.

**Levine M**, O'Connor AD, Padilla-Jones A, et. al. Occurrence of thrombocytopenia following acetaminophen toxicity. Clin Toxicol. 2012; 50:587-8.

Froberg BA, **Levine M**, Engebretsen KM, et. al. Clinical presentations and medical complications after exposure to substances labeled as "Bath Salts." A ToxIC preliminary report. Clin Toxicol. 2012; 50:704-5.

**Levine M**, Ruha AM, Curry SC, et. al. Critical care management of verapamil and diltiazem overdoses at a single center. Clin Toxicol. 2012; 50:586-7.

**Levine M**, O'Connor A, Padilla-Jones A, et. al. Effect of acetaminophen overdose on prothrombin time. Clin Toxicol. 2012; 50:587

**Levine M**, Graeme K, Skolnik A. Pancreatitis following treatment with intravenous lipid emulsion therapy for severe TCA toxicity. Clin Toxicol. 2012; 50:684

**Levine M**, Lovecchio F. Paraspinal compartment syndrome and acute kidney injury complicating MDPV ingestion. Clin Toxicol. 2012; 50:688

**Levine M**, Truitt CA, O'Connor AD. Acute cardiomyopathy following a milnacipran overdose. Clin Toxicol. 2011; 50:205-6.

Curry SC, **Levine M**, French R, Skolnik A. Cardiovascular collapse and shock following ibuprofen ingestion. Clin Toxicol. 2011; 50: 211.

**Levine M**, Canning J, Garcia-Orr R, Shinar B.  Acute colchicine toxicity following fibromyalgia treatment.  Clin Toxicol.  2011; 50:93-4.

**Levine M**, Ruha AM, Stein V, Byrne T.  Myocardial infarction and refractory thrombocytopenia complicating rattlesnake envenomation.  Clin Toxicol.  2011; 50:115.

Ruha AM, Champagne L, Truitt CA, **Levine M**.  Finger debriedment and amputation after rattlesnake envenomation: a case series.  Clin Toxicol.  2011; 50:117-118.

**Levine M**, Ruha AM, LoVecchio F, Chu G, Roque P.  Drug-associated heat illness.  Clin Toxicol.  2011; 50:134-5.

Frankin A, Graham R, **Levine M**, et. al.  Delayed onset seizure and cardiac arrest following amitriptyline overdose, treated with intravenous lipid emulsion therapy.  Crit Care.  2010; 38 (Suppl):921.

**Levine M**, Ruha AM, Curry S, et. al.  Ethylene glycol serum elimination half-life in patients treated with fomepizole but without hemodialysis.  Ann Emerg Med.  2010; 56:S124.

**Levine M**, French R, Ruha AM.  Rattlesnake envenomations in patients on anticoagulants and antiplatelet agents.  Clin Toxicol.  2010; 48:627.

**Levine M**, Ruha AM.  Massive acetaminophen ingestion resulting in hepatic injury despite early use of N-Acetylcysteine.  Clin Toxicol.  2010;48:656.

**Levine M**, Mihalic J, Ruha AM, et. al.  Heavy metal contaminants in yerberia shop products.  Clin Toxicol.  2010; 48:628.

**Levine M**, Gresham H, Brooks D, et. al.  Acid base status as a predictor of severity in salicylate toxicity.  Ann Emerg Med.  2009; S114-5.

**Levine M**, Zorn E, O'Connor A, Truitt C. Use of dexmedetomidine in the treatment of scorpion envenomations.  Clin Toxicol.  2009;42:763.

**Levine M**, Ruha AM, Canning J.  Buprenorphine withdrawal in a toddler.  Clin Toxicol.  2009;42:754.

**Levine M**, Nikkanen H, Pallin DJ.  Intravenous calcium administration in digoxin toxic patients.  Ann Emerg Med.  2008; 83:S27.

**Levine M**, Thomas S, Geib AJ, Thomsen T, Pozner C.  Serum Glucose Concentrations as a Marker of Severity in Calcium Channel Blocker Overdose.  Ann Emerg Med.  2006; 48:S80.

Pozner CN, **Levine M**, Listwa T, Barker T, Zane R, Pallin D.

Does the presence of physicians at professional football games reduce the number of patient transports? Ann Emerg Med. 2006; 48:S55.

Brown J, Li J, **Levine M**, Rosen M. Do anticoagulated patients with minor head trauma need CT? Results from the COSH (anticoagulants and the Study of Head injury). Phase I trial. Acad Emerg Med. 2000; 7:495.

Lin K, Barela AJ, Chang M, Dicus E, Garett S, **Levine M**, Orai S, McClure WO. Prenatal stress generates adult rats with behavioral and neuroanatomical similarities to human schizophrenics. Society for Neuroscience. 1998; 24:746.

Textbook Chapters:

**Levine M**. Management of acetaminophen (paracetamol) poisoning. In: Oxord textbook fo critical care. Webb A, Angus DC, Finfer S, et al. (Eds). 2nd edition. Oxford University Press. Oxford. 2016; 1518-21

**Levine M.** Hemodialysis: Who needs it now? In: Avoiding common errors in the emergency department. Mattu A, Chanmugam AS, Swadron SP, et. al. (Eds). Lippincott, Williams, and Wilkins. New York. 2016.

**Levine M**, Quan D. Nonbenzodiazepine sedatives. In: Tintinalli's Emergency Medicine. A Comprehensive Study Guide. Tintinalli JE (Ed). 8th Edition. McGraw Hill. New York. 2016; 1240-2

**Levine M,** LoVechio F. Antipsychotics. In: Tintinalli's Emergency Medicine. A Comprehensive Study Guide. Tintinalli JE (Ed). 8th Edition. McGraw Hill. New York. 2016; 1228-31.

**Levine M**, Goldstein JN. Bleeding complications of targeted oral anticoagulants: what is the risk? Hematology. 2014. Anderson KC, Bauer KA, Tallman MS, (Eds.). American Society of Hematology. 2014; 504-9

**Levine M**, Ruha AM. Antidepressants. In: Rosen's Emergency Medicine: Concepts and Clinical Practice. Marx JA, Hockberger RS, Walls RM (Eds). Elsevier Sanders. Philadelphia. 2013; 1975-81

**Levine MD**, Zane R. Chemical injuries. In: Rosen's Emergency Medicine: Concepts and Clinical Practice. Marx JA, Hockberger RS, Walls RM (Eds). Elsevier Sanders. Philadelphia. 2013; 818-27

**Levine M**, Goldstein JN. Bleeding disorders. In: Emergency Medicine Clinical Essentials. Adams JG (Ed). 2nd Edition. Elsevier Sanders. Philadelphia. 2013; 1721-6.

**Levine M**.  Rhabdomyolysis.  In: Tintinalli's Emergency Medicine:  Just the Facts.  Cline DM, Ma OJ, Cydulka RK, et. al. (Eds).  McGraw Hill.  New York.  2013; 188-9

**Levine MD**.  Rhabdomyolysis.  In:  Tintinalli's Emergency Medicine Manual.  Cline DM, Ma OJ, Cydulka RK, et.al. (Eds).  7th Edition.  McGraw Hill.  New York.  2012; 256-7.

**Levine M**, Quan D.  Nonbenzodiazepine sedatives.  In: Tintinalli's Emergency Medicine; A Comprehensive Study Guide.  Tintinalli JE, Stapczynski JS, Ma OJ, etl. al. (Eds). 7th Edition.  McGraw Hill.  New York.  2011; 1219-21

**Levine M**, LoVechio F.  Antipsychotics:  In:  Tintinalli's Emergency Medicine; A Comprehensive Study guide.  Tintinalli JE, Stapczynski JS, Ma OJ (Ed).  7th Edition.  McGraw Hill.  New York.  2011; 1207-10

**Levine M**, Zane R.  Chemical Injuries.  In:  Rosen's Emergency Medicine:  Concepts and Clinical Practice.  Marx JA, Hockberger RS, Walls RM (Eds).  7th Edition.  Mosby Elsevier.  Philadelphia.  2010; 767-77.

Burns MJ, **Levine M**.  Diabetic Control Agents.  In: Clinical Management of Poisoning and Drug Overdose.  Shannon MW, Borron SW, Burns MJ (Eds).  4th Edition. Saunders/Elsevier, Inc. Philadelphia.  2007;1019-34.

**Levine M**, Burns MJ.  Antipsychotics.  In: Clinical Management of Poisoning and Drug Overdose.  Shannon MW, Borron SW, Burns MJ (Eds).  4th Edition. Saunders/Elseiver, Inc. Philadelphia.  2007; 703-20.

Burns MJ, **Levine M**.  Toxic Ingestions, Approach to.  In: Signs and Symptoms in Emergency Medicine.  Votey SR, Davis MA.  2nd Edition.  Mosby Elsevier.  Philadelphia.  2006; 496-535.

Pozner CN, Cranmer H, **Levine M**.  Trauma, Approach to.  In: Signs and Symptoms in Emergency Medicine.  Votey SR, Davis MA.  2nd Edition.  Mosby Elsevier.  Philadelphia.  2006; 553-73.

Pozner CN, Lewiss R, **Levine M**.  Trauma, Burns.  In: Signs and Symptoms in Emergency Medicine.  Votey SR, Davis MA.  2nd Edition.  Mosby Elsevier.  Philadelphia.  2006; 574-80.

**Levine M**, Braun RE.  Intravenous fluid requirements and blood products.  In:  Handbook of Bioterrorism and Disaster Medicine.  Antosia RE, Cahill JD (Eds).  Springer Sicence + Business Media, LLC.  New York.  2006; 211-6.

**Levine M**, Pozner CN.  Abdominal Trauma.  In:  Handbook of Bioterrorism and Disaster Medicine. Antosia RE, Cahill JD

(Eds).  Springer Sicence + Business Media, LLC.  New York. 2006; 319-23.

Electronic Book Chapters:

**Levine M**, O'Connor AD.  Digitalis Toxicity.UpToDate. 2012

**Levine M**, O'Connor AD.  Antidotes:  UpToDate.  2012

**Levine MD**, Gresham C. Toxicity, Hydrocarbons. eMedicine from WebMD. Updated April 30, 2009 (original publication June 19, 2006). Available at: http://emedicine.medscape.com/article/821143-overview.

**Levine MD**, Brown DF. Heart Block, Third Degree. eMedicine from WebMD. Updated April 13, 2009. (original publication March 16, 2006).  Available at: http://emedicine.medscape.com/article/758454-overview.

**Levine MD**, Brown DF. Heart Block, Second Degree. eMedicine from WebMD. Updated April 10, 2009. (original publication March 21, 2006).  Available at: http://emedicine.medscape.com/article/758383-overview.

**Levine MD**, Brown DF. Heart Block, First Degree. eMedicine from WebMD. Updated March 9, 2009. (original publication March 20, 2006).  Available at: http://emedicine.medscape.com/article/758322-overview.

**Levine M**, Barker TD.  Toxicity, Alcohols.  E medicine. http://emedicine.medscape.com/article/812411-overview.  27 August, 2008.

MISC:

Course organizer. USC Hyperbaric Medicine Course. Catalina Island, CA.  13-15 June, 2016.

Course organizer.  USC Hyperbaric Medicine Course. Catalina Island, CA 8-10 June, 2015

Course organizer, Fellow in Training Research symposium. American College of Medical Toxicology.  March 28, 2014. Clearwater Beach, FL

Course organizer.  USC Hyperbaric Medicine Course. Catalina Island, CA.  8-10 June, 2014

Course organizer.  USC Hyperbaric Medicine Course. Catalina Island, CA.  18-20 June, 2013

Course organizer, Fellow in Training Research symposium. American College of Medical Toxicology.  March 16, 2013. San Juan, Puerto Rico

Course co-organizer.  Alcohol Academy.  Sponsored by the American College of Medical Toxicology.  San Juan, Puerto Rico.  14 March, 2013.

Course organizer, Fellow in Training Research symposium. American College of Medical Toxicology. March 17, 2012. San Diego, CA

Course co-organizer. Prescription Opioid misuse academy: The dark side of prescription opioids." Sponsored by the American College of Medical Toxicology. San Diego, CA. March 15, 2012

Position Statement: American College of Medical Toxicology, American Academy of Clinical Toxicology, American Association of Poison Control Centers, European Association of Poison Control Centers and Clinical Toxicologists, International Society of Toxinology, Asia Pacific Association of Medical Toxicology. Pressure immobilization after North American Crotaline snake envenomation. 2012

Secondary independent safety monitor for Maricopa Medical Center's study site for the STOP-MRSA study, based out of UCLA-Olive-View Medical Center.

Abstract reviewer. American College of Medical Toxicology's annual meeting. 2012.

Abstract reviewer. American Academy of Emergency Medicine Resident Research Competition. 2011

Abstract reviewer. Society for Academic Emergency Medicine's annual meeting. 2010-current

GRANTS:
Interdepartmental:

Evaluation of aminocaproic acid and tranexamic acid in a rodent model to reverse dabigatran induced coagulopathy. USC Department of Emergency Medicine. $5000.

Use of desmopressin to reverse thienopyridine induced platelet dysfunction in a rodent overdose model. $5000.

CLINICAL TRIALS

Sub-Investigator for open-labeled study of Idarucizumab for reversal of dabigatran. Sponsored by Boehringer Ingelheim. 2015.

Optimal Vancomycin Dosing. University of Southern California. 2012.

Intranasal ketamine for pediatric sedations. University of Southern California. 2012-2014

Sub-Investigator for acetaminophen-adduct study following acetaminophen overdose. Banner Good Samaritan Medical Center. 2011-current

Sub-Investigator for multicenter clinical trial of Anascorp ® scorpion $Fab_2$ antivenom against *Centuroides* venom in Arizona. 2008-2011

Sub-Investigator for multicenter clinical trial of Anavip ® rattlesnake $Fab_2$ antivenom. 2009-2011

INVESTIGATIONAL NEW DRUG DEVICE:

Intranasal ketamine. IND. 116045.   28 August, 2012



Exhibit 3-B

MAC BAN LAW OFFICES
Skyline Esplanade
1795 E. Skyline Drive, Suite 155
Tucson, Arizona 85718
Telephone: (520) 624-6446
Facsimile: (520) 624-6617
Laura V. Mac Ban (SB# 012328)
lvm@macbanlaw.com
Michael L. Linton (SB# 024729)
mlinton@macbanlaw.com
**Attorneys for** Defendant
Holy Cross Hospital, Inc.

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| ASHLEY CERVANTES, a single woman,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION AGENT SHAMEKA LEGGETT and "JOHN DOE" LEGGETT; UNKNOWN UNITED STATES CUSTOMS AND BORDER PROTECTION AGENTS; HOLY CROSS HOSPITAL, INC.; PATRICK F. MARTINEZ AND "JANE DOE" MARTINEZ; QUANTUM PLUS, INC., dba TEAMHEALTH WEST; JOHN DOES 1-5; JANE DOES 1-5; XYZ CORPORATIONS 1-5; ABC PARTNERSHIPS 1-5,<br><br>Defendants. | NO. 4:16-CV-00334-CKJ<br><br>**DEFENDANT HOLY CROSS HOSPITAL, INC.'S SECOND SUPPLEMENTAL RULE 26(a)(1) DISCLOSURE STATEMENT**<br><br>**Additional Information in Bold**<br><br>*(Assigned to*<br>*The Hon. Cindy K. Jorgenson)* |

{00267754;1}                                      1

a. Any and all reports prepared by agents of the United States Customs and Border Protection Agency regarding their encounter with Ms. Cervantes, as well as any additional records.

b. Any and all exhibits listed by any other party regardless of whether or not that party attempts to delist the exhibit, fails to use it at the time of trial, settles, or is dismissed.

c. Exemplary medical charts or exhibits illustrative of medical issues present in this matter.

d. C.V.'s and Affidavits of all experts.

e. Any and all discovery exchanged between the parties, including, but not limited to, Plaintiff's responses to discovery propounded by the Defendants, deposition transcripts, answers to interrogatories, Disclosure Statements, responses to Request for Production and/or Requests for Admission, and any Exhibits attached thereto.

f. Any and all records reflecting collateral source benefits received by Plaintiff including, but not limited to: Mercy Care Plan, Qualified MC Beneficial, Medicare benefits, Cochise County Long Term Care, Social Security benefits, Pima County Health System, AHCCCS, Pima Community Access and/or any other providers of collateral benefits to Plaintiff.

g. Depositions and/or statements of any witness and any exhibit attached to any deposition and/or statement.

h. All disclosures and/or discovery responses, including exhibits or attachments thereto, of any party.

i. To the extent relevant to Plaintiff's claims, complete copies of Plaintiff's federal and state income tax returns, including all schedules and attachments thereto, from five years prior to the date of alleged loss and through the date of trial.

j. Medical literature; will supplement.

5. Records and bills received pursuant to Subpoena from Frank Bejarano, DBH / Alliance Counseling Center in Nogales (attached hereto).

**6. Carondelet Health Network Policy & Procedure – Consent for Treatment (attached hereto).**

**7. Carondelet Health Network Patient Care Services Policy & Procedure – Care of Inmates, Law Offenders, or Persons in Custody of Law Enforcement (attached hereto).**

## CERTIFICATE OF SERVICE

I hereby certify that on March 24th, 2017, I served the attached document and the referenced exhibits by electronic mail to the following:

Matthew C. Davidson, Esq.
Law Offices of
Matthew C. Davidson, Ltd.
1859 N. Grand Avenue, Suite 1
Nogales, AZ 85621-1386
Attorneys for Plaintiff
mdavidsonlaw@gmail.com

Brian Marchetti, Esq.
Marchetti Law, P.L.L.C.
290 N. Meyer Avenue
Tucson, AZ 85701
Attorneys for Plaintiff
brian@yourtucsonlawfirm.com

Michael A. Ambri
Melissa Marcus Kroeger
United States Attorney
District of Arizona
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701-5040
Attorneys for Defendants United States
of America and Shamekia Leggett
melissa.kroeger@usdoj.gov
Michael.Ambri@usdoj.gov

James R. Broening, Esq.
Michelle L. Donovan, Esq.
Broening, Oberg, Woods & Wilson, PC
P.O. Box 20527
Phoenix, AZ 85036-0527
Attorneys for Defendant
Patrick Martinez
jrb@bowwlaw.com
mld@bowwlaw.com

Carolyn Armer Holden, Esq.
Scott A. Holden, Esq.
Michael J. Ryan, Esq., Of Counsel
Holden & Armer, P.C.
4505 E. Chandler Boulevard, Suite 210
Phoenix, AZ 85048
Attorneys for Defendant Quantum Plus, Inc.
dba TeamHealth West
dholden@holdenarmer.com
sholden@holdenarmer.com
mryan@holdenarmer.com

Karen Norton



| | Title: **Consent for Treatment** |
|---|---|
| **NETWORK POLICY & PROCEDURE** | Section: **Leadership** |
| | Dept. of Origin: Legal |
| | Effective Date: **September 2000** |
| | Last Review Date: 3/4/13 |
| | Signature: _____ **Mary Storm** _____ |
| | **Associate General Counsel** |

**I.    POLICY STATEMENT**

In the health care context, a patient may consent to a general course of treatment or a specific procedure. By signing a standard hospital Conditions of Admission form, a patient provides general consent to an anticipated course of treatment and nursing care during hospitalization. If a surgical invasive procedure or diagnostic tests are needed, the patient will be asked to give expressed permission by signing an additional Consent form. The patient, or representative on behalf of the patient, has the right to be informed about proposed treatment and procedures with the right to participate in healthcare decisions. It is the policy of CHN that consents are obtained and placed in the patient's medical record before any non-emergent medical or surgical treatment is performed

**II.    PURPOSE**

The purpose of this policy is to guide CHN associates and Physician / Licensed Professional on the general rules of consent for medical services. For purposes of this policy, consents shall be obtained prior to the following non-emergent services:

1) Major or minor surgeries and invasive procedures (with the exception of the invasive procedures listed In Appendix A).
2) All procedures requiring the administration of regional and or general anesthetics, diagnostic or therapeutic procedures that have more than a negligible risk to the patient, all therapy or procedures involving the use of experimental drugs or equipment (device)
3) Before delivering health care through telemedicine
4) Administration of blood or blood products
5) Administration of moderate or deep sedation

**III.    DEFINITIONS**

**Consent** is an authorization (verbal or written), by the patient or a person authorized by law to consent on the patient's behalf.

**Informed Consent** is a process which includes:

a. A comprehensive discussion with the patient and/or patient's legal representative explaining the planned treatment / procedure, including significant material long and short term risks and the likelihood of each; anticipated benefits; possible complications and consequences; expected recovery process and outcomes; possible alternative treatment options and associated risks of each; and the risks and consequences associated with not undergoing the treatment / procedure.
b. Patient/ representative has opportunity to voice questions or concerns.
c. Patient/ representative appears to have an understanding of the explanation at the time consent is obtained.
d. An actual agreement by the patient or legal representative to consent to have the treatment/ procedure performed

**IV.    PROCESS**

A. Consents in an Emergency:

For consent purposes, an emergency is a situation where the patient requires immediate medical care or life, health or limb is threatened. Express consent is unnecessary in an emergency (consent is presumed) if the following four conditions are met:

1. The patient needs immediate medical attention. Treatment should be limited to only care necessary to resolve the emergency. Expressed consent is required for non-emergencies.
2. The patient is unable to consent, by reason of mental or physical condition and no one entitled by law to consent for the patient, is immediately available.
3. Any attempt to secure a written or oral consent would delay necessary treatment and the delay in treatment would increase the risk to life or limb.
4. The provider has no reason to believe the patient would refuse to give his or her consent to the treatment if given the opportunity to consent. The possibility of consent is insufficient; the treatment must be so clearly and manifestly warranted that there is no reason to believe that consent would be withheld.

## V.  ROLES AND RESPONSIBILITIES

A. It is the responsibility of the physician or licensed professional performing the procedure to obtain informed consent from the patient or legal representative.

B. The physician/licensed professional will sign the CHN Consent for Treatment form thereby attesting that an informed consent discussion has taken place with the patient/legal representative and that the discussion included the following elements if applicable:
   a. Description of the procedure
   b. Indications for the procedure
   c. Who will be conducting the procedure
   d. Benefits and material risks- including likelihood of each based on current evidence and the practitioner's judgment.
   e. Type of anesthesia to be used and discussion of possibility of unexpected change in type at any point prior to or during the procedure if deemed necessary by the practitioner.
   f. Alternatives treatments and associated risks.
   g. Consequences of declining treatment/procedure.
   h. Practitioners other than the operator that will be performing important tasks including opening/closing; dissecting, harvesting, or removing tissue; transplanting tissue, implanting devices, and placing invasive lines.

C. The patient / legal representative will also sign the CHN Informed Consent Form attesting to the fact that he/she has had a discussion with the treating physician regarding the elements listed above and consents to the procedure.

D. The physician/licensed professional also may document the consent discussion in the progress notes or history and physical section of the medical record. Documentation from the physician's office chart detailing the informed consent session with the patient or legal representative is also acceptable. A copy of the office chart note detailing the consent discussion may be placed in the Carondelet Health Network's medical chart.

E. Physicians may opt to obtain consent for procedure at their office using CHN Consent Form. If the CHN Consent Form was completed in the physician's office, it is acceptable to obtain a copy and place it on the patient's medical record.

F. If a Professional Medical Staff member determines that an emergency exists, such that the patient's consent is implied, the circumstances of the emergency and the need for subsequent treatment shall be documented in the progress notes.

G. It shall be the responsibility of the licensed hospital staff to witness the signature of the patient or the patient's legal representative on the hospital consent form. This constitutes the patient's attestation that they have had the informed discussion about the procedure with their physician. An unlicensed cardiac tech may witness patient's signature on the consent form in the Cardiac Testing areas for the purpose of Exercise Stress Testing, including treadmill stress tests, nuclear treadmill tests and echo stress test

H. It is the responsibility of any licensed hospital staff who is witnessing the signature to notify the attending physician if it is apparent that the patient or legal representative does not understand the proposed procedure for which he/she is asked to give consent.

## VI. SPECIAL CONSIDERATIONS

A. Scope of Consent: Consents are generally valid only for the matters specifically covered within them. The hospital Conditions of Admission form is a general consent to allow the hospital staff to treat and bill the patient. A separate consent discussion should take place between the physician and patient (or legal representative) for different diagnostic, surgical or other therapeutic interventions as outlined in section II of this policy.

B. Changes to a signed consent: If before a procedure the professional medical staff member determines an additional procedure(s) or a change in a procedure is necessary the patient (or legal representative) will be informed and a new informed consent will be obtained. The original consent remains a part of the patient's chart along with the new consent.

C. Refusal of Consent: The right to refuse proposed medical treatment is an important aspect of the right to privacy and self-determination. A provider must honor the right of a patient with decision-making capacity to refuse medical treatment. The provider shall document the patient's refusal in the medical record. The provider shall also document that a discussion of the risks of the refusal, the nature of the treatment being offered, the reason the treatment is being urged, and the probable medical consequences of the refusal to consent.

D. This is the overriding Corporate Consent Policy. Specific departmental consent policy may be developed, such as; an Institutional Review Board Policy to meet the consent needs of specific areas.

## VII. REFERENCES

Arizona Revised Statutes (http://www.azleg.state.az.us/ArizonaRevisedStatutes.asp)
Arizona Hospital & Healthcare Association Consent Manual (1999), (2004)
CHN Surrogate Decision-Making Policy
CHN Consent Process for Minors Policy

## VIII. APPROVAL

| Committee/Department | Original Approval | 1st Review | 2nd Review | 3rd Review | 4th Review | 5th Review |
|---|---|---|---|---|---|---|
| CHN Legal Department | 09/00 | 03/01 | 06/01 | 05/03 | 5/16/06 | 10/7/08 |
| CHN Risk Management | 09/00 | 03/01 | 06/01 | 05/03 | 05/06 | 9/1/08 |
| CSJ Div of Cardiology | | | | | | 10/2/08 |
| CSM Div of Cardiology | | | | | | 10/1/08 |
| CSJ Dept Anesthesia | | | | | | 10/1/08 |
| CSM Dept Anesthesia | | | | | | 10/6/08 |
| THH Dept Anesthesia | | | | | | 10/7/08 |
| CSJ Dept Surgery | | | | | | 10/27/08 |
| CSM Dept Surgery | | | | | | 10/27/08 |
| THH Dept Surgery | | | | | | 10/?/08 |
| CHC Dept. of Surgery/OB-Gyn | | 5/08/01 | 5/07/02 | 1/06/04 | 07/11/06 | 10/7/08 |
| CSJ Dept Women/Infant Services | | | | | | 1/22/09 |
| CHC Dept. of Internal Medicine/Family Practice | | 05/08/01 | 05/07/02 | 01/06/04 | 07/18/06 | |
| CHC Dept. of Pediatrics | | 05/15/01 | 04/09/02 | 02/03/04 | 06/06/06 | |
| CHC Board of Directors | | 06/28/01 | 06/25/02 | 03/30/04 | 07/25/06 | |
| CSJ Medical Executive Committee | | 04/26/01 | 03/28/02 | 11/19/03 | 1/25/07 05/26/06 | 1/22/09 |
| CSM Medical Executive Committee | | 12/06/01 | 04/01/02 | | 09/28/06; 1/25/07 | 11/20/08 |
| CHC Medical Executive Committee | | 05/22/01 | 06/18/02 | 03/23/04 | 07/18/06 2/20/07 | 10/21/08 |
| THH Medical Executive | | | | | | 10/15/08 |

| Committee | | | | | | |
|---|---|---|---|---|---|---|
| CHC Quality Council | | 06/04/01 | 06/11/02 | 02/10/04 | 07/11/06 | 10/14/08 |
| Policy Coordinating Committee | 09/00 | 07/01 | 08/27/02 | 05/25/03 | 8/25/06 | 2/05/09 |

| Committee/Department | 6th Review | 7th Review | 8th Review | 9th Review | 10th Review | 11th Review |
|---|---|---|---|---|---|---|
| CHN Nursing Leadership Council | | | 2/25/2013 | | | |
| CHN Legal Department | 9/24/10 | 2/7/11 | 3/4/2013 | | | |
| CHN Risk Management | 9/20/10 | | 3/4/2013 | | | |
| CSJ Div of Cardiology | | | | | | |
| CSM Div of Cardiology | | | | | | |
| CSJ Dept Anesthesia | | | | | | |
| CSM Dept Anesthesia | | | | | | |
| THH Dept Anesthesia | | | | | | |
| CSJ Dept Surgery | | | | | | |
| CSM Dept Surgery | | | | | | |
| THH Dept Surgery | | | | | | |
| CHC Dept. of Surgery/OB-Gyn | | | | | | |
| CSJ Dept Women/Infant Services | | | | | | |
| CHC Dept. of Internal Medicine/Family Practice | | | | | | |
| CHC Dept. of Pediatrics | | | | | | |
| CHC Board of Directors | | | | | | |
| CSJ Medical Executive Committee | | | | | | |
| CSM Medical Executive Committee | | | | | | |
| CHC Medical Executive Committee | | | | | | |
| THH Medical Executive Committee | | | | | | |
| CHC Quality Council | | | | | | |
| Policy Coordinating Committee | 10/07/10 | 2/11/11 | 3/11/13 | | | |

# Appendix A

## *Carondelet Health Network*
## Consent for Treatment Policy

## List of procedures that DO NOT require
## Signed Consent for Treatment

The following is NOT an exhaustive list. It is intended to clarify some procedures which have been questioned whether there is a need for a patient-signed Informed Consent.

| Procedure Name |
| --- |
| Abscess, superficial |
| Aspiration cyst (simple/minor) |
| Feeding Tube (nasoenteral) |
| Rectal Tube Insertion |
| Fistulogram (Dialysis Shunt Angio) |
| Foley Catheter, urinary |
| Straight Catheter, urinary |
| Peripheral IV therapy |
| Lymphoscintigraphy |
| Tube Change (gastrostomy / PEG) |
| Tube Check (such as biliary tubes) |
| Venipuncture |



Exhibit 3-C

MAC BAN LAW OFFICES
Skyline Esplanade
1795 E. Skyline Drive, Suite 155
Tucson, Arizona 85718
Telephone: (520) 624-6446
Facsimile: (520) 624-6617
Laura V. Mac Ban (SB# 012328)
lvm@macbanlaw.com
Michael L. Linton (SB# 024729)
mlinton@macbanlaw.com
**Attorneys for** Defendant
Holy Cross Hospital, Inc.

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| ASHLEY CERVANTES, a single woman, | NO. 4:16-CV-00334-CKJ |
| Plaintiff, | **DEFENDANT HOLY CROSS HOSPITAL, INC.'S INITIAL RULE 26(a)(1) DISCLOSURE STATEMENT** |
| vs. | |
| UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION AGENT SHAMEKA LEGGETT and "JOHN DOE" LEGGETT; UNKNOWN UNITED STATES CUSTOMS AND BORDER PROTECTION AGENTS; HOLY CROSS HOSPITAL, INC.; PATRICK F. MARTINEZ AND "JANE DOE" MARTINEZ; QUANTUM PLUS, INC., dba TEAMHEALTH WEST; JOHN DOES 1-5; JANE DOES 1-5; XYZ CORPORATIONS 1-5; ABC PARTNERSHIPS 1-5, | *(Assigned to The Hon. Cindy K. Jorgenson)* |
| Defendants. | |

## B. **DOCUMENTS:**

Because this case is at its preliminary stages, providing a definitive list of the exhibits to be used at trial is not possible. Nevertheless, Holy Cross Hospital anticipates using the following evidence at trial:

1. Any and all healthcare provider records[*] and billing records of Plaintiff including, but not limited to: Holy Cross Hospital (attached hereto), Joel Block, M.D. (will supplement), as well as healthcare providers whose identities have not yet been disclosed by Plaintiff.

2. Any and all of Plaintiff's medical and psychological records yet to be disclosed or may become known through the course of discovery.

3. The parties' Joint Proposed Case Management Plan, filed with the Court on January 10, 2017.

4. Holy Cross Hospital reserves to supplement this disclosure upon the exchange of disclosures and production of discovery, including but not limited to:

   a. Any and all reports prepared by agents of the United States Customs and Border Protection Agency regarding their encounter with Ms. Cervantes, as well as any additional records.

   b. Any and all exhibits listed by any other party regardless of whether or not that party attempts to delist the exhibit, fails to use it at the time of trial, settles, or is dismissed.

   c. Exemplary medical charts or exhibits illustrative of medical issues present in this matter.

   d. C.V.'s and Affidavits of all experts.

   e. Any and all discovery exchanged between the parties, including, but not limited to, Plaintiff's responses to discovery propounded by the Defendants, deposition transcripts, answers to interrogatories, Disclosure Statements, responses to Request for Production and/or Requests for Admission, and any Exhibits attached thereto.

---

[*]Healthcare provider records includes any and all lab reports, x-rays, scans, films, or other documentation contained in any mental healthcare or healthcare provider of Plaintiff.

f.  Any and all records reflecting collateral source benefits received by Plaintiff including, but not limited to: Mercy Care Plan, Qualified MC Beneficial, Medicare benefits, Cochise County Long Term Care, Social Security benefits, Pima County Health System, AHCCCS, Pima Community Access and/or any other providers of collateral benefits to Plaintiff.

g.  Depositions and/or statements of any witness and any exhibit attached to any deposition and/or statement.

h.  All disclosures and/or discovery responses, including exhibits or attachments thereto, of any party.

i.  To the extent relevant to Plaintiff's claims, complete copies of Plaintiff's federal and state income tax returns, including all schedules and attachments thereto, from five years prior to the date of alleged loss and through the date of trial.

j.  Medical literature; will supplement.

## C.  COMPUTATION OF DAMAGES:

The Defendant affirmatively pleads that the Plaintiff has a duty to mitigate damages, including but not limited to, any past or future medical damages.  This duty may require the Plaintiff to maintain or avail themselves of the applicability of the Patient Protection and Affordable Care Act, along with other traditional public and private health insurance sources, which serve to mitigate expenses and medical damages for the Plaintiff.

Additionally, Holy Cross Hospital will offer all evidence of collateral benefits, and further asserts the full amount billed for past medical or mental, psychiatric and psychological health services is inadmissible to prove: the reasonable value of the past medical, psychiatric and psychological services; the value of past pain and suffering; the value of future medical, psychiatric, and psychological expenses; the value of future pain and suffering.  The amount actually accepted by the care provider in satisfaction of its services may be used to demonstrate the reasonable value of the services.  Expert witnesses may not rely on the full value bills as a basis for rendering

RESPECTFULLY SUBMITTED this 1st February, 2017.

MAC BAN LAW OFFICES, P.A.

By _____
Laura V. Mac Ban
Michael L. Linton
Attorneys for Defendant Holy Cross Hospital, Inc.

////

# CERTIFICATE OF SERVICE

I hereby certify that on February ___, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants:

Matthew C. Davidson, Esq.
Law Offices of
Matthew C. Davidson, Ltd.
1859 N. Grand Avenue, Suite 1
Nogales, AZ 85621-1386
Attorneys for Plaintiff

Brian Marchetti, Esq.
Marchetti Law, P.L.L.C.
290 N. Meyer Avenue
Tucson, AZ 85701
Attorneys for Plaintiff

Michael A. Ambri
Melissa Marcus Kroeger
United States Attorney
District of Arizona
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701-5040
Attorneys for Defendants United States
of America and Shamekia Leggett

James R. Broening, Esq.
Michelle L. Donovan, Esq.
Broening, Oberg, Woods & Wilson, PC
P.O. Box 20527
Phoenix, AZ 85036-0527
Attorneys for Defendant
Patrick Martinez

Carolyn Armer Holden, Esq.
Scott A. Holden, Esq.
Michael J. Ryan, Esq., Of Counsel
Holden & Armer, P.C.
4505 E. Chandler Boulevard, Suite 210
Phoenix, AZ 85048
Attorneys for Defendant Quantum Plus, Inc.
Dba TeamHealth West

PIN # H017321878 ADMIT DT 10/18/14 ADMIT SRC: OJT   MRN H085351
RM/BED                    TIME 1747                    PT STATUS DEP ER
FC PRISON MISCELLANEO     SVC EMERGENCY  HIE OPT OUT N  SSN 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

| PATIENT | PATIENT INFORMATION |
|---|---|
| CERVANTES, ASHLEY | |
| 171 PASEO DULZURA | TOBACCO USE: N |
| | |
| RIO RICO, AZ 85648 | |
| 520-281-2681      520-519-9523 | RACE HISPANIC |
| OTHER NM: CERVANTES, Ashleyn | TRIBAL AFFIL: |
| COUNTY SANTA CRUZ | RLG CATHOLIC |
| | MS SINGLE |

| PATIENT EMPLOYER | NEXT OF KIN |
|---|---|
| UNEMPLOYED | ROMO, ANA |
| | 171 PASEO DULZURA |
| | RIO RICO, AZ 85648 |
| | 520-281-2681   MOTHER |

| GUARANTOR | PERSON TO NOTIFY |
|---|---|
| CERVANTES, JUAN | ROMO, ANA |
| 171 PASEO DULZURA | 171 PASEO DULZURA |
| | RIO RICO, AZ 85648 |
| RIO RICO, AZ 85648 | 520-281-2681   MOTHER |
| 520-281-2681   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 | |

| GUARANTOR EMPLOYER | PHYSICIANS |
|---|---|
| FRESH FARM | PCP:  NO PRIMARY CARE DOCTOR |
| EAST FRONTAGE RD | ER DR: Martinez, Patrick F  MD. |
| RIO RICO, AZ 85648 | ATT DR |
| 520-377-9400 | ADM DR |
| | FAM DR |

| INSURANCE | RATE | POLICY NUMBER | GROUP NO. | | SUBSCRIBER |
| Address | | | | Treatment Auth | |
|---|---|---|---|---|---|
| PR - INS HEALTH SERVIC | | 000000000 | | | CERVANTES, ASHLEY |
| VA FINANCIAL SVCS CENTER | | | | | |
| AUSTIN | | TX | 78714-9345 | 800-479-0523 | |

PORTAL INV: N Email: NA
COMMENTS:
REASON FOR VISIT X-RAY FOREIGN OBJECT                                    ADM: MW
RECEIVED ADVANCE DIRECTIVES PACKET: Y  HAS ADVANCE DIRECTIVES: N  ON FILE: N
Type of Directive:                           FILED:
LAST VIS:07/26/14 ER HCH                      ISOL:
SIGNED COA: Y  Occurrence: ONS    Dt: 10/18/14  Tm: 1747
                           PID     05/17/95

Carondelet
1171 W Target Range Rd Nogales, AZ 85621
Holy Cross Hospital



CARONDELET
HEALTH NETWORK
*An Ascension Health Ministry*

HOLY CROSS HOSPITAL
ADVANCED DIRECTIVE
VERIFICATION

Patient has been provided information on Advanced Directives: ___ Yes/Si ___ No
Se le entrego al paciente informacion sobre Directivas por Adelantado
Has the Patient executed an Advanced Directive? ___ Yes/Si ___ No
Tiene el Paciente una Directiva por Adelantado?
If Yes: Where is the Advanced Directive? Donde tiene su Directiva por Adelantado?
_____ Home /Casa
_____ Medical Record-Chart
_____ Archivo Medico
_____ Family -Familia
_____ Will Bring to Hospital
_____ Entregara al Hospital

If No: Does Patient want to execute an Advanced Directive today?
Quiere el paciente ejecutar una Directiva por Adelantado? _____ Yes /Si
*If Yes: Refer to Social Service Department or Case Management.*
*Si el Paciente prefiere ejecutar hoy un por adelantado comunicarlo con*
*un trabajador social.*
_____ No

Patient is Uncertain at this time will notify staff if further assistance needed _____
El paciente esta incierto y notificara al personal hospitalario si require assistencia
adicional.

Patient Signature: _____
Firma Del Paciente
Witness: _____ Date: 10/18/14
Testigo: Fecha:

Place Patient Label Here:

CERVANTES,ASHLEY   10/18/14
FNMH017321878
Martinez,Patrick F  19
F 05/17/95 MRN   H085351

1. GENERAL DUTY NURSING: The hospital provides only general duty nursing care. If an individual wishes to have continuous private duty nursing, it must be arranged by the patient, or his legal representative. The hospital is hereby released from any and all liability arising from the fact that the patient is not provided with such additional care.

2. MEDICAL AND SURGICAL CONSENT: The undersigned consents to any x-ray examinations, laboratory procedures, anesthesia, medical or surgical treatment, or hospital services rendered to the patient under the general or special instructions of the physician, or by any on-call physician who may substitute for his/her physician during his/her stay in the hospital. All physicians furnishing services to the patient, including the radiologist, E. D. physician and the like are independent contractors and not employees of the hospital. As such the patient will receive separate bills, not associated with the hospital, for these physician services. These same physicians may or may not accept assignment and/or be contracted with the patient's insurance provider. Determination of whether the patient's insurance covers Physician services is the patient's responsibility, not that of the hospital.

3. TAKING OF PICTURES: The taking of pictures of medical or surgical process or of newborn infants, and the use of the same for scientific, educational, research or such other purposes as may be deemed appropriate by the hospital is approved by the patient. The person signing below gives approval for pictures to be taken of the patient.

4. PERSONAL VALUABLES/PERSONAL PROPERTY: The hospital maintains a safe for the safekeeping of money and valuables; (items secured in the safe may be retrieved only between 8:00 a.m. and 4:30 p.m., Monday through Friday). For items deposited in the safe, the limit of the Hospital's liability in case of loss or damage shall be $300.00. In addition, the Hospital shall not be liable for loss or damage to any personal property, such as bridge-work, dentures, hearing aids, eye glasses, prosthesis, cell phone or clothing retained in the possession of the patient during his/her stay in the hospital. Please initial here: ___

5. SMOKING: Carondelet Health Network is committed to the promotion of health including the prevention of disease. Carondelet Health Network supports a smoke free environment. Patients or visitors may not use tobacco products while on the grounds of all Carondelet facilities. Patients who use tobacco products and wish assistance may request nicotine replacement products and intervention therapy through their physician.

6. ASSIGNMENT OF INSURANCE AND SIMILAR BENEFITS: In the event the patient is entitled to hospital benefits of any type whatsoever arising out of any policy of insurance insuring patient or any other party liable to patient, such benefits are hereby assigned to the hospital for application to patient's bill. The patient is responsible for charges not covered by this assignment. Patients eligible for Medicare hereby authorize the Hospital to bill and collect from Medicare directly. Any charges not covered by Medicare or any supplementary insurance are the responsibility of the patient.

7. FINANCIAL AGREEMENT: The undersigned agrees, whether he signs as an agent or as a patient and whether he is insured or is a member of a health maintenance organization, that in consideration of the services to him, he hereby individually obligates himself to pay the account of the hospital in accordance with the regular rates and charges that hospital has on file with the Arizona Department of Health Services, terms and interest on the unpaid balance set out by the hospital. Should the account be referred to an outside collection agency the undersigned agrees to pay (18%) simple interest of the unpaid balance. Should the account be referred to attorney for collection, the undersigned agrees to pay reasonable attorney's fees and collection expense, and if litigation results, the amount of the attorney's fees shall be determined by the Judge of the Court.

8. SPECIAL MESSAGES: I have received the special message from :          Medicare     Champus

9. ADVANCE DIRECTIVES:
   a.  Was the patient advised that he/she has a right to receive information concerning advanced directive?     Y
   b.  Does the patient have a completed advance directive?     N
   c.  Was a copy of any advance directive given to CHN?     N
   d.  Was patient informed of Your Rights as Hospital Patient?     N
   e.  Does the patient require an interpreter or communication adjuncts?     N
The undersigned certifies that he/she has read the document, receives a copy and is the patient, or is duly authorized by the patient's general agent to sign this form and accept its terms.

CERVANTES, ASHLEY     05/17/95                 10/18/14   1747
Patient Name            D. O. B.          Patient Signature          Date Signed    Time

Patient's Agent Signature          Relationship to Patient          Witness

I hereby acknowledge receiving a copy of Carondelet Health Network's Notice of Privacy Practices and Carondelet Health Network Patient Information Guide, that applies to Carondelet Health Network and its professional staff members.
I acknowledge I have read and understand the notice of Health Information Practice for Health Information Network of Arizona brochure.
   Patient or Agent's Signature                  Date:   10/18/14        (I elect to Opt Out [N])



CERVANTES, ASHLEY
FINH017321878  10/18/14
Martinez, Patricia
19            CAT     SELF
               H085351

## Carondelet
### HEALTH NETWORK

### CONDITIONS OF ADMISSION

Page 1 : HC Admissions/H085351/H017321878/CERVANTES,ASHLEY/19950517/000000000042254/COA/HIPAA
Form/301YYBL_01VZK4K7J00ESRD : 9/16/2016 8:52:48 AM

Ashley Cervantes
Holy Cross Hospital
Page 000057

ACKNOWLEDGMENT

I hereby acknowledge receiving a copy of Carondelet Health Network's Notice of Privacy Practices, which is for Carondelet Health Network and its professional staff members.

Date: _____ 10/18/14 _____     _____
                                  Patient/Agent Name

CERVANTES,ASHLEY
FINH01732187810/18/14
Martinez,Patrick F    H085351
19                    CAT

Page 2 : HC Admissions/H085351/H017321878/CERVANTES,ASHLEY/19950517/000000000042254/COA/HIPAA
Form/301YYBL_01VZK4K7J00ESRD : 9/16/2016 8:52:48 AM

Ashley Cervantes
Holy Cross Hospital
Page 000058

# Appendix E

## Standard Consent Form for X-Rays and/or Pregnancy Tests

## Administered by an X-Ray and/or Medical Facility

I, the undersigned, hereby consent, as necessary, to x-ray examination of my body by a medical facility and/or an X-ray facility designated by the United States Customs and Border Protection. If female, I further consent to a pregnancy test prior to undergoing any X-ray examination. I consent to the results of any said examination(s), pregnancy test(s), and related records, including any medical records, being given to officials of the United States Customs and Border Protection. I hereby release the facility and its personnel performing said examinations/tests and any officials of the United States Customs and Border Protection directing that said examinations/tests be carried out, from any liability arising out of the performance of said examinations/tests. I understand that I have the right to refuse such consent and acknowledge that my consent is freely given and is not the result of any threats, coercion, or other intimidation.

Signed:_____

Printed Name:_____

Gender (circle one):    Male    Female

Date:_____

Time:_____

Witness Signature:_____

Badge:_____

55

Page 3 : HC Admissions/H085351/H017321878/CERVANTES,ASHLEY/19950517/000000000042254/PR1011/301YYBL_01VZK6K7J00ER2R :
9/16/2016 8:52:48 AM

Ashley Cervantes
Holy Cross Hospital
Page 000060

# Appendix F

## Standard Consent Form for a Pelvic/Rectal Examination

I, the undersigned, hereby consent to a pelvic and/or rectal examination by a physician designated by the United States Customs and Border Protection. I consent to the result of said examination and related medical records being given to officials of the United States Customs and Border Protection. I hereby release the physician performing said examinations and any officials of the United States Customs and Border Protection directing that said examinations be carried out, from any liability arising out of the performance of said examinations. I understand that I have the right to refuse such consent, and acknowledge that my consent is freely given and is not the result of any threats, coercion, or other intimidation.

Signed: _____

Print Name: _____

Date: _____

Time: _____

Witness Signature: _____

Badge: _____

56

1. GENERAL DUTY NURSING: The hospital provides only general duty nursing care. If an individual wishes to have continuous private duty nursing, it must be arranged by the patient, or his legal representative. The hospital is hereby released from any and all liability arising from the fact that the patient is not provided with such additional care.

2. MEDICAL AND SURGICAL CONSENT: The undersigned consents to any x-ray examinations, laboratory procedures, anesthesia, medical or surgical treatment, or hospital services rendered to the patient under the general or special instructions of the physician, or by any on-call physician who may substitute for his/her physician during his/her stay in the hospital. All physicians furnishing services to the patient, including the radiologist, E. D. physician and the like are independent contractors and not employees of the hospital. As such the patient will receive separate bills, not associated with the hospital, for these physician services. These same physicians may or may not accept assignment and/or be contracted with the patient's insurance provider. Determination of whether the patient's insurance covers Physician services is the patient's responsibility, not that of the hospital.

3. TAKING OF PICTURES: The taking of pictures of medical or surgical process or of newborn infants, and the use of the same for scientific, educational, research or such other purposes as may be deemed appropriate by the hospital is approved by the patient. The person signing below gives approval for pictures to be taken of the patient.

4. PERSONAL VALUABLES/PERSONAL PROPERTY: The hospital maintains a safe for the safekeeping of money and valuables; (items secured in the safe may be retrieved only between 8:00 a.m. and 4:30 p.m., Monday through Friday). For items deposited in the safe, the limit of the Hospital's liability in case of loss or damage shall be $300.00. In addition, the Hospital shall not be liable for loss or damage to any personal property, such as bridge-work, dentures, hearing aids, eye glasses, prosthesis, cell phone or clothing retained in the possession of the patient during his/her stay in the hospital. Please initial here:

5. SMOKING: Carondelet Health Network is committed to the promotion of health including the prevention of disease. Carondelet Health Network supports a smoke free environment. Patients or visitors may not use tobacco products while on the grounds of all Carondelet facilities. Patients who use tobacco products and wish assistance may request nicotine replacement products and intervention therapy through their physician.

6. ASSIGNMENT OF INSURANCE AND SIMILAR BENEFITS: In the event the patient is entitled to hospital benefits of any type whatsoever arising out of any policy of insurance insuring patient or any other party liable to patient, such benefits are hereby assigned to the Hospital for application to patient's bill. The patient is responsible for charges not covered by this assignment. Patients eligible for Medicare hereby authorize the Hospital to bill and collect from Medicare directly. Any charges not covered by Medicare or any supplementary insurance are the responsibility of the patient.

7. FINANCIAL AGREEMENT: The undersigned agrees, whether he signs as an agent or as a patient and whether he is insured or is a member of a health maintenance organization, that in consideration of the services to him, he hereby individually obligates himself to pay the account of the hospital in accordance with the regular rates and charges that hospital has on file with the Arizona Department of Health Services, terms and interest on the unpaid balance set out by the hospital. Should the account be referred to an outside collection agency the undersigned agrees to pay (18%) simple interest of the unpaid balance. Should the account be referred to attorney for collection, the undersigned agrees to pay reasonable attorney's fees and collection expense, and if litigation results, the amount of the attorney's fees shall be determined by the Judge of the Court.

8. SPECIAL MESSAGES: I have received the special message from :  Medicare    Champus

9. ADVANCE DIRECTIVES:
   a. Was the patient advised that he/she has a right to receive information concerning advanced directive?     Y
   b. Does the patient have a completed advance directive?     N
   c. Was a copy of any advance directive given to CHN?     N
   d. Was patient informed of Your Rights as Hospital Patient?     N
   e. Does the patient require an interpretor or communication adjuncts?     N

The undersigned certifies that he/she has read this document, receives a copy and is the patient, or is duly authorized by the patient's general agent to sign this form and accept its terms.

| CERVANTES, ASHLEY | 05/17/95 | | | 10/18/14 | 1747 |
| Patient Name | D. O. B. | Patient Signature | | Date Signed | Time |

| | | | Self | |
| Patient's Agent Signature | | Relationship to Patient | Witness | |

I hereby acknowledge receiving a copy of Carondelet Health Network's Notice of Privacy Practices and Carondelet Health Network Patient Information Guide, that applies to Carondelet Health Network and its professional staff members.
I acknowledge I have read and understand the notice of Health Information Practice for Health Information Network of Arizona brochure.
   Patient or Agent's Signature _____  Date: 10/18/14    (I elect to Opt Out [N])

**Carondelet**
HEALTH NETWORK

CONDITIONS OF ADMISSION

CERVANTES, ASHLEY
FINH017321878 10/18/14
Martinez,    H085351
19  F        CAT    SELF

Page 1 : HC Admissions/H085351/H017321878/CERVANTES,ASHLEY/19950517/000000000042254/COA/HIPAA
Form/301YYBL_01VZK4K7J00ESRD : 9/15/2016 11:05:36 AM

Ashley Cervantes
Holy Cross Hospital
Page 000065

ACKNOWLEDGMENT

I hereby acknowledge receiving a copy of Carondelet Health Network's Notice of Privacy Practices, which is for Carondelet Health Network and its professional staff members.

Date: _____ 10/18/14 _____

_____
Patient/Agent Name

CERVANTES,ASHLEY
FINH01732187810/18/14
Martinez,Patrick F    H085351
19                    CAT

© 1996 - 2010 T-System, Inc

☑ Nursing Assessment Reviewed  ☑ Initial Vital Signs Reviewed  ☐ Telemetry
BP ___  HR ___  RR ___  Temp ___
Pulse Ox ___ % ___ RA  O₂ Interp ___ nml ___ hypoxic

## PHYSICAL EXAM
EXAM LIMITED BY _____

**General Appearance**
☑ appears well          ___ mild / moderate / severe distress
☑ alert                 ___ anxious / lethargic

**HEENT**
☑ head atraumatic       ___ trauma  Raccoon eyes / Battles sign
☑ eyes nml inspection   ___ scleral icterus / pale conjunctivae
☑ PERRL                 ___ EOM palsy / anisocoria
☑ visual fields nml     ___ purulent nasal drainage
☑ ENT inspection nml    ___ dental decay / gum disease
☑ pharynx nml           ___ pharyngeal erythema / exudate
☑ no signs of dehydration ___ oral lesions / dry mucous membranes

**NECK**
☑ nml inspection        ___ thyromegaly / lymphadenopathy
☑ thyroid nml           ___ stiff neck / Kernig's / Brudzinski's sign
                        ___ carotid bruit
**RESPIRATORY**         ___ see diagram
☑ chest non tender      ___ wheezes / rales / rhonchi
☑ no resp distress
☑ breath sounds nml
**CVS**
☑ reg rate & rhythm     ___ irregularly irregular rhythm
☑ no murmur             ___ extrasystoles ( occasional / frequent )
☑ no gallop             ___ tachycardia / bradycardia
                        ___ PMI displaced laterally
                        ___ JVD present
                        ___ murmur  grade ___ /6  sys / dias
                        ___ gallop ( S3 / S4 )
                        ___ friction rub
                        ___ decreased pulse(s)
                        R carotid ___ fem ___ dors ped ___
                        L carotid ___ fem ___ dors ped ___

T=tenderness
R=rebound
m=mild
mod=moderate
sv=severe

**ABDOMEN / GI**
☑ non-tender            ___ tenderness / guarding / rebound
☑ no organomegaly       ___ abnml bowel sounds
☑ nml bowel sounds      ___ hepatomegaly / splenomegaly / mass
☑ no distension         ___ bruit

**FEMALE GENITAL**
☑ external exam nml     ___ vaginal bleeding / discharge
☑ speculum exam nml     ___ cervical motion tenderness
☑ bimanual exam nml     ___ adnexal tenderness / mass ( R /L )
                        ___ enlarged / tender uterus
**MALE GENITAL**        ___ tenderness / swelling  testicular / inguinal
☑ nml inspection
**RECTAL**              ___ black stool / heme pos stool
☑ non tender            ___ tenderness / mass / nodule
☑ prostate exam nml     ___ heme pos stool
**BACK**
☑ nml inspection        ___ CVA tenderness ( R / L )
**EXTREMITIES**
☑ non tender            ___ pedal edema
☑ full ROM              ___ calf tenderness
☑ nml appearance        ___ joint swelling
☑ no pedal edema
**NEURO**
☑ oriented x3           ___ disoriented to person / place / time
☑ CNs nml as tested     ___ facial droop
☑ sensation nml         ___ weakness / sensory loss
☑ motor nml             ___ slurred / abnml speech
**PSYCH**
☑ mood / affect nml     ___ depressed mood / flat affect

10198302432

---

**SKIN**                    ___ cyanosis / diaphoresis / pallor
☑ no embolic lesions        ___ skin rash / abscess / cellulitis
☑ color nml no rash         ___ decubitus
☑ warm dry

## LABS, EKG & XRAYS
*Normal lab value ranges are included on the original lab report

| CBC | | Chem | Creat ___ | CKMB ___ |
|---|---|---|---|---|
| nml except ___ | platelets ___ | nml except ___ | Gluc ___ | Troponin ___ |
| WBC ___ | segs ___ | Na ___ | BNP ___ | UA ___ |
| Hgb ___ | bands ___ | K ___ | D Dimer ___ | nml except ___ |
| Hct ___ | lymphs ___ | BUN ___ | PT ___ | |
| | | | | INR ___ |

Rhythm Strip Rate ___  Rhythm  NSR / PVC ___
EKG  interp by ED provider  Rate ___  ___ NSR ___ A fib
___ nml intervals  ___ nml axis  ___ nml QRS  ___ non-specific ST/TW changes
diagnosis ___ nml ___ abnml
Repeat EKG- unchanged  Old EKG- unchanged  date ___
CXR  interpreted by ED provider unless noted otherwise
___ nml / NAD  ___ no infiltrates  ___ nml heart size  ___ nml mediastinum
Old CXR  unchanged  date ___
CT Scan / MRI / Ultrasound
chest  abdomen  other  contrast / non-contrast
___ nml / NAD

**PROGRESS** ☐ see additional template # 94  Slo ___
Time ___  unchanged  improved  re-examined

☐ patient ambulating / mentating at pre event baseline
Discharge VS  BP ___  HR ___  RR ___  Temp ___
☐ Discussed with Dr ___  Time ___
will see patient in  ED / hospital / office
☐ Counseled patient / family regarding  Additional history from
lab / rad results diagnosis need for follow up  family caretaker paramedics
☐ prior records ordered  ☐ holding orders written
☐ Rx given

**CRITICAL CARE**  (excluding time for other separate services)
TIME ___  ☐ 30-74 min  ☐ 75-104 min ___ min

## CLINICAL IMPRESSION
Congestive Heart Failure    ◆Pneumonia
Hypokalemia                 ◆Pulmonary Embolism
◆Myocardial Infarction  acute   UTI / Pyelonephritis

Present On Admission  decubitus  UTI w/ foley

DISPOSITION  Disposition Order Time ___
DISPOSITION  ☐ home  ☐ admitted  ☐ OBS  ☐ DOA
☐ AMA (see AMA template #73)  ☐ transferred
CONDITION  ☐ unchanged  ☐ improved  ☐ stable
Care transferred to ___  MD / DO / MLP  Time ___
                                        NP / PA
Date ___  Time ___  IDX Provider # ___
☐ I was personally available for consultation in the emergency department. I have
reviewed the chart and agree with the documentation as recorded by the MLP
including the assessment, treatment plan and disposition
☐ I personally evaluated and examined the patient in conjunction with the MLP and
agree with the assessment, treatment plan and disposition of the patient as recorded by
the MLP

___ scribing for ___
(scribe name)                (Provider name)
☐ I have reviewed the information recorded by the scribe for accuracy and agree
with the recorded  Patrick F Martinez M D
                   IDX #17681 ___ MD / DO
Date ___  Time ___  IDX Provider # ___
☑ Template Complete  ☐ Written Addendum

General Adult 24  Pg 2 of 2  Rev 01 / 11  ◆ Quality Measure Initiative

CERVANTES ASHLEY
FN#H01321878   10/ 8/14
Martinez Patrick F  19
MR# H085351

Page 2 : HC Med Records/H085351/H017321878/CERVANTES,ASHLEY/1950517/000000000042254/ED
DOCS/301YYBM_01VZKCK7J00F7YC: 9/15/2016 11:05:36 AM

Ashley Cervantes
Holy Cross Hospital
Page 000067

TSystem Health  Verm 2.1  2010

**TIME SEEN** ___ **ROOM** ___ EMS Arrival
**HISTORIAN** patient family EMS___
UNABLE TO OBTAIN HISTORY DUE TO ___

## HPI

**chief complaint** ___
___
___

**onset / duration** ___
___

| timing | severity | modifying factors |
|---|---|---|
| still present | mild | none |
| better | moderate | |
| gone now | severe | |
| worse | | |

**context** ___
**recent trauma history:** ___
___
___
___
___
___
___
___
___

**quality** ___
___

**location** ___

___
___
___
___

Similar symptoms previously___

Recently seen / treated by doctor___

*Circle or check affirmatives backslash () negatives*

Carondelet Holy Cross Hospital
**EMERGENCY PROVIDER RECORD**

10198302431

## ROS

**CONST**
fever / chills / sweaty___
recent illness___
weakness / weight loss___

**EYES / ENT**
vision change / problems___
sore throat / dental problems___
nasal drainage / congestion___

**CVS / PULMONARY**
chest pain___
hurts to breathe / short of breath
cough bloody / productive___

**GI / GU**
abdominal pain___
nausea / vomiting___
last BM___
diarrhea / black / bloody stools___
problems urinating___
painful urination___

**FEMALE GENITAL**
LNMP___ preg post menop

**MS / SKIN / LYMPH**
calf / leg pain___
neck / back pain___
joint pain___
leg / ankle swelling___
rash___
swollen glands___

**NEURO / PSYCH**
headache___
fainting / dizzy___
lost feeling / power___
difficulty walking cane walker___
difficulty with speech___
confusion / dementia___
depression / anxiety___
☑ all systems neg except as marked

## PAST HX

cardiac disease___
  A Fib angina CHF MI
diabetes Type I Type 2___
  diet / oral / insulin neuropathy___
eye / sinus disease glaucoma___
GI disease___
  GERD / liver disease / cholelithiasis
  hepatitis pancreatitis ulcer
hypertension___
  old records reviewed / summary___

hyperlipidemia___
immunosuppressed AIDS steroids
kidney disease calculi UTI dialysis
lung disease asthma COPD
neuro / psych problems___
  CVA / TIA bleed deficit
  seizure disorder / depression___
skin disorder MRSA___

PERC Rule ≥ 50yo / HR ≥ 100 / RA SAO2 ≤ 94 / prior DVT PE / surg trauma ≤ 4wks / hemoptysis / hormone tx / unilat leg swelling / clin susp PE    [all neg < 2% risk PE]
Wells criteria for PE
3 pts each   clinically suspect DVT / most likely due to PE
1.5 pts each   HR >100 / immobilization or surgery past 4 weeks / prior DVT or PE
1 pt each   hemoptysis / cancer treatment in the past 6 mos
LOW(0-2pts) (3.6%) MOD(3-6pts) (20.5%) HIGH(> 6pts) (66%)   W II PE___

**Surgeries / Procedures** none___
appendectomy___    endoscopy upper / lower___
cardiac bypass / stent / pacemaker hysterectomy / BTL / C section___
cholecystectomy___    indwelling device line / port
   foley catheter / dialysis graft
Imaging   prior CT / MRI / US date___

**Medications** none see nurses note   **Allergies** NKDA
ASA clopidogrel warfarin LMWH___   see nurses note
NSAID acetaminophen BCP narcotic   antibiotic___
recent antibiotic ___

## SOCIAL HX
smoker___ drugs___
alcohol (recent / heavy / occasional)___ occupation___
living situation alone family friend group care facility___

## FAMILY HX ___

CERVANTES ASHLEY
FN#H017321078   10/18/14
Martinez   trick F   19
MR# L0853

TM#040310 rev m.16 2010
© 1996 – 2010 T-Systems, Inc

Page 3 : HC Med Records/H085351/H017321078/CERVANTES,ASHLEY/19950517/000000000042254/ED
DOCS/301YYBM_01VZKCK7J00F7YC : 9/15/2016 11:05:36 AM

Ashley Cervantes
Holy Cross Hospital
Page 000068

**Name** CERVANTES, ASHLEY
**MRN** H085351          **FIN** H017321878

**Patient Education Materials**
JAIL CLEARANCE

I CERVANTES ASHLEY have received the patient discharge information and have verbalized understanding
I acknowledge I have received all my Valuables and Belongings

_____          05/18/14
Patient or Responsible Party Signature          Date

_____          10/18/19
Witness Signature          Date

**\*\*This is a permanent part of the patient's chart  Please place this page in the patient's paper chart after it has been signed**

Name  CERVANTES ASHLEY

UNITED STATES PUBLIC HEALTH SERVICE
DIVISION OF IMMIGRATION HEALTH SERVICES (DIHS)
TREATMENT AUTHORIZATION REQUEST (TAR)
Immigration Health Services
1220 L Street NW  PMB 468  Washington  D C  20005
Phone 1-888-718 8947  Fax 1 866 259 8172

Is this request a TAR APPEAL (Please circle one*)      YES      (NO)

If YES  it is required that you provide the TAR NUMBER you are appealing _____

Detention Facility* NOGALES AZ _US Customs + Border Protection_ Phone#* _520 375 5785_

Address* _9 N GRAND AVE _____  Fax#* __520 287 6657__

City* _NOGALES _____  State* _AZ____  Zip* _85621_____

## DETAINEE INFORMATION

Last Name* _CERVANTES_____  First* __ASHLEY_____

Alien ID* ____  Date of Birth [REDACTED]  Sex* Male ☐  Female ☒

Camp Arrival Date* _10|18|14_____  Country of Origin* _____

## REASON FOR REFERRAL REQUEST

Diagnosis/Symptoms* _Possible internal carrier of Foreign Substance_

Course Of Treatment* _Request for X-ray_____

_____  CPT/CDT

## ATTESTATION OF DETAINEE CUSTODY

I _SHANEKA P LEGGETT_____  as of _10/18/14_  attest that the information provided on this

(PRINT NAME*)                        (TODAY S DATE*)

TAR form is correct to the best of my knowledge and that the detainee is not a U S Citizen and is/was in custody of the (check one*)

_X_ US Customs and Border Protection (CBP) – Please circle one of the following and provide  FIN or Event# or Log# _____

___ US Immigration and Customs Enforcement/Detention and Removal (ICE/DRO)

___ US Office of Refugee Resettlement (ORR)

from _10/18/14_____  to _10/18/14_____

(CUSTODY BEGINNING DATE*)      (CUSTODY END DATE*)

_[signature]_              SCBPO_____  520 375-5785_____

(SIGNATURE*)              (TITLE*)                    (PHONE NUMBER*)

## PROVIDER OF MEDICAL CARE AND OTHER SERVICES

Provider's Name** _____  Specialty* _____

Provider s Phone Number** _____  Provider's City** _____  Provider's State** _____

### DIHS AUTHORIZATION ACTION
(To be completed by DIHS ONLY)

DIHS Managed Care Coordinator (MCC) _____  Date _____

                                    (Signature)      Medically cleared for travel/Medically cleared for detention

MCC TAR Action   Approved ___   Denied ___   Pended ___                      MD/NP

MCC Comments _____  Signed _[signature]_

Please provide a copy of the  Approved  TAR to the Health Service Provider  Non-emergent health services will not be paid without an approved TAR issued prior to health services being rendered  Emergency health services require TAR submittal within one business day after being sought  A separate TAR will be required for health services beyond and outside the scope of the original authorized TAR  For health care claim status inquiries  call 1 800-479-0523  To appeal a TAR decision of DIHS to not authorize a service  a detention facility must submit a TAR Appeal through the TAR process and include the following information  a) "TAR Appeal  b) TAR number and other information from TAR being appealed  c) requested action  and d) justification for the requested action  For further guidance and information  please visit our website at  www icehealth org or contact the DIHS Managed Care Coordinators at 1-888-718 8947  M – F  8AM – 6 PM EST

*Failure to complete required fields will result in an inability of DIHS to process TAR
**Required when reason for TAR submittal is for emergency health services

Page 5 : HC Med Records/H085351/H017321878/CERVANTES,ASHLEY/19950517/000000000042254/ED
DOCS/301YYBM_01VZKCK7J00F7YC : 9/15/2016 11:05:36 AM

Ashley Cervantes
Holy Cross Hospital
Page 000070



## CARONDELET
### HEALTH NETWORK

OUR MISSION | EXCEPTIONAL MEDICINE · EXCEPTIONAL CARE

| *Clinical Documents* |
|---|

*Oxygen Per Hour :* 0

Fessler , Milly  RN - 10/18/14 19:03 MST

---

| DOCUMENT NAME: | ED Disposition Summary Forms | RESULT STATUS: | Auth (Verified) |
|---|---|---|---|
| SERVICE DATE/TIME: | 10/18/2014 19:03 MST | | |
| SIGNED INFORMATION: | Fessler ,Milly RN (10/18/2014 19:03 MST) | | |

**ED Disposition Summary MU Entered On: 10/18/14 19:03 MST**
**Performed On: 10/18/14 19:03 MST by Fessler , Milly  RN**

**ED Disposition MU**
*Condition at Discharge :* Stable
*Disposition Type ED :* Home
*Accompanied By :* Mother
*Method of Transportation :* Private vehicle

Fessler , Milly  RN - 10/18/14 19:03 MST

---

| DOCUMENT NAME: | ED Triage Adults Peds Forms | RESULT STATUS: | Auth (Verified) |
|---|---|---|---|
| SERVICE DATE/TIME: | 10/18/2014 18:14 MST | | |
| SIGNED INFORMATION: | Noriega ,Victor RN (10/18/2014 18:14 MST) | | |

**Triage MU Entered On: 10/18/14 18:20 MST**
**Performed On: 10/18/14 18:14 MST by Noriega , Victor  RN**

**ESI/Chief Complaint(ED)**
*Chief Complaint Description :* foeign  object in body here for RX perr CBP
*Visit Due To Fall :* No

Noriega , Victor  RN - 10/18/14 18:14 MST

**DCP GENERIC CODE**
*Triage Date/Time :* X-RAY FOREIGN OBJECT
*Triage Date/Time :* 10/18/2014 18:14 MST
*ESI Acuity :* 4 – Less Urgent
*Tracking Group :* HCH ED Tracking Group

Noriega , Victor  RN - 10/18/14 18:14 MST

**Vitals and Measurements(ED)**
*Method Used - Weight :* Estimated
*Weight Unit of Measure :* Pounds

---

| **Carondelet Health Network** | | **CERVANTES, ASHLEY** | | | | |
|---|---|---|---|---|---|---|
| Holy Cross Hospital | | FIN:H017321878 | **MRN:** H085351 | | | |
| 1171 W. Target Range Road | | **SEX:** Female | **DOB:** | | **AGE:** | 19 years |
| Nogales, AZ 85621- | | **LOCATION:** Emergency Department HCH | | | **RM/BED:** | |
| 520-285-8019 | | **ADMITTING:** | | | **ADMIT:** | 10/18/2014 |
| | | **ATTENDING:** Martinez ,Patrick F MD | | | **DISCH:** | 10/18/2014 |
| **PT TYPE:** Emergency | | **PCP:** PRIMARY CARE DOCTOR,NO | | | **Cons:** n/a | |
| PRINTED:9/14/2016 11:52 MST | | PRINTED BY: Vargas ,Maria | | | | Page 7 of 21 |

Ashley Cervantes
Holy Cross Hospital
Page 000077



Exhibit 3-D

MAC BAN LAW OFFICES
Skyline Esplanade
1795 E. Skyline Drive, Suite 155
Tucson, Arizona 85718
Telephone: (520) 624-6446
Facsimile: (520) 624-6617
Laura V. Mac Ban (SB# 012328)
lvm@macbanlaw.com
Michael L. Linton (SB# 024729)
mlinton@macbanlaw.com
**Attorneys for** Defendant
Holy Cross Hospital, Inc.

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| ASHLEY CERVANTES, a single woman,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION AGENT SHAMEKA LEGGETT and "JOHN DOE" LEGGETT; UNKNOWN UNITED STATES CUSTOMS AND BORDER PROTECTION AGENTS; HOLY CROSS HOSPITAL, INC.; PATRICK F. MARTINEZ AND "JANE DOE" MARTINEZ; QUANTUM PLUS, INC., dba TEAMHEALTH WEST; JOHN DOES 1-5; JANE DOES 1-5; XYZ CORPORATIONS 1-5; ABC PARTNERSHIPS 1-5,<br><br>Defendants. | NO. 4:16-CV-00334-CKJ<br><br>**DEFENDANT HOLY CROSS HOSPITAL, INC.'S SECOND SUPPLEMENTAL RULE 26(a)(1) DISCLOSURE STATEMENT**<br><br>**Additional Information in Bold**<br><br>*(Assigned to*<br>*The Hon. Cindy K. Jorgenson)* |

a. Any and all reports prepared by agents of the United States Customs and Border Protection Agency regarding their encounter with Ms. Cervantes, as well as any additional records.

b. Any and all exhibits listed by any other party regardless of whether or not that party attempts to delist the exhibit, fails to use it at the time of trial, settles, or is dismissed.

c. Exemplary medical charts or exhibits illustrative of medical issues present in this matter.

d. C.V.'s and Affidavits of all experts.

e. Any and all discovery exchanged between the parties, including, but not limited to, Plaintiff's responses to discovery propounded by the Defendants, deposition transcripts, answers to interrogatories, Disclosure Statements, responses to Request for Production and/or Requests for Admission, and any Exhibits attached thereto.

f. Any and all records reflecting collateral source benefits received by Plaintiff including, but not limited to: Mercy Care Plan, Qualified MC Beneficial, Medicare benefits, Cochise County Long Term Care, Social Security benefits, Pima County Health System, AHCCCS, Pima Community Access and/or any other providers of collateral benefits to Plaintiff.

g. Depositions and/or statements of any witness and any exhibit attached to any deposition and/or statement.

h. All disclosures and/or discovery responses, including exhibits or attachments thereto, of any party.

i. To the extent relevant to Plaintiff's claims, complete copies of Plaintiff's federal and state income tax returns, including all schedules and attachments thereto, from five years prior to the date of alleged loss and through the date of trial.

j. Medical literature; will supplement.

5. Records and bills received pursuant to Subpoena from Frank Bejarano, DBH / Alliance Counseling Center in Nogales (attached hereto).

**6. Carondelet Health Network Policy & Procedure – Consent for Treatment (attached hereto).**

**7. Carondelet Health Network Patient Care Services Policy & Procedure – Care of Inmates, Law Offenders, or Persons in Custody of Law Enforcement (attached hereto).**

insurance premiums or, at a minimum, the amount of future bills as determined from the amount actually accepted by care providers. See, e.g., *Jones v. MetroHealth Medical Center*, Case No. 757131 (Ohio Court of Common Pleas, April 14, 2015); *Brewington v. United States*, C.D. Calif. No. CV 13-07672 (July 24, 2015).

Holy Cross Hospital maintains that it is not responsible for Plaintiff's damages. Holy Cross Hospital denies that Plaintiff is entitled to recover punitive damages and/or attorneys' fees and costs.

## D. **INSURANCE AGREEMENTS:**

Holy Cross Hospital is insured through the Ascension Health Alliance Professional and General Liability Self-Insurance Program.

RESPECTFULLY SUBMITTED this 2 4ᵗʰ March, 2017.

MAC BAN LAW OFFICES, P.A.

By _____
Laura V. Mac Ban/
Michael L. Linton
Attorneys for Defendant Holy Cross Hospital, Inc.

| | Title: Care of Inmates, Law Offenders, or Persons in Custody of Law Enforcement |
|---|---|
|  **Carondelet. Be well.** | Section: Provision of Care, Treatment and Services |
| | Dept. of Origin: Patient Care Services |
| | Effective Date: July 9, 2009 |
| | Last Review/Revision: 11/25/13 |
| **PATIENT CARE SERVICES POLICY & PROCEDURE** | **Supersedes: Care of Inmate/offender-Non Contracted** |
| | **CNO Signature:** Martha Gerganoff CSM, Robin Conklin CSJ, Debra Knapheide CHCH |
| | **Signature:** _____ Pedro Valdez _____ |
| | CHN Director of Security |

## I. POLICY

CHN collaborates with correctional agencies in the provision of care to inmates / law offenders, and all healthcare services provided reflect the Mission, Vision, Values, and Standards of Care of Carondelet Health Network,

All inmates/law offenders are admitted as "confidential" patients and will remain on "DO NOT PUBLISH" status throughout their stay.

CHN associates that work in patient care areas or those that provide services to patients that are inmates/offenders, are required to complete an education /training module related to care of the incarcerated patient. There is initial education (usually completed during the orientation period for new associates), and then ongoing education as determined by the Network Education department.

These guidelines apply to all persons seeking or receiving care at CHN facilities that are in the custody of Law Enforcement Agencies, e.g., Arizona Department of Corrections, Corrections Corporation of America, Marana Community Correctional Treatment Facility, Federal Bureau of Prisons, Border Patrol, Federal Marshall, Local law enforcement agencies etc.

## II. PURPOSE

To provide guidelines regarding the unique safety measures that must be implemented in the management and care of inmates/offenders in order to ensure the safety of all patients, visitors and associates.

## III. DEFINITIONS

**Agency** – Law enforcement/correctional agency utilizing Carondelet Health Network for inmate/offender health care services.
**Inmate/Offender** - Patients under legal/correctional authority.
**Officer** - Employee of an outside law enforcement/correctional agency retaining custody of an inmate/offender.
**Hospital Security** - CHN Department of Security associates.
**CHN associate** – employees or services that are involved directly or indirectly with the inmate/offender's care, including members of departments such as transportation, housekeeping, dietary, SPD, etc.

## IV. ROLES AND RESPONSIBILITIES

**Hospital Security:**

Hospital Security does not assume responsibility for the custody of the inmate/offender.

1. In the event of an extreme emergency that incapacitates the assigned officer, hospital security will be notified immediately to maintain a safe environment. Hospital will notify agency duty officer and local law enforcement agency.
2. Hospital security is responsible for officer orientation and maintenance of documentation for a minimum of two years.
3. Hospital security does not provide relief coverage for enforcement agency officers.

**Law Enforcement / Correctional Officers:**

1. Must complete an orientation to the facility and are required to comply with pertinent hospital policies.
2. Will assume a position to maintain visual contact of the inmate/offender at all times and be able to observe anyone entering or leaving the room.
3. Must accompany the inmate/offender when leaving the bed or room for any purpose, such as visits to ancillary treatment services.
4. Will not be permitted to bring firearms in the MRI suites or any psychiatric units.
5. Will accompany inmate/offender into the operating room and will be provided PPE or scrubs. Once the inmate/offender is under anesthesia the CO will step outside the operating room, observe from the window, and re-enter at any time the inmate/offender awakens and/or poses a security threat.
6. Will determine level of security provided (minimum 1 officer) per the agency's policy. The inmate/offender must have an officer in attendance at all times.
7. Will adhere to designated routes for officer ingress/egress for the hospital.

**All Associates:**

Associates that have direct contact with patients who are inmates/offenders of the law, are responsible for adhering to specific guidelines that are intended to promote a safe working and care environment for all.

**CHN associates:**

1. Are expected to demonstrate professionalism when providing care and interacting with patients and visitors.
2. will not indulge in undue familiarity with inmates/offenders or their visitors.
3. will not sit on the inmates/offender's bed.
4. will not convey written or oral messages for inmates/offenders unless necessary to facilitate medical care. These communications must involve the assigned officer.
5. will not assist an inmate/offender in the submission of an application for executive clemency or any judicial orders (writs).
6. may not provide newspapers, magazines or books to any inmate/offender.
7. will not engage in discussions with an inmate/offender concerning personal issues, other associates, officers, or inmate/offenders in reference to governmental witnesses, informants or any remarks of a personal nature.
8. will not discuss an inmate/offender's crime with him/her. If the inmate/offender chooses to discuss the crime or charges, associates will refrain from making comments, and should change the subject when possible. Conversations between CHN associates and inmate/offender should be limited to content that relates to care, treatment and medical well being.
9. may not accept any favors or gratuity from inmate/offender or any inmate/offender's visitor. There will be no exchange of monies or property between CHN associates and an inmate/offender or family members/friends of inmate/offenders.

# V. SPECIAL CONSIDERATION

## IMPORTANT SECURITY RULES:

1. Inmates/offenders are not to be told times or dates of scheduled procedures outside of the Inpatient Unit, when they will be discharged, or any other information which would be helpful in planning escape.
2. Any information concerning escape plans, attempted suicide, or planned violence is to be reported to the officers on duty. (Appropriate nursing policy and procedure will be followed re: patient mental and physical health).
3. Bribery, attempted bribery or solicitation of bribery by any inmate/offender; any attempt to jeopardize accepted employee-inmate/offender relationship and/or any unauthorized contact by inmates/offenders will be reported to the officer.
4. CHN associates will make certain the inmate/offender is in sight before entering the inmate/offender's room.
5. Inmates/offenders will eat all meals on disposable dishes with disposable silverware without any form of knives.
6. Inmates/offenders will not have supplies, unnecessary equipment or high-risk objects left in their room at any time.
7. CHN associates will not enter inmate/offender room without an officer present.
8. Inmates/offenders taking medication need to be watched to ensure that their medications are in fact taken/swallowed. No medications are to be left unattended at any time.
9. Conflict between CHN associates and officer will be escalated immediately through chain of command. CHN associates will follow their chain of command and the officer will follow his/her chain of command.

**WHEN A QUESTION INVOLVING SECURITY ARISES, PLEASE REFER TO THE LAW ENFORCEMENT/CORRECTIONAL OFFICER.**

## VI. PROCESS

The hospital requires that inmates/offenders have officers assigned to provide the appropriate level of security in order to ensure the safety of CHN associates, patients, and visitors.

1. It is required that each inmate / offender be assigned at least one officer in order to safeguard the public, our associates and physicians. The hospital does not provide security services for inmates/offenders. The inmate/offender must have an officer in attendance at all times.
2. All attempts will be made to place the inmate/offender in a private room. An officer must position him/herself to see the inmate/offender and be able to observe anyone entering or exiting the room. Officers also will position themselves in the room while CHN associates provide direct and/ or indirect care.
3. The agency will provide a contact number to be placed in the patient's record. This information will be utilized by associates to contact an officer in authority with questions or concerns. It is expected that the agency will respond by phone to the hospital within 30 minutes of being contacted.
4. Inmates/offenders who demonstrate verbally or physically abusive behavior or who do not actively participate in their plan of care (are non-compliant) will be referred to the officer in authority.
5. CHN associates are not responsible for monitoring or policing inmate/offenders telephone calls.
6. CHN associates are not responsible for monitoring or policing visitation. Visitation will be regulated by the agency.
7. In situations where the law enforcement agency does not maintain a continuous security presence, the hospital does not have an obligation to notify the agency of the inmate/offender's discharge from the hospital.
8. At the time of discharge, the hospital will provide the officer in charge a copy of the PCS discharge/transfer summary form, required prescriptions, and any other necessary discharge instructions involving the inmate/offender.

**Plan for Discharge and Continuing Care** - Discharge planning will begin on admission and will be coordinated with the law enforcement/correctional agency. Referrals for continuing care and follow-up will be made in conjunction with the appropriate authority, which provides medical services to persons at the law enforcement/correctional institution.

## VII.    REFERENCES

Arizona Department of Corrections. (1997). Chapter 1100: Inmate Health Services. Department Order 1101: Inmate Access to Health Care. Arizona Department of Corrections: Phoenix, AZ. Accessed on 8-12-2010 at http://www.azcorrections.gov/Policies/1100/1101.pdf

## CHN POLICY CROSS REFERENCES

- Corrections Officer Orientation
- Use and Disclosure of PHI to correctional Institutions and other officials with custody over inmates
- Release and Disclosure of PHI with Authorization
- Disclosures required by law

## VII.  APPROVAL

| Committee/Department | Original Approval | 1st Review | 2nd Review | 3rd Review | 4th Review | 5th Review |
|---|---|---|---|---|---|---|
| Patient Care Services Policy & Procedure Committee | 06/12/09 | 8/12/2010 | 2/9/12 | | | |
| Policy Coordinating Committee | 07/09/09 | | | | | |
| CHN Legal Department | 12/29/10 | | | | | |
| CHN Security | 9/2013 | | | | | |
| CHN Nursing Leadership Council | 11/25/13 | | | | | |

Exhibit 4

Deposition of Shamekia Leggett

THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


|  |  |
|---|---|
| ASHLEY CERVANTES, a single woman,<br><br>            Plaintiff,<br><br>        vs.<br><br>UNITED STATES OF AMERICA;<br>UNITED STATES CUSTOMS AND<br>BORDER PROTECTION AGENT SHAMEKA<br>LEGGETT and "JOHN DOE" LEGGETT;<br>UNKNOWN UNITED STATES CUSTOMS<br>AND BORDER PROTECTION AGENTS;<br>HOLY CROSS HOSPITAL, INC.;<br>PATRICK F. MARTINEZ and "JANE<br>DOE" MARTINEZ; QUANTUM PLUS,<br>INC., dba TEAMHEALTH WEST;<br>et al.,<br><br>            Defendants. | No. 4:16-cv-00334-CKJ |



DEPOSITION OF SHAMEKA LEGGETT


Phoenix, Arizona
July 19, 2017
10:00 a.m.




Reported by:  Wanda J. Curry, RPR, RMR
CR No. 50366

_____

MEYER, LUMIA & ASSOCIATES
Certified Court Reporters
6775 East Calle La Paz, Unit C
Tucson, Arizona  85715
520.623.1100  (Fax) 520.722.5180

<pre>
1                    I N D E X

2    SHAMEKA LEGGETT

3                  EXAMINATION
                                      Page  Line
4
     BY:  Mr. Marchetti . . . . . . . . . .    5    6
5    BY:  Ms. Donovan . . . . . . . . . .  164   15
     BY:  Ms. Holden . . . . . . . . . .   175    5
6    BY:  Mr. Linton . . . . . . . . . .   180    5
     BY:  Mr. Marchetti (Further) . . . . . 185   20
7    BY:  Ms. Kroeger . . . . . . . . . .  187   14
     BY:  Ms. Donovan (Further). . . . . . . 191   9
8

9

10   No.                                   Page

11    1    4/25/2017 16:00 EDT "TECS - Person      17
           Encounter" (CBP-58)
12
      2    "TECS II - Incident Log" documents (CBP-50  88
13         through CBP-52  and CBP-1000)

14    3    "Personal Search Worksheet" (one page)   106

15    4    "United States Public Health Service     125
           Division of Immigration Health Services
16         (DHS) Treatment Authorization Request
           (TAR)" (Ashley Cervantes Holy Cross
17         Hospital Page 000059 and 000070)

18    5    "Appendix E Standard Consent Form for    137
           X-Rays and/or Pregnancy Tests Administered
19         by an X-Ray and/or Medical Facility" and
           "Appendix F Standard Consent Form for a
20         "Pelvic/Rectal Examination" (Ashley
           Cervantes Holy Cross Hospital Page 000060
21         and 000061)

22

23                  RECESSES
                                      Page  Line
     (Recess at 10:47 a.m.; resumed at 10:53 a.m.) []    []
24   (Recess at 11:27 a.m.; resumed at 11:35 a.m.) []    []
     (Recess at 12:40 p.m.; resumed at 12:50 p.m.) []    []
25   (Recess at 1:33 p.m.; resumed at 2:05 p.m.)   []    []
</pre>

1           BE IT REMEMBERED that the deposition of

2    SHAMEKA LEGGETT was taken at the offices of the

3    United States Attorney, Two Renaissance Square,

4    40 North Central Avenue, Suite 1253, in the City of

5    Phoenix, County of Maricopa, State of Arizona, before

6    WANDA J. CURRY, a Certified Reporter, Certificate

7    No. 50366, in and for the State of Arizona, on the

8    19th day of July, 2017, commencing at the hour of

9    10:00 a.m., on behalf of the plaintiff in a certain

10   cause now pending in the United States District Court,

11   in and for the District of Arizona.

12

13   APPEARANCES:

14   For the plaintiff:
         Marchetti Law, P.L.L.C.
15       BRIAN MARCHETTI, ESQ.
         177 North Church Avenue, Suite 1100
16       Tucson, Arizona  85701
         520.334.2067
17
     For Defendant United States of America and Shameka
18   Leggett:
         United States Attorney
19       District of Arizona
         MELISSA MARCUS KROEGER, ESQ.
20       405 West Congress Street, Suite 4800
         Tucson, Arizona  85701-5040
21       520.620.7104

22   For Defendants Holy Cross Hospital, Inc.:
         Mac Ban Law Offices
23       MICHAEL L. LINTON, ESQ.
         Skyline Esplanade
24       1795 East Skyline Drive, Suite 155
         Tucson, Arizona 85718-8102
25       520.624.6446

```
 1   For Defendants Martinez:
          Broening Oberg Woods & Wilson, P.C.
 2        MICHELLE L. DONOVAN, ESQ.
          1122 East Jefferson Street
 3        Phoenix, Arizona  85034
          602.271.7700
 4
     For Defendant Quantum Plus, Inc.:
 5        Holden & Armer, P.C.
          DEEDEE A. HOLDEN, ESQ.
 6        4505 East Chandler Boulevard, Suite 210
          Phoenix, Arizona  85048
 7        480.656.0460

 8   Also present:  Ashley Cervantes
                    Danielle Chronister
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   you whether you agree or not.

2       A.   Okay.

3       Q.   "Body cavity searches shall be made only

4   under the most exceptional circumstances."

5           Do you agree that's CBP policy?

6           MS. KROEGER:  Form.

7           THE WITNESS:  If that's what it says, yes.

8       Q.   BY MR. MARCHETTI:  Okay.  What were the

9   "exceptional circumstances" that you believe existed in

10  this case for Ashley to receive a body cavity search?

11          MR. LINTON:  Form, foundation.

12          MS. KROEGER:  Form and foundation.

13          THE WITNESS:  She didn't receive a body

14  cavity search from us.

15      Q.   BY MR. MARCHETTI:  Who may conduct the body

16  cavity search?

17          MS. DONOVAN:  Form and foundation.

18          THE WITNESS:  We would take them to a medical

19  facility of some sort to do a body cavity search.

20      Q.   BY MR. MARCHETTI:  Okay.  So can a CBP

21  officer conduct a body cavity search?

22      A.   I'm not sure.  I believe that they can ask

23  them to remove something, but I don't...

24      Q.   Are you authorized, under CBP policy, to

25  conduct a body cavity search of an individual?

1    A.   It depends on the cavity.  I don't -- I don't

2  know.  I -- I -- I've not ever heard of someone going

3  into someone's vagina to take something out, so no.

4    Q.   Okay.  I'm going to read from the policy

5  again.

6    A.   Sure.

7    Q.   "Only medical personnel may conduct a body

8  cavity search," period; do you agree with that?

9    A.   Yes.

10    Q.   "The CBP officers are prohibited from

11  conducting body cavity searches themselves"; do you

12  agree with that?

13    A.   Yes.

14    Q.   "Or from causing a body cavity search to be

15  conducted at a CBP facility"; do you agree with that?

16    A.   Yes.

17    Q.   But CBP policy allows for a body cavity

18  search; correct?

19    A.   Yes.

20    Q.   So who conducts body cavity searches when

21  they're conducted?

22         MS. DONOVAN:  Form and foundation.

23         THE WITNESS:  Doctors.

24    Q.   BY MR. MARCHETTI:  Okay.  So you're telling

25  me that the doctor conducts the body search for CBP?

```
 1          MS. KROEGER:  Form and foundation.

 2          MS. DONOVAN:  Form and foundation.

 3          MS. HOLDEN:  Join.

 4          THE WITNESS:  "The body search"?  The body

 5   cavity search.

 6      Q.   BY MR. MARCHETTI:  Correct, the body cavity

 7   search.

 8      A.   Yes.

 9      Q.   Does a person need to consent to a body

10   cavity search?

11          MS. DONOVAN:  Form and foundation.

12          MS. KROEGER:  Form and foundation.

13          THE WITNESS:  As far as -- it depends, I

14   believe.  We ask for an x-ray, which would, in turn,

15   probably show -- maybe, if there's suspicion there or

16   if there's something there, show that there is

17   something internal; however, we don't do body cavity

18   searches, so...

19          I guess I don't know.

20      Q.   BY MR. MARCHETTI:  Do involuntary body...

21          Do you agree involuntary body cavity searches

22   require a court order?

23          MS. KROEGER:  Form and foundation.

24          MS. DONOVAN:  Form and foundation.

25          THE WITNESS:  I don't know what requires a
```

1    record.

2         Q.    BY MR. MARCHETTI:  And we're going to go

3    through what you observed at the hospital now.  So I

4    want you to walk us through your -- you've taken Ashley

5    out of the vehicle and brought her into Holy Cross.

6    And walk us through what happened, please.

7         A.    Okay.  Ms. Cervantes and Gracia --

8    Officer Gracia, they sat down in the waiting area.  I

9    took the TAR form sheet to the administration window

10   and gave it to them and told them that we were there

11   for her to be seen.

12        Q.    And Ashley was handcuffed at this point in

13   time?

14        A.    She was still handcuffed.

15        Q.    In the waiting -- in the public waiting area

16   of the hospital?

17        A.    In the public waiting area.

18        Q.    Okay.  And what happened next?

19        A.    The administrator did all of what she needed

20   to do and we waited until she was bought to the back of

21   the emergency area.

22        Q.    And did you go with Ashley?

23        A.    We did.

24        Q.    So did somebody come get you?

25        A.    Yes.  They opened up the door.  They called

1   us to come inside.  They took us to a hospital room, at

2   which time we waited for a doctor to come and see us.

3       Q.   Okay.  And were you -- did Ashley leave your

4   side at all during this time period?

5       A.   No.

6       Q.   Okay.  Was she still in handcuffs?

7       A.   She was.

8       Q.   And was she free to leave the hospital?

9       A.   No.

10      Q.   Okay.  So what happened next?

11      A.   The doctor entered into the room and he asked

12  me what was the purpose for her visit.  And we told him

13  that we were looking to get an x-ray because we

14  believed that she had something in her body, inside her

15  body.

16      Q.   Let me stop you there.

17      A.   Yes.

18      Q.   Oh, I'm sorry, go ahead.  Keep going.

19      A.   Okay.  He asked me if we -- if I believed she

20  swallowed anything.  And we told him no, we thought it

21  was something that was vaginal.

22      Q.   Okay.  Did he ask whether you had a court

23  order?

24      A.   No.

25      Q.   Did he ask if you had a search warrant of any

Exhibit 5


Quantum Plus Responses to Discovery

## ◆Holden & Armer, P.C.

**Attorneys at Law**

Carolyn Armer Holden, Esq. State Bar No. 014315
Michael J. Ryan, Esq. State Bar No. 017467
Of Counsel
4505 East Chandler Blvd., Suite 210
Phoenix, Arizona 85048
(480) 656-0460
dholden@holdenarmer.com
mryan@holdenarmer.com
*Attorneys for Defendants Quantum Plus, LLC. dba*
*TeamHealth West*

### IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

| | |
|---|---|
| ASHLEY CERVANTES, a single woman, | |
| Plaintiff, | Case No.: 4:16-CV-00334-CKJ |
| v. | |
| UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION AGENT SHAMEKA LEGGETT and "JOHN DOE" LEGGETT; UNKNOWN UNITED STATES CUSTOMS AND BORDER PROTECTION AGENTS; HOLY CROSS HOSPITAL, INC.; PATRICK F. MARTINEZ and "JANE DOE" MARTINEZ; QUANTUM PLUS, INC., dba TEAMHEALTH WEST; JOHN DOES 1-5; JANE DOES 1-5; XYZ CORPORATIONS 1-5; and ABC PARTNERSHIPS 1-5, | **DEFENDANT QUANTUM PLUS, LLC.'S RESPONSE TO PLAINTIFF'S SECOND SET OF DISCOVERY REQUESTS TO DEFENDANT QUANTUM PLUS, INC.**<br><br>**DATED NOVEMBER 17, 2017**<br><br>*(Assigned to the Honorable Cindy K. Jorgenson)* |
| Defendants. | |

Defendant Quantum Plus, LLC (f/k/a Quantum Plus, Inc.) dba TeamHealth West, by and through undersigned counsel, hereby responds to Plaintiff's Discovery Requests dated October 10, 2017.

## REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 9:** Admit a bill was generated for Ashley Cervantes relating to her interactions with Dr. Patrick Martinez while at Holy Cross Hospital on October 18, 2014.

_____ Admit     __X__ Deny

## INTERROGATORIES

**NON-UNIFORM INTERROGATORY NO. 5:** If your response to any of the Requests for Admission above are anything other than an unqualified admission, state the legal and factual bases supporting your qualifications and/or denials of the Requests. Identify all documents supporting any such qualifications and/or denials.

> **RESPONSE: Objection. Overly broad, vague, relevance. Without waving this objection, a bill was generated by Chase Dennis Nogales. Plaintiff, Ms. Cervantes, signed an assignment of insurance benefits form. Ms. Cervantes did not respond to a later request for updated insurance information. The bill was not paid and was written off as bad debt.** _See_ **Patient Invoice attached as Exhibit 1.**

**NON-UNIFORM INTERROGATORY NO. 6:** Identify and describe each and every service/procedure that Quantum and/or its agents/employees provided to Ashley on October 18, 2014.

> **RESPONSE: Objection. Overly broad, vague, relevance. Without waving this objection, Defendant, Quantum Plus, LLC, is not the employer or principle of any**

2

health care provider at Holy Cross Hospital who provided service/procedure to Plaintiff.

**NON-UNIFORM INTERROGATORY NO. 7:** Describe whether Quantum or any of its agents/employees/assigns/affiliated billing entities were paid for the services/procedures allegedly provided to Ashley on October 18, 2014. If Quantum or any of its agents/employees/assigns/affiliated billing entities were paid for those services in any way, identify who paid the bill/invoice and provide the date on which it was paid. If Quantum or any of its agents/employees/assigns/affiliated billing entities were not paid for those services, describe whether Quantum has taken any steps to collect the amounts allegedly outstanding.

**RESPONSE: Objection. Overly broad, vague, relevance. Without waving this objection, a bill was generated by Chase Dennis Nogales. Plaintiff, Ms. Cervantes, signed an assignment of insurance benefits form. Ms. Cervantes did not respond to a later request for updated insurance information. The bill was not paid and was written off as bad debt.** *See* **Patient Invoice attached as Exhibit 1.**

**NON-UNIFORM INTERROGATORY NO. 8:** State with specificity the policies/procedural guidelines which Quantum believes controlled the interactions with Ashley while she was at Holy Cross Hospital on October 18, 2014. For each policy/procedural guideline, state what entity created the same and who was responsible for ensuring the policy/procedural guideline was adhered to on October 18, 2014.

**RESPONSE: Objection. Overly broad, relevance, vague. Without waiving this objection, Quantum Plus, LLC, acted as a staffing company.** *See* **Subsidiary Services Agreement, Carondelet Holy Cross Hospital Emergency Medical Services Agreement, Medical Professional Independent Contractor Agreement and Professional Services Agreement as disclosed by Defendant, Quantum Plus, LLC, in response to Plaintiff's Initial Request for Admission, Request for Production and Non-Uniform Interrogatories dated June 15, 2017.**

**REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 3:** Provide true and correct copies of any and all policies listed in response to Interrogatory No. 8, above.

> **RESPONSE: Objection. Relevance, overly broad, vague. Without waving this objection, Defendant, Quantum Plus, LLC, is a staffing company and does not create policies. All policies, procedures, and guidelines were generated by Holy Cross Hospital.** *See* **Subsidiary Services Agreement, Carondelet Holy Cross Hospital Emergency Medical Services Agreement, Medical Professional Independent Contractor Agreement and Professional Services Agreement as disclosed by Defendant, Quantum Plus, LLC, in response to Plaintiff's Initial Request for Admission, Request for Production and Non-Uniform Interrogatories dated June 15, 2017.**

**RESPECTFULLY SUBMITTED** this 17th day of November 2017.

                    **HOLDEN & ARMER, P.C.**

                    By: /s/ Carolyn Holden
                            Carolyn Armer Holden, Esq.
                            Michael J. Ryan, Esq.
                            Of Counsel
                            4505 E. Chandler Blvd., Suite 210
                            Phoenix, Arizona 85048
                            *Attorneys for Quantum Plus, LLC. dba*
                            *TeamHealth West.*

**COPY E-mailed** this 17th day of
November 2017, to:

Matthew C. Davidson, Esq.
LAW OFFICES OF MATTHEW C. DAVIDSON, LTD.
1859 N. Grand Avenue, Suite 1
Nogales, Arizona 85621-1386
mdavidsonlaw@gmail.com
*Attorney for Plaintiff*

Brian Marchetti, Esq.
MARCHETTI LAW, PLLC.

4

290 N. Meyer Avenue
Tucson, Arizona 85701
brian@yourtucsonlawfirm.com
*Attorney for Plaintiff*

James R. Broening, Esq.
Michelle L. Donovan, Esq.
BROENING, OBERG, WOODS & WILSON
P.O. Box 20527
Phoenix, Arizona 85036
jrb@bowwlaw.com
*Attorney for Defendant Martinez*

Michael A. Ambri, Esq.
Melissa Marcus Kroeger, Esq.
UNITED STATES ATTORNEY'S OFFICE
Assistant U.S. Attorneys
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Michael.ambri@usdoj.gov
Melissa.kroeger@usdoj.gov
*Attorneys for Defendant United States of America and Shamekia Leggett*

Laura V. Mac Ban, Esq.
Michael L. Linton, Esq.
MAC BAN LAW OFFICES
Skyline Esplanade
1795 E. Skyline Drive, Suite 155
Tucson, Arizona 85718
lvm@macbanlaw.com
mlinton@macbanlaw.com
*Attorneys for Defendants Holy Cross Hospital, Inc. and Ascension Arizona, Inc.*

Exhibit 1

| ACCOUNT NUMBER | STATEMENT DATE |
|---|---|
| 22786255/507 | 11/02/17 |

| CHECK NUMBER | PAYMENT AMOUNT |
|---|---|
| | |

FOR PROPER POSTING
PLEASE WRITE IN CHECK
NUMBER AND AMOUNT PAID

22786255-507-5131

ASHLEY CERVANTES
171 PASEO DULZURA
RIO RICO AZ 85648

PLEASE WRITE YOUR ACCOUNT NUMBER ON YOUR CHECK.
MAKE PAYABLE IN U.S. DOLLARS TO:

CHASE DENNIS NOGALES
PO BOX 634718
CINCINNATI,OH 45263-4718

PATIENT NAME: ASHLEY CERVANTES

TO PAY BY CREDIT CARD, COMPLETE
AND SIGN THE OTHER SIDE OF THIS STATEMENT.

CARONDELET HOLY CROSS E.D.
PHYSICIAN SERVICES RENDERED AT:
PAYMENTS AND INSURANCE INFORMATION MAILED SEVEN DAYS
PRIOR TO THE ABOVE STATEMENT DATE MAY NOT YET APPEAR.

TAXPAYER ID: 94-3259637

BILLING INQUIRIES: 1-888-952-6772

HOURS OF OPERATION: MONDAY - FRIDAY 8AM TO 8PM & SATURDAY 10AM TO 3PM ET
PROVIDE INSURANCE INFO OR PAY BY CREDIT CARD AT WWW.TEAMHEALTH.COM/BILLING

| DATE/INVOICE # | DX/CPT CODE | DESCRIPTION | PROVIDER | CHARGES | PAYMENTS/CREDITS |
|---|---|---|---|---|---|
| 10/18/14 | 99283 | EMERGENCY DEPT VISIT - 99283 | | 344.00 | |
| 141439847 | V70.8 | | MARTINEZ MD,PATRICK F | | |
| 12/19/15 | | CLOSE & RETURN FACTOR/SERVICE W OFF | | | 344.00 |
| 141439847 | | | | | |

PHYSICIAN CHARGES ARE NOT INCLUDED IN THE FACILITY BILL.

ACCOUNT NUMBER: 22786255/507    STATEMENT DATE: 11/02/17 (CCB )    TOTAL NOW DUE ▶ 0.00

Exhibit 6

Dr. Martinez's Responses to Discovery

LAW OFFICES
BROENING OBERG WOODS & WILSON
PROFESSIONAL CORPORATION
POST OFFICE BOX 20527
PHOENIX, ARIZONA 85036
(602) 271-7700

Michelle L. Donovan (027958)
Minute Entries/Orders to: cjg@bowwlaw.com

Attorneys for Defendant Martinez

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| ASHLEY CERVANTES, a single woman, | NO. 4:16-CV-00334-CKJ |
| Plaintiff, | |
| vs. | **DEFENDANT MARTINEZ'S ANSWERS TO PLAINTIFF'S DISCOVERY REQUESTS** |
| UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION AGENT SHALEKA LEGGETT and "JOHN DOE" LEGGETT; UNKNOWN UNITED STATES CUSTOMS AND BORDER PROTECTION AGENTS; HOLY CROSS HOSPITAL, INC.; ASCENSION ARIZONA, INC.; PATRICK F. MARTINEZ AND "JANE DOE" MARTINEZ; et al., | |
| Defendants. | |

Defendant Patrick Martinez, through undersigned counsel, responds to Plaintiff's Discovery Requests dated May 11, 2017 as follows:

## Requests for Admission

**RFA No. 1:** Admit Ashley did not possess any illegal drugs and / or contraband while at

Holy Cross Hospital on October 18, 2014.

Admit __X*__          Deny __X*___

    **\*Defendant Martinez admits ONLY that his exam of Ashley Cervantes revealed no illegal drugs and/or contraband in the areas he examined on October 18, 2014. To the extent this request calls for speculation as to matters outside Dr. Martinez's examination, and is vague and ambiguous as to the time and manner, Defendant objects and denies.**

**RFA No. 2:** Admit Ashley was in the custody and / or control of the U.S. Government

while she was at Holy Cross Hospital on October 18, 2014.

Admit _____          Deny __X*___

    **OBJECTION.**    **This Request calls for speculation and lacks foundation on the part of this answering Defendant. This Request also calls for a legal conclusion on the part of this answering Defendant, which is improper in a Request for Admission. *Davis v. Buckley,* 2013 WL 12114581, 2 (D. Ariz. 2013). Requests for Admission are intended to aid a party in establishing certain material facts and cannot be used to solicit "admissions or denials as to legal conclusions." *Id.***

    **\*Dr. Martinez has no opinion as to whether the circumstances rendered Ms. Cervantes "in the custody and/or control of the U.S. Government" and therefore denies.**

**RFA No. 3:** Admit there was not a valid court order / search warrant regarding Ashley on

October 18, 2014.

Admit __X*___          Deny _____

    **OBJECTION.**    **This Request calls for speculation and lacks foundation on the part of this answering Defendant. It is also vague and ambiguous. This Request also calls for a legal conclusion on the part of this answering Defendant, which is improper in a**

Request for Admission. *Davis v. Buckley*, 2013 WL 12114581, 2 (**D. Ariz. 2013**). Requests for Admission are intended to aid a party in establishing certain material facts and cannot be used to solicit "admissions or denials as to legal conclusions." *Id.*

*Objections notwithstanding, Dr. Martinez admits ONLY that he was not presented with a court order or warrant.

**RFA No. 4:** Admit Ashley was brought to Holy Cross Hospital on October 18, 2014 by agents of the U.S. Government for a forensic evidence search of her person.

Admit _____          Deny __X*___

**OBJECTION.** This Request calls for speculation and lacks foundation on the part of this answering Defendant. This Request also calls for a legal conclusion on the part of this answering Defendant, which is improper in a Request for Admission. *Davis v. Buckley*, 2013 WL 12114581, 2 (**D. Ariz. 2013**). Requests for Admission are intended to aid a party in establishing certain material facts and cannot be used to solicit "admissions or denials as to legal conclusions." *Id.*

*Objections notwithstanding, Dr. Martinez is not privy to the thought process and determinations made by the Border Patrol agents prior to presenting to Holy Cross Hospital on October 18, 2014 and cannot comment. Dr. Martinez is aware that the Border Patrol agents expressed concern about Ms. Cervantes carrying drugs internally, but this does not alter his role as an emergency department physician or transform Dr. Martinez's Medical Screening Examination and patient care into a forensic search. Dr. Martinez denies conducting a forensic evidence search of Ms. Cervantes.

**RFA No. 5:** Admit Ashley was not brought to Holy Cross Hospital on October 18, 2014 by agents of the U.S. Government for medical treatment.

Admit _____          Deny __X*___

3

| | |
|---|---|
| **OBJECTION.** | This Request calls for speculation and lacks foundation on the part of this answering Defendant. To the extent this Request also calls for a legal conclusion on the part of this answering Defendant, such is improper in a Request for Admission. *Davis v. Buckley*, 2013 WL 12114581, 2 (D. Ariz. 2013). Requests for Admission are intended to aid a party in establishing certain material facts and cannot be used to solicit "admissions or denials as to legal conclusions." *Id.* |
| | *Objections notwithstanding, Dr. Martinez cannot comment on the state of mind of the Border Patrol agents prior to presenting to Holy Cross Hospital on October 18, 2014. Dr. Martinez is aware that the Border Patrol agents expressed concern about Ms. Cervantes carrying drugs internally, but this does not change Dr. Martinez's role as an emergency department physician providing patient care and performing a Medical Screening Examination. Dr. Martinez lacks sufficient information to admit or deny motives of the Border Patrol and thus denies this Request. |

**RFA No. 6:** Admit you examined Ashley on October 18, 2014 for the purpose of determining whether she was carrying contraband internally.

Admit _____          Deny \_\_X\_\_

**Dr. Martinez performed a Medical Screening Examination on Ms. Cervantes, as is performed on all patients presenting to the Emergency Department, when she was brought to Holy Cross on October 18, 2014. That the examination included a pelvic and rectal examination following evaluation, discussion with, and consent by the patient does not mean that the "purpose" of the examination was to determine whether she was carrying contraband internally. Request for Admission No. 6 is therefore denied.**

**RFA No. 7:** Admit Ashley was entitled to her constitutional rights, as provided by the Fourth and Fifth amendments to the U.S. Constitution, while she was at Holy Cross Hospital on October 18, 2014.

Admit _____          Deny \_\_X\*\_\_\_

**OBJECTION.**          *This Request calls for a legal conclusion on the part of this

answering Defendant, which is improper in a Request for Admission. *Davis v. Buckley*, 2013 WL 12114581, 2 (D. Ariz. 2013). Requests for Admission are intended to aid a party in establishing certain material facts and cannot be used to solicit "admissions or denials as to legal conclusions." *Id.* As such, RFA No. 7 is denied.

**RFA No. 8:** Admit Ashley did not complain of feeling sick or unwell at any time while at Holy Cross Hospital on October 18, 2014.

Admit _____      Deny __X*___

**OBJECTION.** This Request calls for speculation, is vague and ambiguous as to what specifically is meant by "complain of feeling sick or unwell", and asks Dr. Martinez to confirm with 100% certainty a portion of a patient encounter occurring over two and a half years ago. As such, RFA No. 8 is denied.

***Objections notwithstanding, Dr. Martinez directs Plaintiff to the medical records disclosed by Holy Cross Hospital.**

<u>Interrogatories</u>

**No. 1:** If your response to any of the Requests for Admission above are anything other than an unqualified admission, state the legal and factual bases supporting your qualifications and / or denials of the Requests. Identify all documents supporting any such qualifications and / or denial(s).

**See answers and / or objections, above.**

**No. 2:** Identify each and every person who you believe interacted with Ashley on October 18, 2014 while she was at Holy Cross Hospital.

Objection – overly broad, vague and ambiguous, and calls for speculation. Dr. Martinez did not accompany Plaintiff throughout her time at Holy Cross Hospital and thus cannot provide names of all healthcare providers, employees, and lay individuals that may have interacted with Plaintiff. Ms. Cervantes testified about registration/intake personnel and a male nurse. She also testified about her interactions with various Border Patrol agents. Dr. Martinez recalls Victor Noriega, the male nurse likely referenced by Ms. Cervantes. Dr. Martinez does not recall the name of the female Holy Cross employee/nurse present during his examination of Plaintiff. *See* records produced by Holy Cross

5

**Hospital and Holy Cross Hospital's disclosure statements for healthcare providers also involved in the care.**

**No. 3:** Identify each and every person who whim [sic] interacted relating in any way to Ashley on October 18, 2014. For each person identified, describe the nature of your interactions and the substance of the same.

      **OBJECTION.**     **Unintelligible**

**No. 4:** Describe your academic and / or post-academic training on the Fourth and Fifth amendments to the US Constitution and on any and all policies in effect at Holy Cross Hospital on October 18, 2014 relating to the search of individuals / patients who presented in the custody of law enforcement.

      **Objection. Plaintiffs' Non-Uniform Interrogatory No. 4 assumes facts not established in this case and assumes legal conclusions that are not conceded by Defendants Martinez. Objections notwithstanding, Dr. Martinez does not recall any academic or post-academic training specifically on the Fourth and Fifth Amendments to the US Constitution. Dr. Martinez likewise does not recall at this time training on specific policies and/or procedures regarding "the search of individuals/patients who presented in the custody of law enforcement" at Holy Cross.**

**No. 5:** If you have you [sic] ever been a party to a civil lawsuit, state whether you were a plaintiff or defendant and describe the nature of the lawsuit.

      **Dr. Martinez has never been a party to a civil lawsuit.**

**No. 6:** State with specificity the policies / procedural guidelines which controlled your interactions with Ashley on October 18, 2014. For each policy / procedural guideline, state what entity created the same and who was responsible for ensuring the policy / procedural guideline was adhered to on October 18, 2014.

      **Objection – overly broad, vague an ambiguous. Dr. Martinez does not know who created any such policy(ies), nor who was responsible for ensuring they are followed. Dr. Martinez does not specifically recall any policies/procedural guidelines that "controlled" his patient encounter with Ms. Cervantes on October 18, 2014. Some policies may generally reflect Dr. Martinez's professional practice, but Dr. Martinez cannot identify any specific policies or procedures that may apply to Ms. Cervantes presentation at Holy Cross**

Hospital with any specificity at this time.

<b><u>Requests for Production</u></b>

**RFP No. 1:** Provide the complete file regarding your application / credentialing / employment as it relates to your ability to practice medicine at Holy Cross Hospital on October 18, 2014.

> **Objection. A physician's application for hospital privileges and credentialing file is absolutely privileged from discovery.** *See* **A.R.S. § 36-445.01; A.R.S. § 36-455.02;** *Humana Hospital Desert Valley v. Superior Court of Arizona In and For Maricopa County***, 742 P.2d 396, 154 Ariz. 396 (App. 1987). Additionally, Dr. Martinez is not in possession or control of the credentialing file maintained by Holy Cross Hospital.**

**RFP No. 2:** Provide the operative contract / documents establishing your relationship with Holy Cross Hospital and / or Quantum Plus, Inc. which provided the basis for your ability to practice medicine at Holy Cross Hospital on October 18, 2014.

> **The sole contract responsive to Plaintiff's Request has been provided by Defendant Quantum Plus, LLC.** *See* **Quantum Plus, LLC's responses to Plaintiffs' Request for Production No. 2.**

**RFP No. 3:** Provide copies of any and all policies / procedural guidelines identified in response to Interrogatory No. 6, above.

> **Dr. Martinez is not in possession of Holy Cross Hospital's policies / procedural guidelines.**

DATED this 15th day of June, 2017.

BROENING OBERG WOODS & WILSON, P.C.

By /s/ _____
Michelle L. Donovan
Post Office Box 20527
Phoenix, Arizona 85036
*Attorneys for Defendant Martinez*

# CERTIFICATE OF ELECTRONIC FILING AND SERVICE

I hereby certify that on June 15th, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants:

Matthew D. Davidson, Esq.
**LAW OFFICES OF MATTHEW C. DAVIDSON, LTD.**
1859 N. Grand Avenue, Suite 1
Nogales, AZ 85621
*Attorneys for Plaintiff*

Brian Marchetti, Esq.
**MARCHETTI LAW, P.L.L.C.**
290 N. Meyer Avenue
Tucson, AZ 85701
*Attorneys for Plaintiff*

Laura V. Mac Ban
Michael L. Linton
**MAC BAN LAW OFFICES**
Skyline Esplanade
1795 E. Skyline Drive, Suite 155
Tucson, AZ 85718
*Attorneys for Defendants Holly Cross Hospital, Inc. and Ascension Arizona, Inc.*

Carolyn Armer Holden
Michael J. Ryan
**HOLDEN AND ARMER, PC**
4505 East Chandler Blvd., Suite 210
Phoenix, Arizona 85048
(480) 656-0460
*Attorneys for Defendants Quantum Plus, Inc. dba Teamhealth West*

John S. Leonardo
Melissa Marcus Kroeger
**UNITED STATES ATTORNEY**
**DISTRICT OF ARIZONA**
405 W. Congress Street, Suite 4800
Tucson, AZ 85701
*Attorneys for Defendant United States of America and Shamekia Leggett*

By /s/ _Sina Barrera_

8

## VERIFICATION

*Cervantes v. Patrick F. Martinez, M.D., et al.*
*U.S. District Court, District of Arizona Cause No. 4: 1 6-CV-003 34-CKJ*

STATE OF ARIZONA ) ss.
County of Pima )

I, PATRICK F. MARTINEZ, M.D., being first duly sworn upon my oath, depose and say:

That I am a Defendant in the above-referenced matter; that I have read Defendant Patrick F. Martinez, M.D.'s Responses to Plaintiff's Interrogatories and know the contents thereof; that the same is true both in substance and in fact to the best of my knowledge, except as to those matters and things therein alleged on information and belief, and as to those matters, I believe them to be true.

_____
PATRICK F. MARTINEZ, M.D.

SUBSCRIBED AND SWORN TO before me this 16 day of ~~July,~~ August 2017 by MJ

_____
Notary Public        01/18/2018

MARILOU FRANCISCO
NOTARY PUBLIC
STATE OF ALASKA