# EXHIBIT 1



**U.S. Customs and Border Protection**
**U.S. Department of Homeland Security**
**TECS - Person Encounter List**

04/25/2017 16:00 EDT

Page 1 of 6

| Last Name | First Name | DOB | Date | Time | Carrier Code | Carrier Num. | I/O | Site | Type | Status | Ref | Arr Loc | Dep Loc |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CERVANTES | ASHLEY | 05/17/1995 | 04/09/2017 | 06:17 | | | I | L265 | PEDESTRIAN | | | | |
| CERVANTES | ASHLEY ROMO | 05/17/1995 | 04/08/2017 | 22:46 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 03/20/2017 | 03:55 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 02/17/2017 | 02:57 | | | I | L265 | VEHICLE | | | | |
| CERVANTES | ASHLEY | 05/17/1995 | 02/05/2017 | 04:37 | | | I | L265 | PEDESTRIAN | | | | |
| CERVANTES | ASHLEY | 05/17/1995 | 02/03/2017 | 19:12 | | | I | L265 | PEDESTRIAN | | | | |
| CERVANTES | ASHLEY | 05/17/1995 | 01/30/2017 | 16:28 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 01/22/2017 | 05:29 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 01/21/2017 | 04:38 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 01/15/2017 | 21:42 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 01/14/2017 | 11:41 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 01/08/2017 | 06:15 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 01/06/2017 | 03:50 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 01/02/2017 | 21:59 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 12/31/2016 | 15:18 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 12/24/2016 | 05:06 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 11/20/2016 | 06:22 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 10/29/2016 | 20:29 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 10/16/2016 | 09:53 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 10/09/2016 | 08:27 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 10/07/2016 | 04:56 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 10/01/2016 | 09:30 | | | I | L265 | PEDESTRIAN | | | - | - |

**For Official Use Only / Law Enforcement Sensitive**

CBP - 1002



**U.S. Customs and Border Protection**
**U.S. Department of Homeland Security**
**TECS - Person Encounter List**

04/25/2017 16:00 EDT

| Last Name | First Name | DOB | Date | Time | Carrier Code | Carrier Num. | I/O | Site | | Type | Status | Ref | Arr Loc | Dep Loc |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CERVANTES | ASHLEY | 05/17/1995 | 09/25/2016 | 08:48 | | | I | L265 | | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 09/18/2016 | 06:31 | | | I | L265 | | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 09/16/2016 | 06:16 | | | I | L265 | | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 08/14/2016 | 07:30 | | | I | L265 | | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 08/08/2016 | 04:28 | | | I | L265 | | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 07/30/2016 | 05:00 | | | I | L265 | | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 07/24/2016 | 07:01 | | | I | L265 | | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 06/13/2016 | 16:44 | | | I | L265 | | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 06/06/2016 | 23:16 | | | I | L264 | | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 06/06/2016 | 00:00 | TUP | 233 | I | | | BUS | PASSENGER | | | |
| CERVANTES | ASHLEY | 05/17/1995 | 05/29/2016 | 06:36 | | | I | L265 | | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 05/28/2016 | 02:31 | | | I | L265 | | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY ROMO | 05/17/1995 | 05/27/2016 | 06:18 | | | I | L265 | | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 05/19/2016 | 18:22 | | | I | L265 | | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 05/16/2016 | 07:30 | | | I | L265 | | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 05/08/2016 | 08:19 | | | I | L265 | | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 05/01/2016 | 06:11 | | | I | L265 | | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 04/30/2016 | 06:35 | | | I | L265 | | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 04/23/2016 | 06:03 | | | I | L265 | | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 04/19/2016 | 03:19 | | | I | L265 | | VEHICLE | | | - | - |
| CERVANTES | ASHLEY ROMO | 05/17/1995 | 04/15/2016 | 17:26 | | | I | L265 | | VEHICLE | | | - | - |

**For Official Use Only / Law Enforcement Sensitive**



**U.S. Customs and Border Protection**
**U.S. Department of Homeland Security**
**TECS - Person Encounter**

04/25/2017 16:00 EDT

Page 3 of 6

| Last Name | First Name | DOB | Date | Time | Carrier Code | Carrier Num. | I/O | Site | Type | Status | Ref | Arr Loc | Dep Loc |
|-----------|-----------|-----|------|------|--------------|--------------|-----|------|------|--------|-----|---------|---------|
| CERVANTES | ASHLEY | 05/17/1995 | 04/04/2016 | 05:42 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 03/27/2016 | 06:02 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 03/24/2016 | 03:51 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 03/17/2016 | 14:27 | | | I | L264 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 03/10/2016 | 04:32 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 03/06/2016 | 06:48 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 03/05/2016 | 05:32 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 02/28/2016 | 03:56 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 02/23/2016 | 03:18 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1996 | 02/21/2016 | 05:26 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 01/31/2016 | 04:53 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 01/24/2016 | 02:40 | | | I | L264 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 01/17/2016 | 05:48 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 01/10/2016 | 05:37 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 01/09/2016 | 02:11 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 12/18/2015 | 13:24 | | | I | L264 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 12/13/2015 | 05:10 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 12/11/2015 | 17:03 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 12/01/2015 | 23:57 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 11/22/2015 | 04:59 | | | I | L265 | PEDESTRIAN | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 11/21/2015 | 05:28 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 11/20/2015 | 04:26 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 11/14/2015 | 05:34 | | | I | L265 | VEHICLE | | | - | - |

For Official Use Only / Law Enforcement Sensitive

CBP - 1004



**U.S. Customs and Border Pro**
**U.S. Department of Homeland**
**TECS - Person Encounter**

04/25/2017 16:00 EDT

| Last Name | First Name | DOB | Date | Time | Carrier Code | Carrier Num. | I/O | Site | Type | Status | Ref | Arr Loc | Dep Loc |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CERVANTES | ASHLEY | 05/17/199 5 | 11/07/201 | 05:20 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 11/02/201 | 04:24 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 10/30/201 | 04:56 | | | I | L265 | PEDESTRIA N | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 10/25/201 | 05:52 | | | I | L265 | PEDESTRIA N | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 10/04/201 | 07:24 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 09/27/201 | 07:35 | | | I | L265 | PEDESTRIA N | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 09/20/201 | 07:21 | | | I | L265 | PEDESTRIA N | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 08/30/201 | 06:34 | | | I | L265 | PEDESTRIA N | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 08/28/201 | 15:08 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 08/22/201 | 06:54 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 08/16/201 | 06:54 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 08/14/201 | 21:13 | | | I | L265 | PEDESTRIA N | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 08/11/201 | 14:59 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 07/26/201 | 07:36 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 07/21/201 | 03:27 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 07/19/201 | 08:55 | | | I | L265 | VEHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 07/15/201 | 04:33 | | | I | L265 | PEDESTRIA N | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 07/12/201 | 08:09 | | | I | L265 | PEDESTRIA N | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 06/23/201 | 20:59 | | | I | L265 | PEDESTRIA N | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 06/14/201 | 05:31 | | | I | L265 | PEDESTRIA N | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 05/31/201 | 06:19 | | | I | L265 | PEDESTRIA N | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 05/29/201 | 02:01 | | | I | L265 | PEDESTRIA N | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 05/24/201 | 06:54 | | | I | L265 | PEDESTRIA N | | | - | - |

For Official Use Only / Law Enforcem    itive

CBP - 1005



**U.S. Customs and Border Prot**
**U.S. Department of Homeland S**
**TECS - Person Encounter L**

04/25/2017 16:00 EDT

Page 5 of 6

| Last Name | First Name | DOB | Date | Time | Carrier Code | Carrier Num. | I/O | Site | | ype | Status | Ref | Arr Loc | Dep Loc |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CERVANTES | ASHLEY | 05/17/199 5 | 04/26/201 6 | 06:16 | | | I | L265 | | EDESTRIA | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 03/23/201 6 | 16:56 | | | I | L265 | | EHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 03/22/201 6 | 07:34 | | | I | L265 | | EHICLE | | | | |
| CERVANTES | ASHLEY | 05/17/199 5 | 03/17/201 6 | 01:27 | | | I | L265 | | EHICLE | | | | |
| CERVANTES | ASHLEY | 05/17/199 5 | 03/08/201 5 | 08:35 | | | I | L265 | | EDESTRIA | | | - | |
| CERVANTES | ASHLEY | 05/17/199 5 | 02/28/201 6 | 04:46 | | | I | L265 | | EDESTRIA | | | - | |
| CERVANTES | ASHLEY | 05/17/199 5 | 02/22/201 6 | 06:58 | | | I | L265 | | EHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 02/21/201 6 | 05:27 | | | I | L265 | | EDESTRIA | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 02/15/201 6 | 05:19 | | | I | L265 | | EHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 6 | 02/08/201 6 | 05:34 | | | I | L265 | | EHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 02/01/201 6 | 05:30 | | | I | L265 | | EDESTRIA | | | - | - |
| CERVANTES | ASHLEY ROMO | 05/17/199 6 | 01/31/201 5 | 04:31 | | | I | L265 | | EHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 01/21/201 6 | 13:28 | | | I | L265 | | EDESTRIA | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 01/11/201 6 | 06:51 | | | I | L265 | | EDESTRIA | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 01/04/201 6 | 18:05 | | | I | L265 | | EDESTRIA | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 4 | 12/28/201 5 | 05:17 | | | I | L265 | | EDESTRIA | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 4 | 12/21/201 5 | 05:15 | | | I | L265 | | EDESTRIA | | | - | |
| CERVANTES | ASHLEY | 05/17/199 5 | 12/07/201 5 | 04:13 | | | I | L265 | | EDESTRIA | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 6 | 12/02/201 4 | 22:58 | | | I | L265 | | EDESTRIA | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 11/30/201 4 | 18:30 | | | I | L265 | | EDESTRIA | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 11/27/201 4 | 04:07 | | | I | L265 | | EDESTRIA | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 11/23/201 4 | 05:29 | | | I | L265 | | EHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 11/16/201 4 | 05:20 | | | I | L265 | | EDESTRIA | | | - | - |

For Official Use Only / Law Enforcement Sensitive

CBP - 1006



U.S. Customs and Border Protection
U.S. Department of Homeland
TECS - Person Encounter

04/25/2017 16:00 EDT

Page 6 of 6

| Last Name | First Name | DOB | Date | Time | Carrier Code | Carrier Num. | I/O | Site | | ype | Status | Ref | Arr Loc | Dep Loc |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CERVANTES | ASHLEY | 05/17/199 5 | 11/09/201 4 | 04:13 | | | I | L265 | | EDESTRIA | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 11/02/201 4 | 19:11 | | | I | L265 | | EHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/194 5 | 10/18/201 4 | 18:43 | | | I | L265 | | EDESTRIA | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 10/19/201 4 | 06:21 | | | I | L265 | | EDESTRIA | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 10/05/201 4 | 15:11 | | | I | L265 | | EHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/199 5 | 10/04/201 4 | 04:11 | | | I | L265 | | EDESTRIA | | | - | - |

Total Number of Records 118

For Official Use Only / Law Enforcement Sensitive

CBP - 1007

# EXHIBIT 2

In re:   Cervantes v. USA -- Shameka Leggett -- July 19, 2017

THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

ASHLEY CERVANTES, a single          )
woman,                              )
                                    )
            Plaintiff,              )
                                    )
       vs.                          )
                                    )
UNITED STATES OF AMERICA;           )
UNITED STATES CUSTOMS AND           )
BORDER PROTECTION AGENT SHAMEKA )
LEGGETT and "JOHN DOE" LEGGETT; )  No. 4:16-cv-00334-CKJ
UNKNOWN UNITED STATES CUSTOMS       )
AND BORDER PROTECTION AGENTS;       )
HOLY CROSS HOSPITAL, INC.;          )
PATRICK F. MARTINEZ and "JANE       )
DOE" MARTINEZ; QUANTUM PLUS,        )
INC., dba TEAMHEALTH WEST;          )
et al.,                             )
                                    )
            Defendants.             )
_____    )

DEPOSITION OF SHAMEKA LEGGETT

Phoenix, Arizona
July 19, 2017
10:00 a.m.

Reported by:   Wanda J. Curry, RPR, RMR
CR No. 50366

MEYER, LUMIA & ASSOCIATES
Certified Court Reporters
6775 East Calle La Paz, Unit C
Tucson, Arizona  85715
520.623.1100  (Fax) 520.722.5180

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 152

1    point in time?

2        A.    No.

3        Q.    She was still in her clothes?

4        A.    She was still in her clothes.

5        Q.    Okay.  And chained to the bed?

6        A.    And chained to the bed.

7        Q.    Okay.

8        A.    Well, handcuffed to the bed.

9        Q.    And tell me what Dr. Martinez asked her.

10            MS. DONOVAN:  Form.

11            THE WITNESS:  He basically -- not knowing

12   exactly what he said word for word, he told her that he

13   could do the check faster, and because we didn't

14   suspect that she had swallowed anything that she could

15   have a vaginal exam and be out of the ER in less time

16   than it would take for them to actually do the exam and

17   wait for the results of the x-ray.

18        Q.    BY MR. MARCHETTI:  Who was in the room

19   exactly while he was allegedly explaining this?

20        A.    It was myself, Officer Gracia and the doctor.

21        Q.    There was no other hospital staff, that

22   you're aware of?

23        A.    I don't recall.

24        Q.    Okay.  Well, this is my only chance to talk

25   to you --

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 153

1       A.   Yes.

2       Q.   -- so do you remember anybody else being in

3   the room?

4       A.   At that time, no.

5       Q.   Okay.  So what happened next?

6       A.   He told her that she could take a few moments

7   to think about which course she would like to go

8   through, if she wanted to do the exam -- the vaginal

9   exam or if she wanted to continue to do the x-ray.  And

10  he stepped out of the room to give her a couple of

11  minutes to think about it.

12            And then it was just the three of us in the

13  room.  We had to unhandcuff her so that she could

14  change into the hospital gear, robe.  She -- basically

15  we didn't handcuff her at this point because we were

16  both in the room with her.  She was extremely

17  cooperative.  She was talking with Officer Gracia.

18            And at the time that we were waiting for the

19  doctor to come back, she was explaining to us, well,

20  this is a possibility why the dogs could have hit on

21  me, because I had been smoking weed or doing drugs or

22  whatever it was she was doing during that day in Mexico

23  with her boyfriend and that she smoked weed every day

24  and she believed that those are the reasons why the

25  dogs were hitting on her.

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 154

1           I remember Officer Gracia saying why didn't

2    you say these things at the port when we asked you what

3    was going on, had you been around any drugs or

4    whatever.  They spoke some English, they spoke some

5    Spanish, so I don't recall every single thing that was

6    said, but she freely was having a comfortable

7    conversation with Officer Gracia.

8           Q.    Then what happened?

9           A.    Then the doctor entered in the room with the

10   nurse and he asked her if she'd decided if she wanted

11   to do it vaginally or she wanted to do the x-ray and

12   she said she would go ahead and do it vaginally.

13          Those exact words, I don't recall it being

14   exactly those words, but she said she would do the

15   vaginal exam, it was faster, we could get her out of

16   there.

17          Q.    Exhibit 5 is an example of a consent form for

18   a pelvic or a rectal search.

19          A.    Okay.

20          Q.    Did you, at any point in time, advise Ashley

21   that she had the right to refuse that search?

22          A.    No, I did not advise her of that at the time

23   because we did not bring her there for a rectal or a

24   vaginal search.

25          Q.    Did Dr. Martinez -- did you hear Dr. Martinez

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 177

1    A.    That's fair.  I didn't see anything that said

2  she'd been injured.

3    Q.    Okay.  And she sure didn't complain about

4  being physically injured during this examination; is

5  that fair?

6    A.    She did not complain to us about being

7  physically injured.

8    Q.    Okay.  And am I correct, ma'am, that during

9  the entire time that you were dealing with

10  Ms. Cervantes, you were treating her with respect and

11  respecting her privacy?

12    A.    I was treating her with respect and

13  respecting her privacy.

14    Q.    Okay.  And that would include having females

15  present during any type of patdown, all the way up

16  through the time that you took her into the examination

17  room at Holy Cross Hospital; is that fair?

18    A.    That is correct.

19    Q.    All right.

20    A.    It was the two female officers present.

21    Q.    Sure.

22          I might have missed this, but when

23  Ms. Cervantes finally said, oh, I was smoking marijuana

24  with my boyfriend, I smoke all the time, that might be

25  why the dog thought I had drugs, and I think the

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

1    officer asked her why didn't you tell us this before,

2    something along those lines I think you told us

3    about -- do you remember that line of questioning?

4         A.   I don't remember all of the words word for

5    word.  This is not something -- we didn't have a line

6    of questioning --

7         Q.   Okay.

8         A.   -- while we were in there.

9         Q.   And I -- I did -- I asked you that -- it was

10   a bad -- that was a bad question.

11             I'm trying to just refresh you and bring you

12   back to the questions that the attorney for

13   Ms. Cervantes asked you.

14        A.   Oh, okay.

15        Q.   When Ms. Cervantes said that she smoked

16   marijuana on a daily basis and had been smoking it with

17   her boyfriend, I believe the other officer said, well,

18   why didn't you tell us this before?

19        A.   Yes.

20        Q.   Do you remember what her response was, if

21   anything, to that?

22        A.   I don't recall what her responses were with

23   Officer Gracia.

24        Q.   Did she respond in Spanish?

25        A.   I don't recall.  I -- I honestly don't recall

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

1    all of the conversations that they had.  They were in

2    and out of the Spanish language and English language

3    and I didn't have, really, any direct con- --

4    conversations with Ms. Cervantes on that day.

5         Q.   Okay.  And would it be fair to say that after

6    the examination, Ms. Cervantes was still cooperative

7    with you?

8         A.   She was very cooperative, to the point where

9    we no longer had her handcuffed.

10        Q.   Okay.  And when did that -- when did that

11   take place, that you took the handcuffs off?

12        A.   We took the handcuffs off of her before she

13   got undressed to put on her hospital gown for her

14   examination.  And we were both in the room with

15   her.  We didn't see any reason to handcuff -- handcuff

16   her back to the bed.  She was very cooperative.  She

17   was having conversations with Officer Gracia.  They

18   were talking about her drug use and habits.

19             And -- and that was it.  We didn't -- we

20   didn't feel that she was any flight risk.  She was very

21   comfortable.

22        Q.   And she was offering a reason why, she

23   thought, well, I was doing drugs, so maybe that's why

24   I'm ultimately here, frankly; would that be fair?

25        A.   That's fair.

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

1      Q.    Do you know if you had ever met Dr. Martinez

2   prior to August -- or October 18th, 2014?

3      A.    Yes, I had seen him previously in the other

4   case where we brought a young lady for a pregnancy

5   test.

6      Q.    Okay.  And the young lady with the pregnancy

7   test, as you've told us a few times today, that was a

8   completely different situation; correct?

9      A.    Correct.

10      Q.    And I imagine the fact that you were phrasing

11   it that way was because you're not at liberty to

12   discuss the facts of that situation --

13      A.    Absolutely.

14      Q.    -- is that correct?

15      A.    Yes.

16      Q.    Now, when you took Ms. Cervantes to the

17   hospital, would you defer to the physician with respect

18   to medical treatment and professional judgment?

19      A.    Yes.

20      Q.    And as a Border Patrol officer, do you have a

21   general understanding that internally carrying drugs

22   can be harmful to one's health?

23      A.    Well, one, I'm not a Border Patrol officer.

24      Q.    I apologize.

25      A.    I'm a Customs officer for Border Protection.

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 166

1    Q.   That's correct.

2    A.   And rephrase the second portion of your

3    question.

4    Q.   Thank you for that clarification.

5         Do you have a general understanding that

6    internally carrying drugs can be harmful to one's

7    health?

8    A.   I do have a general understanding of that

9    because I have had experience, again, with MBMs, which

10   are monitored bowel movements.  And so having drugs

11   internally in your system could be a problem.

12   Q.   And whether there were any clinical

13   indications at the hospital that might raise suspicion

14   for internally carrying drugs, you would not be privy

15   to that information; correct?

16   A.   That's correct.

17   Q.   And you would defer to the medical

18   professionals with respect to assessing clinical

19   indications such as vital signs and whether that raises

20   suspicion of internally carrying drugs; correct?

21   A.   Absolutely.  I couldn't do it myself.

22   Q.   And the appropriate course of action with a

23   patient in an emergency room setting with a report of

24   suspicion of carrying drugs and elevated vital signs,

25   you would leave the decision as to what's appropriate

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 167

1      to the medical professional; correct?

2          A.    Absolutely.

3          Q.    Have you ever heard of EMTALA?

4          A.    I've not heard of that.

5          Q.    The Emergency Medical Treatment and Labor

6      Act?

7          A.    I've not heard of that.

8          Q.    So whether or not the medical professionals

9      at the hospital had a duty to medically evaluate

10     Ms. Cervantes, regardless of the reason that you

11     brought her there, you don't have any knowledge about

12     that; correct?

13         A.    No.

14         Q.    Correct?

15         A.    Correct.

16         Q.    Okay.  Sometimes we get a double negative.

17         A.    Yes.

18         Q.    I'm not trying to be rude.

19               Now, you told us before that Ms. Cervantes

20     was cooperative throughout the time at Holy Cross

21     Hospital; correct?

22         A.    That is correct.

23         Q.    Did she ever object to any requests that were

24     made to her?

25         A.    No, she did not.

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 180

1          MS. HOLDEN:  I think that's all the questions

2    I have.  Thank you, ma'am.

3          THE WITNESS:  Okay.

4

5                      EXAMINATION

6    BY MR. LINTON:

7      Q.   I have a few.  They covered most of them.

8          But as far as you could tell, the hospital

9    personnel, did they treat her -- treat Ms. Cervantes

10   with respect and dignity?

11     A.   As far as the doctor and nurse?

12     Q.   As far as -- well, I'm not expecting you to

13   know who was hospital personnel and who was not.

14     A.   Right.

15     Q.   As far as the medical -- as far as the

16   professionals at the hospital that day, did they treat

17   her with respect and dignity?

18     A.   That day, every person that was in contact

19   with Ms. Cervantes treated her with respect and

20   dignity.

21     Q.   They were polite to Ms. Cervantes?

22     A.   Everyone was polite to Ms. Cervantes that

23   day.

24     Q.   Did you or Officer Gracia ever instruct any

25   professionals at the hospital, at any time, that they

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 181

1   were required to provide any type of services to her --

2   for her?

3       A.   No, we did not instruct anybody that they had

4   to do anything.

5       Q.   Okay.  You mentioned these -- having

6   witnessed prior instances of monitored bowel movements.

7   Can you maybe elaborate on that?  Could you talk about

8   your prior experiences with individuals who were

9   suspected of or actually were internal carriers of

10  illegal drugs or of any dangerous body on the inside?

11      A.   Okay.  Exactly -- I'm not exactly sure what

12  part of that you want to know.

13      Q.   Yeah.  Well, I take it you -- as you said

14  before, you have encountered people who were carrying

15  contraband internally?

16      A.   Yes.

17      Q.   About how many times in your career has this

18  happened?

19      A.   Maybe five or six times.

20      Q.   And I take it in those instances, you had

21  concern about the person's medical safety at that time;

22  is that correct?

23      A.   That is correct.

24      Q.   Is that based on some sort of training or

25  professional -- any sort of training that you received

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 191

1       Q.    And you've told us about -- about TECS

2   earlier in your deposition as well.  Is that another

3   tool that is available to officers in determining

4   whether to conduct a personal search?

5       A.    Yes.

6             MS. KROEGER:  Okay.  That's all I have.  I'll

7   pass the witness.

8

9                   EXAMINATION (Further)

10  BY MS. DONOVAN:

11      Q.    Ms. Leggett, just a few follow-up questions.

12            You told us earlier that you did not have any

13  authority to order Dr. Martinez to conduct the x-ray;

14  correct?

15      A.    That is correct.

16      Q.    And you had no authority to order

17  Dr. Martinez to perform the physical examination;

18  correct?

19      A.    Correct.

20      Q.    And whether Dr. Martinez had any legal duty

21  to perform an examination, called a medical screening

22  examination, you have no knowledge of that; correct?

23      A.    Correct.

24      Q.    Whether an emergency doctor has to perform a

25  medical screening examination on all persons brought to

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 192

1    the emergency department, you have no knowledge of

2    that; correct?

3        A.    I have no knowledge of that.

4        Q.    If Dr. Martinez had said I'm not doing this

5    exam, you could not force him, absent a court order;

6    correct?

7        A.    I -- no, I could not.

8              And I don't get court orders.  I don't know

9    how that process works, so no.

10       Q.    Okay.  And while your purpose and

11   Officer Gracia's purpose of bringing Ms. Cervantes to

12   the hospital may have included determining whether she

13   was carrying drugs internally, whether Dr. Martinez was

14   performing a search or an examination, you will let

15   Dr. Martinez speak for himself as to what he was

16   conducting; correct?

17       A.    Correct.

18       Q.    And if he testifies that he was performing an

19   examination as part of his medical screening

20   examination, you will defer to him on that; correct?

21       A.    Correct.

22             MS. DONOVAN:  That's all I have.  Thank you.

23             MR. LINTON:  No further questions for me.

24             MS. KROEGER:  DeeDee?

25             MS. HOLDEN:  Nope.

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 170

1       Q.   So you didn't tell him what to do while you

2   were there?

3       A.   No, we did not.

4       Q.   Okay.

5       A.   I simply told him why we were there and he

6   took the course to make the decision on how to further

7   go about doing the exam.

8       Q.   Okay.  Now, you told us that Ms. Cervantes

9   was given the option of pursuing an x-ray or having the

10  physical exam done by Dr. Martinez; correct?

11      A.   Correct.

12      Q.   Did she ever say I don't want to do either?

13      A.   Never.

14      Q.   And although she may have -- she did

15  communicate consent to -- or -- or -- strike that.

16           Ms. Cervantes elected to proceed with the

17  physical examination; correct?

18      A.   That is correct.

19      Q.   And she communicated those words while you

20  were in the room; correct?

21      A.   That is correct.

22      Q.   And did you have any doubt that even if she

23  was saying I want that exam, that she was going to say

24  later I never consented to that?

25      A.   No.  I would have never thought, for any

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 171

1    reason, that this would have been happening.

2        Q.   By "this," you mean the fact that it would be

3    alleged years later that she did not consent to the

4    exam?

5        A.   Correct.

6        Q.   I do have a question -- one question -- or

7    one line of questioning related to the original time

8    frame at the port.

9        A.   Okay.

10       Q.   And you told us that Ms. Cervantes went to

11   the bathroom, I think it was immediately prior to the

12   second dog coming in; was that correct?  Or was it

13   immediately after the second dog?

14       A.   What do you mean she went to the bathroom?

15       Q.   That you took her to a bathroom.

16       A.   We took her to -- okay.  We took her to where

17   the bathroom was located.  She was not in the bathroom

18   at the time.

19            Until the canine showed up.  And once I

20   walked in to see that there was no other officers or

21   persons from the public inside the bathroom, the canine

22   instructed her to go inside the bathroom so they could

23   do the canine search.

24       Q.   So to your knowledge, she did not use the

25   toilet during that time; correct?

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 150

1      Q.    Before the doctor came in?

2      A.    I -- I don't recall the order but I believe

3   so.

4      Q.    Okay.  So let's go back, then, because we

5   just -- we jumped over a whole thing, it sounds like.

6      A.    Yeah.

7      Q.    Officer Gracia and yourself walked Ashley

8   into a hospital room?

9      A.    Yes.

10      Q.    What happened next?

11      A.    I can't recall every single thing or remember

12   exactly all of what happened in that time.  I just

13   remember the doctor coming in, asking what was the

14   purpose for her visit, and I explained to him that we

15   thought she had something inside of her body.  He asked

16   me if it was -- did I believe that she swallowed

17   something and we told him no, we believed it was in her

18   vaginal area.

19      Q.    Were you present when the -- the nurse who

20   you believe checked her vitals, were you present

21   throughout that entire process?

22      A.    We did not leave Cervantes' side.

23      Q.    Okay.  So from the moment --

24      A.    If that's what you're asking.

25      Q.    -- Ashley walked in the hospital to the

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 151

1    moment she left, you were with her the entire time?

2         A.   We were with her up until the actual exam.

3         Q.   Okay.  So you said you personally interacted

4    with Dr. Martinez?

5         A.   Yes.

6         Q.   Okay.  And he -- and he asked if -- he asked

7    you if you thought she had something and you said you

8    thought she had something in her vaginal cavity;

9    correct?

10        A.   We believed she had something in her body.

11        Q.   Okay.  So what happened next?

12        A.   He then started to speak to Ms. Cervantes.

13        Q.   Okay.  Did you actually tell Dr. Martinez you

14   were there for x-rays?

15        A.   We told him that we came to get an x-ray to

16   see if there was something in her body.

17        Q.   Okay.  And then, I'm sorry, you said he

18   started to talk to --

19        A.   He began to talk to her directly.

20        Q.   Okay.  What did he say?

21        A.   I don't recall all of what was said to her

22   exactly.

23        Q.   Was Ashley still in handcuffs?

24        A.   She was handcuffed to the bed, yes.

25        Q.   Had she changed into a hospital gown at this

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 152

1    point in time?

2        A.    No.

3        Q.    She was still in her clothes?

4        A.    She was still in her clothes.

5        Q.    Okay.  And chained to the bed?

6        A.    And chained to the bed.

7        Q.    Okay.

8        A.    Well, handcuffed to the bed.

9        Q.    And tell me what Dr. Martinez asked her.

10             MS. DONOVAN:  Form.

11             THE WITNESS:  He basically -- not knowing

12   exactly what he said word for word, he told her that he

13   could do the check faster, and because we didn't

14   suspect that she had swallowed anything that she could

15   have a vaginal exam and be out of the ER in less time

16   than it would take for them to actually do the exam and

17   wait for the results of the x-ray.

18       Q.    BY MR. MARCHETTI:  Who was in the room

19   exactly while he was allegedly explaining this?

20       A.    It was myself, Officer Gracia and the doctor.

21       Q.    There was no other hospital staff, that

22   you're aware of?

23       A.    I don't recall.

24       Q.    Okay.  Well, this is my only chance to talk

25   to you --

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 153

1      A.   Yes.

2      Q.   -- so do you remember anybody else being in

3   the room?

4      A.   At that time, no.

5      Q.   Okay.  So what happened next?

6      A.   He told her that she could take a few moments

7   to think about which course she would like to go

8   through, if she wanted to do the exam -- the vaginal

9   exam or if she wanted to continue to do the x-ray.  And

10   he stepped out of the room to give her a couple of

11   minutes to think about it.

12          And then it was just the three of us in the

13   room.  We had to unhandcuff her so that she could

14   change into the hospital gear, robe.  She -- basically

15   we didn't handcuff her at this point because we were

16   both in the room with her.  She was extremely

17   cooperative.  She was talking with Officer Gracia.

18          And at the time that we were waiting for the

19   doctor to come back, she was explaining to us, well,

20   this is a possibility why the dogs could have hit on

21   me, because I had been smoking weed or doing drugs or

22   whatever it was she was doing during that day in Mexico

23   with her boyfriend and that she smoked weed every day

24   and she believed that those are the reasons why the

25   dogs were hitting on her.

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 154

1          I remember Officer Gracia saying why didn't

2   you say these things at the port when we asked you what

3   was going on, had you been around any drugs or

4   whatever.  They spoke some English, they spoke some

5   Spanish, so I don't recall every single thing that was

6   said, but she freely was having a comfortable

7   conversation with Officer Gracia.

8          Q.   Then what happened?

9          A.   Then the doctor entered in the room with the

10  nurse and he asked her if she'd decided if she wanted

11  to do it vaginally or she wanted to do the x-ray and

12  she said she would go ahead and do it vaginally.

13          Those exact words, I don't recall it being

14  exactly those words, but she said she would do the

15  vaginal exam, it was faster, we could get her out of

16  there.

17          Q.   Exhibit 5 is an example of a consent form for

18  a pelvic or a rectal search.

19          A.   Okay.

20          Q.   Did you, at any point in time, advise Ashley

21  that she had the right to refuse that search?

22          A.   No, I did not advise her of that at the time

23  because we did not bring her there for a rectal or a

24  vaginal search.

25          Q.   Did Dr. Martinez -- did you hear Dr. Martinez

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 155

1   advise Ashley that she had the right to refuse the

2   search?

3           MS. DONOVAN:  Form and foundation.

4           THE WITNESS:  I did not hear him say you have

5   a right to refuse it; however, he gave her time to

6   consent whether or not she wanted to do it or not by

7   stepping out of the room, before he returned and asked

8   her if she wanted to go ahead and do the vaginal exam

9   or the x-ray.

10      Q.   BY MR. MARCHETTI:  Did you hear Dr. Martinez

11  ask Ashley any questions about her -- her vital -- her

12  vitals?  Did he ask her how she was feeling?

13          MS. DONOVAN:  Form and foundation.

14          THE WITNESS:  I don't recall any of that, no.

15      Q.   BY MR. MARCHETTI:  Did you, at any point,

16  call back or communicate with anybody in your

17  supervisory chain about what was happening in the

18  emergency room?

19      A.   No.

20      Q.   Okay.  So then Dr. Martinez and the nurse

21  came back in and what happened next?

22      A.   We -- Gracia -- myself and Officer Gracia, we

23  stepped out of the room so that they could do the

24  vaginal exam.  We were outside of the room for maybe a

25  couple of minutes.  The doctor came out of the room and

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 157

1    with Holy Cross -- with anybody at Holy Cross?

2         A.   No.  They -- we waited to get discharge

3    papers and that was it.

4         Q.   Okay.  And did somebody give the TAR back to

5    you?

6         A.   Yes, they gave us the TAR back.

7         Q.   And did they give you other paperwork?

8         A.   The discharge paper was given to

9    Ms. Cervantes.

10        Q.   Did you hear Dr. Martinez ask Ashley any

11   questions about whether she had smoked marijuana?

12             MS. DONOVAN:  Form.

13             THE WITNESS:  I don't recall him asking those

14   questions.

15        Q.   BY MR. MARCHETTI:  Okay.  If you can

16   remember, how long was Dr. Martinez's interaction with

17   Ashley from when he first came in the room to when you

18   and Officer Gracia left?

19             MS. DONOVAN:  Form.

20             MR. LINTON:  Brian --

21             THE WITNESS:  I don't recall.

22             MR. LINTON:  -- the first time or the second?

23             MR. MARCHETTI:  Sure.  Thank you, Michael, I

24   appreciate that.

25        Q.   BY MR. MARCHETTI:  The very first time.

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 158

1      A.   His first interaction when he first came in

2   the room?

3      Q.   Correct.  So from start to finish, from when

4   Dr. Martinez walked in the room the first time to when

5   you and Officer Gracia left for him to do the

6   examination, how long was that whole process?

7           MS. DONOVAN:  Form and foundation.

8           THE WITNESS:  I really don't know.  Maybe 20,

9   30 minutes.

10     Q.   BY MR. MARCHETTI:  Okay.

11     A.   If that long.

12     Q.   Okay.  I'm going to run through some names

13   here real quick.

14     A.   Sure.

15     Q.   I think we've talked about most of these

16   folks but I want to make sure we have.

17     A.   Okay.

18     Q.   Do you know an Officer Chad Harkins?

19     A.   No.

20     Q.   No idea?

21     A.   No idea.

22     Q.   Okay.  And Supervisory Officer Joe Hernandez,

23   that's this Officer Hernandez that we've been talking

24   about?

25     A.   Yes.

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 186

1     Q.   Okay.  She was also brought to Holy Cross for

2  the purposes of determining whether she had committed a

3  crime; correct?

4          MS. KROEGER:  Form and foundation.

5          THE WITNESS:  That is correct.

6     Q.   BY MR. MARCHETTI:  Okay.  And Dr. Martinez

7  searched her -- is it your opinion that Dr. Martinez

8  searched her for the potential evidence of a crime?

9          MS. HOLDEN:  Foundation.

10         MS. DONOVAN:  Form and foundation.

11         THE WITNESS:  It is my condition that he did

12  do a search on her to see if she had a foreign illegal

13  substance in her, yes.

14    Q.   BY MR. MARCHETTI:  For the purposes of

15  determining whether she had committed a crime?

16         MS. DONOVAN:  Form and foundation.

17         MS. HOLDEN:  Form, foundation.

18         MR. LINTON:  Form and foundation.

19         THE WITNESS:  For the purposes of knowing

20  whether or not she had a foreign substance in her body.

21    Q.   BY MR. MARCHETTI:  Okay.  What would have

22  happened if he had found contraband inside of her?

23    A.   He would have informed us and we would have

24  made the determination whether there was a crime or

25  not.

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 187

```
 1       Q.    Okay.  So I'm going to ask this as clear as I

 2  can.

 3       A.    Sure.

 4       Q.    Was part of what Dr. Martinez doing searching

 5  her for the possibility of her committing a crime?

 6             MS. DONOVAN:  Form and foundation.

 7             THE WITNESS:  He was searching for a foreign

 8  substance in her body.

 9             MR. MARCHETTI:  Okay.  That's all I have.

10             THE WITNESS:  Okay.

11             MS. KROEGER:  Let's take a break.

12             (Recess from 1:33 p.m. to 2:05 p.m.)

13

14                       EXAMINATION

15  BY MS. KROEGER:

16       Q.    All right.  Officer Leggett, you were asked a

17  number of questions earlier in the deposition about the

18  "Personal Search Handbook"?

19       A.    Yes.

20       Q.    And you testified that you considered the

21  handbook to be a guideline?

22       A.    I did.

23       Q.    All right.  And a handbook like this can't

24  anticipate every situation that you, an officer, may

25  encounter in the field; is that fair?
```

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 170

1      Q.    So you didn't tell him what to do while you

2   were there?

3      A.    No, we did not.

4      Q.    Okay.

5      A.    I simply told him why we were there and he

6   took the course to make the decision on how to further

7   go about doing the exam.

8      Q.    Okay.  Now, you told us that Ms. Cervantes

9   was given the option of pursuing an x-ray or having the

10  physical exam done by Dr. Martinez; correct?

11     A.    Correct.

12     Q.    Did she ever say I don't want to do either?

13     A.    Never.

14     Q.    And although she may have -- she did

15  communicate consent to -- or -- or -- strike that.

16           Ms. Cervantes elected to proceed with the

17  physical examination; correct?

18     A.    That is correct.

19     Q.    And she communicated those words while you

20  were in the room; correct?

21     A.    That is correct.

22     Q.    And did you have any doubt that even if she

23  was saying I want that exam, that she was going to say

24  later I never consented to that?

25     A.    No.  I would have never thought, for any

In re:  Cervantes v. USA -- Shameka Leggett -- July 19, 2017

Page 171

1    reason, that this would have been happening.

2         Q.   By "this," you mean the fact that it would be

3    alleged years later that she did not consent to the

4    exam?

5         A.   Correct.

6         Q.   I do have a question -- one question -- or

7    one line of questioning related to the original time

8    frame at the port.

9         A.   Okay.

10        Q.   And you told us that Ms. Cervantes went to

11   the bathroom, I think it was immediately prior to the

12   second dog coming in; was that correct?  Or was it

13   immediately after the second dog?

14        A.   What do you mean she went to the bathroom?

15        Q.   That you took her to a bathroom.

16        A.   We took her to -- okay.  We took her to where

17   the bathroom was located.  She was not in the bathroom

18   at the time.

19             Until the canine showed up.  And once I

20   walked in to see that there was no other officers or

21   persons from the public inside the bathroom, the canine

22   instructed her to go inside the bathroom so they could

23   do the canine search.

24        Q.   So to your knowledge, she did not use the

25   toilet during that time; correct?

# EXHIBIT 3

1    ELIZABETH A. STRANGE
     Acting United States Attorney
2    District of Arizona
     Michael A. Ambri (#021653)
3    Melissa Marcus Kroeger (#025209)
     Assistant U.S. Attorneys
4    405 W. Congress Street, Suite 4800
     Tucson, Arizona 85701-5040
5    Telephone: (520) 620-7300
     Fax: (520) 620-7138
6    Michael.Ambri@usdoj.gov
     Melissa.Kroeger@usdoj.gov
7

*Attorneys for Defendant United States of America*

8

9            IN THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF ARIZONA

10

11    Ashley Cervantes,                  4:16-CV-00334-CKJ

12             Plaintiff,      **DECLARATION OF GUADALUPE**

13    v.                            **RAMIREZ**

14    United States of America, et al.

15            Defendants.

16

17       I, Guadalupe Ramirez, declare and state the following:

18       1.      I am currently employed by United States Customs and Border Protection

19 ("CBP") as the Assistant Director of Field Operations at the Tucson Field Office. Prior to

20 my current post, I served as the Port Director at the Nogales Ports of Entry for seven (7)

21 years.

22       2.      Prior to my assignment as the Port Director in Nogales, I served as an

23 Assistant Port Director for Passenger at the Port of Laredo in Texas for three (3) years. In

24 total, I have served 32 years with CBP.

25       3.      Based on my position as the Assistant Director of Field Operations, as well

26 as my prior experience as both the Port Director and Assistant Port Director, I am familiar

27 with CBP's Treasury Enforcement Communication System ("TECS") system and the

28 "TECS – Person Encounter List" that may be generated by the TECS system.

4.  The date and time stamp on the "TECS – Person Encounter List" is recorded by the TECS system in Eastern Time Zone ("ET"), observing both Eastern Standard Time ("EST") and Eastern Daylight Time ("EDT") depending upon the time of year.  I have verified this information with CBP's Office of Information Technology ("OIT").

5.  As such, the date and time stamp on the attached "TECS – Person Encounter List" for Ashley Cervantes is recorded in Eastern Daylight Time and reflects entry by Ms. Cervantes into the United States on October 18, 2014 at 18:43 Eastern Daylight Time (3:43 PM Arizona Time).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _11_ day of August, 2017.


Guadalupe Ramirez

CBP - 1001



**U.S. Customs and Border Protection**
**U.S. Department of Homeland**
**TECS - Person Encounter**

04/25/2017 16:00 EDT

Page 6 of 6

| Last Name | First Name | DOB | Date | Time | Carrier Code | Carrier Num. | I/O | Site | | ype | Status | Ref | Arr Loc | Dep Loc |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CERVANTES | ASHLEY | 05/17/1995 | 11/09/2014 | 04:13 | | | I | L265 | | EDESTRIA | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 11/02/2014 | 19:11 | | | I | L265 | | EHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 10/18/2014 | 18:43 | | | I | L265 | | EDESTRIA | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 10/18/2014 | 06:21 | | | I | L265 | | EDESTRIA | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 10/05/2014 | 15:11 | | | I | L265 | | EHICLE | | | - | - |
| CERVANTES | ASHLEY | 05/17/1995 | 10/04/2014 | 06:11 | | | I | L265 | | EDESTRIA | | | - | - |

Total Number of Records  118

**For Official Use Only / Law Enforcement Sensitive**

CBP - 1007


## CARONDELET
### HEALTH NETWORK

REPORT REQUEST ID: 62994080

OUR MISSION | EXCEPTIONAL MEDICINE · EXCEPTIONAL CARE

### Allergy List

| Substance | Updated Date/Time | Updated By | Reaction Status | Reaction Symptom | Estimated Onset | Allergy Type | Severity |
|---|---|---|---|---|---|---|---|
| No Known Medication Allergies | 7/26/2014 08:37 MST | Hembree , Hosanna RN | Active | | | Allergy | |

### Provider Documents

DOCUMENT NAME:      ED Clinical Summary           RESULT STATUS           Modified
SERVICE DATE/TIME:   10/18/2014 19:03 MST
SIGNED INFORMATION   Fessler ,Milly RN (10/18/2014 19:03 MST); Martinez ,Patrick F MD (10/18/2014 18:53
                     MST); Martinez ,Patrick F MD (10/18/2014 18:53 MST)

**ED Clinical Summary**

## Carondelet Holy Cross Hospital
## Emergency
## Clinical Visit Summary

**\*\*\*\*\*Please give the following pages to your healthcare provider at your follow-up visit.\*\*\*\*\***

---

### PERSON INFORMATION

**Name:** CERVANTES, ASHLEY
**Sex:** Female

**Marital Status:** Single

**MRN:** H085351
**Track Group:** HCH ED Tracking Group
**Arrival:** 10/18/2014 5:47 PM
**Check In:** 10/18/2014 5:47 PM
**Race:** Hispanic
**Address:**
171 PASEO DULZURA RIO RICO AZ 85648

**Age:** 19 Years
**Smoking Status:** Never Smoker

**Phone:** 520-281-2681

**Acct #:** H017321878
**Tracking ID:** 30180900

**Discharge:**
**Check Out:** 10/18/2014 7:03 PM
**Ethnicity:** Declined to answer

**DOB:** 5/17/1995 12:00 AM
**PCP:** PRIMARY CARE DOCTOR, NO
**Visit Reason:** X-RAY FOREIGN OBJECT
**Enc Type:** Emergency
**Acuity:** 4 - Less Urgent

**Dispo Type:**
**LOS:** 000 01:16
**Preferred Language:** English

---

| | |
|---|---|
| **Carondelet Health Network**<br>Holy Cross Hospital<br>1171 W. Target Range Road<br>Nogales, AZ 85621-<br>520-285-8019<br><br>PT TYPE: Emergency<br>PRINTED:9/14/2016 11:52 MST | **CERVANTES, ASHLEY**<br>FIN:H017321878        MRN:  H085351<br>SEX: Female        DOB:  5/17/1995<br>LOCATION:    Emergency Department HCH<br>ADMITTING:<br>ATTENDING:  Martinez ,Patrick F MD<br>PCP: PRIMARY CARE DOCTOR,NO<br>PRINTED BY: Vargas ,Maria |

AGE:        19 years
RM/BED:
ADMIT:      10/18/2014
DISCH:      10/18/2014
Cons: n/a
                Page 1 of 21

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA**

ASHLEY CERVANTES, a single woman,
PLAINTIFF

v.

UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER
PROTECTION AGENT SHAMEKA LEGGETT and "JOHN DOE" LEGGETT;
UNKNOWN UNITED STATES CUSTOMS AND BORDER PROTECTION AGENTS;
HOLY CROSS HOSPITAL, INC; PATRICK F. MARTINEZ AND "JANE DOE"
MARTINEZ; QUANTUM PLUS, INC., dba TEAMHEALTH WEST; JOHN DOES 1-5;
JANE DOES 1-5; XYZ CORPORATIONS 1-5; ABC PARTNERSHIPS 1-5
DEFENDANTS

**Civil No. 4:16-cv-00334-CKJ**

**Expert Report**

**Roneet Lev, MD, FACEP**

**May 1, 2017**

{00268841;1}

The following represents my Rule 26(a)(2) Report in the matter of Ashley Cervantes v. United States of America, United States Customs and Border Protection, Agent Shameka Leggett, Unknown United States Customs and Border Protection Agents, Holy Cross Hospital, Inc., Patrick F. Martinez, MD, and Quantum Plus, Inc., dba Teamhealth West.  It is based on review of materials listed below, my medical training and experience as an emergency medical physician, as an Emergency Department Chief, as a former Director of Operations of the Emergency Department, and other experience as a trained medical physician.  I reserve the right to amend this report as other evidence becomes available.

## I.    Complete Statement of Opinions:

I categorically reject Plaintiff's expert's contention that Holy Cross Hospital failed to obtain informed, express consent for a pelvic and/or rectal exam, failing to have appropriate trained staffing, policies, and procedures in the emergency department on October 18, 2014, or failed to prohibit collection of forensic evidence. The Plaintiff's expert has not identified: who was responsible for to supervise or prohibit Dr. Martinez's treatment; whether that individual was negligent in his or her supervision of Dr. Martinez; if Dr. Martinez needed supervision; what policy, procedure, or protocol should have been in place to prevent Dr. Martinez's examination of Ms. Cervantes; or any articulable theory of how Holy Cross Hospital was negligent in its supervision of Dr. Martinez.  It is my professional opinion that Holy Cross Hospital and its emergency department met the standard of care in all respects to the care provided Ms. Cervantes as well as its policies, procedures, and protocols.

Though I reserve the right to supplement this report after having received additional evidence and/or deposition transcripts, and to potentially rebut the opinions of any party's expert(s), I have opined as follows:

1.  Holy Cross Hospital was not required to have any policy or protocol to prevent physicians with privileges at its facility from evaluating and examining patients in the manner in which Dr. Martinez evaluated and examined Ms. Cervantes on October 18, 2014.  It is standard medical knowledge that a pelvic examination requires either the informed consent of the examined patient or, in the case of a preexisting agreement with law enforcement, a judicial search warrant.  Hospitals are not required to prevent or promote physicians from assisting law enforcement in forensic searches, but it is standard medical practice to know that such an examination can only be performed if any of these two circumstances have been met.  The plaintiff's expert has contradictory statements in "These standard of care area bedrock principal of emergency care and the standard is so explicit that a specific written policy is not necessary," and later stating that the hospital "fell below the standard of care in negligently failing to have appropriate and trained staffing policies and procedures in the emergency department..."  "In addition, the

standard of care does not require hospitals, physicians, or other medical settings to obtain separate, written consent for the performance of a pelvic examination.

2. Dr. Martinez and/or Holy Cross Hospital were medically justified in treating and/or examining Ms. Cervantes because it was reported that she was a suspected internal carrier of illicit drugs. Holy Cross Hospital was made aware that a canine unit alerted positively on her for the presence of drugs, and law enforcement personnel advised that it was their belief that she was carrying drugs in her vagina. Under these circumstances, Dr. Martinez and hospital personnel were justifiably concerned about her safety. The medical record stated a chief complaint stated "Here for pelvic exam concern she may have placed drugs in vagina today, positive dog canine test at border." There is also report of "Jail clearance." It is common in emergency medicine documentation that the chief complaint is not reflective of the entire picture of what may be a medical emergency. Although she denied having drugs, the question remained, with possible life threatening consequences if she was carrying drugs. She had a low-grade fever of 99.9 degrees, an elevated heart rate of 116, and a credible concern, all which could be consistent with carrying drugs internally. Internal drug carriers do not normally display more emergent clinical symptoms unless and until the packaging is compromised and the drugs absorbed into the patient's blood stream. Because packaging could be compromised at any moment, Dr. Martinez and Holy Cross Hospital were medically justified and had the duty in proceeding with their care of Ms. Cervantes. Dr. Martinez was acting on Ms. Cervantes' best interests for her medical health by performing this examination with her consent.

3. The Emergency Medical Treatment and Active Labor Act ("EMTALA") requires any person presenting to an emergency department to be stabilized and treated if they have an emergency medical condition. The potential of packing drugs meets the definition of an emergency medical condition and would require a medical screening examination and stabilization. Only after it was established that Ms. Cervantes was not packing any drugs was it determined that she did not have an emergency medical condition and that her condition was stabilized. As a physician who likely conducts more EMTALA reviews than almost any other physician in the nation, the circumstances described in Paragraph 2 above qualify as the type of emergent diagnosis and stabilizing treatment covered under EMTALA.

4. Dr. Martinez's decision to conduct a visual pelvic examination rather than an x-ray was the proper decision under the circumstances. While an x-ray examination would have been an option for a patient believed to have ingested a dangerous foreign body, because a direct visual examination is not possible if the object is in the gastrointestinal tract, a direct visual examination is preferred for a patient believed to have a dangerous foreign body in her vagina. Moreover, an x-ray examination would not have been definitive - it would have either suggested the

presence of the dangerous foreign body, in which case Dr. Martinez would have had to recommend a pelvic examination to remove the object for her safety, or it would not have suggested the presence of a dangerous foreign body, in which case Dr. Martinez would not have been able to rule out the presence of the foreign body and would have had to recommend a pelvic examination anyway. Thus Dr. Martinez made the right decision to seek Ms. Cervantes' informed consent for the pelvic examination, which ultimately expedited her care.

5. The written consent for treatment in the Emergency Department in the Conditions of Admission Form covers standard examinations, vital signs, x-rays, and other examinations. The standard of care does not require a separate written consent for a pelvic examination. A separate written consent for these examinations is rarely, if ever, required or documented in the patient's chart.

6. Though I reserve the right to supplement this report, it would appear that Dr. Martinez obtained the appropriate informed consent from Ms. Cervantes for the pelvic examination. Ms. Cervantes signed a Conditions of Admissions form consenting to treatment at Holy Cross Hospital. As detailed below, Dr. Martinez, the nursing staff, and the Customs and Border Protection agent have offered that Ms. Cervantes consented to the pelvic examination after Dr. Martinez described the examination to her and she indicated that she understood the examination. In addition, it would have been nearly impossible for Dr. Martinez to perform this examination without her cooperation, absent the administration of anesthesia. The fact that he was able to perform this examination and be able to visualize no foreign objects suggests she was cooperating. There is no evidence that Ms. Cervantes had to be physically restrained. I will supplement this opinion upon receipt of additional evidence and/or deposition transcripts.

7. A standard pelvic examination in an otherwise healthy patient is not likely to cause any level of trauma or physical harm. There is no evidence that this examination caused any physical harm to Ms. Cervantes. Ms. Cervantes' claims of physical injury as a result of the examination are not credible.

8. Neither I nor Dr. Levine is qualified to render standard of care opinions about the Holy Cross Hospital nursing staff in the State of Arizona.

## II.   Factual Basis:

I have been provided materials in this matter, including, but not limited to, the following:

- Holy Cross Hospital records 2009 – 2014 regarding Ashley Cervantes, Bates Nos. 000001 - 000091

- Plaintiff's Initial Rule 26 Disclosure Statement
- Preliminary Expert Affidavit Frank Bejarano, DBH, LPC
- Preliminary Expert Affidavit of Michael Levine, MD
- Holy Cross Hospital's Initial Rule 26(a)(1) Disclosure Statement
- Holy Cross Hospital's First and Second Supplemental Rule 26(a)(1) Disclosure Statements
- The Parties' Proposed Case Management Plan
- Defendant Quantum Plus, L.L.C.'s Initial Disclosure Statement
- Defendant Quantum Plus, L.L.C.'s First and Second Supplemental Rule 26(a)(1) Disclosure Statements
- Defendant Dr. Martinez's Initial Disclosure Statement
- Defendant Dr. Martinez's First Supplemental Disclosure Statement
- Defendants United States of America and Officer Shamekia Leggett's Initial Disclosure Statement
- Defendant United States of America's First Supplemental Disclosure Statement

I understand that I will continue to be provided disclosures and information as they are made available and will supplement this report accordingly.

According to the US Customs and Border Protection Narrative Report, CBP-52, Ashley Cervantes made entry through a Pedestrian Entrance at the Port of Entry in Nogales, Arizona on October 28, 2014 at 5pm. A Border Protection Officer stopped her for questioning and noticed that she was "extremely nervous" during this encounter. She was taken to "secondary," where she gave permission for a personal search. She was then taken to a cell for a "pat-down" and, when asked if she was hiding anything in her body, she advised that she was menstruating and wearing a tampon. The examining agent was under the belief that the tampon was not inserted correctly and that there may be another object in her vagina that was not allowing for the correct insertion of the tampon. Two drug searching dogs gave two independent, positive alerts for a "trained odor." Customs and Border Protection authorities then made the decision to transport Ms. Cervantes to Holy Cross Hospital in Nogales, Arizona, for an internal "examination." CBP-52

Upon arrival at Holy Cross Hospital at 5:47pm, Ms. Cervantes signed a "Conditions of Admissions" form affirming that she consents to any "x-ray examinations, laboratory procedures, anesthesia, medical or surgical treatment, or hospital services rendered to the patient under general or special instructions of the physician, or by any on-call physician who may substitute for his/her physician during his/her stay in the hospital." Holy Cross Hospital 000059. At 6:14pm, Nurse Victor Noriega performed triage and an initial assessment, noting that her chief complaint was "foeign [sic] object in body here for RX perr [sic] CBP" and triaged her for "X-RAY FOREIGN OBJECT."

*Id.* at 0000077. He also noted that she was a recreational marijuana user. *Id.* at 000076. She had a low grade fever of 99.9 deg. and an elevated heart rate of 116 BPM. *Id.* at 000078. The triage and assessment appear to have been completed by 6:20pm.

Shortly thereafter, the records indicate that Dr. Martinez saw this patient. He noted that she was at the hospital for "pelvic exam – concern she may have placed drugs in vagina today." *Id.* at 000068. He specifically noted that there was a positive canine test at the border. *Id.* Though she was originally brought over for an x-ray examination, Dr. Martinez ultimately decided that a visual pelvic examination was more appropriate, and the order for the x-ray was discontinued at 6:51pm.

According to the Customs and Border Protection Report, Ms. Cervantes agreed to the vaginal examination. CBP-52. Dr. Martinez has disclosed that he will "testify that Ashley Cervantes gave consent to the examination." Dr. Martinez's Initial Disclosure Statement at 3:3-4. While I will supplement this report upon receipt of additional evidence or the deposition transcripts of additional witnesses, Holy Cross Hospital has disclosed that Dr. Martinez entered the examination room after Ms. Cervantes had changed into a hospital gown, and explained what the examination would entail. Case Management Plan at 5:5-6. Ms. Cervantes acknowledged that she understood and consented to the pelvic examination, which was also witnessed. *Id.* at 5:6-7. The examination was brief and at no point did Ms. Cervantes express an objection to or resistance to the treatment or the examination. *Id.* at 5:11-12. At one point, she stated that she believed the dogs alerted to her because she had smoked marijuana while on the Mexico side of the border, and that she must have smelled like contraband. *Id.* at 5:7-10.

Dr. Martinez did not find any contraband and advised the Customs and Border Protection agent of this. *Id.* at 5:15-16. She was discharged at 7:03pm, which was approximately 76 minutes from the time she was brought in to the hospital. *Id.* at 5:16-18.

Holy Cross Hospital's policy on Informed Consent states that by signing a standard hospital Conditions of Admissions form, "a patient provides general consent to an anticipated course of treatment and nursing care during hospitalization." Consent for Treatment Policy at 1. Informed, written consent, is only required for enumerated categories of non-emergent services, including surgical and invasive procedures, the administration of general anesthetics, diagnostic or therapeutic procedures that have more than a negligible risk to the patient, therapy or procedures involving the use of experimental drugs or equipment, before delivering health care through telemedicine, administration of blood or blood products, or the administration of moderate or deep sedation. *Id.* A non-exhaustive list of treatments not requiring a signed consent, including the insertion of a rectal tube or a straight urinary catheter, is at Appendix A of the policy. A pelvic examination would not require a separate signed informed consent under the hospital's policy.

[00268841;1]

### III.   Attachments:

1. Curriculum Vitae: **Attached hereto as Exhibit A**

2. Fee Schedule: **Attached hereto as Exhibit B**

3. List of Publications, authored in the past 10 years: **See Curriculum Vitae, attached hereto as Exhibit A.**

4. List of All Other Cases, in which during the previous 4 years I testified as an expert at trial or by deposition:

   **While I have testified on matters before medical review boards during this time period, I have not testified as an expert at trial or by deposition in any lawsuit during this period.**

### IV.   Qualifications:

I am a full time practicing emergency physician, Chief of the Emergency Department and former Director of Operations of the Emergency Department of Scripps Mercy Hospital in San Diego.  I am also the President and Founder of the Independent Emergency Physician Consortium, which brings together over 30 different emergency departments in California for the purpose of formulating best business and clinical practices.  I am also the Chair and Founder of the San Diego Emergency Medicine Oversight Commission, which unites all emergency departments in San Diego and Imperial County for optimizing care for emergency medicine patients, including an annual emergency department survey report.  I also consult with a number of agencies that do quality reviews of emergency medical care throughout the United States, including reviews under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), as listed in my Curriculum Vitae.  I attended California State University, San Bernardino as an undergraduate and the University of Texas Health Science Center for Medical School, receiving my medical degree in 1989.  I attended residency in Emergency Medicine at the University of California San Diego Medical Center.  I am Board-Certified in Emergency Medicine and have an ongoing fellowship with the American Board of Emergency Medicine.

I was the Director of Operations at Scripps Mercy Hospital over the last ten years, and am now serving as the Chief of the Emergency Department.  As such, I am responsible for providing leadership and management of the emergency department, for working cooperatively and supportively with the members of the medical and support staff to provide emergency services for all patients who present to the emergency department, for working with the heads and chiefs of services to ensure that staff services

are appropriate, and for monitoring community needs and providing significant input.   I am responsible for medical administration, personnel, and activities in the emergency department, for providing leadership, planning, organization, staffing, coordination, and evaluation for emergency department activities, and for ensuring the ethical practice of emergency medicine within the department.  I am directly involved in the formation and enforcement of policies and protocols of emergency departments that pertain to both physicians and the nursing and support staff.  I am well familiar with the standards required of physicians pertaining to body examinations based on both warrants and informed consent of the individual.

In the year immediately preceding the events that gave rise to this suit, I devoted a majority of my professional time to clinical, patient care in emergency medicine at Scripps Mercy Hospital.  See Curriculum Vitae, attached hereto as Addendum A.

**V.     Compensation:**

I am receiving compensation for the review and testimony in this case per the fee schedule, attached hereto as Exhibit B.

Roneet Lev, MD, FACEP
5-1-2017

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

ASHLEY CERVANTES, a single woman,
PLAINTIFF

v.

UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER
PROTECTION AGENT SHAMEKA LEGGETT and "JOHN DOE" LEGGETT;
UNKNOWN UNITED STATES CUSTOMS AND BORDER PROTECTION AGENTS;
HOLY CROSS HOSPITAL, INC; PATRICK F. MARTINEZ AND "JANE DOE"
MARTINEZ; QUANTUM PLUS, INC., dba TEAMHEALTH WEST; JOHN DOES 1-5;
JANE DOES 1-5; XYZ CORPORATIONS 1-5; ABC PARTNERSHIPS 1-5
DEFENDANTS

Civil No. 4:16-cv-00334-CKJ

**Expert Report Re: Rebuttal to the
Opinions of Dr. Michael Levine**

**Roneet Lev, MD, FACEP**

**July 3, 2017**

The following represents my Rebuttal and Supplemental Opinions, supplementing my Rule 26(a)(2) Report in the matter of *Ashley Cervantes v. United States of America, United States Customs and Border Protection, Agent Shameka Leggett, Unknown United States Customs and Border Protection Agents, Holy Cross Hospital, Inc., Patrick F. Martinez, MD, and Quantum Plus, Inc., dba Teamhealth West.* It is based on review of materials listed below, my medical training and experience as an emergency medical physician for over 25 years, as an Emergency Department Chief, as a former Director of Operations of the Emergency Department, quality and EMTALA medical reviewer across the country, and other experience as a trained medical physician. I reserve the right to amend this report as other evidence becomes available.

**Complete Statement of Rebuttal Opinions to Dr. Michael Levine:**

1. **Dr. Levine's assertion that the standard of care for a hospital emergency department is not to participate in law enforcement searches without a search warrant or the express, informed consent of the individual is irrelevant, because this was a medical screening examination.**

   Dr. Levine's fundamentally incorrect assumption is that the care provided at Holy Cross Hospital was in fact a forensic examination, as opposed to a medical screening evaluation under EMTALA. Thus his statement that a hospital emergency department is not to participate in a law enforcement search absent a search warrant or the express, informed consent of the individual to be searched is irrelevant to this case because the hospital emergency department admitted Plaintiff for, and Dr. Martinez performed, a medical screening examination, not a law enforcement search, consistent with the requirements under the Emergency Medical Treatment and Active Labor Act ("EMTALA").

   Dr. Levine is conflating the medical screening examination performed by Holy Cross Hospital in this case with a forensic evidence collection. Some hospitals do have agreements with law enforcement agencies to perform forensic evaluations on individuals, such as the collection of blood alcohol content specimens or so called "rape kits." However, the patient's treatment in this case did not involve any such cooperative agreement or procedure. From a review of the records, it does not appear that this examination was performed any differently than it would have been performed had the patient arrived to the hospital by other means.

   Ms. Cervantes presented to Holy Cross Hospital accompanied by United States Customs and Border Protection agents with a chief complaint that these agents suspected her to be an internal carrier of a dangerous foreign body. The standard of care for an emergency department and emergency physician is to perform a medical screening examination when a patient arrives at an emergency department

for any reason to determine if an emergency medical condition exists.  Hospitals are then required to provide stabilizing treatment for any emergency medical conditions.

Holy Cross Hospital obtained Ms. Cervantes' general consent for treatment to perform this medical screening examination as evidenced by her signature on the Conditions of Admissions form, which states:

"The undersigned consents to any x-ray examinations, laboratory procedures, anesthesia, medical or surgical treatment, or hospital services rendered to the patient under the general or special instructions of the physician, or by any on call physician who may substitute his or her physician during his or her stay in the hospital..."

Holy Cross Hospital's nursing staff then proceeded to perform the initial stages of the medical screening examination.  Emergency Department Nurse Victor Noriega performed a full triage and initial assessment, as would be done with any emergency department patient, noting that the patient had some elevated vital signs, including a low-grade fever of 99.9 degrees and an elevated heart rate of 116, which can be consistent with being an internal carrier of dangerous drugs. The patient advised Nurse Noriega that she was a recreational marijuana user.

Dr. Levine is also incorrect in asserting that any EMTALA examination could have been performed by a nurse or non-physician.  To the contrary, a medical screening examination involves any form of emergency treatment, even on-call services, in order to determine whether an emergent medical condition exists. Internal drug carriers do not normally display more emergent clinical symptoms unless and until the packaging is compromised and the drugs absorbed into the patient's blood stream.  Because packaging could be compromised at any moment, Dr. Martinez and Holy Cross Hospital were medically justified and had the duty in proceeding with their care of Ms. Cervantes.

Holy Cross Hospital was acting in Ms. Cervantes' best interests for her medical health by following through with this medical screening examination pursuant to her consent, in order to determine if an emergent medical condition existed.  Holy Cross Hospital and Dr. Martinez would have breached the standard of care and violated EMTALA had they refused to pursue perform the examination.

2. **While the appropriate consent of an individual is required for medical treatment, the standard of care of an emergency department does not require the care providers to obtain a separate, signed informed consent for the medical screening examination performed.**

Dr. Levine's opinions are unclear, but it appears that he may be trying to imply that the standard of care required that the hospital and/or Dr. Martinez obtain a separate, signed informed consent for a pelvic and/or rectal examination once Dr. Martinez decided an x-ray examination would not be in the patient's best interest. To the extent this is the case, this is a misreading of the hospital's policy as well as the well-recognized standard of care practiced in emergency departments and hospitals across the country.

Dr. Levine is correct in stating that the standard of care for obtaining the proper consent for an examination is so explicit that a specific written policy is unnecessary, but any implication that this standard of care requires a separate, signed informed consent to perform pelvic/rectal examinations is completely incorrect. The standard of care requires that a hospital obtain a signed consent for general treatment, which was found in the patient's Conditions of Admissions form. Next, under the bedrock standard of care principles, known to all physicians and emergency departments, Dr. Martinez was required only to obtain verbal consent to perform the pelvic/rectal examinations. It was the sole duty of Dr. Martinez, as the practitioner performing the examination, to obtain verbal consent to perform the rectal/pelvic examinations after having explained the examinations to her. In my experience as a medical professional, I am unaware of the standard of care ever requiring a separate, signed consent any pelvic or rectal examination.

He is further incorrect to the extent that he is suggesting that the hospital's consent policy requires a separate *signed* consent. The policy first requires that a patient consent to a general course of treatment. "By signing a standard hospital Conditions of Admissions form, a patient provides general consent to an anticipated course of treatment and nursing care during hospitalization." This consent is for the anticipated course of treatment which, in this case, was to ascertain whether the patient was an internal carrier of a dangerous foreign body and, if she was, to remove that foreign body from her safely. The consent form specifically acknowledges that the patient consented to "x-ray examinations, laboratory procedures, anesthesia, medical or surgical treatment, or hospital services rendered to the patient under the general or special instructions of the physician." In this case, the pelvic/rectal examinations were the services rendered to the patient under the general or special instructions of the physician. If a "surgical invasive" procedure or diagnostic test is required, only then does the policy require that the patient "be asked to give express permission by signing an additional Consent form." However, the pelvic/rectal examinations performed by Dr. Martinez do not constitute either a surgically invasive procedure or surgically invasive diagnostic test. The policy specifically delineates when a separate consent form is required, and those include: 1) major or minor surgeries and invasive procedures (with the exception of a NON-EXHAUSTIVE list of procedures in Appendix A), 2) all procedures requiring the administration of

regional or general anesthetics, diagnostic or therapeutic procedures that have more than a negligible risk to the patient, and other invasive treatments not applicable here.  Pelvic/rectal examinations are clearly not major or minor surgeries or invasive procedure or diagnostic test, nor are they diagnostic procedures that have more than a negligible risk to the patient.  Even if they were invasive diagnostic procedures (which they are not), Appendix A is a non-exhaustive list of a series of "invasive procedures" that do not require a separate informed consent, and most of these procedures are more invasive than rectal and pelvic examinations.  For example, the insertion of a rectal tube, which does not require a separate, written informed consent, requires not only the invasion of the rectum, but the placement of a tube within that rectum for an indeterminate period of time.

Despite Dr. Levine's assertions to the contrary, Section V of this policy is inapplicable to the facts of this case because it pertains to *signed* informed consent *forms*, which, as detailed above, the consent policy does not require in this case.  Thus the various roles and responsibilities of the care providers in Section V are inapplicable here.

3. **Dr. Martinez followed the standard of care required in performing a rectal/vaginal examination, and Dr. Levine is incorrect in asserting that the standard of care requires the documentation of consent for the patient's rectal and vaginal examinations.**

Dr. Martinez followed the standard of care required in performing a rectal/vaginal examination.  The totality of the evidence shows that Ms. Cervantes consented to the exam.  In addition, in my experience as an emergency physician, it would be next to impossible to perform a pelvic and/or rectal examination adequately to obtain appropriate visualization to rule out the presence of a foreign body without the cooperation of the patient.

Based on my experience as an emergency physician for 25 years and manager of an emergency department, the standard of care does not require documentation in the patient's chart that a patient provided specific consent to a rectal or vaginal examination.  Physicians and medical professionals of all types routinely perform these examinations without documenting in the chart that they did the examinations with consent.

4. **Dr. Levine is incorrect in asserting that Dr. Martinez was required to advise the patient of her legal rights prior to this procedure.**

As detailed above, this was a medical screening examination, not a forensic examination.  The health care provider's duty during the course of obtaining

consent is to hold a comprehensive discussion with the patient explaining the planned treatment, including any known risks (which in this case, would have been negligible). The patient then must appear to have an understanding of the explanation at the time the consent is obtained, and the patient must actually agree to the examination. A care provider obtaining consent is not required to advise a patient of his or her legal rights when providing medical treatment. If a patient refuses medical treatment, then the health care provider has a duty to advise the patient of the consequences of that refusal. Nothing changes regarding the consent process just by virtue of the fact that the patient is accompanied by law enforcement personnel.

5. **Holy Cross Hospital took reasonable measures to ensure its staff followed its policies.**

Because Dr. Martinez was the medical provider who performed this examination, it was his duty, per well-established "bedrock" principles, to obtain consent for the examination, and the evidence suggests he did. The standard of care requires a physician to know the consent requirements for these procedures, independently of any hospital policy on the issue, as Dr. Levine concedes in his opinions.

Per the evidence available, only one Holy Cross Hospital health care professional, CNA Gamez, was present with the patient after Dr. Martinez determined that a pelvic/rectal examination would be needed and when the examination took place. CNA Gamez's training records, produced with Holy Cross Hospital's Responses to Discovery, show that she did receive training on this policy, as well as follow up training on updates to the hospital's policies. In holding training sessions to instruct a CNA on these policies, Holy Cross Hospital met the standard of care required of hospital emergency department in having appropriate and trained staff. I am unfamiliar with any requirement under the standard of care of a hospital emergency department that there be policies requiring staff to follow policies.

Dr. Levine also has opined that he has not been provided with proof of completion of the Hospital's "Care of Inmates, Law Offenders, or Persons in Custody of Law Enforcement" policy by any staff. Again, the only relevant staff member in this case is CNA Gamez, and her training records indicate that she did receive training on the care of incarcerated persons. However, this policy is irrelevant to this case, as none of the requirements of the policy have anything to do with consent requirements or any other material issue in this case. Dr. Levine apparently agrees, as he has not identified how the policy is at issue.

6. **Dr. Levine cannot properly contend that the Holy Cross Hospital staff failed to meet the standard of care.**

It is my understanding that physicians are not qualified under the applicable law to testify as to the standard of care of other classes of health care professions, such as nurses, certified nursing assistants, and patient care technicians.  In addition to Holy Cross Hospital providing proper training on its consent policy, to the extent I am permitted under law to testify to the standard of care of a Certified Nursing Assistant, CNA Gamez met the standard of care, especially considering that she did not have any independent duty to obtain consent for the examinations under these circumstances – that was the role of Dr. Martinez.  In addition, none of the other staff involved, including the ED clerk (Marion Wallace), the triage and initial assessment nurse (Victor Noriega, RN), and the discharging nurse (Milly Fessler, RN), had any duties in this case with respect to obtaining consent for the rectal and pelvic examinations, because they were not involved in the patient's care when the decision was made to perform the examinations, nor did they administer or witness the examinations.

I have reviewed the following materials since my initial report:

- Defendant Holy Cross Hospital's Fourth Supplement Disclosure Statement, with attached Expert Report of Dr. Roneet Lev, and exhibits thereto, and Plaintiff's medical records from Mariposa Health Clinic, Bates Nos. "Ashley Cervantes Mariposa Pages 1 – 111"
- Defendant Quantum Plus, L.L.C.'s Third Supplemental Disclosure Statement, with attached Expert Witness Report of Alan G. Molk, MD, FACEP, and exhibits thereto
- Defendant Dr. Martinez's Second Supplemental Disclosure Statement, with attached Expert Witness Reports of John Levin, MD and Christopher Nicholls, PhD, and exhibits thereto
- Plaintiff's First Supplemental Disclosure Statement with attached Expert Reports of Dr. Michael Levine and Frank Bejarano, DBH, and exhibits thereto, including Plaintiff's records from Mr. Bejarano, Bates Nos. "Ashley Cervantes Frank Bejarano, DBH Pages 1 - 31
- Deposition transcript of Plaintiff Ashley Cervantes
- Defendant Holy Cross Hospital's Responses to Plaintiff's Requests for Admissions, Requests for Production, and Interrogatories
- Defendant Quantum Plus, L.L.C.'s Responses to Plaintiff's Requests for Admissions, Requests for Production, and Interrogatories, and exhibits thereto.
- Defendant U.S.A.'s Responses to Plaintiff's Requests for Admissions, Requests for Production, and Interrogatoriess, and exhibits thereto.
- Defendant Officer Leggett's Responses to Plaintiff's Requests for Admissions, Requests for Production, and Interrogatories, and exhibits thereto.

- Defendant Dr. Martinez's Responses to Plaintiff's Requests for Admissions, Requests for Production, and Interrogatories, and exhibits thereto.

I understand that I will continue to be provided disclosures and information as they are made available and will supplement this report accordingly.

Roneet Lev, MD, FACEP

1  **LAW OFFICES OF MATTHEW C.**
2  **DAVIDSON, LTD**
   1859 N Grand Ave, Suite 1
3  Nogales, AZ 85621-1386
   (520) 281-0433
4  Matthew C. Davidson
5  State Bar No. 015021

6  **MARCHETTI LAW, PLLC**
   290 N. Meyer Avenue
7  Tucson, Arizona 85701
   (520) 334-2067
8  Brian Marchetti, brian@yourtucsonlawfirm.com
9  State Bar No. 027193

10 *Attorneys for Plaintiff*

11                 **IN THE UNITED STATES DISTRICT COURT**
12
13                        **DISTRICT OF ARIZONA**

14 ASHLEY CERVANTES, a single woman,

15              Plaintiff                    **4:16-CV-00334-CKJ**
16 v.

17 UNITED STATES OF AMERICA; UNITED       **DECLARATION OF MICHAEL**
   STATES CUSTOMS AND BORDER                    **LEVINE, M.D.**
18 PROTECTION AGENT SHAMEKA
   LEGGETT and "JOHN DOE" LEGGETT;
19 UNKNOWN UNITED STATES CUSTOMS
20 AND BORDER PROTECTION AGENTS;
   HOLY CROSS HOSPITAL, INC; PATRICK
21 F. MARTINEZ AND "JANE DOE"
   MARTINEZ; QUANTUM PLUS, INC., dba
22 TEAMHEALTH WEST
23
24              Defendants
25
26       Pursuant to 28 U.S.C. § 1746, Dr. Michael Levine, MD, provides the following
27 declaration:
28

1.    A copy of my CV is attached as Exhibit A.

2.    I earned my medical degree from the Chicago Medical School and completed a residency in Emergency Medicine at Harvard. I received my Board Certification in Emergency Medicine in 2009 and am currently licensed to practice medicine in the State of Arizona and in the State of California.

3.    I presently serve as an Associate Professor of Emergency Medicine at the University of Southern California ("USC"). Currently, I perform between ten and fourteen shifts in USC's Emergency Department per month, during which I am engaged in the active clinical practice of emergency medicine. I also train residents in my role as an Associate Professor.

4.    During the year immediately preceding October 2014, I devoted a majority of my professional time to the active clinical practice of emergency medicine and to the instruction of students in an accredited emergency medicine residency.

5.    Throughout my medical career, I have worked in and around the emergency departments of a number of hospitals. I have encountered innumerable situations in which law enforcement officers brought an individual into the emergency department for the purposes of conducting a search and/or seizure of evidence.

6.    Based on my training and experience, I am acutely aware of the role and responsibility a medical doctor plays in the provision of law enforcement searches. I have personally performed countless searches based on a warrant or the express, informed consent of the individual. I am also aware of the role medical practice staffing agencies play in staffing an emergency department and of the relationship as between the physician,

staffing agency and hospital. Further, I am aware and have been involved in all phases of the development of policy, practices and procedures concerning emergency departments.

7.     The standard of care for a hospital emergency department, any entity engaged in staffing an emergency department, and any medical doctor working in an emergency department is not to participate in law enforcement searches without a search warrant or the express, informed consent of the individual to be searched. That standard of care requires a hospital, staffing agency and emergency department physicians to ensure that individuals who are accompanied by law enforcement are treated with dignity and respect and are educated about their rights prior to an examination for forensic evidence collection.

8.     Absent a search warrant or the express, informed consent of the individual, a doctor must not undertake, and a hospital must not allow, a forensic evidence collection examination of any kind. If an examination is undertaken based on the individual's consent, that consent must be given knowingly and freely and only after the doctor has adequately explained the examination(s) to be conducted and advised the individual of their right to withhold consent.

9.     The standard of care further requires a doctor and/or emergency department staff member to document the method and manner in which the consent was sought and obtained. A hospital and staffing agency must ensure that all doctors and staff are aware of the extreme limitations on examining an individual to collect evidence absent a warrant or express, informed consent. These standards of care are a bedrock principal of emergency care and the standard is so explicit that a specific written policy is unnecessary. That said, the Carondelet Health Network appears to have written policies in effect at the time

Plaintiff was brought in to the Holy Cross Emergency Department by agents of the United States.

10.     I have reviewed the "Consent for Treatment" policy disclosed by Holy Cross, a true and correct copy of which is attached as Exhibit B, and it is in accord with standard policy I would expect to be present and implemented at any medical facility in the United States. The "Consent for Treatment" sets out the principles and practices underlying the method and manner in which consent must be obtained and documented.

11.     As set out in section I of the "Consent for Treatment" policy, a signature on the Conditions for Admission form provides the hospital with, at most, consent only for an anticipated course of treatment. Based on the hospital's own policy, a patient must give express permission for a specific invasive or diagnostic test by signing an additional consent form. Moreover, the hospital's own policy requires that additional consent forms be signed before any non-emergent procedures are performed, and that signed form must be placed in the patient's medical records.

12.     Section II of the "Consent for Treatment" policy sets out the requirement that consent be obtained for all invasive procedures with few exceptions unrelated to this case. Section III of the "Consent for Treatment" policy sets out the hospital's definition of "consent" and "informed consent" which I believe are consistent with the generally accepted uses and definitions of those terms in medicine.

13.     Section V of the "Consent for Treatment" policy details the roles and responsibilities of the health care professionals who interact with a patient during the process of obtaining and documenting consent.

- 3 -

14.     In the medical documentation I have reviewed associated with Plaintiff's time at Holy Cross Hospital on October 18, 2014, a true and correct copy of the relevant pages of which are attached as Exhibit C, there are no documented references to any discussion with Ashley about the examinations to be performed or her right to refuse them. There are also no documented references to her providing her express, informed consent for any examination, let alone the pelvic and rectal examinations that were performed. At most, Holy Cross secured Ashley's general consent for admission.

15.     I also reviewed the Carondelet Health Network "Care of Inmates, Law Offenders, or Persons in Custody of Law Enforcement" policy, a true and correct copy of which is attached as Exhibit D. As set out in section I of that policy, employees or anyone involved in interacting with an in-custody patient are required to have completed an education/training module related to the care of incarcerated persons. I have not been provided with proof of completion of such training.

16.     I have reviewed pages from Ashley's deposition, the medical records provided by Holy Cross Hospital on December 14, 2016 (Exhibit C) and the policies discussed above (Exhibits B and D).

17.     This claim involves a scenario in which Ashley, a U.S. Citizen, was detained by federal law enforcement while she was reentering the United States after travelling to Mexico. Ashley was apparently detained at the Port of Entry by federal law enforcement agents for at least a few hours after her reentry. While Ashely was still in the custody of the federal agents, she was transported to Holy Cross Hospital. As set out in the United States Public Health Services Division of Immigration Health Services' Treatment Authorization

Request ("TAR") included in the records Holy Cross provided (Exhibit C), Ashley was "diagnosed" as an alleged "potential internal carrier of foreign substance" and the "course of treatment" was identified as "request for X-Ray".

18.    I understand that no warrant was issued for Ashley's detention or transportation to Holy Cross or for a search of Ashley while she was at Holy Cross.

19.    Based on the Holy Cross records, Ashley did not present to the emergency department for medical care or in an emergent situation. The Holy Cross charts indicate that Ashley's vitals were near normal, and she did not complain of any pain. The records do not document that Ashley presented with any symptoms consistent with internal drug smuggling or that she exhibited any symptoms of feeling sick or unwell. As set out in those records, Ashley denied using or carrying drugs. She was, however, apparently in the midst of her menstrual cycle.

20.    Based on the Holy Cross records, Ashley may have signed a Condition of Admissions form, which contains a general consent provision, set out in paragraph 2 of the document, that references X-rays. I find no evidence in the Holy Cross records that Ashley underwent an X-ray. The records from Holy Cross also include "consent" forms, denoted as Appendix E and Appendix F, which are apparently United States Customs and Border Protection forms. Those forms are blank and are unsigned. I have seen no evidence that Ashley consented to any examination in writing. I also have seen no evidence that she provided oral consent for any examination while at Holy Cross Hospital. I understand from her deposition that she denies providing consent for a pelvic or rectal examination. Regardless, Dr. Martinez performed vaginal and rectal exams on Ashley while she was at

Holy Cross. There is no indication in the Holy Cross records that Ashley expressly provided her knowing and informed consent for a pelvic and/or rectal exam.

21.     Ashley was not a patient for medical purposes. For that reason, the Consent of Admission form is not applicable. Nor is it sufficient to permit for a rectal or pelvic exam to search Ashley for evidence of contraband. Holy Cross Hospital and Quantum Health Plus, through their agents and employees, including Dr. Martinez, fell below the standard of care by failing to obtain Ashley's informed, express consent for a pelvic and/or rectal exam. Holy Cross Hospital and Quantum Health Plus, through their agents and employees, including but not limited to Dr. Martinez, further fell below the standard of care by negligently failing to have appropriate and trained staffing and failing to have policies and procedures in place in the emergency department to ensure the internal policy was followed.

22.     It is my opinion, based on the medical documentation I have reviewed, that Dr. Patrick Martinez, MD, did not adequately obtain and document an express, informed and voluntary consent from Ashley Cervantes for the forensic evidence collection procedures he performed on her.

23.     It is also my opinion that Holy Cross and Quantum Plus, the staffing agency that facilitated Dr. Martinez's work in the Emergency Department, failed to ensure the "Consent for Treatment" policy was followed.

24.     Plaintiff was brought to Holy Cross for the forensic collection of evidence only, not for a medical emergency or for medical treatment. EMTALA applied to this situation only to the extent necessary to perform a Medical Screening Examination to determine and rule out an imminent condition threatening her life or limb. That type of an

exam can be performed by a nurse or non-doctor during the triage/initial admission process.

EMTALA does not provide any basis for the pelvic or rectal examinations which Plaintiff

underwent. Therefore, the "Consents in an Emergency" exemptions set out in section IV of

the "Consent for Treatment" policy do not apply to Plaintiff.

25.    I declare and state under penalty of perjury that the foregoing is true and

correct.

Executed on _____30_____ N/11 Co.r_____

_____

Michael Levine, M.D.

- 7 -

# EXHIBIT 5

**VERIFICATION**

*Cervantes v. Patrick F. Martinez, M.D., et al.*
*U.S. District Court, District of Arizona Cause No. 4: 1 6-CV-003 34-CKJ*

STATE OF ARIZONA    )
                    ) ss.
County of Pima      )

I, PATRICK F. MARTINEZ, M.D., being first duly sworn upon my oath, depose and say:

That I am a Defendant in the above-referenced matter; that I have read Defendant Patrick F. Martinez, M.D.'s Responses to Plaintiff s Interrogatories and know the contents thereof; that the same is true both in substance and in fact to the best of my knowledge, except as to those matters and things therein alleged on information and belief, and as to those matters, I believe them to be true.

PATRICK F. MARTINEZ, M.D.

SUBSCRIBED AND SWORN TO before me this 14 day of ~~July,~~ August 2017 by My

Notary Public    01.18.2018

MARILOU FRANCISCO
NOTARY PUBLIC
STATE OF ALASKA

LAW OFFICES
BROENING OBERG WOODS & WILSON
PROFESSIONAL CORPORATION
POST OFFICE BOX 20527
PHOENIX, ARIZONA 85036
(602) 271-7700

Michelle L. Donovan (027958)
Minute Entries/Orders to: cjg@bowwlaw.com

Attorneys for Defendant Martinez

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| ASHLEY CERVANTES, a single woman, | NO. 4:16-CV-00334-CKJ |
| Plaintiff, | |
| vs. | **DEFENDANT MARTINEZ'S ANSWERS TO PLAINTIFF'S DISCOVERY REQUESTS** |
| UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION AGENT SHALEKA LEGGETT and "JOHN DOE" LEGGETT; UNKNOWN UNITED STATES CUSTOMS AND BORDER PROTECTION AGENTS; HOLY CROSS HOSPITAL, INC.; ASCENSION ARIZONA, INC.; PATRICK F. MARTINEZ AND "JANE DOE" MARTINEZ;  et al., | |
| Defendants. | |

Defendant Patrick Martinez, through undersigned counsel, responds to Plaintiff's Discovery Requests dated May 11, 2017 as follows:

<u>Requests for Admission</u>

**RFA No. 1:**  Admit Ashley did not possess any illegal drugs and / or contraband while at Holy Cross Hospital on October 18, 2014.

Admit __X*__          Deny __X*__

 **\*Defendant Martinez admits ONLY that his exam of Ashley Cervantes revealed no illegal drugs and/or contraband in the areas he examined on October 18, 2014.  To the extent this request calls for speculation as to matters outside Dr. Martinez's examination, and is vague and ambiguous as to the time and manner, Defendant objects and denies.**

**RFA No. 2:**  Admit Ashley was in the custody and / or control of the U.S. Government while she was at Holy Cross Hospital on October 18, 2014.

Admit _____          Deny __X*__

 **OBJECTION.** **This Request calls for speculation and lacks foundation on the part of this answering Defendant. This Request also calls for a legal conclusion on the part of this answering Defendant, which is improper in a Request for Admission.** *Davis v. Buckley,* **2013 WL 12114581, 2 (D. Ariz. 2013). Requests for Admission are intended to aid a party in establishing certain material facts and cannot be used to solicit "admissions or denials as to legal conclusions."** *Id.*

 **\*Dr. Martinez has no opinion as to whether the circumstances rendered Ms. Cervantes "in the custody and/or control of the U.S. Government" and therefore denies.**

**RFA No. 3:**  Admit there was not a valid court order / search warrant regarding Ashley on October 18, 2014.

Admit _X*_          Deny _____

 **OBJECTION.** **This Request calls for speculation and lacks foundation on the part of this answering Defendant.  It is also vague and ambiguous. This Request also calls for a legal conclusion on the part of this answering Defendant, which is improper in a**

2

1    Request for Admission.  *Davis v. Buckley,* 2013 WL
     12114581, 2 (D. Ariz. 2013).  Requests for Admission are
2    intended to aid a party in establishing certain material facts
     and cannot be used to solicit "admissions or denials as to
3    legal conclusions." *Id.*

4
     *Objections notwithstanding, Dr. Martinez admits ONLY
5    that he was not presented with a court order or warrant.

6

7    **RFA No. 4:**  Admit Ashley was brought to Holy Cross Hospital on October 18, 2014 by

8    agents of the U.S. Government for a forensic evidence search of her person.

9            Admit _____          Deny __X*__

10
             **OBJECTION.**        This Request calls for speculation and lacks foundation on
11                                 the part of this answering Defendant.  This Request also calls
                                   for a legal conclusion on the part of this answering
12                                 Defendant, which is improper in a Request for Admission.
                                   *Davis v. Buckley,* 2013 WL 12114581, 2 (D. Ariz. 2013).
13                                 Requests for Admission are intended to aid a party in
                                   establishing certain material facts and cannot be used to
14                                 solicit "admissions or denials as to legal conclusions." *Id.*
15

16                                 *Objections notwithstanding, Dr. Martinez is not privy to
                                   the thought process and determinations made by the Border
17                                 Patrol agents prior to presenting to Holy Cross Hospital on
                                   October 18, 2014 and cannot comment. Dr. Martinez is
18                                 aware that the Border Patrol agents expressed concern
                                   about Ms. Cervantes carrying drugs internally, but this does
19                                 not alter his role as an emergency department physician or
                                   transform Dr. Martinez's Medical Screening Examination
20                                 and patient care into a forensic search. Dr. Martinez denies
                                   conducting a forensic evidence search of Ms. Cervantes.
21

22

23   **RFA No. 5:**  Admit Ashley was not brought to Holy Cross Hospital on October 18, 2014 by

24   agents of the U.S. Government for medical treatment.

25           Admit _____          Deny __X*__

26

                                        3

1

**OBJECTION.**   This Request calls for speculation and lacks foundation on

2            the part of this answering Defendant. To the extent this

            Request also calls for a legal conclusion on the part of this

3            answering Defendant, such is improper in a Request for

            Admission. *Davis v. Buckley,* 2013 WL 12114581, 2 (D. Ariz.

4            2013). Requests for Admission are intended to aid a party in

            establishing certain material facts and cannot be used to

5            solicit "admissions or denials as to legal conclusions." *Id.*

6

7            *Objections notwithstanding, Dr. Martinez cannot comment

            on the state of mind of the Border Patrol agents prior to

8            presenting to Holy Cross Hospital on October 18, 2014. Dr.

            Martinez is aware that the Border Patrol agents expressed

9            concern about Ms. Cervantes carrying drugs internally, but

            this does not change Dr. Martinez's role as an emergency

10            department physician providing patient care and

            performing a Medical Screening Examination. Dr. Martinez

11            lacks sufficient information to admit or deny motives of the

            Border Patrol and thus denies this Request.

12

13

14   **RFA No. 6:** Admit you examined Ashley on October 18, 2014 for the purpose of

15   determining whether she was carrying contraband internally.

16            Admit _____         Deny __X__

17            **Dr. Martinez performed a Medical Screening Examination on Ms. Cervantes, as

            is performed on all patients presenting to the Emergency Department, when she

18            was brought to Holy Cross on October 18, 2014. That the examination included

            a pelvic and rectal examination following evaluation, discussion with, and

19            consent by the patient does not mean that the "purpose" of the examination was

            to determine whether she was carrying contraband internally. Request for

20            Admission No. 6 is therefore denied.

21

22   **RFA No. 7:** Admit Ashley was entitled to her constitutional rights, as provided by the

23   Fourth and Fifth amendments to the U.S. Constitution, while she was at Holy Cross Hospital

24   on October 18, 2014.

25            Admit _____         Deny __X*___

26            **OBJECTION.**         *This Request calls for a legal conclusion on the part of this

4

answering Defendant, which is improper in a Request for Admission. *Davis v. Buckley,* 2013 WL 12114581, 2 (D. Ariz. 2013). Requests for Admission are intended to aid a party in establishing certain material facts and cannot be used to solicit "admissions or denials as to legal conclusions." *Id.* As such, RFA No. 7 is denied.

**RFA No. 8:**  Admit Ashley did not complain of feeling sick or unwell at any time while at Holy Cross Hospital on October 18, 2014.

Admit _____          Deny __X*___

**OBJECTION.**          This Request calls for speculation, is vague and ambiguous as to what specifically is meant by "complain of feeling sick or unwell", and asks Dr. Martinez to confirm with 100% certainty a portion of a patient encounter occurring over two and a half years ago. As such, RFA No. 8 is denied.

*Objections notwithstanding, Dr. Martinez directs Plaintiff to the medical records disclosed by Holy Cross Hospital.

## Interrogatories

**No. 1:** If your response to any of the Requests for Admission above are anything other than an unqualified admission, state the legal and factual bases supporting your qualifications and / or denials of the Requests.  Identify all documents supporting any such qualifications and / or denial(s).

**See answers and / or objections, above.**

**No. 2:** Identify each and every person who you believe interacted with Ashley on October 18, 2014 while she was at Holy Cross Hospital.

Objection – overly broad, vague and ambiguous, and calls for speculation. Dr. Martinez did not accompany Plaintiff throughout her time at Holy Cross Hospital and thus cannot provide names of all healthcare providers, employees, and lay individuals that may have interacted with Plaintiff. Ms. Cervantes testified about registration/intake personnel and a male nurse. She also testified about her interactions with various Border Patrol agents. Dr. Martinez recalls Victor Noriega, the male nurse likely referenced by Ms. Cervantes. Dr. Martinez does not recall the name of the female Holy Cross employee/nurse present during his examination of Plaintiff. *See* records produced by Holy Cross

5

**Hospital and Holy Cross Hospital's disclosure statements for healthcare providers also involved in the care.**

**No. 3:** Identify each and every person who whim [sic] interacted relating in any way to Ashley on October 18, 2014.  For each person identified, describe the nature of your interactions and the substance of the same.

**OBJECTION.      Unintelligible**

**No. 4:** Describe your academic and / or post-academic training on the Fourth and Fifth amendments to the US Constitution and on any and all policies in effect at Holy Cross Hospital on October 18, 2014 relating to the search of individuals / patients who presented in the custody of law enforcement.

**Objection. Plaintiffs' Non-Uniform Interrogatory No. 4 assumes facts not established in this case and assumes legal conclusions that are not conceded by Defendants Martinez. Objections notwithstanding, Dr. Martinez does not recall any academic or post-academic training specifically on the Fourth and Fifth Amendments to the US Constitution. Dr. Martinez likewise does not recall at this time training on specific policies and/or procedures regarding "the search of individuals/patients who presented in the custody of law enforcement" at Holy Cross.**

**No. 5:** If you have you [sic] ever been a party to a civil lawsuit, state whether you were a plaintiff or defendant and describe the nature of the lawsuit.

**Dr. Martinez has never been a party to a civil lawsuit.**

**No. 6:** State with specificity the policies / procedural guidelines which controlled your interactions with Ashley on October 18, 2014.  For each policy / procedural guideline, state what entity created the same and who was responsible for ensuring the policy / procedural guideline was adhered to on October 18, 2014.

**Objection – overly broad, vague an ambiguous.  Dr. Martinez does not know who created any such policy(ies), nor who was responsible for ensuring they are followed.   Dr. Martinez does not specifically recall any policies/procedural guidelines that "controlled" his patient encounter with Ms. Cervantes on October 18, 2014.  Some policies may generally reflect Dr. Martinez's professional practice, but Dr. Martinez cannot identify any specific policies or procedures that may apply to Ms. Cervantes presentation at Holy Cross**

6

1   Hospital with any specificity at this time.

2   <u>Requests for Production</u>

3   **RFP No. 1:**   Provide the complete file regarding your application / credentialing /

4   employment as it relates to your ability to practice medicine at Holy Cross Hospital on

5   October 18, 2014.

6   **Objection. A physician's application for hospital privileges and credentialing file
    is absolutely privileged from discovery.** *See* A.R.S. § 36-445.01; A.R.S. § 36-

7   455.02; *Humana Hospital Desert Valley v. Superior Court of Arizona In and For
    Maricopa County*, 742 P.2d 396, 154 Ariz. 396 (App. 1987).  **Additionally, Dr.**

8   **Martinez is not in possession or control of the credentialing file maintained by
    Holy Cross Hospital.**

9

10  **RFP No. 2:**   Provide the operative contract / documents establishing your relationship with

11  Holy Cross Hospital and / or Quantum Plus, Inc. which provided the basis for your ability to

12  practice medicine at Holy Cross Hospital on October 18, 2014.

13  **The sole contract responsive to Plaintiff's Request has been provided by
    Defendant Quantum Plus, LLC.** *See* **Quantum Plus, LLC's responses to**

14  **Plaintiffs' Request for Production No. 2.**

15  **RFP No. 3:**   Provide copies of any and all policies / procedural guidelines identified in

16  response to Interrogatory No. 6, above.

17  **Dr. Martinez is not in possession of Holy Cross Hospital's policies / procedural
    guidelines.**

18

19  DATED this 15ᵗʰ day of June, 2017.

20  BROENING OBERG WOODS & WILSON, P.C.

21

    By /s/

22  Michelle L. Donovan
    Post Office Box 20527

23  Phoenix, Arizona  85036
    *Attorneys for Defendant Martinez*

24

25

26

    7

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

I hereby certify that on June _15th_, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants:

Matthew D. Davidson, Esq.
**LAW OFFICES OF MATTHEW C. DAVIDSON, LTD.**
1859 N. Grand Avenue, Suite 1
Nogales, AZ 85621
*Attorneys for Plaintiff*

Brian Marchetti, Esq.
**MARCHETTI LAW, P.L.L.C.**
290 N. Meyer Avenue
Tucson, AZ 85701
*Attorneys for Plaintiff*

Laura V. Mac Ban
Michael L. Linton
**MAC BAN LAW OFFICES**
Skyline Esplanade
1795 E. Skyline Drive, Suite 155
Tucson, AZ 85718
*Attorneys for Defendants Holly Cross*
*Hospital, Inc. and Ascension Arizona, Inc.*

Carolyn Armer Holden
Michael J. Ryan
**HOLDEN AND ARMER, PC**
4505 East Chandler Blvd., Suite 210
Phoenix, Arizona 85048
(480) 656-0460
*Attorneys for Defendants Quantum Plus, Inc. dba*
*Teamhealth West*

John S. Leonardo
Melissa Marcus Kroeger
**UNITED STATES ATTORNEY**
**DISTRICT OF ARIZONA**
405 W. Congress Street, Suite 4800
Tucson, AZ 85701
*Attorneys for Defendant United States of*
*America and Shamekia Leggett*

By _/s/ Gina Barrera_

8

# EXHIBIT 6

ASHLEY CERVANTES v. UNITED STATES OF AMERICA, et al.
MICHAEL LEVINE, MD - December 1, 2017

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

ASHLEY CERVANTES, a single          )
woman,                              )
                                    )
            Plaintiff,              )
                                    )
      v.                            )  No. 4-16-CV-00334-CKJ
                                    )
UNITED STATES OF AMERICA;           )
UNITED STATES CUSTOMS AND           )
BORDER PROTECTION AGENT             )
SHALEKA LEGGETT and "JOHN DOE"      )
LEGGETT; UNKNOWN UNITED STATES      )
CUSTOMS AND BORDER PROTECTION       )
AGENTS; HOLY CROSS HOSPITAL,        )
INC.; ASCENSION ARIZONA, INC.;      )
PATRICK F. MARTINEZ AND "JANE       )
DOE" MARTINEZ; JOHN DOES 1-5;       )
JANE DOES 1-5; XYZ CORPORATIONS     )
1-5; ABC PARTNERSHIPS 1-5,          )
                                    )
            Defendants.             )
_____)

DEPOSITION OF MICHAEL LEVINE, MD,

Phoenix, Arizona
December 1, 2017
11:21 a.m.

Carmelita Lee
Professional Reporter

1

ASHLEY CERVANTES v. UNITED STATES OF AMERICA, et al.
MICHAEL LEVINE, MD - December 1, 2017

1   a position, and you agreed that you are not in a

2   position to discuss nursing staff and the standard of

3   care required of them.

4       A.   I am not in a position to discuss them with

5   regard to that; correct.

6       Q.   Do you agree that as a patient presents with a

7   possible foreign body, that they present with a medical

8   condition?

9       A.   Yes.  It somewhat depends on why they are there

10  and what they're there for, but if they are presenting

11  to an emergency department to be seen by a physician for

12  a foreign body, then yes.

13      Q.   So what's the risk associated with foreign

14  bodies?

15      A.   It totally depends on what the foreign body is

16  and where it is.

17      Q.   Let's go back to the hypothetical.  I'm talking

18  about a lodged tampon.  What risk could be posed there?

19      A.   Theoretically the person can get toxic shock

20  syndrome.

21      Q.   So I am going through my notes to keep this as

22  short as I can.

23      A.   Thank you.

24      Q.   I know it's your intention that in this study

25  some type of written documentation confirming consent to

58

ASHLEY CERVANTES v. UNITED STATES OF AMERICA, et al.
MICHAEL LEVINE, MD - December 1, 2017

1             If it's something like cocaine, the

2    patient may become agitated, become sweaty, have a high

3    blood pressure, potentially have a seizure, things like

4    that.

5             So it just depends on the drugs.  You

6    can't say this is how it's going to present, because it

7    really depends on the drug.

8        Q.   So when a patient is presented to you, and it

9    is reported that there is concern that a patient is

10   internally carrying drugs, as a reasonable and prudent

11   emergency provider, that's something that you need to

12   take seriously, and you can't make assumptions about the

13   patient; correct?

14       A.   Explain, when you say you can't make

15   assumptions about the patient.

16       Q.   Well, you told us that depending on what drug

17   is being carried internally, the vitals could be

18   elevated, or they could be low; correct?

19       A.   That's correct.

20       Q.   So unless you know whether drugs either are

21   being carried internally, or what kinds of drugs there

22   are, you need to evaluate the patient and rule out those

23   two issues; correct?

24       A.   You always need to evaluate every patient;

25   correct.

                                                          24

ASHLEY CERVANTES v. UNITED STATES OF AMERICA, et al.
MICHAEL LEVINE, MD - December 1, 2017

1          THE WITNESS:  I would say those are all near

2    normal vital signs, or normal or near normal vital

3    signs.

4          Q.    BY MS. DONOVAN:  Doctor, that wasn't the

5    question.

6               Do you think that they should be ignored

7    when combined with a reported concern of internally

8    carrying drugs?

9          A.    I wouldn't ignore it.  I would look at the

10   overall clinical context.

11         Q.    And in terms of the overall clinical context,

12   at least according to the opinions that you've provided

13   to us, the fact that she didn't complain of pain or

14   exhibit symptoms of being sick or unwell, that she

15   should have been discharged from the emergency

16   department without further workup.  Is that your

17   testimony?

18         A.    She was there for a forensic examination so --

19         Q.    Doctor, what was the last part of your answer?

20   Your phone keeps kinda cutting out a little bit.

21         A.    She was there for a forensic examination, so I

22   am not sure that that is an accurate statement.

23         Q.    Well, Doctor, you keep saying she was there for

24   a forensic examination, but as an emergency physician,

25   regardless of the reason a patient is brought in, the

                                                         37

ASHLEY CERVANTES v. UNITED STATES OF AMERICA, et al.
MICHAEL LEVINE, MD - December 1, 2017

1   patient needs to be evaluated to be sure that they are

2   medically stable; correct?

3        A.   That is a correct statement.

4        Q.   Regardless of who brings them in, they need to

5   be evaluated to determine if they are stable; correct?

6        A.   Correct.

7        Q.   So the forensic aspect of this that you keep

8   inserting into your answers, as a medical provider, is

9   secondary to making sure this patient's okay; correct?

10       A.   Correct.

11       Q.   Now, in this case, if you -- strike that.

12            You are aware that Dr. Martinez, Officer

13   Leggett and the nurses are all going to testify at trial

14   that Ms. Cervantes consented to the exam.  You are

15   aware of that; correct?

16       A.   I don't know for sure what they are going to

17   testify about.

18       Q.   Well, you saw what the nurses and Dr. Martinez

19   were disclosed to testify about; true?

20       A.   I can say that that is what they are expected

21   to testify, but I can't say that that is what they are

22   really going to say.  I don't know.

23       Q.   Well, do you have anything that informs you

24   that they are going to testify that they -- that this

25   exam was performed without consent?

                                                      38

ASHLEY CERVANTES v. UNITED STATES OF AMERICA, et al.
MICHAEL LEVINE, MD - December 1, 2017

1      Q.   So you believe anything under 140/90 would be

2   normal for her?

3      A.   At the time, yeah.

4      Q.   And why are you saying at the time?

5      A.   There are new definitions of hypertension that

6   came out, and subsequently lowered the numbers a little

7   bit.  But at the time of this case it was 140/90 is my

8   understanding.

9      Q.   Okay.  So blood pressure of 142/77 is maybe a

10  little bit elevated for a young healthy person but still

11  within normal; is that fair?

12     A.   More or less, yeah.

13     Q.   Okay.  So we have borderline high blood

14  pressure, tachycardia, slightly elevated temperature and

15  elevated respiratory rate, but you believe that those

16  vitals are insignificant for purposes of having concern

17  about internally carrying drugs?

18     A.   I didn't say she had -- I think we are

19  disagreeing on the temperature.  I didn't think she had

20  a fever.

21     Q.   All right.  You don't consider 99.9 a low grade

22  fever, maybe just an elevated temperature?

23     A.   I would say it is still within the normal

24  ranges, and meets the definition of a normal

25  temperature.

                                                        35

ASHLEY CERVANTES v. UNITED STATES OF AMERICA, et al.
MICHAEL LEVINE, MD - December 1, 2017

1      Q.   But in any event, that combination of vitals

2   you believe are -- should be pretty much ignored and

3   assumed as normal when combined with a reported concern

4   of internally carrying drugs?

5      A.   I'm so sorry.  Something just popped up on our

6   screen.  And I apologize.

7           Can you repeat the question, please?

8         MS. DONOVAN:  Can you read that back?

9         (The record was read as follows:

10           Q.   But in any event, that

11        combination of vitals you believe

12        are -- should be pretty much ignored

13        and assumed as normal when combined

14        with a reported concern of internally

15        carrying drugs?)

16        THE WITNESS:  I'm sorry.  Can you say that one

17   more time please?  Repeat the question.  I'm not sure

18   I'm -- can you say it one more time?  I apologize.

19           (The record was read as follows:

20           Q.   But in any event, that

21        combination of vitals you believe

22        are -- should be pretty much ignored

23        and assumed as normal when combined

24        with a reported concern of internally

25        carrying drugs?)

36

ASHLEY CERVANTES v. UNITED STATES OF AMERICA, et al.
MICHAEL LEVINE, MD - December 1, 2017

1          THE WITNESS:  I would say those are all near

2    normal vital signs, or normal or near normal vital

3    signs.

4          Q.   BY MS. DONOVAN:  Doctor, that wasn't the

5    question.

6               Do you think that they should be ignored

7    when combined with a reported concern of internally

8    carrying drugs?

9          A.   I wouldn't ignore it.  I would look at the

10    overall clinical context.

11          Q.   And in terms of the overall clinical context,

12    at least according to the opinions that you've provided

13    to us, the fact that she didn't complain of pain or

14    exhibit symptoms of being sick or unwell, that she

15    should have been discharged from the emergency

16    department without further workup.  Is that your

17    testimony?

18          A.   She was there for a forensic examination so --

19          Q.   Doctor, what was the last part of your answer?

20    Your phone keeps kinda cutting out a little bit.

21          A.   She was there for a forensic examination, so I

22    am not sure that that is an accurate statement.

23          Q.   Well, Doctor, you keep saying she was there for

24    a forensic examination, but as an emergency physician,

25    regardless of the reason a patient is brought in, the

                                                        37

ASHLEY CERVANTES v. UNITED STATES OF AMERICA, et al.
MICHAEL LEVINE, MD - December 1, 2017

1   patient needs to be evaluated to be sure that they are
2   medically stable; correct?
3        A.   That is a correct statement.
4        Q.   Regardless of who brings them in, they need to
5   be evaluated to determine if they are stable; correct?
6        A.   Correct.
7        Q.   So the forensic aspect of this that you keep
8   inserting into your answers, as a medical provider, is
9   secondary to making sure this patient's okay; correct?
10       A.   Correct.
11       Q.   Now, in this case, if you -- strike that.
12            You are aware that Dr. Martinez, Officer
13   Leggett and the nurses are all going to testify at trial
14   that Ms. Cervantes consented to the exam.  You are
15   aware of that; correct?
16       A.   I don't know for sure what they are going to
17   testify about.
18       Q.   Well, you saw what the nurses and Dr. Martinez
19   were disclosed to testify about; true?
20       A.   I can say that that is what they are expected
21   to testify, but I can't say that that is what they are
22   really going to say.  I don't know.
23       Q.   Well, do you have anything that informs you
24   that they are going to testify that they -- that this
25   exam was performed without consent?

                                                      38